IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DATA MOUNTAIN SOLUTIONS, INC.<br>1116 Smith Street<br>Charleston, WV 25301<br><br>and<br><br>DEREK McUMBER<br>5809 Midhill Street<br>Bethesda, MD 20817<br><br>and<br><br>FREDERICK S. HILL, JR.<br>1486 Grandview Court<br>Arnold, MD 21012<br><br>Plaintiffs,<br><br>v.<br><br>GREGG GIORDANO<br>2403 Dakota Lakes Drive<br>Herndon, VA 20105<br><br>and<br><br>ANTHONY WATSON<br>303-F Holden Green<br>Cambridge, MS 02138<br><br>and<br><br>JOHN W. THOMAS<br>1660 L Street, N.W.<br>Suite 506<br>Washington, DC 20036<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT
### (Shareholders' Derivative Action & Related Claims)

Plaintiffs, Data Mountain Solutions, Inc., Derek McUmber, and Frederick S. Hill, Jr.,

by their attorneys, Hughes & Bentzen, PLLC, pursuant to, *inter alia*, Fed. R. Civ. P. 3, 8, 9,

and 23.1, for their Complaint against Defendants, state as follows:

## Jurisdiction and Venue

1. Jurisdiction of this Court is based on 28 U.S.C. §1332(a), in that this civil action is between citizens of different States, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Subject matter jurisdiction of this Court is also based on 28 U.S.C. §1331, in that causes of this civil action arise under laws of the United States.

2. Venue in this judicial district is based on 28 U.S.C. §1391, in that a substantial part of the events and omissions giving rise to the claims hereof occurred in, and property the subject hereof is situated in, the District of Columbia. Defendants are subject to personal jurisdiction in the District of Columbia under, *inter alia*, D.C. Code Ann. §13-422 and §13-423.

## Parties

3. Plaintiff, Data Mountain Solutions, Inc. ("DMS"), is a West Virginia corporation, with its principal offices situate in West Virginia; DMS is also duly authorized to transact business in the District of Columbia. A copy of the By-Laws of DMS (the "By-Laws") is attached hereto as Exhibit 1, and is incorporated herein by this reference.[1] DMS is engaged in the business of electronic data management services for its clients, including providing such services to state and federal governments under contracts or subcontracts according multi-million dollar payments to DMS for said services.

4. Plaintiff, Derek McUmber (" McUmber"), is a citizen of the State of Maryland, and the holder of approximately 22.5% of the shares of stock in DMS. McUmber is a Director and the Chief Executive Officer ("CEO") of DMS.

---

[1]All referenced Exhibits are attached to and are incorporated into this Complaint by the references herein.

5.  Plaintiff, Frederick S. Hill, Jr. (" Hill"), is a citizen of the State of Maryland.  He is also a shareholder of the issued and outstanding shares of stock of DMS.  Hill is a Director and is the President of DMS.

6.  Defendant, Gregg Giordano (" Giordano"), is a citizen of the Commonwealth of Virginia.  Giordano is a shareholder and a Director of DMS.  Giordano is also the corporate Secretary of DMS.

7.  Defendant, Anthony Watson (" Watson"), is a citizen of the Commonwealth of Virginia or the State of Massachusetts.  Watson was formerly, and may claim still to be, a shareholder, director and officer of DMS.

8.  Defendant, John W. Thomas (" Thomas"), is a citizen of the Commonwealth of Virginia;  Thomas is an attorney who practices law in, and  transacts business from, offices situate in the District of Columbia.   Thomas has alleged, at various times,  that he was/is counsel for DMS, and that he has not done legal work for DMS since 2003. DMS stock has been issued to his firm, purportedly as payments for  Thomas' claimed legal services as counsel for DMS.

## Facts Relevant to All Counts

9.  DMS is a close corporation by virtue of, *inter alia*, a Shareholders Agreement dated June 2, 2003 by and among McUmber, Watson, Hill and Giordano (the "Shareholders Agreement").  A copy of the Shareholders Agreement is attached hereto as Exhibit 2.

10. Under the Shareholders Agreement the parties agreed that the equitable allocation of ownership between them is "one-fourth owned by each."  They further agreed that "it is essential to maintain such ownership proportions" among those four shareholders.  *See* Shareholders Agreement, Exhibit 2 hereto, at para. 12.  Accordingly, the parties agreed that no Shareholder, "without the prior written consent of **all** the Shareholders" may directly or

-3-

indirectly sell, assign, mortgage, hypothecate, transfer or otherwise voluntarily or involuntarily dispose of **any** shares of DMS stock owned by him. *See id.*, at para. 3(a)(emphasis added). The Shareholders' Agreement further provides that any unauthorized disposition of shares "shall be null, void and without effect" as against the Corporation and the other Shareholders. *See id.*, at para. 4(e) (emphasis added), and para. 3(a), respectively.

11.    Since June, 2004, DMS and its officers have been receiving substantial remuneration on account of a multi-million dollar federal government contract awarded to a DMS client, NativeTechnologies, Inc. ("NTI") by the General Services Administration ("GSA"). DMS designed and developed the software and operates and maintains the system on which the NTI contract is based. The software source code constitutes a proprietary asset and trade secret of DMS and is its most valuable asset.

12.    Thereafter,   Giordano schemed, conspired,  and overtly acted to acquire a majority of the outstanding shares of DMS' stock, so that he could then pick his own Directors of DMS, who in turn could then appoint DMS officers picked by him, such that he could elevate his position to "control" the substantial remuneration now being received by DMS and take other actions to the detriment of the other shareholders.  By such wrongful scheme, Giordano would greatly increase the monies and other benefits paid and inured to him on account of his relations with DMS, all for his own personal and selfish benefit and to the detriment of the other officers, directors, and shareholders of DMS.

13. Specifically, without any authority or approval from the Corporation, Giordano issued and negotiated a check payable to "Cash", in the amount of $40,000, and issued another check in the amount of $20,000 (for purchase of a cashier's check in like-amount), **both out of DMS' bank account "starter-kit".** Copies of the DMS bank account "starter-

kit" checks, in the amounts of $40,000 and $20,000, respectively, are attached hereto collectively as Exhibit 3.

14. The aforesaid $60,000 taken from DMS' bank account by defendant Giordano was done with the collusion, consent and participation of defendant Watson, who has alleged that he sold all but one (1) of his shares of DMS stock to Giordano, and otherwise relinquished most of his rights, duties and entitlements to and with DMS, in exchange for some of the $60,000 taken from DMS' bank account and a $10,000 annual compensation as a continuing employee or consultant to DMS.   Watson has also alleged that he obtained valuable property and assets of DMS, known as "SecuriCabinet", as purported additional consideration for his relinquishment of his roles and entitlements as a shareholder, director, and officer of DMS.   The foregoing allegations are largely false and, except as noted immediately below, were never approved by the Corporation or the other three shareholders to the Shareholders' Agreement.

In fact, the Corporation did approve a transaction with Watson whereby Watson agreed to convey 100% (22,500 shares) of his stock in DMS to the treasury of DMS in exchange for cash of $28,406, plus the source code, logo and other rights to the website platform and related assets known as "SecuriCabinet," along with other consideration. This transaction was approved by all parties to the Shareholders' Agreement.

15. Defendant, Giordano,  now contends that certain monies paid by DMS to Hill constituted payment for nearly all of the DMS shares of stock issued to Hill[2], but that the

---

[2]Hill once offered to relinquish approximately 2/3rds of his stock to the corporation in exchange for $32,000, the book value of his stock if returned to the treasury of the company at the time. However, the transaction was never approved by the corporation and, according to Thomas, the corporation's counsel at the time of the transaction with Hill, no minutes exist approving the transaction. As a result of this confusion and the fact that Hill has an outstanding loan to DMS, the Plaintiffs are unaware of Hill's actual stock position in the company.

$40,000 of DMS' monies that Giordano gained by the starter-check payable to "Cash" as aforesaid constituted an unspecified and unauthorized "bonus" to him and was not in payment for any of his shares of DMS stock. Based on his alleged acquisition of Watson's shares of DMS stock, and his position that DMS purchased most of Hill's shares of DMS stock, defendant Giordano currently contends that he owns 60% of the outstanding shares of DMS, and that plaintiff McUmber only owns 30% of the outstanding shares[s] of DMS. *See* Letter from defendant Giordano to defendant/attorney Thomas, of July, 2006, attached hereto as Exhibit 4. As a result of these contentions, Giordano has set up a scenario under which he can control the Corporation's business, prospective business, and assets, including the invaluable source code, without interference from the other Shareholders, in violation of the letter and the spirit of the Shareholders' Agreement and to the detriment of the other shareholders for his own self-interest.

16. However, on or about August 22, 2006, the plaintiffs herein, Hill and McUmber, the President and CEO of DMS, respectively, were finally able to obtain what Thomas alleges are "copies" of the stock registry and transfer books, minutes of meetings of and resolutions of the directors and shareholders of DMS, and a few other DMS corporate documents. These documents were picked-up by a group of messengers sent by the Plaintiffs to Thomas' law offices after nearly a **month** of attempts to obtain all of the corporate records held by Thomas.[3] The documents supplied by Thomas show and reveal that **none** of the alleged sales or transfers of DMS stock were authorized or approved in writing by either the shareholders or directors of DMS. Moreover, it is clear from Thomas' response to the

---

[3]Thomas' production was woefully incomplete. Several known documents were not produced including communications by and among shareholders concerning which Thomas received copies, and records of corporate meetings that took place during the period that Thomas and his firm represented DMS.

Plaintiffs' requests that the subject sales and/or transfers were **not** authorized as required by the Shareholders' Agreement, that is by "the prior written consent of all the Shareholders." Nor were they conducted or performed as specifically required by paras. 3(a) and 4(e) of the Shareholders Agreement cited *id*.

17. Rather, the copies of DMS's corporate documents, as received from Thomas, document and evince that each of the shareholders, the plaintiffs Hill, and McUmber, and the defendants Watson, and Giordano, each own **equal** shares of DMS stock – 22,500 shares – and that **no** sale, transfer or other disposition of those shares has been properly authorized, approved or otherwise documented. *See* Letter from defendant Thomas dated August 22, 2006, and stock registry and transfer records therewith, attached hereto, collectively, as Exhibit 5.

18. Apparently recognizing that the Shareholders Agreement nullifies and voids any sale, transfer, or other disposition of DMS stock other than as expressly permitted by the Shareholders Agreement, the defendants have engaged in a pattern of concealment and misrepresentation over the corporate affairs and stock registry, transfer, and related corporate books and records of DMS. The obvious purpose of the defendants' actions has been to conceal and obfuscate the number of DMS shares formally held by defendants and the other shareholders.

19. By his unlawful and illegal maneuvering, defendant Giordano, whose status in the Corporation is only that of a minority shareholder and Corporate Secretary, now contends that he "controls" DMS. Using that claimed (but unsupported and erroneous) control of DMS, Giordano has been dictating the terms and conditions of the work being performed upon, and all communications related to, DMS' multi-million dollar NTI contract. For example, Giordano has repeatedly ordered the individual plaintiffs, his superior corporate

-7-

officers, to refrain from and cease any contacts or talks with the other principals to the NTI contract, on the alleged grounds that he "controls" said contract and that any such communications are supposedly prohibited by that contract. Worse, when asked to actually produce such contract, Giordano now alleges that he alone controls the NTI contract, and that he is the only person who can, and does, dictate performance of the terms of that contract.

20. On information and belief, however, there is **no** written NTI contract containing the contract terms and conditions dictated by Giordano. He is simply fabricating those terms and conditions as part of his attempts to control DMS and manipulate not only the compensation due DMS and its other officers, but also the value of DMS's stock, all for his own personal benefit and self-aggrandizement. And, even if there were such terms as Giordano alleges, it constitutes just another example of Giordano's improper attempts to control and ultimately convert valuable assets of the Corporation to the detriment of the other shareholders.

21. Perhaps worst of all, using his wrongful reasoning that he is now majority owner of NTI and allegedly now controls the NTI contract, Giordano has intercepted, and now holds, substantial payments from DMS's client, NTI, that are intended for, and payable to, plaintiffs DMS and McUmber. Despite demand for these payments Giordano has retained these payments from NTI as ransom, bait, or other improper leverage against the plaintiffs. In the meantime, DMS's bank account is dangerously close to a $0.00 balance and the Corporation's ability to pay its ordinary business expenses is in immediate jeopardy. If the Corporation cannot pay its obligations on a current basis it loses the ability to protect its property and assets. That could lead to endangering the entire .gov email and web routing

system which DMS supports under the NTI contract. Giordano is willing to use the potential disastrous effect on the .gov email and web routing system as a pawn in his fight to wrest control of the Corporation from its rightful owners, the current shareholders, of which Giordano is merely a minority member.

22. Specifically, by Letter dated July 28, 2006, McUmber (by counsel) requested that Giordano and Thomas produce the corporate records required to be kept under DMS' By-Laws, including the stock transfer and related books of DMS, and the minutes of shareholder and directors' meetings, notices of such meeting, and any consents, resolutions, or other writings related to the stock ownership now claimed by Giordano. The Letter also demanded that Giordano and Thomas cease and desist from taking any monies, stock, or other property or remuneration from DMS until resolution, adjudication, or other disposition of the parties' differences. A copy of the July 28, 2006 Letter is attached hereto as Exhibit 6.

23. By reply Letter dated August 3, 2006, Thomas denied having any of the requested documents or having any contacts with DMS, but he nonetheless revealed that his law firm has 192 shares of DMS stock. A copy of Thomas's August 3, 2006 Letter is attached hereto as Exhibit 7. In that Letter, Thomas also stated that after August, 2003, Thomas's firm, Luman, Lange, Thomas & McMullen ( "LLTM"), had no significant contacts with DMS, and that legal work for DMS was being handled by another firm, alleged to be the new firm of Christopher Wheeler, a former partner at Luman, Lange & Wheeler[4]. *See* Exhibit 7 hereto, at 2.

---

[4]Mr. Wheeler was a member of Luman, Lange and Wheeler until August, 2003 when he joined Hughes & Bentzen, PLLC. However, all of the work and files of DMS were at the Luman, Lange firm, as it was constituted after Mr. Wheeler left. The firm is now known as Luman, Lange, Thomas & McMullen.

24. Upon being informed of Thomas's claim (*see* Exhibit 7) that his law firm had not handled any legal work for DMS and had no significant contacts with DMS for the period from September, 2003 until the spring of 2006, DMS' President, Hill, reviewed numerous billing statements to DMS from Thomas and his law firm for that period. Copies of the LLTM billing Statements to DMS are attached hereto as Exhibit 8.

25. The LLTM Statements show that substantial legal work, including significant legal contacts with representatives of DMS, was performed by Thomas and LLTM for the **same** September, 2003 through spring of 2006 period concerning which Thomas now alleges that another firm was "handling any legal work for DMS". *Compare* Exhibit 7 hereto, at 2, *with* Exhibit 8 hereto, at *passim*. Perhaps worse, the services represented by those same billing statements for legal work allegedly performed by Thomas and his current law firm, during the same time-period wherein he now alleges his firm did no work for DMS, were fully paid by DMS through payments **and** the issuance of stock to LLTM.

26. By Letter to Thomas dated August 18, 2006, DMS, by its President, Hill, served formal notice of the termination of Thomas and LLTM as counsel for DMS. A copy of the Letter of August 18, 2006 is attached hereto as Exhibit 9. In that letter, DMS once again demanded return to it of all corporate documents, both originals and copies, and including all stock registry and stock transfer records. *See* Exhibit 9 hereto, at 1-2.

27. On August 16, 2006, McUmber, through his counsel, reiterated his demand for any documents or information regarding the subject DMS stock issuances. A copy of the August 16, 2006 Letter is attached hereto as Exhibit 10. That Letter referenced court intervention to remedy the plaintiffs' inability to obtain corporate records and the continuing failure of Thomas to provide information or documents concerning the extent of, amounts,

and alleged reasons for, the DMS stock transfers and payments to LLTM and others. *See* Exhibit 10 hereto, at 2.

28. In response to the August 16, 2006 Letter, Thomas sent an e-mail addressed to "Data Mountain Solutions, Inc., Shareholders". A copy of said e-mail is attached hereto as Exhibit 11. In that e-mail, Thomas finally admitted that he had possession of at least some of the corporate records of the Corporation and stated to the shareholders of DMS that he had "accumulated" documents. These were the same documents, in part, which Thomas earlier denied having in his possession. Curiously, without consultation with, or any apparent authorization, approval, or consent of, DMS, Thomas' e-mail sets forth various explanations, exculpations, and defenses as to his firm's involvement with, and liability for what the corporate documents might demonstrate (or fail to demonstrate). *See* Exhibit 11 hereto, *passim*.

29. Moreover, Thomas's August 17th e-mail gives the defendants an additional opportunity to conceal, alter, amend or otherwise change the **original** corporate records of DMS to their advantage by preserving whatever originals exist outside of the control or review of the plaintiffs or other parties for an additional five days (until copies were eventually produced). The only other plausible explanation for additional delay is that the defendants desired to cover up the fact that corporate documents that should have existed, did not, in fact, exist, through the fault of one or more of the defendants.

30. Predictably, Giordano, through his counsel's Letter to Thomas dated August 22, 2006, then appears to have authorized the dissemination to Hill and McUmber of copies of some corporate documents ("whatever documents you deem fit in your professional judgment"). However, in the same letter, Giordano demands that Thomas "retain all original documents, including the stock book, minute book, etc. until all outstanding matters are

-11-

resolved." A copy of the Letter from Giordano's attorney to Thomas, dated August 22, 2006, is attached hereto as Exhibit 12.

31. The defendants are acting in collusion to conceal their continuing manipulation of the corporate records, including specifically the stock transfer records, of DMS. As just one example, both letters refusing and objecting to McUmber's and Hill's requests for the **originals** of the corporate documents, letters sent by Thomas and counsel for Giordano, respectively, repeat the same irrelevant and bizarre argument that under "applicable law, a shareholder does not appear to be given the right to demand corporate documents from the corporation's counsel." *Compare* Exhibit 11 hereto (e-mail from Thomas) *with* Exhibit 12 hereto (Letter from counsel for Giordano). However, the request for the corporate documents has been made by the President of DMS, Hill. The President of a corporation does not lose his right to demand corporate documentation from the corporation's counsel simply because he is also a shareholder, as the defendants seem to assert in their responses to the plaintiff's legitimate requests.

32. Likewise, all defendants are now maintaining that Thomas and LLTM cannot be terminated by act of DMS' President. After the August 18, 2006 Letter from Hill terminating Thomas and LLTM, Thomas sent an e-mail to Hill, on August 21, 2006 acknowledging the termination, stating that "we...will do nothing more by or on behalf of the corporation unless requested to do so by all four DMS principals" and " . . . Pursuant to your direction today, we are no longer counsel for DMS ." A copy of such August 21, 2006 e-mail from Thomas is attached hereto as Exhibit 13.

33. Immediately thereafter, by faxed Letter to Thomas on August 22, 2006, counsel for Giordano, corporate Secretary of DMS and minority shareholder, demanded that

Thomas "remain as corporate counsel" and that he "retain all originals [of DMS'] stock book, minute book, etc." *See* Exhibit 12 hereto. Obviously, preservation of LLTM as counsel to DMS is vital to the defendants' attempt to conceal their continuing manipulation of the corporate records of DMS. On that same day, August 22, 2006, Thomas failed and refused to provide to the plaintiffs the original DMS documents held by Thomas and LLTM. *See* Letter from defendant Thomas dated August 22, 2006, attached hereto as Exhibit 14; *compare with* Exhibits 12 & 13 hereto.

34. By his Letter of August 22, 2006, defendant Thomas provided to undersigned counsel only "copies" of certain documents that Thomas believed were "requested", and he still "kept in the custody of [his] firm the original stock book and minute book" of DMS – the same crucial corporate documents that Thomas had earlier denied were in his possession, custody or control. *Compare* Exhibit 14 hereto, *with* Exhibit 7 hereto. As suspected by the plaintiffs all along, even the copies of DMS stock book and minute book show that there is absolutely no basis for Giordano's claims and misrepresentations that he owns "60% of the outstanding shares of DMS". *See* Exhibit 5 hereto. The corporate records also show that there have been recent issues of DMS stock to LLTM, without **any** consent, authorization, resolution, or other requisite corporate approval or ratification thereof. *See id.*, at *passim*.

35. Then, on August 29, 2006, Thomas sent an e-mail Letter to some of the parties, by which he threatened to record reductions of the record shares of DMS stock issued to Hill because of an "understanding that [such] transactions were unanimously approved by the four principal shareholders". Yet, no such approvals were included in the corporate documents Thomas delivered to plaintiffs' counsel. A copy of such August 29, 2006 e-mail Letter is attached hereto as Exhibit 15.

36. Thomas' e-mail of August 29th and other recent correspondence assert that

-13-

defendant Watson is a shareholder and director of DMS, despite the fact that he earlier relinquished his roles and entitlements as a shareholder, director, and officer of DMS in exchange for some of the aforesaid $60,000 taken from DMS' bank account and the transfer to him of the SecuriCabinet property and assets. Thomas' latest writings, threatening to reduce the number of shares held by Hill while effectively ratifying (through inaction) the retention by Watson of his shares demonstrates another example of the continuing pattern of concealment, misrepresentation, conversion and fraud by the defendants to allow them to unlawfully control the majority of the issued stock shares of DMS and, thus, the business, business opportunities and assets of DMS to the detriment of the other shareholders, including the plaintiffs.

37. McUmber and Hill did formally object to the "actions" threatened by Thomas in his e-mail of August 29th in an attempt to preserve the status quo pending some independent review of the corporate books, records and agreements to determine the actual stock ownership in DMS. *See* August 31, 2006$^t$ Letter from Plaintiff's counsel, attached hereto as Exhibit 16.

38. Immediately thereafter, Giordano demanded that DMS' operative corporate documents, including specifically DMS' stock registry and transfer books, and its records of the minutes of DMS shareholder and directors' meetings, be hand-delivered to Giordano as corporate secretary of DMS. *See* Exhibit 17, attached hereto. Such transfer would enable the defendants to continue their manipulation of the corporate books and records of DMS to the detriment of the other shareholders, including the plaintiffs.

39. By Letter of September 5, 2006 (attached as Exhibit 18 hereto), defendant Giordano threatened to take immediate "possession of the original minutes and stock book"

-14-

and to "correct the stock book" for the purpose of perpetuating the defendants' efforts to control the business and assets of the corporation to the detriment of the other shareholders, including the plaintiffs. In this manner, Giordano intends to assert ownership of approximately **two-thirds** of DMS's stock without having to spend **any** of his own personal finances. These maneuvers and attempted maneuvers by the defendants clearly violate the letter, intent, and spirit of the Shareholder's Agreement wherein the parties agreed, *inter alia* "that the equitable allocation of ownership between them is **one-fourth** owned by each" and that "it is essential" to maintain the ownership proportion among the subject Shareholders.

40. As is clear from the foregoing, plaintiffs DMS, its shareholders, Hill and McUmber, and the public at large, are all currently being mislead and manipulated by the defendants as to the amount and identity of the currently issued and outstanding shares of stock issued of the Corporation, the amount of stock in the Corporation's treasury, the management structure and hierarchy of the Corporation and Corporate control over the business and assets of the Corporation.

41. At this juncture, Thomas and LLTM are still in possession of DMS' stock registry and transfer records. In furtherance of his scheme to control the Corporation and to manipulate the Corporation's books and records to reflect his claimed majority ownership of the Corporation to the detriment of the other shareholders, Giordano has issued orders to Thomas to "correct", change, modify, or otherwise alter the corporate books so that Giordano emerges as the majority shareholder of DMS, to the detriment of all other DMS shareholders. Given the apparent collusion of the parties and the clear intent of the defendants as set forth in the email and correspondence referenced hereinabove, Thomas is likely to modify the corporate records as requested by Giordano and Watson, to the detriment of the other shareholders, including the plaintiffs.

-15-

42. Through the defendants' scheme, Giordano will be able to use the corporate assets as his own, to manipulate corporate business opportunities for Giordano, personally, and to condone and dictate payments to himself out of the remuneration being received on account of DMS' contracts with its clients, including the substantial sums being paid under the subject DMS contract with NTI, all without having to spend **a dime** of his own money, through the direct, but unauthorized and improper, use of corporate funds of DMS, all to the direct and immediate detriment of the other shareholders, including the plaintiffs. By asserting that he is the majority shareholder, officer in charge and controlling director of the Corporation, all without any approval or authority, Giordano has caused the Corporation to fail to enforce rights which otherwise may properly be asserted by the Corporation against the defendants, Giordano, Watson and Thomas, including, without limitation, the right to corporate funds, receipts and contracts, the pursuit of corporate business opportunities, rights to the review and possession of the corporate books and records, and the right to void, rescind, or otherwise modify, terminate or cancel improper, unauthorized or illegal actions by the defendants purportedly on behalf of the Corporation.

43. It is therefore necessary for this Honorable Court to preserve the status quo in existence before the stock manipulation and asset conversion of defendants: namely, to temporarily, preliminarily, and permanently enjoin any actions of the defendants as stockholders or directors of DMS until an accurate accounting of the financial obligations of the parties to each other and a court determination of the amount and percentage of stock ownership in DMS by each of its shareholders; to temporarily, preliminarily, and permanently enjoin any sales, transfers, or assignments to Giordano of any shares of DMS' stock; and to temporarily, preliminarily, and permanently enjoin any actions or attempts by any of the Defendants to purportedly update, correct, change, modify, or otherwise alter the

-16-

Case 1:06-cv-01666-PLF    Document 1    Filed 09/28/2006    Page 17 of 45

corporate books of DMS to cancel or reduce the shares of DMS stock recorded as issued and outstanding to Hill or McUmber. Such appropriate equitable relief should also include a mandatory injunction ordering the defendants, individually and collectively, to relinquish, release and transfer to the plaintiffs, as their interests may properly appear, any and all contract proceeds, checks and other payments due the plaintiffs but wrongfully retained or withheld by the defendants, and an appropriate order to temporarily, preliminarily, and permanently enjoin any wasting, misappropriation and/or the selling, liquidation or disposing of any of the Companies' assets by any of the defendants, pending final disposition of this case. Appropriate relief should also be granted to assure that the plaintiffs can properly and effectively pursue, evaluate, prosecute and close on any corporate business opportunities for the benefit of the Corporation and its shareholders prior to a final judgment herein.

44. As a result of the actions, errors and omissions aforesaid of the Defendants, the Plaintiffs have suffered and will continue to suffer damages, including damages caused by Defendant Giordano's wrongful taking, misappropriation, detinue and conversion of shares of DMS stock above the equal "ownership proportion" thereof that he contracted, promised, covenanted, and agreed by the Shareholders' Agreement as aforesaid, the actual value of which additional shares totals at least $56,595; damages of approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract but which payments were wrongfully intercepted and are being detained and otherwise converted by the Defendants as aforesaid; damages of $410,000 in further contract proceeds due and payable to the Plaintiffs under the NTI contract but that are instead being wrongly claimed, diverted, and converted by the Defendants for their own selfish benefit; damages of at least $119,012.36, being the value of DMS' property and assets misappropriated and wasted by the Defendants (including the DMS property known as "SecuriCabinet", and the aforesaid

$60,000 taken from DMS' bank account by Giordano for his alleged purchase of additional shares of DMS stock); and damages of at least $6,109.15, being payment by DMS to Thomas for legal services allegedly rendered during the past three year period in which Thomas and his law firm now claim that another attorney was handling all legal work for DMS. The damages caused Plaintiffs by the Defendants thus totals the sum of approximately $686,716.51 for which the Plaintiffs seek judgment *infra*.

45. Pursuant to, *inter alia*, Fed. R. Civ. P. 23.1, plaintiffs Derek McUmber and Frederick S. Hill, Jr. allege and verify that: 1) each such plaintiff was a shareholder of DMS at the time of the transactions of which the plaintiffs complain, and 2) that this action is not a collusive one to confer jurisdiction on a Court of the United States which it would not otherwise have.

## COUNT I - INJUNCTIVE RELIEF

46. Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-45 of this Complaint.

47. The Defendant, Giordano, claims that he is the majority shareholder and thereby in "control" of DMS, all in violation of the terms and conditions under the Shareholders' Agreement and the by-laws of DMS.

48. By virtue of his claimed ownership of a majority of the stock of DMS, Giordano has converted to his own use, and continues to convert and manipulate the business, property and assets of DMS for his own use and to the detriment of the other shareholders of DMS, including the plaintiffs, McUmber and Hill, and will continue to dictate the terms and conditions of, the work being performed upon, and all communications related to, DMS' subject multi-million dollar NTI contract. Moreover, Giordano has intercepted and continues to hold substantial payments from DMS' client NTI that are intended for and payable to

-18-

plaintiffs DMS and Mr. McUmber. The payments due DMS are essential to the immediate and continued operation of the Corporation.

49. The Defendants assert that Watson swapped shares of his stock for the DMS' asset "SecuriCabinet", and that DMS purchased Mr. Hill's shares of its stock, such that Mr. Giordano now claims he owns "60% of the outstanding share[s] of DMS". These assertions are contrary to the corporate books and records, copies of which have been turned over by the defendant, Thomas.

50. Defendants Watson and Giordano, as well as plaintiff, Hill, have each received valuable consideration from DMS for its purchase of portions of their respective shares of its outstanding stock, including the receipt by Mr. Watson of the valuable DMS' asset "SecuriCabinet" for purchase of his shares of DMS' stock. However, DMS' stock registry and stock transfer books still show that each individual party to this action owns 22,500 shares of DMS, or 90% of the issued shares of the Corporation. Defendants Giordano and Thomas have threatened to use, and are in sole possession poised to use, DMS' stock registry and stock transfer books against the plaintiffs by eliminating most of Mr. Hill's shares as having been purchased by DMS, while leaving untouched the shares of the Defendant, Watson that were allegedly purchased by DMS through transfers of valuable consideration -- including cash and other corporate assets such as "SecuriCabinet" -- to the Defendants.

51. DMS' stock registry, stock transfer books, and like-corporate records, are in the possession of, and in the alleged custody and control of, defendant Thomas and LLTM, who have already taken shares of DMS stock as alleged payments for legal services rendered during time-periods where they now deny providing **any** such services. The issuance of shares of stock to Thomas is not authorized by any minutes, agreements or other corporate formalities. Furthermore, Thomas and LLTM are still in possession of DMS' stock registry

and transfer records. Moreover, with the consent and support of defendant, Watson, Giordano has issued orders to Thomas to "correct", change, modify, or otherwise wrongly alter the corporate books so that Mr. Giordano emerges as the majority shareholder of DMS, to the detriment of all other DMS shareholders.

52. By the scheme set forth above, absent injunctive relief, Giordano can continue to condone and dictate payments to the defendants out of the remuneration being received on account of DMS' contracts with it clients -- including the substantial sums being paid under the DMS contract with NTI – all without having to spend **any** of his personal finances for the DMS stock, contract, and management control Mr. Giordano now asserts for himself. Furthermore, the defendants can continue to manipulate the stock of the Corporation in violation of its by-laws and the Shareholders' Agreement among the parties.

53. Plaintiffs therefore request that this Honorable Court preserve the status quo in existence before the alleged manipulation, misrepresentations and conversion by the defendants, as follows: (1) to temporarily, preliminarily, and permanently enjoin any actions of the Defendants as stockholders or directors of DMS until it is revealed and/or determined who has, or should have, proper shares of stock in that corporation, including temporarily, preliminarily, and permanently enjoining any sales, transfers, or assignments of any shares of DMS' stock, and any actions or attempts by any of the Defendants to purportedly update, correct, change, modify, or otherwise alter the corporate books of DMS to cancel, reduce, or increase the shares of DMS stock recorded as issued and outstanding to any shareholder, previous shareholder or prospective shareholder; and (2) to temporarily, preliminarily and permanently enjoin any sale, transfer, distribution, or disposition of the property or assets of the Corporation; and (3) to order the defendants to disgorge and transfer to the plaintiffs, as their interests may appear, any and all contract proceeds, checks and other payments due the

-20-

plaintiffs whether now retained or withheld by the defendants, or received by them in the future; and (4) to temporarily, preliminarily, and permanently enjoin any wasting, misappropriation, liquidation, or disposition of any of the Corporation's business, business assets, or business opportunities by any of the defendants, pending further order of this court of final disposition of this case.

54. By the Shareholders' Agreement, all of the parties hereto expressly agreed by written contract that Court-Ordered injunctive relief is an appropriate remedy for resolving disputes with DMS' shareholders, which disputes and contractually-agreed injunctive remedy are respectively recited above and requested below. *See* Shareholders' Agreement (Exhibit 2), at 10, para. 10(b).

WHEREFORE, Plaintiffs, Data Mountain Solutions, Inc., Derek McUmber, and Frederick S. Hill, Jr., request that this Honorable Court pursuant to, *inter alia*, Fed. R. Civ. P. 65, enter an Order that:

A. temporarily, preliminarily, and permanently enjoins any actions of defendants Giordano, Watson, and Thomas in any matters or manners concerning the corporate and business affairs of plaintiff DMS, and/or concerning plaintiffs McUmber or Hill *viz* DMS, until a determination of the proper shareholders of DMS;

B. temporarily, preliminarily, and permanently enjoins any actions or attempts by any of the Defendants to update, correct, change, modify, or otherwise alter the corporate books of DMS to cancel, reduce or increase the shares of DMS stock recorded as issued and outstanding to any shareholder;

C temporarily, preliminarily, and permanently mandates the disgorgement from defendants Thomas, Giordano, and/or Watson, and transfer to plaintiff DMS, through its President, Hill, all stock registry, stock certificate, and stock transfer books, and all other

-21-

corporate and business records of DMS, that are found, revealed, or asserted as in the possession, custody, or control of the defendants;

D. temporarily and preliminarily enjoins any actions or attempts by any of the defendants to remove McUmber or Hill from their current corporate officer positions at, and/or as Directors of DMS, pending final disposition of this case;

E. preliminarily, and permanently mandates and directs the cancellation on the stock registry, stock transfer, and other appropriate corporate books of DMS, the shares of DMS stock purportedly used by Mr. Watson to allegedly purchase DMS' assets (such as SecuriCabinet), and enjoins any sales, transfers, or assignments to Giordano of any shares of DMS' stock except as specifically allowed by the by-laws of the Corporation and the parties' Shareholders Agreement;

F. temporarily, preliminarily, and permanently enjoins any actions or attempts by any of the Defendants to dictate, supervise or control the terms, conditions, and/or payments under, and/or the plaintiffs' communications related to, DMS' subject multi-million dollar NTI contract, and mandates the disgorgement from, and transfer to, the plaintiffs of any and all contract proceeds, checks and other payments due any of the Plaintiffs that are being retained or withheld by any of the Defendants;

G. temporarily and preliminarily enjoins any or all of the Defendants from selling, transferring, assigning, secreting, and/or otherwise disposing of any of DMS' stock and/or assets pending final disposition of this case;

H. temporarily, preliminarily, and permanently enjoins Giordano and Watson from wasting and/or misappropriating the assets of DMS, or in any manner modifying the existent purchase terms, conditions, and price for shares of DMS' stock;

I. and for such other and further relief as the Court may deem appropriate.

## COUNT II - SPECIFIC PERFORMANCE

55.    Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-54 of this Complaint.

56.  By the Shareholders' Agreement, all of the parties hereto expressly agreed "that their respective rights and obligations shall be enforceable in a court of equity by a decree of specific performance and that . . . irreparable damage would result if this Agreement is not specifically enforced."  *See* Shareholders' Agreement, Exhibit 2 hereto, at para. 10(b).

57.  By the Shareholders Agreement, the parties agreed "that the equitable allocation of ownership between them is one-fourth owned by each, and they agree that it is essential to maintain such ownership proportions between themselves." *See* Shareholders Agreement, Exhibit 2 hereto, at para. 12.  Therefore, under  the Shareholders Agreement, the parties agreed that "no Shareholder, without the prior written consent of **all** the Shareholders, shall directly or indirectly sell, assign, mortgage, hypothecate, transfer . . . or otherwise voluntarily or involuntarily dispose of **any** shares" of DMS stock owned by him, "except as specifically provided" by certain provisions  of the Shareholders Agreement. *See id.*, at para. 3(a)(emphasis added)

58.  Except as specifically provided under the Shareholders Agreement, any other disposition of DMS stock  shares "shall be null, void and without effect as against the Corporation and the other Shareholders." *See id.*, at para. 4(e) (emphasis added), and para. 3(a), respectively.

59.  The shares of stock in DMS and the percentage ownership of the issued shares of DMS stock are special and unique, and irreparable damages will result to the plaintiffs if the Shareholders Agreement is not specifically enforced by this Honorable Court. Likewise,

the current administration of DMS work upon, and proceeds due the plaintiffs from, the subject NTI/GSA contract are now being controlled and retained by Giordano, in violation of his own contractual duties and obligations to the plaintiffs and his fiduciary duties as an officer and director of DMS, and irreparable damages will result to the plaintiffs if such duties and obligations are not specifically enforced by this Court.

60.  Similarly, DMS' stock registry, stock transfer books, and like-corporate records are also special and unique, but such have been kept by defendant Thomas and LLTM. Irreparable damages will result to the plaintiffs if the subject termination of such attorneys (and their concurrent duties and obligations to return  DMS' subject corporate records) are not specifically enforced, as the defendants are conspiring and acting to change, modify, "correct", or otherwise wrongly alter the corporate books so that defendant Giordano emerges as the majority shareholder of DMS, to the detriment of DMS and all other DMS shareholders.

61.  Therefore, Plaintiffs request that this Honorable Court enter a decree of specific performance of the parties' Shareholders Agreement, which orders the  transfer to plaintiff DMS,  through its President (Mr. Hill) and CEO (Mr. McUmber), of all stock registry, stock certificate, and stock transfer books, and all other corporate and business records of DMS, that are found, revealed, or asserted as in the possession, custody, or control of any and/or all of the defendants.  Such decree should also require specific performance of the covenants, terms, and provisions of the  Shareholders Agreement wherein the parties hereto agreed "that the equitable allocation of ownership between them is one-fourth owned by each, and they agree that it is essential to maintain such ownership proportions between themselves", and thereby order the cancellation on DMS'  stock registry, stock transfer, and other appropriate corporate books of DMS, of the shares of DMS stock purportedly used by Mr. Watson  to

allegedly purchase DMS' assets (such as Secure-a-Cabinet), and the cancellation on such corporate records of any sales, transfers, or assignments to Mr. Giordano of any shares of DMS' stock claimed as once-owned by Mr. Watson.

WHEREFORE, Plaintiffs, DMS, McUmber, and Hill, request that this Honorable Court, pursuant to the Shareholder Agreement (Exhibit 2 hereto), at para. 10(b), and applicable law, enter a decree of specific performance that

A. specifically enforces the parties' Shareholders' Agreement, and the provisions thereof restricting the disposition of the parties' shares of DMS stock, so "that the equitable allocation of ownership between them is [equal shares] owned by each", and mandates the parties to "maintain such ownership proportions between themselves", all as originally contracted, covenanted, and promised by the parties' Shareholders' Agreement; and

B. orders the disgorgement from defendants Thomas, Giordano, and/or Watson, and transfer to plaintiff DMS, through its President, Hill, of all stock registry, stock certificate, and stock transfer books, and all other corporate and business records of DMS, that are found, revealed, or asserted as in the possession, custody, or control of any and/or all of the defendants; and

C. orders such other and further relief as the Court may deem appropriate.

## COUNT III - ESTOPPEL

62. Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-61 of this Complaint.

63. Defendants have promised plaintiffs on numerous occasions, and expressly agreed in writing by the Shareholders Agreement, that the allocation of DMS' issued voting stock

-25-

is in equal ownership proportions for McUmber, Hill, Watson, and Giordano, and defendants promised and agreed "that it is essential to maintain such ownership proportions". *See* Shareholders Agreement, Exhibit 2 hereto, at para. 12. Accordingly, by the Shareholders Agreement, the parties agreed that "no Shareholder, without the prior written consent of **all** the Shareholders, shall directly or indirectly sell, assign, mortgage, hypothecate, transfer . . . or otherwise voluntarily or involuntarily dispose of **any** shares" of DMS stock owned by him, "except as specifically provided" by certain provisions of the Shareholders Agreement. *See id.*, at para. 3(a)(emphasis added).

64. Plaintiffs relied to plaintiffs' detriment on the defendants' promises that the allocation of DMS' issued voting stock would be maintained in equal ownership proportions for the founding principals of DMS. Specifically, the Plaintiffs provided employment, remuneration, offices, and services to Defendants, all based on the Defendants' promises and agreements that the allocation of DMS's shares of voting stock would be maintained in equal ownership proportions between the founding principals of DMS. Plaintiffs further entrusted defendants with the Corporation's business and income, as well as the Corporation's valuable assets, including its source code for the NTI subcontract.

65. Plaintiffs' reliance on defendants' said promises was reasonable. Indeed, until defendants' recent schemes to seize control of DMS (and thereby its monies and assets), the defendants themselves had consistently recognized, affirmed, ratified and evinced the existence of the parties' subject Shareholders' Agreement and the equitable allocation of stock ownership required thereby.

WHEREFORE, Plaintiff, Data Mountain Solutions, Inc., requests that this Honorable Court enter an order and/or judgment against the Defendants, as follows:

A. that defendants be estopped from asserting, maintaining and/or claiming in any

manner of acts, words, or deeds, that plaintiffs and defendants do not have equal ownership proportions of the shares of stock of DMS;

B. that defendant Mr. Giordano be estopped specifically from asserting, maintaining and/or claiming in any manner of acts, words, or deeds, that he is the majority shareholder of DMS' stock, or otherwise controls the corporate or business affairs of DMS;

C. that defendant Mr. Giordano be estopped specifically from asserting, maintaining and/or claiming in any manner of acts, words, or deeds, that he acts by authority of the Corporation except as specifically directed by the President, CEO and/or Board of Directors as constituted and acting pursuant to the by-laws of the Corporation;

D. and for such other and further relief as the Court may deem appropriate.

## COUNT IV - RESCISSION

66.    Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-65 of this Complaint.

67. Under the Shareholders' Agreement, any disposition of DMS stock shares except as specifically provided therein "shall be null, void and without effect as against the Corporation and the other Shareholders, so "that the equitable allocation of ownership between them", agreed by them to be "essential", is maintained by the parties to the Shareholders' Agreement.

68. However, defendants now contend that Watson sold or transferred some of his shares of DMS stock to Giordano, and that DMS allegedly "purchased" some of Hill's shares of its stock, such that Giordano now claims he owns "60% of the outstanding share[s] of DMS". But as also stated aforesaid, these alleged sales, purchases, transfers, or

assignments of DMS stock occurred without proper notice to and consent of the plaintiffs to such stock transactions. The defendants further contend that Thomas or LLTM received stock from the Corporation in payment of legal services.

69. Without proper notice to and the consent of all the Shareholders' to defendants' subject disposition of their DMS stock, such stock disposition "shall be null, void and without effect as against the Corporation and the other Shareholders." Shareholders Agreement, Exhibit 2 hereto, at para. 3(a).

70. Accordingly, because of the uniqueness of DMS's stock, and the material misrepresentations and fraud of the defendants in their schemes to make Giordano the purported majority shareholder of DMS, and because of the failure of such alleged stock transfers to comply with the requirements of the Corporation, including the Shareholders Agreement, the plaintiffs demand  rescission of any DMS stock issuances or transfers to Giordano above the equal "ownership proportion" therefor  that he promised, represented, and agreed by the Shareholders' Agreement, and rescission of any DMS stock issuances or transfers to Thomas/LLTM   above any amounts agreed to, or otherwise authorized, in accordance with such Agreement and the by-laws of the Corporation

WHEREFORE, Plaintiff, Data Mountain Solutions, Inc., requests that this Honorable Court enter an order that:

A.. rescinds any issuances or transfers of DMS stock to Giordano above the equal "ownership proportion" for such stock that was promised, represented and agreed to by all the parties by their subject Shareholders' Agreement, and rescinds any issuances or transfers of DMS stock to Thomas/LLTM  beyond that authorized by such Agreement and the by-laws of the Corporation;

B. orders such other and further relief as the Court may deem appropriate.

-28-

## COUNT V - BREACH OF FIDUCIARY DUTIES

71. Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-70 of this Complaint.

72. Defendants Giordano and Watson, as directors, shareholders and officers of DMS, breached their respective fiduciary duties owed to the Plaintiffs by such defendants' actions and inactions aforesaid, including their schemes to attempt acquisition of the majority of the outstanding shares of DMS' stock, so that Giordano could then pick his own Directors of DMS, who in turn could then appoint DMS officers picked by him, such that the defendants could conceal and condone their past and ongoing misappropriations of the substantial remuneration now being received by DMS . By such wrongful scheme, Giordano attempted to accomplish, and in fact  has now accomplished, excessive increases to the monies and other benefits paid and inured to him on account of his relations with DMS, all for his own personal and selfish benefit and to the detriment of the legitimate officers, directors, and shareholders of DMS.  Upon information and belief, Watson received more than the fair value of his stock in exchange for participating in Giordano's scheme to defraud the other shareholders of DMS, including, without limitation, a $10,000 annual consulting fee, or salary for little or no services or benefit to the Corporation..

73.    Defendants Giordano and Watson, as directors, shareholders and officers of DMS, breached their respective fiduciary duties owed to the Plaintiffs by said Defendants' concealment, misrepresentations, and other improper and unlawful gamesmanship over the corporate affairs and stock registry, transfer, and related corporate books and records of DMS, in order to conceal or obfuscate the number of DMS shares  held by defendants and the other shareholders.  By such unlawful and illegal maneuvering, defendant Giordano - only a minority shareholder and merely the Secretary of DMS - now contends that he

"controls" DMS, by his claimed ownership of "60% of the outstanding share[s] of DMS".

74. Defendants' breaches of their fiduciary duties and self-dealing as aforesaid were and are the direct and proximate causes of the Plaintiffs' actual damages suffered in the approximate total amount of $680,607, representing damages caused by defendant Giordano's wrongful taking, misappropriation, detinue and conversion of shares of DMS stock above the equal "ownership proportion" thereof that he contracted, promised, covenanted, and agreed by the Shareholders' Agreement as aforesaid, the actual value of which additional shares totals at least $56,595; damages of approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract but which payments were wrongfully intercepted and are being detained and otherwise converted by the Defendants as aforesaid; damages of $410,000 in further contract proceeds due and payable to the Plaintiffs under the NTI contract but that are instead being wrongly claimed, diverted, and converted by the Defendants for their own selfish benefit; and, damages of at least $119,012.36, being the value of DMS' property and assets misappropriated by the Defendants, which include the DMS property known as "SecuriCabinet" taken by Mr. Watson, and the aforesaid $60,000 taken from DMS' bank account by Mr. Giordano, all taken and used wrongfully by them in their illicit schemes to attempt shareholder, and thereby directorship and officership, control of the corporate, business, and financial affairs of DMS.

WHEREFORE, the Plaintiffs demand judgment against Defendants Gregg Giordano and Anthony Watson, jointly and severally, as follows:

A. Compensatory damages in the sum of $680,607, with legal interest thereon;

B. Punitive damages in the sum of $1,000,000, each;

C. And for such other and further relief as the Court may deem appropriate.

## COUNT VI - BREACH OF CONTRACT[S]

75.     Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-74 of this Complaint.

76.   Defendants Giorrdano and Watson breached their contracts with the Plaintiffs, express and/or implied, including the Shareholders' Agreement, by their actions and inactions to take control of DMS as aforesaid.

77.   The aforesaid maneuvers and acts by the Defendants clearly breach and violate the letter, intent, and spirit of the Shareholder's Agreement wherein the parties thereto (and to this lawsuit) agreed that the equitable allocation of ownership between them is one-fourth owned by each, and they agree that it is essential to maintain such ownership proportions between the other shareholders.

78.   In further breach of his contracts with the Plaintiffs, Giordano has begun dictating the terms and conditions of, the work being performed upon, and all communications related to, DMS' subject multi-million dollar NTI contract, by using his false claims of "control" of DMS.

79.   Using his wrongful reasoning that he is now majority owner of NTI and allegedly now "controls" the NTI contract, Giordano has intercepted and now holds substantial payments from DMS client NTI that are intended for and payable to plaintiffs DMS and McUmber.

80.   As further stated aforesaid, defendants Watson and Giordano have each received valuable consideration from DMS for its purchase of portions of their respective shares of its outstanding stock. However, DMS's stock registry and stock transfer books still show the

original issue of 22,500 shares to each of such parties, such that the taking of the DMS' asset "SecuriCabinet" by Mr. Watson and the taking of said $60,000 in cash by Mr. Giordano constitute breach of defendants' contracts, express or implied, with the Plaintiffs.

81. Defendants' breaches of contract were and are the direct and proximate causes of the Plaintiffs' actual damages suffered in the approximate total amount of $680,607, representing damages caused by defendant Mr. Giordano's wrongful misappropriation of shares of DMS stock above the equal "ownership proportion" thereof that he contracted, promised, covenanted, and agreed by the Shareholders' Agreement as aforesaid, the actual value of which additional shares totals at least $56,595; damages of approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract but which payments were wrongfully intercepted and are being detained and otherwise converted by the Defendants as aforesaid; damages of $410,000 in further contract proceeds due and payable to the Plaintiffs under the NTI contract but that are instead being wrongly claimed, diverted, and converted by the Defendants for their own selfish benefit; and, damages of at least $119,012.36, being the value of DMS' property and assets misappropriated by the Defendants, which include the DMS property known as "SecuriCabinet" taken by Watson, and $60,000 taken from DMS' bank account by Giordano, all taken and used wrongfully by them in their attempt to seize shareholder control, and thereby policy, management and operational control of the corporate, business, and financial affairs of DMS in violation of their contracts with the Plaintiffs, the Corporation's by-laws and applicable law.

WHEREFORE, the Plaintiffs demand judgment against Defendants Gregg Giordano and Anthony Watson, as follows:

A. compensatory damages in the sum of $680,607, with legal interest thereon;

B. and for such other and further relief as the Court may deem appropriate.

-32-

## COUNT VII - TORTIOUS BREACHES OF COVENANTS OF
## GOOD FAITH AND FAIR DEALING ARISING OUT OF CONTRACT[S]

82.    Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-81 of this Complaint.

83. The actions of defendants including their schemes and actions to control the voting stock shares, directorship, and officership of DMS, and then the monies, payments, proceeds, and receipts from clients of DMS all constitute breaches of the covenants of good faith and fair dealing arising out of the Defendants' contracts with the Plaintiffs, including but not limited to, the Shareholders Agreement between the parties hereto.

84. In addition, the actions of defendant Giordano, with the consent, participation, and collusion of Watson, in his removal of $60,000 from the start-up of DMS' bank account, and his use of same to claim purchase of Watson's shares of DMS' stock, and in his intercepting and retaining substantial payments from DMS' client NTI that are intended for and payable to plaintiffs DMS and McUmber and holding same as ransom, bait, or other attempted wrongful inducement to the Plaintiffs for condonation or settlement of the Defendants' tortious acts and schemes, constitute breaches of the covenants of good faith and fair dealing arising out of the Plaintiffs' contracts with the Defendants, including but not limited to, the Shareholders' Agreement.

85. Giordano's attempts to assert majority "control" over DMS, likewise constitute breaches of the covenants of good faith and fair dealing arising out of the Plaintiffs' contracts with the Defendants, including but not limited to, the Shareholders' Agreement. Similarly, the taking by Watson of the valuable DMS' asset "SecuriCabinet" for purchase of his shares of DMS' stock, but then his contrary assertion that he still owns and may transfer such DMS stock shares to Giordano without the knowledge or consent of the other DMS's shareholders,

-33-

also constitutes a breach or breaches of the covenants of good faith and fair dealing arising out of the Plaintiffs' contracts with the Defendants, including but not limited to, the Shareholders' Agreement.

86. Defendants' tortious breaches of the covenants of good faith and fair dealing arising out of contract[s] as aforesaid were and are the direct and proximate cause of the Plaintiffs' actual damages suffered in the approximate total amount of $680,607, representing damages caused by defendant Mr. Giordano's wrongful misappropriation of shares of DMS stock above the equal "ownership proportion" thereof that he contracted, promised, covenanted, and agreed by the Shareholders' Agreement as aforesaid, the actual value of which additional shares totals at least $56,595; damages of approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract but which payments were wrongfully intercepted and are being detained and otherwise converted by the Defendants as aforesaid; damages of $410,000 in further contract proceeds due and payable to the Plaintiffs under the NTI contract but that are instead being wrongly claimed, diverted, and converted by the Defendants for their own selfish benefit; and, damages of at least $119,012.36, being the value of DMS' property and assets misappropriated by the Defendants, which include the DMS property known as "SecuriCabinet" taken by Watson, and the aforesaid $60,000 taken from DMS' bank account by Giordano.

WHEREFORE, the Plaintiffs demand judgment against defendants Gregg Giordano and Anthony Watson, jointly and severally, as follows:

A. compensatory damages in the sum of at least $680,607, with legal interest thereon;

B. punitive damages in the sum of $1,000,000, each;

C. and for such other and further relief as the Court may deem appropriate.

## COUNT VIII - TORTIOUS INTERFERENCE WITH CONTRACT

87. Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-86 of this Complaint.

88. Defendants' tortious interference with the Plaintiffs' subject contract with NTI, for services to and payment from GSA as aforesaid, were and are the direct and proximate cause of the Plaintiffs' actual damages of approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract but which payments were wrongfully intercepted and are being detained by the Defendants as aforesaid, and damages of $410,000 in further contract proceeds due and payable to the Plaintiffs under the NTI contract but that are instead being wrongly claimed, diverted, and converted by the Defendants for their own selfish benefit.

WHEREFORE, Plaintiff, Data Mountain Solutions, Inc., demands judgment against defendants Gregg Giordano and Anthony Watson, jointly and severally, as follows:

A. compensatory damages in the sum of at least $505,000, with legal interest thereon;

B. punitive damages in the sum of $1,000,000, each;

C. and for such other and further relief as the Court may deem appropriate.

## COUNT IX - WASTE/MISAPPROPRIATION OF CORPORATE ASSETS/FUNDS; CONSPIRACY TO WASTE/MISAPPROPRIATE CORPORATE ASSETS/FUNDS

89. Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-88 of this Complaint.

90. Defendants Giordano and Watson, each acting individually and not in his/their capacity as agents or employees of DMS, and each acting in conspiracy with the other, and/or also on his own, committed tortious acts, by Giordano's subject removal of $60,000 from DMS' bank account, and his use of same to claim purchase of Watson's shares of DMS'

-35-

stock and thereby assert majority "control" over DMS, and by the taking of the valuable DMS' asset "SecuriCabinet" for purchase of Watson's shares of DMS' stock ( which Watson now claims he still owns), that constitute waste, misappropriation of, and improper self-dealing with, the corporate assets and properties of DMS.

91. Defendants' waste/misappropriation of corporate assets and properties aforesaid was the direct and proximate cause of DMS' damages suffered in the amount of at least $119,012.36,  being the value of DMS' property and assets misappropriated by the Defendants, which include the DMS property known as "SecuriCabinet" taken by Mr. Watson, and the aforesaid $60,000 taken from DMS' bank account by Mr. Giordano, all misappropriated and used wrongfully by them in their  to attempt to attain the status of a majority shareholder, and thereby control the directors and officers of DMS, and control the corporate, business, and financial affairs of DMS and the Corporation's valuable assets and business opportunities.

WHEREFORE, Plaintiff, Data Mountain Solutions, Inc., demands judgment against defendants Gregg Giordano and  Anthony Watson, jointly and severally, as follows:

A.  compensatory damages in the sum of at least $119,012.36, with legal interest thereon;

B.  punitive damages in the sum of $1,000,000, each;

C.  and for such other and further relief as the Court may deem appropriate.

## COUNT X - CONVERSION

92.     Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-91 of this Complaint.

93.  Defendants Giordano and  Watson, each acting individually and not in his/their

-36-

capacity as agents or employees of DMS, and each acting in conspiracy with the other, and/or also on his own, did wrongfully, maliciously, tortiously, wantonly, and with ill-will and willful disregard of the Plaintiffs' rights, sought to, and have exercised, complete control of, dominion over, and ownership of, the assets, stocks, properties, contract proceeds, and other remuneration belonging to, earned by, accruing for, and owed to Plaintiffs and did thereby deprive the Plaintiffs of said assets, properties, contract proceeds, and other remuneration belonging to, earned by, accruing for, and owed to Plaintiffs as aforesaid.

94. Defendants did and have converted to his and/or their own use and benefit those assets, stocks, properties, contract proceeds, and other remuneration belonging to, earned by, accruing for, and owed to Plaintiffs as aforesaid, for the Defendants' own satisfaction and gain and with evil and rancorous motive influenced by hate or ill-will, their purpose being to deliberately and willfully injure the Plaintiffs.

95. Defendants conversion of the assets and property of DMS and its shareholders, and the individual property of the plaintiffs, McUmber and Hill, was the proximate cause of Plaintiffs'    actual damages suffered in the approximate total amount of $680,607, representing damages caused by defendant Giordano's wrongful conversion of shares of DMS stock the actual value of which shares totals at least $56,595; damages of approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract but which payments were wrongfully intercepted and converted by the Defendants; damages of $410,000 in further contract proceeds due and payable to the Plaintiffs under the NTI contract but that are instead being wrongly claimed, diverted, and converted by the Defendants for their own selfish benefit; and, damages of at least $119,012.36, being the value of DMS' property and assets misappropriated by the Defendants, which include the

-37-

DMS property known as "SecuriCabinet" converted by defendant Watson, and the aforesaid $60,000 converted from DMS' bank account by defendat Giordano.

WHEREFORE, the Plaintiffs demand judgment against defendants Gregg Giordano and Anthony Watson, jointly and severally, as follows:

A. compensatory damages in the sum of at least $680,607, with legal interest thereon;

B. punitive damages in the sum of $2,000,000, each;

C. and for such other and further relief as the Court may deem appropriate.

## COUNT XI - UNJUST ENRICHMENT

96.     Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-95 of this Complaint.

97.  Defendants have been unjustly enriched by their actions in retaining, for their own use and benefit, of the monies, stocks, assets, properties, contract proceeds, and other remuneration belonging to, earned by, accruing for, and owed to Plaintiffs as aforesaid, including the misappropriation by and unjust enrichment to Defendants of: the subject shares of DMS stock above the equal "ownership proportion" therefor that Defendants' contracted, promised, covenanted, and agreed by the Shareholders' Agreement as aforesaid, the actual value of which additional shares totals at least $56,595; the approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract but which payments were wrongfully intercepted and are being used by the Defendants, the $410,000  in further contract proceeds due and payable to the Plaintiffs under the NTI contract but that are instead being wrongly taken and used by the Defendants for their own selfish benefit; and, the DMS property and assets misappropriated by the Defendants, the

-38-

actual value of which is at least $119,012.36, including the DMS property known as "SecuriCabinet" taken by defendant Watson and the aforesaid $60,000 taken from DMS' bank account by defendant Giordano.

WHEREFORE, the Plaintiffs demand judgment against defendants Gregg Giordano and Anthony Watson, jointly and severally, as follows:

A. compensatory damages in the sum of at least $680,607, with legal interest thereon;

B. punitive damages in the sum of $1,000,000, each;

C. and for such other and further relief as the Court may deem appropriate.

## COUNT XII - FRAUD/TORTIOUS MISREPRESENTATION

98.     Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-97 of this Complaint.

99.     Defendants have induced the Plaintiffs to provide services, properties, assets, remuneration, and other benefits to the Defendants, all in reliance on the promises and representations of the Defendants that the allocation of DMS' issued voting stock shall be in equal ownership proportions for McUmber, Hill, Watson, and Giordano, and that it is essential to maintain such ownership proportions. The Defendants have induced the Plaintiffs to provide services, properties, assets, remuneration, and other benefits to the Defendants, all in reliance on the promises and representations of the Defendants that proceeds received from DMS' contracts and from services provided by DMS would be used for, and inure to the use and benefit of, the Plaintiffs.

100. Plaintiffs relied to plaintiffs' detriment on the defendants' promises that the allocation of DMS' issued voting stock would be maintained in equal ownership proportions for the founding principals of DMS; specifically, the Plaintiffs provided employment,

-39-

remuneration, offices, and services to Defendants, all based on the Defendants' promises and agreements that the allocation of DMS's shares of voting stock would be maintained in equal ownership proportions between the founding principals of DMS. Likewise, the Plaintiffs relied to their detriment by providing services, properties, assets, remuneration, and other benefits to the Defendants, all based on the promises and representations of the Defendants that proceeds received upon DMS' contracts and from services provided by DMS would be used for, and inure to the use and benefit of, the Plaintiffs.

101.  The Plaintiffs' reliance on the Defendants' said promises was reasonable. Indeed, until defendants' recent schemes to seize control of DMS , and thereby its monies and assets, the Defendants themselves had consistently recognized, affirmed and ratified the parties' Shareholders Agreement, the equitable allocation of stock ownership required thereby, and the equitable distribution and use of the proceeds received upon DMS' contracts and from services provided by DMS.

102.  The Defendants' promises and representations aforesaid were false when made, and known by them to be false, and Plaintiffs have been defrauded by Defendants, in that the Defendants intended to, and have in fact, schemed to control DMS through their wrongful stock manipulations, primarily to divert to themselves the substantial remuneration being paid and due the Plaintiffs on account of the NTI/GSA contract and other business opportunities and profits derived from the Corporation's assets. The Defendants' promises and representations were willingly, wantonly, tortiously and maliciously made to induce the Plaintiffs into providing services, properties, assets, remuneration, and other benefits to the Defendants.

103.  Plaintiffs had a right to rely on the promises and representations of the Defendants, and the Plaintiffs did rely on such promises and representations to their

detriment. Plaintiffs provided employment, remuneration, offices, and services to Defendants, all based on the Defendants' promises and agreements that the allocation of DMS's shares of voting stock would be maintained in equal ownership proportions between the founding principals of DMS, and that proceeds received upon DMS' contracts and from services provided by DMS would be used for, and inure to the use and benefit of, the Plaintiffs.

104.  The Plaintiffs' reliance on the Defendants' promises was reasonable.

105.  However, the Defendants have defrauded the Plaintiffs, as the Defendants intended and schemed to, and have now asserted that they "control" DMS through their wrongful stock manipulations. As a result of the Defendants' false promises, misrepresentations, and fraud aforesaid, Plaintiffs have suffered damages in the approximate total amount of $680,607, representing damages caused by defendant Giordano's tortious misappropriation and conversion of shares of DMS stock, the actual value of which additional shares totals at least $56,595; damages of approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract; damages of $410,000 in further contract proceeds due and payable to the Plaintiffs under the NTI contract; and, damages of at least $119,012.36, being the value of DMS' property and assets fraudulently misappropriated by the Defendants.

WHEREFORE, the Plaintiffs demand judgment against defendants Gregg Giordano and Anthony Watson, jointly and severally, as follows:

A.  compensatory damages in the sum of $680,607, with legal interest thereon;

B.  punitive damages in the sum of $2,000,000, each;

C.  and for such other and further relief as the Court may deem appropriate.

## COUNT XIII - DECLARATORY RELIEF

106.  Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-105 of this Complaint.

107.  As parties to the Shareholders Agreement, and as shareholders of DMS entitled thereunder to "the equitable allocation of ownership between them" that "is essential to maintain", Plaintiffs are entitled to a declaration of their rights thereby, including declaration that the equitable allocation of ownership of DMS is equal at least between plaintiff McUmber and defendant Giordano.

108.  Also as parties to the Shareholders' Agreement, and as shareholders, directors, and officers of DMS, the Plaintiffs are entitled to a declaration that they are entitled to, and shall be immediately provided with, the stock registry, stock certificate, and stock transfer books, and all other corporate and business records of DMS.

109.  Further, as shareholders, directors, and officers of DMS, the Plaintiffs are entitled to a declaration that they are entitled to any and all contract proceeds, checks and other payments payable to or otherwise due any of the Plaintiffs.

WHEREFORE, Plaintiffs request that this Honorable Court, pursuant to, *inter alia*, Fed. R. Civ. P. 57, enter a decree that:

A.  declares that Plaintiffs are entitled to all stock registry, stock certificate, and stock transfer books, and all other corporate and business records of DMS, and that defendants Thomas, Giordano, and/or Watson shall therefore transfer to plaintiff DMS, through its President Hill, any and all of such records that are found, revealed, or asserted as in the possession, custody, or control of any and/or all of the defendants;

B.  declares that the existent original shareholders of DMS are entitled to "the equitable allocation of ownership between them" that "is essential to maintain", such that the

decree Declares the cancellation on the stock registry, stock transfer, and other appropriate corporate books of DMS, of the shares of DMS stock purportedly used by defendant Watson to allegedly purchase DMS' assets (such as Secure-a-Cabinet), and the cancellation thereon of any sales, transfers, or assignments to defendant Giordano of any shares of DMS' stock claimed as once-owned by Watson;

C. declares that Watson, Giordano and Thomas/LLTM are entitled to no shares, or no additional shares in DMS;

D. declares that Plaintiffs are entitled to any and all NTI/GSA-related contract documents, and proceeds, checks and other payments due any of the Plaintiffs thereon, that are being retained or withheld by any of the Defendants;

E. pursuant to Fed. R. Civ. P. 57, orders a speedy hearing of this action and advances it on the Court's docket;

F. and for such other and further relief as the Court may deem appropriate.

## COUNT XIV - ACCOUNTING AND EQUITABLE LIEN/CONSTRUCTIVE TRUST

110. Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-109 of this Complaint.

111. As is claimed, shown, and demonstrated by the foregoing, it is necessary for this Honorable Court to order defendants to account for all receipts, expenditures, and distributions on their accounts, and to compel the production of all books, records or other information concerning monies, stocks, assets, properties, contract proceeds, and other remuneration to which the Plaintiffs are rightfully entitled.

112. As parties rightfully entitled to monies, stocks, assets, properties, contract proceeds, and other remuneration that has not been received by Plaintiffs, the reasonable

value of which has not been fully compensated by the Defendants but which has instead been diverted and converted by the Defendants as aforesaid, the Plaintiffs are entitled to an equitable lien or constructive trust on the assets of defendants in such amount[s] as may be due and rightfully belonging to the Plaintiffs.

WHEREFORE, Plaintiffs request that this Honorable Court enter a decree that:

A. orders the appointment of an independent accountant, to be paid for by the defendants, to provide an accounting for all proceeds, checks and other payments due and/or payable to any of the Plaintiffs, including accounting for any and all NTI/GSA-related payments and other proceeds, and production of any documentation related thereto, such as the NTI/GSA contract itself and payments made on account of such contract;

B. orders defendants to produce all books, records or other information concerning monies, stocks, assets, properties, contract proceeds, and other remuneration to which any or all of the Plaintiffs may be entitled;

C. order defendants to remit to the Plaintiffs all proceeds, checks and other payments due and/or payable to any of the Plaintiffs, including payments on account of the subject NTI/GSA contract;

D. creates an equitable lien and/or constructive trust upon the assets of Defendants, both severally and jointly, in favor of the Plaintiffs, for all monies, stocks, assets, properties, contract proceeds, and other remuneration to which any or all of the Plaintiffs are rightfully entitled and are due to the Plaintiffs;

E. and for such other and further relief as the Court may deem appropriate.

Dated: September, 2006                    HUGHES & BENTZEN, PLLC

By:    _____
       Philip J. McNutt
       D.C. Bar No. 491258
       1100 Connecticut Avenue, N.W.
       Suite 506
       Washington, DC  20036
       Tel: (202) 293-8975
       Attorneys for Plaintiffs


## LOCAL RULE 11.2 VERIFICATIONS

DISTRICT OF COLUMBIA              ):

    I, Derek McUmber, certify under penalty of perjury that I am a Plaintiff in this action and that the foregoing Complaint is true and correct.

    Executed on _____, 2006.

                         _____
                         Derek McUmber


DISTRICT OF COLUMBIA              ):

    I, Frederick S. Hill, Jr., certify under penalty of perjury that I am a Plaintiff in this action and that the foregoing Complaint is true and correct.

    Executed on _____, 2006.

                         _____
                         Frederick S. Hill, Jr.

-45-

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DATA MOUNTAIN SOLUTIONS, INC. )<br>1116 Smith Street )<br>Charleston, WV 25301 )<br> )<br>and )<br> )<br>DEREK McUMBER )<br>5809 Midhill Street )<br>Bethesda, MD 20817 )<br> )<br>and )<br> )<br>FREDERICK S. HILL, JR. )<br>1486 Grandview Court )<br>Arnold, MD 21012 )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br> )<br>GREGG GIORDANO )<br>2403 Dakota Lakes Drive )<br>Herndon, VA 20105 )<br> )<br>and )<br> )<br>ANTHONY WATSON )<br>303-F Holden Green )<br>Cambridge, MS 02138 )<br> )<br>and )<br> )<br>JOHN W. THOMAS )<br>1660 L Street, N.W. )<br>Suite 506 )<br>Washington, DC 20036 )<br> )<br>Defendants. )<br>_____ ) | Civil Action No. _____ |

### COMPLAINT
### (Shareholders' Derivative Action & Related Claims)

Plaintiffs, Data Mountain Solutions, Inc., Derek McUmber, and Frederick S. Hill, Jr.,

by their attorneys, Hughes & Bentzen, PLLC, pursuant to, *inter alia*, Fed. R. Civ. P. 3, 8, 9,

and 23.1, for their Complaint against Defendants, state as follows:

## Jurisdiction and Venue

1. Jurisdiction of this Court is based on 28 U.S.C. §1332(a), in that this civil action is between citizens of different States, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Subject matter jurisdiction of this Court is also based on 28 U.S.C. §1331, in that causes of this civil action arise under laws of the United States.

2. Venue in this judicial district is based on 28 U.S.C. §1391, in that a substantial part of the events and omissions giving rise to the claims hereof occurred in, and property the subject hereof is situated in, the District of Columbia. Defendants are subject to personal jurisdiction in the District of Columbia under, *inter alia*, D.C. Code Ann. §13-422 and §13-423.

## Parties

3. Plaintiff, Data Mountain Solutions, Inc. ("DMS"), is a West Virginia corporation, with its principal offices situate in West Virginia; DMS is also duly authorized to transact business in the District of Columbia. A copy of the By-Laws of DMS (the "By-Laws") is attached hereto as Exhibit 1, and is incorporated herein by this reference.[1] DMS is engaged in the business of electronic data management services for its clients, including providing such services to state and federal governments under contracts or subcontracts according multi-million dollar payments to DMS for said services.

4. Plaintiff, Derek McUmber (" McUmber"), is a citizen of the State of Maryland, and the holder of approximately 22.5% of the shares of stock in DMS. McUmber is a Director and the Chief Executive Officer ("CEO") of DMS.

---

[1]All referenced Exhibits are attached to and are incorporated into this Complaint by the references herein.

-2-

5. Plaintiff, Frederick S. Hill, Jr. (" Hill"), is a citizen of the State of Maryland. He is also a shareholder of the issued and outstanding shares of stock of DMS. Hill is a Director and is the President of DMS.

6. Defendant, Gregg Giordano (" Giordano"), is a citizen of the Commonwealth of Virginia. Giordano is a shareholder and a Director of DMS. Giordano is also the corporate Secretary of DMS.

7. Defendant, Anthony Watson (" Watson"), is a citizen of the Commonwealth of Virginia or the State of Massachusetts. Watson was formerly, and may claim still to be, a shareholder, director and officer of DMS.

8. Defendant, John W. Thomas (" Thomas"), is a citizen of the Commonwealth of Virginia; Thomas is an attorney who practices law in, and transacts business from, offices situate in the District of Columbia. Thomas has alleged, at various times, that he was/is counsel for DMS, and that he has not done legal work for DMS since 2003. DMS stock has been issued to his firm, purportedly as payments for Thomas' claimed legal services as counsel for DMS.

## Facts Relevant to All Counts

9. DMS is a close corporation by virtue of, *inter alia*, a Shareholders Agreement dated June 2, 2003 by and among McUmber, Watson, Hill and Giordano (the "Shareholders Agreement"). A copy of the Shareholders Agreement is attached hereto as Exhibit 2.

10. Under the Shareholders Agreement the parties agreed that the equitable allocation of ownership between them is "one-fourth owned by each." They further agreed that "it is essential to maintain such ownership proportions" among those four shareholders. *See* Shareholders Agreement, Exhibit 2 hereto, at para. 12. Accordingly, the parties agreed that no Shareholder, "without the prior written consent of **all** the Shareholders" may directly or

-3-

indirectly sell, assign, mortgage, hypothecate, transfer or otherwise voluntarily or involuntarily dispose of **any** shares of DMS stock owned by him. *See id.*, at para. 3(a)(emphasis added). The Shareholders' Agreement further provides that any unauthorized disposition of shares "shall be null, void and without effect" as against the Corporation and the other Shareholders. *See id.*, at para. 4(e) (emphasis added), and para. 3(a), respectively.

11.    Since June, 2004, DMS and its officers have been receiving substantial remuneration on account of a multi-million dollar federal government contract awarded to a DMS client, NativeTechnologies, Inc. ("NTI") by the General Services Administration ("GSA"). DMS designed and developed the software and operates and maintains the system on which the NTI contract is based. The software source code constitutes a proprietary asset and trade secret of DMS and is its most valuable asset.

12.    Thereafter,  Giordano schemed, conspired,  and overtly acted to acquire a majority of the outstanding shares of DMS' stock, so that he could then pick his own Directors of DMS, who in turn could then appoint DMS officers picked by him, such that he could elevate his position to "control" the substantial remuneration now being received by DMS and take other actions to the detriment of the other shareholders. By such wrongful scheme, Giordano would greatly increase the monies and other benefits paid and inured to him on account of his relations with DMS, all for his own personal and selfish benefit and to the detriment of the other officers, directors, and shareholders of DMS.

13. Specifically, without any authority or approval from the Corporation, Giordano issued and negotiated a check payable to "Cash", in the amount of $40,000, and issued another check in the amount of $20,000 (for purchase of a cashier's check in like-amount), **both out of DMS' bank account "starter-kit".** Copies of the DMS bank account "starter-

-4-

kit" checks, in the amounts of $40,000 and $20,000, respectively, are attached hereto collectively as Exhibit 3.

14. The aforesaid $60,000 taken from DMS' bank account by defendant Giordano was done with the collusion, consent and participation of defendant Watson, who has alleged that he sold all but one (1) of his shares of DMS stock to Giordano, and otherwise relinquished most of his rights, duties and entitlements to and with DMS, in exchange for some of the $60,000 taken from DMS' bank account and a $10,000 annual compensation as a continuing employee or consultant to DMS. Watson has also alleged that he obtained valuable property and assets of DMS, known as "SecuriCabinet", as purported additional consideration for his relinquishment of his roles and entitlements as a shareholder, director, and officer of DMS. The foregoing allegations are largely false and, except as noted immediately below, were never approved by the Corporation or the other three shareholders to the Shareholders' Agreement.

In fact, the Corporation did approve a transaction with Watson whereby Watson agreed to convey 100% (22,500 shares) of his stock in DMS to the treasury of DMS in exchange for cash of $28,406, plus the source code, logo and other rights to the website platform and related assets known as "SecuriCabinet," along with other consideration. This transaction was approved by all parties to the Shareholders' Agreement.

15. Defendant, Giordano, now contends that certain monies paid by DMS to Hill constituted payment for nearly all of the DMS shares of stock issued to Hill[2], but that the

---

[2] Hill once offered to relinquish approximately 2/3rds of his stock to the corporation in exchange for $32,000, the book value of his stock if returned to the treasury of the company at the time. However, the transaction was never approved by the corporation and, according to Thomas, the corporation's counsel at the time of the transaction with Hill, no minutes exist approving the transaction. As a result of this confusion and the fact that Hill has an outstanding loan to DMS, the Plaintiffs are unaware of Hill's actual stock position in the company.

$40,000 of DMS' monies that Giordano gained by the starter-check payable to "Cash" as aforesaid constituted an unspecified and unauthorized "bonus" to him and was not in payment for any of his shares of DMS stock. Based on his alleged acquisition of Watson's shares of DMS stock, and his position that DMS purchased most of Hill's shares of DMS stock, defendant Giordano currently contends that he owns 60% of the outstanding shares of DMS, and that plaintiff McUmber only owns 30% of the outstanding shares[s] of DMS. *See* Letter from defendant Giordano to defendant/attorney Thomas, of July, 2006, attached hereto as Exhibit 4. As a result of these contentions, Giordano has set up a scenario under which he can control the Corporation's business, prospective business, and assets, including the invaluable source code, without interference from the other Shareholders, in violation of the letter and the spirit of the Shareholders' Agreement and to the detriment of the other shareholders for his own self-interest.

16. However, on or about August 22, 2006, the plaintiffs herein, Hill and McUmber, the President and CEO of DMS, respectively, were finally able to obtain what Thomas alleges are "copies" of the stock registry and transfer books, minutes of meetings of and resolutions of the directors and shareholders of DMS, and a few other DMS corporate documents. These documents were picked-up by a group of messengers sent by the Plaintiffs to Thomas' law offices after nearly a **month** of attempts to obtain all of the corporate records held by Thomas.[3] The documents supplied by Thomas show and reveal that **none** of the alleged sales or transfers of DMS stock were authorized or approved in writing by either the shareholders or directors of DMS. Moreover, it is clear from Thomas' response to the

---

[3]Thomas' production was woefully incomplete. Several known documents were not produced including communications by and among shareholders concerning which Thomas received copies, and records of corporate meetings that took place during the period that Thomas and his firm represented DMS.

Plaintiffs' requests that the subject sales and/or transfers were **not** authorized as required by the Shareholders' Agreement, that is by "the prior written consent of all the Shareholders." Nor were they conducted or performed as specifically required by paras. 3(a) and 4(e) of the Shareholders Agreement cited *id.*

17. Rather, the copies of DMS's corporate documents, as received from Thomas, document and evince that each of the shareholders, the plaintiffs Hill, and McUmber, and the defendants Watson, and Giordano, each own **equal** shares of DMS stock – 22,500 shares – and that **no** sale, transfer or other disposition of those shares has been properly authorized, approved or otherwise documented. *See* Letter from defendant Thomas dated August 22, 2006, and stock registry and transfer records therewith, attached hereto, collectively, as Exhibit 5.

18. Apparently recognizing that the Shareholders Agreement nullifies and voids any sale, transfer, or other disposition of DMS stock other than as expressly permitted by the Shareholders Agreement, the defendants have engaged in a pattern of concealment and misrepresentation over the corporate affairs and stock registry, transfer, and related corporate books and records of DMS. The obvious purpose of the defendants' actions has been to conceal and obfuscate the number of DMS shares formally held by defendants and the other shareholders.

19. By his unlawful and illegal maneuvering, defendant Giordano, whose status in the Corporation is only that of a minority shareholder and Corporate Secretary, now contends that he "controls" DMS. Using that claimed (but unsupported and erroneous) control of DMS, Giordano has been dictating the terms and conditions of the work being performed upon, and all communications related to, DMS' multi-million dollar NTI contract. For example, Giordano has repeatedly ordered the individual plaintiffs, his superior corporate

-7-

officers, to refrain from and cease any contacts or talks with the other principals to the NTI contract, on the alleged grounds that he "controls" said contract and that any such communications are supposedly prohibited by that contract. Worse, when asked to actually produce such contract, Giordano now alleges that he alone controls the NTI contract, and that he is the only person who can, and does, dictate performance of the terms of that contract.

20. On information and belief, however, there is **no** written NTI contract containing the contract terms and conditions dictated by Giordano. He is simply fabricating those terms and conditions as part of his attempts to control DMS and manipulate not only the compensation due DMS and its other officers, but also the value of DMS's stock, all for his own personal benefit and self-aggrandizement. And, even if there were such terms as Giordano alleges, it constitutes just another example of Giordano's improper attempts to control and ultimately convert valuable assets of the Corporation to the detriment of the other shareholders.

21. Perhaps worst of all, using his wrongful reasoning that he is now majority owner of NTI and allegedly now controls the NTI contract, Giordano has intercepted, and now holds, substantial payments from DMS's client, NTI, that are intended for, and payable to, plaintiffs DMS and McUmber. Despite demand for these payments Giordano has retained these payments from NTI as ransom, bait, or other improper leverage against the plaintiffs. In the meantime, DMS's bank account is dangerously close to a $0.00 balance and the Corporation's ability to pay its ordinary business expenses is in immediate jeopardy. If the Corporation cannot pay its obligations on a current basis it loses the ability to protect its property and assets. That could lead to endangering the entire .gov email and web routing

system which DMS supports under the NTI contract. Giordano is willing to use the potential disastrous effect on the .gov email and web routing system as a pawn in his fight to wrest control of the Corporation from its rightful owners, the current shareholders, of which Giordano is merely a minority member.

22. Specifically, by Letter dated July 28, 2006, McUmber (by counsel) requested that Giordano and Thomas produce the corporate records required to be kept under DMS' By-Laws, including the stock transfer and related books of DMS, and the minutes of shareholder and directors' meetings, notices of such meeting, and any consents, resolutions, or other writings related to the stock ownership now claimed by Giordano. The Letter also demanded that Giordano and Thomas cease and desist from taking any monies, stock, or other property or remuneration from DMS until resolution, adjudication, or other disposition of the parties' differences. A copy of the July 28, 2006 Letter is attached hereto as Exhibit 6.

23. By reply Letter dated August 3, 2006, Thomas denied having any of the requested documents or having any contacts with DMS, but he nonetheless revealed that his law firm has 192 shares of DMS stock. A copy of Thomas's August 3, 2006 Letter is attached hereto as Exhibit 7. In that Letter, Thomas also stated that after August, 2003, Thomas's firm, Luman, Lange, Thomas & McMullen ("LLTM"), had no significant contacts with DMS, and that legal work for DMS was being handled by another firm, alleged to be the new firm of Christopher Wheeler, a former partner at Luman, Lange & Wheeler[4]. *See* Exhibit 7 hereto, at 2.

---

[4]Mr. Wheeler was a member of Luman, Lange and Wheeler until August, 2003 when he joined Hughes & Bentzen, PLLC. However, all of the work and files of DMS were at the Luman, Lange firm, as it was constituted after Mr. Wheeler left. The firm is now known as Luman, Lange, Thomas & McMullen.

24. Upon being informed of Thomas's claim (*see* Exhibit 7) that his law firm had not handled any legal work for DMS and had no significant contacts with DMS for the period from September, 2003 until the spring of 2006, DMS' President, Hill, reviewed numerous billing statements to DMS from Thomas and his law firm for that period. Copies of the LLTM billing Statements to DMS are attached hereto as Exhibit 8.

25. The LLTM Statements show that substantial legal work, including significant legal contacts with representatives of DMS, was performed by Thomas and LLTM for the **same** September, 2003 through spring of 2006 period concerning which Thomas now alleges that another firm was "handling any legal work for DMS". *Compare* Exhibit 7 hereto, at 2, *with* Exhibit 8 hereto, at *passim*. Perhaps worse, the services represented by those same billing statements for legal work allegedly performed by Thomas and his current law firm, during the same time-period wherein he now alleges his firm did no work for DMS, were fully paid by DMS through payments **and** the issuance of stock to LLTM.

26. By Letter to Thomas dated August 18, 2006, DMS, by its President, Hill, served formal notice of the termination of Thomas and LLTM as counsel for DMS. A copy of the Letter of August 18, 2006 is attached hereto as Exhibit 9. In that letter, DMS once again demanded return to it of all corporate documents, both originals and copies, and including all stock registry and stock transfer records. *See* Exhibit 9 hereto, at 1-2.

27. On August 16, 2006, McUmber, through his counsel, reiterated his demand for any documents or information regarding the subject DMS stock issuances. A copy of the August 16, 2006 Letter is attached hereto as Exhibit 10. That Letter referenced court intervention to remedy the plaintiffs' inability to obtain corporate records and the continuing failure of Thomas to provide information or documents concerning the extent of, amounts,

and alleged reasons for, the DMS stock transfers and payments to LLTM and others. *See* Exhibit 10 hereto, at 2.

28. In response to the August 16, 2006 Letter, Thomas sent an e-mail addressed to "Data Mountain Solutions, Inc., Shareholders". A copy of said e-mail is attached hereto as Exhibit 11. In that e-mail, Thomas finally admitted that he had possession of at least some of the corporate records of the Corporation and stated to the shareholders of DMS that he had "accumulated" documents. These were the same documents, in part, which Thomas earlier denied having in his possession. Curiously, without consultation with, or any apparent authorization, approval, or consent of, DMS, Thomas' e-mail sets forth various explanations, exculpations, and defenses as to his firm's involvement with, and liability for what the corporate documents might demonstrate (or fail to demonstrate). *See* Exhibit 11 hereto, *passim*.

29. Moreover, Thomas's August 17th e-mail gives the defendants an additional opportunity to conceal, alter, amend or otherwise change the **original** corporate records of DMS to their advantage by preserving whatever originals exist outside of the control or review of the plaintiffs or other parties for an additional five days (until copies were eventually produced). The only other plausible explanation for additional delay is that the defendants desired to cover up the fact that corporate documents that should have existed, did not, in fact, exist, through the fault of one or more of the defendants.

30. Predictably, Giordano, through his counsel's Letter to Thomas dated August 22, 2006, then appears to have authorized the dissemination to Hill and McUmber of copies of some corporate documents ("whatever documents you deem fit in your professional judgment"). However, in the same letter, Giordano demands that Thomas "retain all original documents, including the stock book, minute book, etc. until all outstanding matters are

-11-

resolved." A copy of the Letter from Giordano's attorney to Thomas, dated August 22, 2006, is attached hereto as Exhibit 12.

31. The defendants are acting in collusion to conceal their continuing manipulation of the corporate records, including specifically the stock transfer records, of DMS. As just one example, both letters refusing and objecting to McUmber's and Hill's requests for the **originals** of the corporate documents, letters sent by Thomas and counsel for Giordano, respectively, repeat the same irrelevant and bizarre argument that under "applicable law, a shareholder does not appear to be given the right to demand corporate documents from the corporation's counsel." *Compare* Exhibit 11 hereto (e-mail from Thomas) *with* Exhibit 12 hereto (Letter from counsel for Giordano). However, the request for the corporate documents has been made by the President of DMS, Hill. The President of a corporation does not lose his right to demand corporate documentation from the corporation's counsel simply because he is also a shareholder, as the defendants seem to assert in their responses to the plaintiff's legitimate requests.

32. Likewise, all defendants are now maintaining that Thomas and LLTM cannot be terminated by act of DMS' President. After the August 18, 2006 Letter from Hill terminating Thomas and LLTM, Thomas sent an e-mail to Hill, on August 21, 2006 acknowledging the termination, stating that "we...will do nothing more by or on behalf of the corporation unless requested to do so by all four DMS principals" and " . . . Pursuant to your direction today, we are no longer counsel for DMS ." A copy of such August 21, 2006 e-mail from Thomas is attached hereto as Exhibit 13.

33. Immediately thereafter, by faxed Letter to Thomas on August 22, 2006, counsel for Giordano, corporate Secretary of DMS and minority shareholder, demanded that

-12-

Thomas "remain as corporate counsel" and that he "retain all originals [of DMS'] stock book, minute book, etc." *See* Exhibit 12 hereto. Obviously, preservation of LLTM as counsel to DMS is vital to the defendants' attempt to conceal their continuing manipulation of the corporate records of DMS. On that same day, August 22, 2006, Thomas failed and refused to provide to the plaintiffs the original DMS documents held by Thomas and LLTM. *See* Letter from defendant Thomas dated August 22, 2006, attached hereto as Exhibit 14; *compare with* Exhibits 12 & 13 hereto.

34. By his Letter of August 22, 2006, defendant Thomas provided to undersigned counsel only "copies" of certain documents that Thomas believed were "requested", and he still "kept in the custody of [his] firm the original stock book and minute book" of DMS – the same crucial corporate documents that Thomas had earlier denied were in his possession, custody or control. *Compare* Exhibit 14 hereto, *with* Exhibit 7 hereto. As suspected by the plaintiffs all along, even the copies of DMS stock book and minute book show that there is absolutely no basis for Giordano's claims and misrepresentations that he owns "60% of the outstanding shares of DMS". *See* Exhibit 5 hereto. The corporate records also show that there have been recent issues of DMS stock to LLTM, without **any** consent, authorization, resolution, or other requisite corporate approval or ratification thereof. *See id.*, at *passim*.

35. Then, on August 29, 2006, Thomas sent an e-mail Letter to some of the parties, by which he threatened to record reductions of the record shares of DMS stock issued to Hill because of an "understanding that [such] transactions were unanimously approved by the four principal shareholders". Yet, no such approvals were included in the corporate documents Thomas delivered to plaintiffs' counsel. A copy of such August 29, 2006 e-mail Letter is attached hereto as Exhibit 15.

36. Thomas' e-mail of August 29th and other recent correspondence assert that

defendant Watson is a shareholder and director of DMS, despite the fact that he earlier relinquished his roles and entitlements as a shareholder, director, and officer of DMS in exchange for some of the aforesaid $60,000 taken from DMS' bank account and the transfer to him of the SecuriCabinet property and assets. Thomas' latest writings, threatening to reduce the number of shares held by Hill while effectively ratifying (through inaction) the retention by Watson of his shares demonstrates another example of the continuing pattern of concealment, misrepresentation, conversion and fraud by the defendants to allow them to unlawfully control the majority of the issued stock shares of DMS and, thus, the business, business opportunities and assets of DMS to the detriment of the other shareholders, including the plaintiffs.

37. McUmber and Hill did formally object to the "actions" threatened by Thomas in his e-mail of August 29th in an attempt to preserve the status quo pending some independent review of the corporate books, records and agreements to determine the actual stock ownership in DMS. *See* August 31, 2006' Letter from Plaintiff's counsel, attached hereto as Exhibit 16.

38. Immediately thereafter, Giordano demanded that DMS' operative corporate documents, including specifically DMS' stock registry and transfer books, and its records of the minutes of DMS shareholder and directors' meetings, be hand-delivered to Giordano as corporate secretary of DMS. *See* Exhibit 17, attached hereto. Such transfer would enable the defendants to continue their manipulation of the corporate books and records of DMS to the detriment of the other shareholders, including the plaintiffs.

39. By Letter of September 5, 2006 (attached as Exhibit 18 hereto), defendant Giordano threatened to take immediate "possession of the original minutes and stock book"

-14-

and to "correct the stock book" for the purpose of perpetuating the defendants' efforts to control the business and assets of the corporation to the detriment of the other shareholders, including the plaintiffs.    In this manner,    Giordano intends to assert ownership of approximately **two-thirds** of DMS's stock without having to spend **any** of his own personal finances. These maneuvers and attempted maneuvers by the defendants clearly violate the letter, intent, and spirit of the Shareholder's Agreement wherein the parties agreed, *inter alia* "that the equitable allocation of ownership between them is **one-fourth** owned by each" and that "it is essential" to maintain the ownership proportion among the subject Shareholders.

40.    As is clear from the foregoing, plaintiffs DMS, its shareholders, Hill and McUmber, and the public at large, are all currently being mislead and manipulated by the defendants as to the amount and identity of the currently issued and outstanding shares of stock issued of the Corporation, the amount of stock in the Corporation's treasury, the management structure and hierarchy of the Corporation and Corporate control over the business and assets of the Corporation.

41.    At this juncture, Thomas and LLTM are still in possession of DMS' stock registry and transfer records.    In furtherance of his scheme to control the Corporation and to manipulate the Corporation's books and records to reflect his claimed majority ownership of the Corporation to the detriment of the other shareholders, Giordano has issued orders to Thomas to "correct", change, modify, or otherwise alter the corporate books so that Giordano emerges as the majority shareholder of DMS, to the detriment of all other DMS shareholders.    Given the apparent collusion of the parties and the clear intent of the defendants as set forth in the email and correspondence referenced hereinabove, Thomas is likely to modify the corporate records as requested by Giordano and Watson, to the detriment of the other shareholders, including the plaintiffs.

-15-

42. Through the defendants' scheme, Giordano will be able to use the corporate assets as his own, to manipulate corporate business opportunities for Giordano, personally, and to condone and dictate payments to himself out of the remuneration being received on account of DMS' contracts with its clients, including the substantial sums being paid under the subject DMS contract with NTI, all without having to spend **a dime** of his own money, through the direct, but unauthorized and improper, use of corporate funds of DMS, all to the direct and immediate detriment of the other shareholders, including the plaintiffs. By asserting that he is the majority shareholder, officer in charge and controlling director of the Corporation, all without any approval or authority, Giordano has caused the Corporation to fail to enforce rights which otherwise may properly be asserted by the Corporation against the defendants, Giordano, Watson and Thomas, including, without limitation, the right to corporate funds, receipts and contracts, the pursuit of corporate business opportunities, rights to the review and possession of the corporate books and records, and the right to void, rescind, or otherwise modify, terminate or cancel improper, unauthorized or illegal actions by the defendants purportedly on behalf of the Corporation.

43. It is therefore necessary for this Honorable Court to preserve the status quo in existence before the stock manipulation and asset conversion of defendants: namely, to temporarily, preliminarily, and permanently enjoin any actions of the defendants as stockholders or directors of DMS until an accurate accounting of the financial obligations of the parties to each other and a court determination of the amount and percentage of stock ownership in DMS by each of its shareholders; to temporarily, preliminarily, and permanently enjoin any sales, transfers, or assignments to Giordano of any shares of DMS' stock; and to temporarily, preliminarily, and permanently enjoin any actions or attempts by any of the Defendants to purportedly update, correct, change, modify, or otherwise alter the

-16-

corporate books of DMS to cancel or reduce the shares of DMS stock recorded as issued and outstanding to Hill or McUmber. Such appropriate equitable relief should also include a mandatory injunction ordering the defendants, individually and collectively, to relinquish, release and transfer to the plaintiffs, as their interests may properly appear, any and all contract proceeds, checks and other payments due the plaintiffs but wrongfully retained or withheld by the defendants, and an appropriate order to temporarily, preliminarily, and permanently enjoin any wasting, misappropriation and/or the selling, liquidation or disposing of any of the Companies' assets by any of the defendants, pending final disposition of this case. Appropriate relief should also be granted to assure that the plaintiffs can properly and effectively pursue, evaluate, prosecute and close on any corporate business opportunities for the benefit of the Corporation and its shareholders prior to a final judgment herein.

44. As a result of the actions, errors and omissions aforesaid of the Defendants, the Plaintiffs have suffered and will continue to suffer damages, including damages caused by Defendant Giordano's wrongful taking, misappropriation, detinue and conversion of shares of DMS stock above the equal "ownership proportion" thereof that he contracted, promised, covenanted, and agreed by the Shareholders' Agreement as aforesaid, the actual value of which additional shares totals at least $56,595; damages of approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract but which payments were wrongfully intercepted and are being detained and otherwise converted by the Defendants as aforesaid; damages of $410,000 in further contract proceeds due and payable to the Plaintiffs under the NTI contract but that are instead being wrongly claimed, diverted, and converted by the Defendants for their own selfish benefit; damages of at least $119,012.36, being the value of DMS' property and assets misappropriated and wasted by the Defendants (including the DMS property known as "SecuriCabinet", and the aforesaid

$60,000 taken from DMS' bank account by Giordano for his alleged purchase of additional shares of DMS stock); and damages of at least $6,109.15, being payment by DMS to Thomas for legal services allegedly rendered during the past three year period in which Thomas and his law firm now claim that another attorney was handling all legal work for DMS.    The damages caused Plaintiffs    by the Defendants thus totals the sum of approximately $686,716.51 for which the Plaintiffs seek judgment *infra*.

45.  Pursuant to, *inter alia*, Fed. R. Civ. P. 23.1, plaintiffs Derek McUmber and Frederick S. Hill, Jr. allege and verify that: 1) each such plaintiff was a shareholder of DMS at the time of the transactions of which the plaintiffs complain, and 2) that this action is not a collusive one to confer jurisdiction on a Court of the United States which it would not otherwise have.

## COUNT I - INJUNCTIVE RELIEF

46.    Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-45 of this Complaint.

47.  The Defendant, Giordano, claims that he is the majority shareholder and thereby in "control" of DMS, all in violation of the terms and conditions under the Shareholders' Agreement and the by-laws of DMS.

48.  By virtue of his claimed ownership of a majority of the stock of DMS, Giordano has converted to his own use, and continues to convert and manipulate the business, property and assets of DMS for his own use and to the detriment of the other shareholders of DMS, including the plaintiffs, McUmber and Hill, and will continue to dictate the terms and conditions of, the work being performed upon, and all communications related to, DMS' subject multi-million dollar NTI contract. Moreover, Giordano has intercepted and continues to hold substantial payments from DMS' client NTI that are intended for and payable to

-18-

plaintiffs DMS and Mr. McUmber. The payments due DMS are essential to the immediate and continued operation of the Corporation.

49. The Defendants assert that Watson swapped shares of his stock for the DMS' asset "SecuriCabinet", and that DMS purchased Mr. Hill's shares of its stock, such that Mr. Giordano now claims he owns "60% of the outstanding share[s] of DMS". These assertions are contrary to the corporate books and records, copies of which have been turned over by the defendant, Thomas.

50. Defendants Watson and Giordano, as well as plaintiff, Hill, have each received valuable consideration from DMS for its purchase of portions of their respective shares of its outstanding stock, including the receipt by Mr. Watson of the valuable DMS' asset "SecuriCabinet" for purchase of his shares of DMS' stock. However, DMS' stock registry and stock transfer books still show that each individual party to this action owns 22,500 shares of DMS, or 90% of the issued shares of the Corporation. Defendants Giordano and Thomas have threatened to use, and are in sole possession poised to use, DMS' stock registry and stock transfer books against the plaintiffs by eliminating most of Mr. Hill's shares as having been purchased by DMS, while leaving untouched the shares of the Defendant, Watson that were allegedly purchased by DMS through transfers of valuable consideration -- including cash and other corporate assets such as "SecuriCabinet" -- to the Defendants.

51. DMS' stock registry, stock transfer books, and like-corporate records, are in the possession of, and in the alleged custody and control of, defendant Thomas and LLTM, who have already taken shares of DMS stock as alleged payments for legal services rendered during time-periods where they now deny providing **any** such services. The issuance of shares of stock to Thomas is not authorized by any minutes, agreements or other corporate formalities. Furthermore, Thomas and LLTM are still in possession of DMS' stock registry

and transfer records.  Moreover, with the consent and support of defendant, Watson, Giordano has issued orders to Thomas to "correct", change, modify, or otherwise wrongly alter the corporate books so that Mr. Giordano emerges as the majority shareholder of DMS, to the detriment of all other DMS shareholders.

52.  By the scheme set forth above, absent injunctive relief, Giordano can continue to condone and dictate payments to the defendants out of the remuneration being received on account of DMS' contracts with it clients -- including the substantial sums being paid under the DMS contract with NTI – all without having to spend **any** of his personal finances for the DMS stock, contract, and management control Mr. Giordano now asserts for himself.    Furthermore, the defendants can continue to manipulate the stock of the Corporation in violation of its by-laws and the Shareholders' Agreement among the parties.

53.  Plaintiffs therefore request that this Honorable Court  preserve the status quo in existence before the alleged manipulation, misrepresentations and conversion by the defendants, as follows:  (1) to temporarily, preliminarily, and permanently enjoin any actions of the Defendants as stockholders or directors of DMS until it is revealed and/or determined who has, or should have, proper shares of stock in that corporation, including temporarily, preliminarily, and permanently enjoining any sales, transfers, or assignments of any shares of DMS' stock, and any actions or attempts by any of the Defendants to purportedly update, correct, change, modify, or otherwise alter the corporate books of DMS to cancel, reduce, or increase the shares of DMS stock  recorded as issued and outstanding to any shareholder, previous shareholder or prospective shareholder; and (2)  to temporarily, preliminarily and permanently enjoin any sale, transfer, distribution, or disposition of the property or assets of the Corporation; and (3) to order the defendants to disgorge and transfer to the plaintiffs, as their interests may appear, any and all contract proceeds, checks and other payments due the

-20-

plaintiffs whether now retained or withheld by the defendants, or received by them in the future; and (4) to temporarily, preliminarily, and permanently enjoin any wasting, misappropriation, liquidation, or disposition of any of the Corporation's business, business assets, or business opportunities by any of the defendants, pending further order of this court of final disposition of this case.

54. By the Shareholders' Agreement, all of the parties hereto expressly agreed by written contract that Court-Ordered injunctive relief is an appropriate remedy for resolving disputes with DMS' shareholders, which disputes and contractually-agreed injunctive remedy are respectively recited above and requested below. *See* Shareholders' Agreement (Exhibit 2), at 10, para. 10(b).

WHEREFORE, Plaintiffs, Data Mountain Solutions, Inc., Derek McUmber, and Frederick S. Hill, Jr., request that this Honorable Court pursuant to, *inter alia*, Fed. R. Civ. P. 65, enter an Order that:

A. temporarily, preliminarily, and permanently enjoins any actions of defendants Giordano, Watson, and Thomas in any matters or manners concerning the corporate and business affairs of plaintiff DMS, and/or concerning plaintiffs McUmber or Hill *viz* DMS, until a determination of the proper shareholders of DMS;

B. temporarily, preliminarily, and permanently enjoins any actions or attempts by any of the Defendants to update, correct, change, modify, or otherwise alter the corporate books of DMS to cancel, reduce or increase the shares of DMS stock recorded as issued and outstanding to any shareholder;

C temporarily, preliminarily, and permanently mandates the disgorgement from defendants Thomas, Giordano, and/or Watson, and transfer to plaintiff DMS, through its President, Hill, all stock registry, stock certificate, and stock transfer books, and all other

-21-

corporate and business records of DMS, that are found, revealed, or asserted as in the possession, custody, or control of the defendants;

D. temporarily and preliminarily enjoins any actions or attempts by any of the defendants to remove McUmber or Hill from their current corporate officer positions at, and/or as Directors of DMS, pending final disposition of this case;

E. preliminarily, and permanently mandates and directs the cancellation on the stock registry, stock transfer, and other appropriate corporate books of DMS, the shares of DMS stock purportedly used by Mr. Watson to allegedly purchase DMS' assets (such as SecuriCabinet), and enjoins any sales, transfers, or assignments to Giordano of any shares of DMS' stock except as specifically allowed by the by-laws of the Corporation and the parties' Shareholders Agreement;

F. temporarily, preliminarily, and permanently enjoins any actions or attempts by any of the Defendants to dictate, supervise or control the terms, conditions, and/or payments under, and/or the plaintiffs' communications related to, DMS' subject multi-million dollar NTI contract, and mandates the disgorgement from, and transfer to, the plaintiffs of any and all contract proceeds, checks and other payments due any of the Plaintiffs that are being retained or withheld by any of the Defendants;

G. temporarily and preliminarily enjoins any or all of the Defendants from selling, transferring, assigning, secreting, and/or otherwise disposing of any of DMS' stock and/or assets pending final disposition of this case;

H. temporarily, preliminarily, and permanently enjoins Giordano and Watson from wasting and/or misappropriating the assets of DMS, or in any manner modifying the existent purchase terms, conditions, and price for shares of DMS' stock;

I. and for such other and further relief as the Court may deem appropriate.

-22-

## COUNT II - SPECIFIC PERFORMANCE

55.    Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-54 of this Complaint.

56. By the Shareholders' Agreement, all of the parties hereto expressly agreed "that their respective rights and obligations shall be enforceable in a court of equity by a decree of specific performance and that . . . irreparable damage would result if this Agreement is not specifically enforced." *See* Shareholders' Agreement, Exhibit 2 hereto, at para. 10(b).

57. By the Shareholders Agreement, the parties agreed "that the equitable allocation of ownership between them is one-fourth owned by each, and they agree that it is essential to maintain such ownership proportions between themselves." *See* Shareholders Agreement, Exhibit 2 hereto, at para. 12. Therefore, under the Shareholders Agreement, the parties agreed that "no Shareholder, without the prior written consent of **all** the Shareholders, shall directly or indirectly sell, assign, mortgage, hypothecate, transfer . . . or otherwise voluntarily or involuntarily dispose of **any** shares" of DMS stock owned by him, "except as specifically provided" by certain provisions of the Shareholders Agreement. *See id.*, at para. 3(a)(emphasis added)

58. Except as specifically provided under the Shareholders Agreement, any other disposition of DMS stock shares "shall be null, void and without effect as against the Corporation and the other Shareholders." *See id.*, at para. 4(e) (emphasis added), and para. 3(a), respectively.

59. The shares of stock in DMS and the percentage ownership of the issued shares of DMS stock are special and unique, and irreparable damages will result to the plaintiffs if the Shareholders Agreement is not specifically enforced by this Honorable Court. Likewise,

-23-

the current administration of DMS work upon, and proceeds due the plaintiffs from, the subject NTI/GSA contract are now being controlled and retained by Giordano, in violation of his own contractual duties and obligations to the plaintiffs and his fiduciary duties as an officer and director of DMS, and irreparable damages will result to the plaintiffs if such duties and obligations are not specifically enforced by this Court.

60. Similarly, DMS' stock registry, stock transfer books, and like-corporate records are also special and unique, but such have been kept by defendant Thomas and LLTM. Irreparable damages will result to the plaintiffs if the subject termination of such attorneys (and their concurrent duties and obligations to return DMS' subject corporate records) are not specifically enforced, as the defendants are conspiring and acting to change, modify, "correct", or otherwise wrongly alter the corporate books so that defendant Giordano emerges as the majority shareholder of DMS, to the detriment of DMS and all other DMS shareholders.

61. Therefore, Plaintiffs request that this Honorable Court enter a decree of specific performance of the parties' Shareholders Agreement, which orders the transfer to plaintiff DMS, through its President (Mr. Hill) and CEO (Mr. McUmber), of all stock registry, stock certificate, and stock transfer books, and all other corporate and business records of DMS, that are found, revealed, or asserted as in the possession, custody, or control of any and/or all of the defendants. Such decree should also require specific performance of the covenants, terms, and provisions of the Shareholders Agreement wherein the parties hereto agreed "that the equitable allocation of ownership between them is one-fourth owned by each, and they agree that it is essential to maintain such ownership proportions between themselves", and thereby order the cancellation on DMS' stock registry, stock transfer, and other appropriate corporate books of DMS, of the shares of DMS stock purportedly used by Mr. Watson to

-24-

allegedly purchase DMS' assets (such as Secure-a-Cabinet), and the cancellation on such corporate records of any sales, transfers, or assignments to Mr. Giordano of any shares of DMS' stock claimed as once-owned by Mr. Watson.

WHEREFORE, Plaintiffs, DMS, McUmber, and Hill, request that this Honorable Court, pursuant to the Shareholder Agreement (Exhibit 2 hereto), at para. 10(b), and applicable law, enter a decree of specific performance that

A. specifically enforces the parties' Shareholders' Agreement, and the provisions thereof restricting the disposition of the parties' shares of DMS stock, so "that the equitable allocation of ownership between them is [equal shares] owned by each", and mandates the parties to "maintain such ownership proportions between themselves", all as originally contracted, covenanted, and promised by the parties' Shareholders' Agreement; and

B. orders the disgorgement from defendants Thomas, Giordano, and/or Watson, and transfer to plaintiff DMS, through its President, Hill, of all stock registry, stock certificate, and stock transfer books, and all other corporate and business records of DMS, that are found, revealed, or asserted as in the possession, custody, or control of any and/or all of the defendants; and

C. orders such other and further relief as the Court may deem appropriate.

## COUNT III - ESTOPPEL

62. Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-61 of this Complaint.

63. Defendants have promised plaintiffs on numerous occasions, and expressly agreed in writing by the Shareholders Agreement, that the allocation of DMS' issued voting stock

-25-

is in equal ownership proportions for McUmber, Hill, Watson, and Giordano, and defendants promised and agreed "that it is essential to maintain such ownership proportions". *See* Shareholders Agreement, Exhibit 2 hereto, at para. 12. Accordingly, by the Shareholders Agreement, the parties agreed that "no Shareholder, without the prior written consent of **all** the Shareholders, shall directly or indirectly sell, assign, mortgage, hypothecate, transfer . . . or otherwise voluntarily or involuntarily dispose of **any** shares" of DMS stock owned by him, "except as specifically provided" by certain provisions of the Shareholders Agreement. *See id.*, at para. 3(a)(emphasis added).

64. Plaintiffs relied to plaintiffs' detriment on the defendants' promises that the allocation of DMS' issued voting stock would be maintained in equal ownership proportions for the founding principals of DMS. Specifically, the Plaintiffs provided employment, remuneration, offices, and services to Defendants, all based on the Defendants' promises and agreements that the allocation of DMS's shares of voting stock would be maintained in equal ownership proportions between the founding principals of DMS. Plaintiffs further entrusted defendants with the Corporation's business and income, as well as the Corporation's valuable assets, including its source code for the NTI subcontract.

65. Plaintiffs' reliance on defendants' said promises was reasonable. Indeed, until defendants' recent schemes to seize control of DMS (and thereby its monies and assets), the defendants themselves had consistently recognized, affirmed, ratified and evinced the existence of the parties' subject Shareholders' Agreement and the equitable allocation of stock ownership required thereby.

WHEREFORE, Plaintiff, Data Mountain Solutions, Inc., requests that this Honorable Court enter an order and/or judgment against the Defendants, as follows:

A. that defendants be estopped from asserting, maintaining and/or claiming in any

manner of acts, words, or deeds, that plaintiffs and defendants do not have equal ownership proportions of the shares of stock of DMS;

B. that defendant Mr. Giordano be estopped specifically from asserting, maintaining and/or claiming in any manner of acts, words, or deeds, that he is the majority shareholder of DMS' stock, or otherwise controls the corporate or business affairs of DMS;

C. that defendant Mr. Giordano be estopped specifically from asserting, maintaining and/or claiming in any manner of acts, words, or deeds, that he acts by authority of the Corporation except as specifically directed by the President, CEO and/or Board of Directors as constituted and acting pursuant to the by-laws of the Corporation;

D. and for such other and further relief as the Court may deem appropriate.

## COUNT IV - RESCISSION

66.  Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-65 of this Complaint.

67. Under the Shareholders' Agreement, any disposition of DMS stock shares except as specifically provided therein "shall be null, void and without effect as against the Corporation and the other Shareholders, so "that the equitable allocation of ownership between them", agreed by them to be "essential", is maintained by the parties to the Shareholders' Agreement.

68. However, defendants now contend that Watson sold or transferred some of his shares of DMS stock to Giordano, and that DMS allegedly "purchased" some of Hill's shares of its stock, such that Giordano now claims he owns "60% of the outstanding share[s] of DMS". But as also stated aforesaid, these alleged sales, purchases, transfers, or

assignments of DMS stock occurred without proper notice to and consent of the plaintiffs to such stock transactions. The defendants further contend that Thomas or LLTM received stock from the Corporation in payment of legal services.

69. Without proper notice to and the consent of all the Shareholders' to defendants' subject disposition of their DMS stock, such stock disposition "shall be null, void and without effect as against the Corporation and the other Shareholders." Shareholders Agreement, Exhibit 2 hereto, at para. 3(a).

70. Accordingly, because of the uniqueness of DMS's stock, and the material misrepresentations and fraud of the defendants in their schemes to make Giordano the purported majority shareholder of DMS, and because of the failure of such alleged stock transfers to comply with the requirements of the Corporation, including the Shareholders Agreement, the plaintiffs demand  rescission of any DMS stock issuances or transfers to Giordano above the equal "ownership proportion" therefor  that he promised, represented, and agreed by the Shareholders' Agreement, and rescission of any DMS stock issuances or transfers to Thomas/LLTM   above any amounts agreed to, or otherwise authorized, in accordance with such Agreement and the by-laws of the Corporation

WHEREFORE, Plaintiff, Data Mountain Solutions, Inc., requests that this Honorable Court enter an order that:

A.. rescinds any issuances or transfers of DMS stock to Giordano above the equal "ownership proportion" for such stock that was promised, represented and agreed to by all the parties by their subject Shareholders' Agreement, and rescinds any issuances or transfers of DMS stock to Thomas/LLTM  beyond that authorized by such Agreement and the by-laws of the Corporation;

B. orders such other and further relief as the Court may deem appropriate.

-28-

## COUNT V - BREACH OF FIDUCIARY DUTIES

71. Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-70 of this Complaint.

72. Defendants Giordano and Watson, as directors, shareholders and officers of DMS, breached their respective fiduciary duties owed to the Plaintiffs by such defendants' actions and inactions aforesaid, including their schemes to attempt acquisition of the majority of the outstanding shares of DMS' stock, so that Giordano could then pick his own Directors of DMS, who in turn could then appoint DMS officers picked by him, such that the defendants could conceal and condone their past and ongoing misappropriations of the substantial remuneration now being received by DMS . By such wrongful scheme, Giordano attempted to accomplish, and in fact has now accomplished, excessive increases to the monies and other benefits paid and inured to him on account of his relations with DMS, all for his own personal and selfish benefit and to the detriment of the legitimate officers, directors, and shareholders of DMS. Upon information and belief, Watson received more than the fair value of his stock in exchange for participating in Giordano's scheme to defraud the other shareholders of DMS, including, without limitation, a $10,000 annual consulting fee, or salary for little or no services or benefit to the Corporation..

73.    Defendants Giordano and Watson, as directors, shareholders and officers of DMS, breached their respective fiduciary duties owed to the Plaintiffs by said Defendants' concealment, misrepresentations, and other improper and unlawful gamesmanship over the corporate affairs and stock registry, transfer, and related corporate books and records of DMS, in order to conceal or obfuscate the number of DMS shares held by defendants and the other shareholders. By such unlawful and illegal maneuvering, defendant Giordano - only a minority shareholder and merely the Secretary of DMS - now contends that he

-29-

"controls" DMS, by his claimed ownership of "60% of the outstanding share[s] of DMS".

74. Defendants' breaches of their fiduciary duties and self-dealing as aforesaid were and are the direct and proximate causes of the Plaintiffs' actual damages suffered in the approximate total amount of $680,607, representing damages caused by defendant Giordano's wrongful taking, misappropriation, detinue and conversion of shares of DMS stock above the equal "ownership proportion" thereof that he contracted, promised, covenanted, and agreed by the Shareholders' Agreement as aforesaid, the actual value of which additional shares totals at least $56,595; damages of approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract but which payments were wrongfully intercepted and are being detained and otherwise converted by the Defendants as aforesaid; damages of $410,000 in further contract proceeds due and payable to the Plaintiffs under the NTI contract but that are instead being wrongly claimed, diverted, and converted by the Defendants for their own selfish benefit; and, damages of at least $119,012.36, being the value of DMS' property and assets misappropriated by the Defendants, which include the DMS property known as "SecuriCabinet" taken by Mr. Watson, and the aforesaid $60,000 taken from DMS' bank account by Mr. Giordano, all taken and used wrongfully by them in their illicit schemes to attempt shareholder, and thereby directorship and officership, control of the corporate, business, and financial affairs of DMS.

WHEREFORE, the Plaintiffs demand judgment against Defendants Gregg Giordano and Anthony Watson, jointly and severally, as follows:

A. Compensatory damages in the sum of $680,607, with legal interest thereon;

B. Punitive damages in the sum of $1,000,000, each;

C. And for such other and further relief as the Court may deem appropriate.

## COUNT VI - BREACH OF CONTRACT[S]

75.    Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-74 of this Complaint.

76.  Defendants Giorrdano and Watson breached their contracts with the Plaintiffs, express and/or implied, including the Shareholders' Agreement, by their actions and inactions to take control of DMS as aforesaid.

77.  The aforesaid maneuvers and acts by the Defendants clearly breach and violate the letter, intent, and spirit of the Shareholder's Agreement wherein the parties thereto (and to this lawsuit) agreed that the equitable allocation of ownership between them is one-fourth owned by each, and they agree that it is essential to maintain such ownership proportions between the other shareholders.

78.  In further breach of his contracts with the Plaintiffs, Giordano has begun dictating the terms and conditions of, the work being performed upon, and all communications related to, DMS' subject multi-million dollar NTI contract, by using his false claims of "control" of DMS.

79.  Using his wrongful reasoning that he is now majority owner of NTI and allegedly now "controls" the NTI contract, Giordano has intercepted and now holds substantial payments from DMS client NTI that are intended for and payable to plaintiffs DMS and McUmber.

80.  As further stated aforesaid, defendants Watson and Giordano have each received valuable consideration from DMS for its purchase of portions of their respective shares of its outstanding stock. However, DMS's stock registry and stock transfer books still show the

original issue of 22,500 shares to each of such parties, such that the taking of the DMS' asset "SecuriCabinet" by Mr. Watson and the taking of said \$60,000 in cash by Mr. Giordano constitute breach of defendants' contracts, express or implied, with the Plaintiffs.

81. Defendants' breaches of contract were and are the direct and proximate causes of the Plaintiffs' actual damages suffered in the approximate total amount of \$680,607, representing damages caused by defendant Mr. Giordano's wrongful misappropriation of shares of DMS stock above the equal "ownership proportion" thereof that he contracted, promised, covenanted, and agreed by the Shareholders' Agreement as aforesaid, the actual value of which additional shares totals at least \$56,595; damages of approximately \$95,000 in payments actually made to the plaintiffs for their work on the NTI contract but which payments were wrongfully intercepted and are being detained and otherwise converted by the Defendants as aforesaid; damages of \$410,000 in further contract proceeds due and payable to the Plaintiffs under the NTI contract but that are instead being wrongly claimed, diverted, and converted by the Defendants for their own selfish benefit; and, damages of at least \$119,012.36, being the value of DMS' property and assets misappropriated by the Defendants, which include the DMS property known as "SecuriCabinet" taken by Watson, and \$60,000 taken from DMS' bank account by Giordano, all taken and used wrongfully by them in their attempt to seize shareholder control, and thereby policy, management and operational control of the corporate, business, and financial affairs of DMS in violation of their contracts with the Plaintiffs, the Corporation's by-laws and applicable law.

WHEREFORE, the Plaintiffs demand judgment against Defendants Gregg Giordano and Anthony Watson, as follows:

A. compensatory damages in the sum of \$680,607, with legal interest thereon;

B. and for such other and further relief as the Court may deem appropriate.

-32-

## COUNT VII - TORTIOUS BREACHES OF COVENANTS OF
## GOOD FAITH AND FAIR DEALING ARISING OUT OF CONTRACT[S]

82.    Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-81 of this Complaint.

83. The actions of defendants including their schemes and actions to control the voting stock shares, directorship, and officership of DMS, and then the monies, payments, proceeds, and receipts from clients of DMS all constitute breaches of the covenants of good faith and fair dealing arising out of the Defendants' contracts with the Plaintiffs, including but not limited to, the Shareholders Agreement between the parties hereto.

84. In addition, the actions of defendant Giordano, with the consent, participation, and collusion of Watson, in his removal of $60,000 from the start-up of DMS' bank account, and his use of same to claim purchase of Watson's shares of DMS' stock, and in his intercepting and retaining substantial payments from DMS' client NTI that are intended for and payable to plaintiffs DMS and McUmber and holding same as ransom, bait, or other attempted wrongful inducement to the Plaintiffs for condonation or settlement of the Defendants' tortious acts and schemes, constitute breaches of the covenants of good faith and fair dealing arising out of the Plaintiffs' contracts with the Defendants, including but not limited to, the Shareholders' Agreement.

85. Giordano's attempts to assert majority "control" over DMS, likewise constitute breaches of the covenants of good faith and fair dealing arising out of the Plaintiffs' contracts with the Defendants, including but not limited to, the Shareholders' Agreement. Similarly, the taking by Watson of the valuable DMS' asset "SecuriCabinet" for purchase of his shares of DMS' stock, but then his contrary assertion that he still owns and may transfer such DMS stock shares to Giordano without the knowledge or consent of the other DMS's shareholders,

-33-

also constitutes a breach or breaches of the covenants of good faith and fair dealing arising out of the Plaintiffs' contracts with the Defendants, including but not limited to, the Shareholders' Agreement.

86.  Defendants' tortious breaches of the covenants of good faith and fair dealing arising out of contract[s] as aforesaid were and are the direct and proximate cause of the Plaintiffs' actual damages suffered in the approximate total amount of $680,607, representing damages caused by defendant Mr. Giordano's wrongful misappropriation of shares of DMS stock above the equal  "ownership proportion" thereof that he contracted, promised, covenanted, and agreed by the Shareholders' Agreement as aforesaid, the actual value of which additional shares totals at least $56,595; damages of approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract but which payments were wrongfully intercepted and are being detained and otherwise converted by the Defendants as aforesaid; damages of $410,000  in further contract proceeds due and payable to the Plaintiffs under the NTI contract but that are instead being wrongly claimed, diverted, and converted by the Defendants for their own selfish benefit; and, damages of at least $119,012.36, being the value of DMS' property and assets misappropriated by the Defendants, which include the DMS property known as "SecuriCabinet" taken by Watson, and the aforesaid $60,000 taken from DMS' bank account by Giordano.

WHEREFORE, the Plaintiffs demand judgment against defendants Gregg Giordano and  Anthony Watson, jointly and severally, as follows:

A.  compensatory damages in the sum of at least $680,607, with legal interest thereon;

B.  punitive damages in the sum of $1,000,000, each;

C.  and for such other and further relief as the Court may deem appropriate.

## COUNT VIII - TORTIOUS INTERFERENCE WITH CONTRACT

87. Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-86 of this Complaint.

88. Defendants' tortious interference with the Plaintiffs' subject contract with NTI, for services to and payment from GSA as aforesaid, were and are the direct and proximate cause of the Plaintiffs' actual damages of approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract but which payments were wrongfully intercepted and are being detained by the Defendants as aforesaid, and damages of $410,000 in further contract proceeds due and payable to the Plaintiffs under the NTI contract but that are instead being wrongly claimed, diverted, and converted by the Defendants for their own selfish benefit.

WHEREFORE, Plaintiff, Data Mountain Solutions, Inc., demands judgment against defendants Gregg Giordano and Anthony Watson, jointly and severally, as follows:

A. compensatory damages in the sum of at least $505,000, with legal interest thereon;

B. punitive damages in the sum of $1,000,000, each;

C. and for such other and further relief as the Court may deem appropriate.

## COUNT IX - WASTE/MISAPPROPRIATION OF CORPORATE ASSETS/FUNDS; CONSPIRACY TO WASTE/MISAPPROPRIATE CORPORATE ASSETS/FUNDS

89. Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-88 of this Complaint.

90. Defendants Giordano and Watson, each acting individually and not in his/their capacity as agents or employees of DMS, and each acting in conspiracy with the other, and/or also on his own, committed tortious acts, by Giordano's subject removal of $60,000 from DMS' bank account, and his use of same to claim purchase of Watson's shares of DMS'

-35-

stock and thereby assert majority "control" over DMS, and by the taking of the valuable DMS' asset "SecuriCabinet" for purchase of Watson's shares of DMS' stock ( which Watson now claims he still owns), that constitute waste, misappropriation of, and improper self-dealing with, the corporate assets and properties of DMS.

91.  Defendants' waste/misappropriation of corporate assets and properties aforesaid was the direct and proximate cause of DMS' damages suffered in the amount of at least $119,012.36,   being the value of DMS' property and assets misappropriated by the Defendants, which include the DMS property known as "SecuriCabinet" taken by Mr. Watson, and the aforesaid $60,000 taken from DMS' bank account by Mr. Giordano, all misappropriated and used wrongfully by them in their  to attempt to attain the status of a majority shareholder, and thereby control the directors and officers of DMS, and control the corporate, business, and financial affairs of DMS and the Corporation's valuable assets and business opportunities.

WHEREFORE, Plaintiff, Data Mountain Solutions, Inc., demands judgment against defendants Gregg Giordano and  Anthony Watson, jointly and severally, as follows:

A.  compensatory damages in the sum of at least $119,012.36, with legal interest thereon;

B.  punitive damages in the sum of $1,000,000, each;

C.  and for such other and further relief as the Court may deem appropriate.

## COUNT X - CONVERSION

92.     Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-91 of this Complaint.

93.  Defendants Giordano and  Watson, each acting individually and not in his/their

capacity as agents or employees of DMS, and each acting in conspiracy with the other, and/or also on his own, did wrongfully, maliciously, tortiously, wantonly, and with ill-will and willful disregard of the Plaintiffs' rights, sought to, and have exercised, complete control of, dominion over, and ownership of, the assets, stocks, properties, contract proceeds, and other remuneration belonging to, earned by, accruing for, and owed to Plaintiffs and did thereby deprive the Plaintiffs of said assets, properties, contract proceeds, and other remuneration belonging to, earned by, accruing for, and owed to Plaintiffs as aforesaid.

94. Defendants did and have converted to his and/or their own use and benefit those assets, stocks, properties, contract proceeds, and other remuneration belonging to, earned by, accruing for, and owed to Plaintiffs as aforesaid, for the Defendants' own satisfaction and gain and with evil and rancorous motive influenced by hate or ill-will, their purpose being to deliberately and willfully injure the Plaintiffs.

95. Defendants conversion of the assets and property of DMS and its shareholders, and the individual property of the plaintiffs, McUmber and Hill, was the proximate cause of Plaintiffs' actual damages suffered in the approximate total amount of $680,607, representing damages caused by defendant Giordano's wrongful conversion of shares of DMS stock the actual value of which shares totals at least $56,595; damages of approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract but which payments were wrongfully intercepted and converted by the Defendants; damages of $410,000 in further contract proceeds due and payable to the Plaintiffs under the NTI contract but that are instead being wrongly claimed, diverted, and converted by the Defendants for their own selfish benefit; and, damages of at least $119,012.36, being the value of DMS' property and assets misappropriated by the Defendants, which include the

DMS property known as "SecuriCabinet" converted by defendant Watson, and the aforesaid $60,000 converted from DMS' bank account by defendat Giordano.

WHEREFORE, the Plaintiffs demand judgment against defendants Gregg Giordano and Anthony Watson, jointly and severally, as follows:

A. compensatory damages in the sum of at least $680,607, with legal interest thereon;

B. punitive damages in the sum of $2,000,000, each;

C. and for such other and further relief as the Court may deem appropriate.

## COUNT XI - UNJUST ENRICHMENT

96.    Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-95 of this Complaint.

97. Defendants have been unjustly enriched by their actions in retaining, for their own use and benefit, of the monies, stocks, assets, properties, contract proceeds, and other remuneration belonging to, earned by, accruing for, and owed to Plaintiffs as aforesaid, including the misappropriation by and unjust enrichment to Defendants of: the subject shares of DMS stock above the equal "ownership proportion" therefor that Defendants' contracted, promised, covenanted, and agreed by the Shareholders' Agreement as aforesaid, the actual value of which additional shares totals at least $56,595; the approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract but which payments were wrongfully intercepted and are being used by the Defendants, the $410,000 in further contract proceeds due and payable to the Plaintiffs under the NTI contract but that are instead being wrongly taken and used by the Defendants for their own selfish benefit; and, the DMS property and assets misappropriated by the Defendants, the

-38-

actual value of which is at least $119,012.36, including the DMS property known as "SecuriCabinet" taken by defendant Watson and the aforesaid $60,000 taken from DMS' bank account by defendant Giordano.

WHEREFORE, the Plaintiffs demand judgment against defendants Gregg Giordano and Anthony Watson, jointly and severally, as follows:

A. compensatory damages in the sum of at least $680,607, with legal interest thereon;

B. punitive damages in the sum of $1,000,000, each;

C. and for such other and further relief as the Court may deem appropriate.

## COUNT XII - FRAUD/TORTIOUS MISREPRESENTATION

98.    Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-97 of this Complaint.

99.    Defendants have induced the Plaintiffs to provide services, properties, assets, remuneration, and other benefits to the Defendants, all in reliance on the promises and representations of the Defendants that the allocation of DMS' issued voting stock shall be in equal ownership proportions for McUmber, Hill, Watson, and Giordano, and that it is essential to maintain such ownership proportions. The Defendants have induced the Plaintiffs to provide services, properties, assets, remuneration, and other benefits to the Defendants, all in reliance on the promises and representations of the Defendants that proceeds received from DMS' contracts and from services provided by DMS would be used for, and inure to the use and benefit of, the Plaintiffs.

100.   Plaintiffs relied to plaintiffs' detriment on the defendants' promises that the allocation of DMS' issued voting stock would be maintained in equal ownership proportions for the founding principals of DMS; specifically, the Plaintiffs provided employment,

-39-

remuneration, offices, and services to Defendants, all based on the Defendants' promises and agreements that the allocation of DMS's shares of voting stock would be maintained in equal ownership proportions between the founding principals of DMS. Likewise, the Plaintiffs relied to their detriment by providing services, properties, assets, remuneration, and other benefits to the Defendants, all based on the promises and representations of the Defendants that proceeds received upon DMS' contracts and from services provided by DMS would be used for, and inure to the use and benefit of, the Plaintiffs.

101. The Plaintiffs' reliance on the Defendants' said promises was reasonable. Indeed, until defendants' recent schemes to seize control of DMS , and thereby its monies and assets, the Defendants themselves had consistently recognized, affirmed and ratified the parties' Shareholders Agreement, the equitable allocation of stock ownership required thereby, and the equitable distribution and use of the proceeds received upon DMS' contracts and from services provided by DMS.

102. The Defendants' promises and representations aforesaid were false when made, and known by them to be false, and Plaintiffs have been defrauded by Defendants, in that the Defendants intended to, and have in fact, schemed to control DMS through their wrongful stock manipulations, primarily to divert to themselves the substantial remuneration being paid and due the Plaintiffs on account of the NTI/GSA contract and other business opportunities and profits derived from the Corporation's assets. The Defendants' promises and representations were willingly, wantonly, tortiously and maliciously made to induce the Plaintiffs into providing services, properties, assets, remuneration, and other benefits to the Defendants.

103. Plaintiffs had a right to rely on the promises and representations of the Defendants, and the Plaintiffs did rely on such promises and representations to their

-40-

detriment. Plaintiffs provided employment, remuneration, offices, and services to Defendants, all based on the Defendants' promises and agreements that the allocation of DMS's shares of voting stock would be maintained in equal ownership proportions between the founding principals of DMS, and that proceeds received upon DMS' contracts and from services provided by DMS would be used for, and inure to the use and benefit of, the Plaintiffs.

104. The Plaintiffs' reliance on the Defendants' promises was reasonable.

105. However, the Defendants have defrauded the Plaintiffs, as the Defendants intended and schemed to, and have now asserted that they "control" DMS through their wrongful stock manipulations. As a result of the Defendants' false promises, misrepresentations, and fraud aforesaid, Plaintiffs have suffered damages in the approximate total amount of $680,607, representing damages caused by defendant Giordano's tortious misappropriation and conversion of shares of DMS stock, the actual value of which additional shares totals at least $56,595; damages of approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI contract; damages of $410,000 in further contract proceeds due and payable to the Plaintiffs under the NTI contract; and, damages of at least $119,012.36, being the value of DMS' property and assets fraudulently misappropriated by the Defendants.

WHEREFORE, the Plaintiffs demand judgment against defendants Gregg Giordano and Anthony Watson, jointly and severally, as follows:

A. compensatory damages in the sum of $680,607, with legal interest thereon;

B. punitive damages in the sum of $2,000,000, each;

C. and for such other and further relief as the Court may deem appropriate.

## COUNT XIII - DECLARATORY RELIEF

106.    Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-105 of this Complaint.

107.    As parties to the Shareholders Agreement, and as shareholders of DMS entitled thereunder to "the equitable allocation of ownership between them" that "is essential to maintain", Plaintiffs are entitled to a declaration of their rights thereby, including declaration that the equitable allocation of ownership of DMS is equal at least between plaintiff McUmber and defendant Giordano.

108.    Also as parties to the Shareholders' Agreement, and as shareholders, directors, and officers of DMS, the Plaintiffs are entitled to a declaration that they are entitled to, and shall be immediately provided with, the stock registry, stock certificate, and stock transfer books, and all other corporate and business records of DMS.

109.    Further, as shareholders, directors, and officers of DMS, the Plaintiffs are entitled to a declaration that they are entitled to any and all contract proceeds, checks and other payments payable to or otherwise due any of the Plaintiffs.

WHEREFORE, Plaintiffs request that this Honorable Court, pursuant to, *inter alia*, Fed. R. Civ. P. 57, enter a decree that:

A.    declares that Plaintiffs are entitled to all stock registry, stock certificate, and stock transfer books, and all other corporate and business records of DMS, and that defendants Thomas, Giordano, and/or Watson shall therefore transfer to plaintiff DMS, through its President Hill, any and all of such records that are found, revealed, or asserted as in the possession, custody, or control of any and/or all of the defendants;

B.    declares that the existent original shareholders of DMS are entitled to "the equitable allocation of ownership between them" that "is essential to maintain", such that the

-42-

decree Declares the cancellation on the stock registry, stock transfer, and other appropriate corporate books of DMS, of the shares of DMS stock purportedly used by defendant Watson to allegedly purchase DMS' assets (such as Secure-a-Cabinet), and the cancellation thereon of any sales, transfers, or assignments to defendant Giordano of any shares of DMS' stock claimed as once-owned by Watson;

C. declares that Watson, Giordano and Thomas/LLTM are entitled to no shares, or no additional shares in DMS;

D. declares that Plaintiffs are entitled to any and all NTI/GSA-related contract documents, and proceeds, checks and other payments due any of the Plaintiffs thereon, that are being retained or withheld by any of the Defendants;

E. pursuant to Fed. R. Civ. P. 57, orders a speedy hearing of this action and advances it on the Court's docket;

F. and for such other and further relief as the Court may deem appropriate.

## COUNT XIV - ACCOUNTING AND EQUITABLE LIEN/CONSTRUCTIVE TRUST

110. Plaintiffs reallege and incorporate herein by reference the allegations of paras. 1-109 of this Complaint.

111. As is claimed, shown, and demonstrated by the foregoing, it is necessary for this Honorable Court to order defendants to account for all receipts, expenditures, and distributions on their accounts, and to compel the production of all books, records or other information concerning monies, stocks, assets,  properties, contract proceeds, and other remuneration to which the Plaintiffs are rightfully entitled.

112. As parties rightfully entitled to monies, stocks, assets,  properties, contract proceeds, and other remuneration that has not been received by Plaintiffs, the reasonable

value of which has not been fully compensated by the Defendants but which has instead been diverted and converted by the Defendants as aforesaid, the Plaintiffs are entitled to an equitable lien or constructive trust on the assets of defendants in such amount[s] as may be due and rightfully belonging to the Plaintiffs.

WHEREFORE, Plaintiffs request that this Honorable Court enter a decree that:

A. orders the appointment of an independent accountant, to be paid for by the defendants, to provide an accounting for all proceeds, checks and other payments due and/or payable to any of the Plaintiffs, including accounting for any and all NTI/GSA-related payments and other proceeds, and production of any documentation related thereto, such as the NTI/GSA contract itself and payments made on account of such contract;

B. orders defendants to produce all books, records or other information concerning monies, stocks, assets, properties, contract proceeds, and other remuneration to which any or all of the Plaintiffs may be entitled;

C. order defendants to remit to the Plaintiffs all proceeds, checks and other payments due and/or payable to any of the Plaintiffs, including payments on account of the subject NTI/GSA contract;

D. creates an equitable lien and/or constructive trust upon the assets of Defendants, both severally and jointly, in favor of the Plaintiffs, for all monies, stocks, assets, properties, contract proceeds, and other remuneration to which any or all of the Plaintiffs are rightfully entitled and are due to the Plaintiffs;

E. and for such other and further relief as the Court may deem appropriate.

Dated: *September*, 2006          HUGHES & BENTZEN, PLLC

-44-

By:    _____
       Philip J. McNutt
       D.C. Bar No. 491258
       1100 Connecticut Avenue, N.W.
       Suite 506
       Washington, DC  20036
       Tel: (202) 293-8975
       Attorneys for Plaintiffs


## LOCAL RULE 11.2 VERIFICATIONS

DISTRICT OF COLUMBIA            ):

   I, Derek McUmber, certify under penalty of perjury that I am a Plaintiff in this action
and that the foregoing Complaint is true and correct.

   Executed on _____ 24 , 2006.

                              _____
                              Derek McUmber


DISTRICT OF COLUMBIA            ):

   I, Frederick S. Hill, Jr., certify under penalty of perjury that I am a Plaintiff in this
action and that the foregoing Complaint is true and correct.

   Executed on _____ 24 , 2006.

                              _____
                              Frederick S. Hill, Jr.


-45-

# EXHIBIT -1-

## BYLAWS

### OF

### DATA MOUNTAIN SOLUTIONS, INC

### ARTICLE I

#### Meetings of Shareholders

Section 1.1 Annual Meetings. The annual meeting of the shareholders, held for the election of directors and for the transaction of such other business as may properly come before the annual meeting, shall be held in May of each year at such time on a business day as designated in a resolution of the Board of Directors (sometimes referred to as "the Board").

Section 1.2 Special Meetings. Special meetings of the shareholders for any purpose or purposes may be called at any time by the Board of Directors, the President, or such other person authorized by law to do so.

Section 1.3 Place of Meetings. The annual meeting and any special meeting of the shareholders may be held at any place, within or without the State of West Virginia, designated in a resolution of the Board of Directors.

Section 1.4 Notice of Meetings. Written notice stating the place, day, and hour of a meeting of the shareholders, and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not less than 10 nor more than 60 calendar days before the date of the meeting, either personally or by mail, to each shareholder of record entitled to vote at the meeting. Notice of a meeting of the shareholders to act on an amendment to the Articles of Incorporation, a plan of merger or share exchange, a proposed sale, lease, exchange, or disposition of all or substantially all of the corporation's property or the dissolution of the corporation shall be given not less than 10 nor more than 60 calendar days before the date of the meeting. If notice of any shareholders' meeting is mailed, the notice shall be deemed to be given when deposited in the United States mail, postage prepaid, addressed to the shareholder at his address as it appears on the stock transfer books of the Corporation at the close of business on the record date established by the resolution of the Board for the meeting.

Section 1.5 Fixing the Record Date. The Board of Directors by resolution may fix in advance a date as the record date for any of the following purposes: To determine the shareholders entitled to notice of or to vote at any meeting of the shareholders or any adjournment thereof, or entitled to receive payment of any dividend, or in order to make a determination of the shareholders for any other purpose. The record date in any case shall not be more than 70 calendar days prior to the date on which the particular action is to be taken. If no record date is fixed, the close of business on the day before the day on which notice of the meeting is mailed, or the day on which the resolution of the Board of Directors declaring a dividend is adopted, shall be the record date. A determination of the shareholders entitled to vote

at a meeting shall apply to any adjournment of the meeting. Any determination of the shareholders of record on a certain date shall be made as of the close of business on such date.

Section 1.6 <u>Quorum</u>. Except as otherwise required by law, a majority of the shares entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of the shareholders. If less than a quorum is represented, the holders of a majority of the shares represented may adjourn the meeting until a later time without further notice, but they may take no other action. At the adjourned meeting at which a quorum is present in person or by proxy, any business may be transacted which might have been transacted at the meeting originally called. Once a share is represented for any purpose at a meeting of the shareholders, it shall be deemed present for quorum purposes for the remainder of the meeting and for any adjournment of that meeting, unless a new record date is set for that adjourned meeting.

Section 1.7 <u>Proxies</u>. At each meeting of the shareholders, a shareholder entitled to vote may vote in person or by proxy executed in writing by the shareholder or his attorney-in-fact. An appointment of a proxy is effective when received by the Secretary or other officer or agent authorized to tabulate votes before or at the time of the meeting. No proxy shall be valid after 11 months from its date, unless otherwise expressly provided in the proxy.

Section 1.8 <u>Voting of Shares</u>. Unless otherwise required by law, the Articles of Incorporation, or these Bylaws, action on a matter (other than election of directors) shall be approved if the number of votes cast favoring the action exceeds the number cast opposing the action. Directors shall be elected by a plurality of the votes cast. The attendance at any meeting of shareholders by a shareholder who had earlier given a proxy for voting his shares shall not have the effect of revoking the proxy unless the shareholder so notifies the Secretary in writing prior to the voting of the proxy. Each outstanding share is entitled to one vote on each matter voted on at a shareholders' meeting. Voting on all matters shall be by voice vote or by a show of hands unless the holders of 15 percent of the shares represented at a meeting demand a ballot vote (by roll call or by written ballot) on that particular matter.

Section 1.9 <u>Presiding Officer</u>. Meetings of the shareholders shall be presided over by the President. If the President is not present, a chairman chosen at the meeting shall preside. The Secretary, or, in his absence, a person selected at the meeting, shall act as the secretary of the meeting.

Section 1.10 <u>Actions Taken by Written Consent of the Shareholders</u>. Any action which may be taken at a meeting of the shareholders may be taken without a meeting if a written consent, setting forth the action taken, is signed by all the shareholders who would be entitled to vote upon the action at a meeting and delivered to the Secretary for inclusion in the Corporation's minutes or for filing with the corporate records. Multiple counterparts of the consent may be executed, which collectively shall be deemed to be one act of the shareholders. Any action taken by unanimous written consent of the shareholders shall be effective according to its terms when all consents are in possession of the Corporation and shall have the same force and effect as a

2

unanimous vote of the shareholders, provided the consent states the date of its execution by each shareholder. An action taken by written consent of the shareholders that specifies an effective date shall be effective as of such date. A shareholder may withdraw his written consent only by delivering a written notice of withdrawal to the Corporation prior to the time all consents are in possession of the Corporation. If not otherwise determined by resolution of the Board of Directors, the record date for determining the shareholders entitled to take action without a meeting shall be the day before the mailing of any notice proposing the action. If there is no written proposal of action, the record date shall be the date the first shareholder signs a consent.

## ARTICLE II

### Board of Directors

Section 2.1 Duties of the Board of Directors; Number of Directors. All corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation shall be managed under the direction of, the Board of Directors. There shall initially be four directors on the Board of Directors; the number may be changed by resolution of the Board.

Section 2.2 Election of Directors. The directors shall be elected at each annual meeting of shareholders. No individual shall be elected as director without his prior consent.

Section 2.3 Term of Director; Removal. The term of each director shall be one year, and there is no limit on the number of times a director may be reelected. A director shall hold office until the next annual meeting of shareholders following his election. Despite the expiration of a director's term, he shall continue to serve until his successor is elected and qualifies. A director may be removed from office, with or without cause, at a meeting of shareholders called for that purpose.

Section 2.4 Resignation. A director may resign at any time by giving written notice to the President or the Secretary. Any resignation shall become effective when the notice is delivered unless the notice specifies a later effective date.

Section 2.5 Chairman. At the annual meeting of the Board of Directors, a Chairman shall be elected from among the Board members to serve a one-year term. No individual may serve two consecutive terms as Chairman.

Section 2.6 Annual Meetings. An annual meeting of the Board of Directors shall be held immediately after the annual meeting of the shareholders or, if not then, within a reasonable time thereafter upon the call of the President.

Section 2.7 Regular Meetings. The Board of Directors may provide by resolution for the holding of regular meetings in addition to its annual meeting.

Section 2.8 Special Meetings. Special meetings of the Board of Directors shall be held upon the call of the President or a majority of the directors.

Section 2.9 Place of Meetings. All meetings of the Board of Directors shall be held at the principal office of the Corporation or at such other place, within or without the State of West Virginia, as designated by the person or persons calling the meeting and specified in the notice thereof, and at such time as the Board of Directors may provide by resolution or as may be designated in the notice.

Section 2.10 Notice of Meetings. Annual and regular meetings of the Board of Directors may be held without notice. The person or persons calling a special meeting of the Board of Directors shall, at least 48 hours before the meeting, give notice thereof by any usual means of communication. Notices of special meetings shall specify the purpose or purposes for which the meeting is called.

Section 2.11 Quorum. A majority of the number of directors then in office immediately before a meeting begins shall constitute a quorum for the transaction of business at such meeting of the Board of Directors.

Section 2.12 Manner of Acting. Except as otherwise provided in these Bylaws or by law, the act of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors. In the event of a tie vote on any matter, the Chairman of the Board shall have the authority to cast the deciding vote for or against the proposal. No proxy shall be allowed for the vote of a director in a Board of Directors' meeting.

Section 2.13 Actions Taken by Written Consent. Any action which may be taken at a meeting of the Board of Directors may be taken without a meeting if such action is unanimously approved and evidenced by one or more written consents, setting forth the action taken, signed by all of the directors, either before or after the action is taken, and included in the minutes or filed with the corporate records reflecting the action so taken. Such action shall be effective when the last director signs the consent, unless the consent specifies a different effective date. Such action shall have the same force and effect as a unanimous vote of the directors. The consent must state the date of execution by each director. Multiple counterparts of the consent may be executed, which collectively shall be deemed to be one act of the Board.

Section 2.14 Participation in Meetings Through the Use of Communications Devices. Any or all directors may participate in a regular or special meeting of the Board of Directors by, or conduct the meeting through, the use of any means of communication by which all directors participating may simultaneously hear each other. A director participating in a meeting by such means shall be deemed to be present in person.

4

## ARTICLE III

### Officers

Section 3.1  <u>Appointment of Officers; Terms</u>.  The officers of the Corporation shall consist of a President, a Vice President, a Secretary, and a Treasurer.  Other officers may be appointed by the Board of Directors, and they shall hold office for such terms as the Board may prescribe.  Any two or more offices may be held by the same person, except that the offices of President and Secretary cannot be held by one person.

Section 3.2  <u>Terms of Officers; Removal</u>.  Officers shall be appointed to serve until the next annual meeting.  Despite the expiration of an officer's term, he shall continue to serve until his successor is elected.  Any officer of the Corporation may be removed at any time, with or without cause, by the Board of Directors.

Section 3.3  <u>Duties Generally</u>.  Each officer shall have the authority and shall perform the duties set forth in these Bylaws or prescribed by the Board of Directors or by direction of an officer authorized by the Board to prescribe the duties of other officers.

Section 3.4  <u>Duties of Vice President</u>.  There may be one or more Vice Presidents, and each shall have such authority and duties prescribed by the Board from time to time.

Section 3.5  <u>Duties of the Secretary</u>.  In addition to any other authority and duties prescribed by the Board, the Secretary shall have the responsibility for preparing and maintaining custody of minutes of all meetings of the shareholders, the Board of Directors, and committees; for making a timely record of the issuance or transfer of shares of stock; and for authenticating records of the corporation.

Section 3.6  <u>Duties of Treasurer</u>.  The Treasurer shall: (a) have charge and custody of and be responsible for all funds and securities of the Corporation;  (b) receive and give receipts for moneys due and payable to the Corporation from any source whatsoever, and deposit all such moneys in the name of the Corporation in such banks, trust companies or other depositories as shall be selected by the Board of Directors; and (c) in general perform all of the duties incident to the office of Treasurer and such other duties as from time to time may be assigned to him by the President or by the Board of Directors.  If required by the Board of Directors, the Treasurer shall give a bond for the faithful discharge of his duties in such sum and with such surety or sureties as the Board of Directors shall determine.

5

ARTICLE IV

Stock Certificates

Section 4.1  Certificates for Shares.  Certificates evidencing shares of stock of the Corporation shall be in such form as specified by resolution of the Board of Directors.  Such certificates shall be signed by the President and by the Secretary, or by any other officer authorized by resolution of the Board, and may (but need not) have affixed thereto the seal of the Corporation or a facsimile thereof.  All certificates for shares of stock shall be consecutively numbered or otherwise individually identified.  The name and address of the person to whom the certificate is issued, with the number of shares and the date of issue, shall be entered on the stock transfer books of the Corporation.

Section 4.2  Transfer of Shares.  Transfer of shares of the Corporation shall be made only by the holder of record thereof or by his duly authorized representative, who shall furnish proper evidence of authority to transfer, or by his attorney authorized by power of attorney duly executed and filed with the Secretary.  The transfer shall be effective for determining the shareholders of record only when the transfer has been entered on the stock transfer books of the Corporation.  All certificates surrendered to the Corporation or its transfer agent for transfer shall be promptly canceled, and no new certificate shall be issued until the former certificate for a like number of shares has been surrendered and canceled, except that in the case of a lost, destroyed or mutilated certificate, a new certificate may be issued therefor upon such terms and indemnity to the Corporation as the Board of Directors may prescribe.  The person in whose name shares stand on the books of the Corporation shall be deemed by the Corporation to be the owner thereof for all purposes.

ARTICLE V

Corporate Records

Section 5.1  Minutes of Meetings.  The Corporation shall keep permanent records of all meetings of the shareholders and the Board of Directors, of all actions taken by the shareholders or Board without a meeting, and all actions taken by a committee of the Board.

Section 5.2  List of Shareholders.  The Corporation shall maintain a record of its shareholders in a form that permits preparation of a list of the names and addresses of all shareholders, in alphabetical order, showing the number of shares held by each.

Section 5.3  Form of Records.  The Corporation shall maintain its records in written form or in another form capable of conversion into written form within a reasonable time.

Section 5.4  Financial Statements.  The Corporation shall furnish to a shareholder, upon

written request, within thirty (30) days, a copy of the Corporation's financial statements for the most recent fiscal year, including a balance sheet and income statement as of the end of the fiscal year and a statement of changes in the shareholders' equity for the year. Provided, however, that the Corporation shall have not less that 90 days following the end of the fiscal year to prepare the financial statements for such year.

Section 5.5  Specific Records.  The Corporation shall keep a copy of the following records:

a.    The Corporation's Articles of Incorporation or restated Articles and all amendments to them currently in effect;

b.    The Corporation's Bylaws or restated Bylaws and all amendments to them currently in effect;

c.    Any resolutions adopted by the Board of Directors creating one or more classes or series of shares and fixing their relative rights, preferences, and limitations, if shares issued pursuant to these resolutions are outstanding;

d.    The minutes described in Section 5.1;

e.    All written communications to shareholders generally within the past three (3) years, including the financial statements provided to them;

f.    A list of the names and business addresses of the Corporation's current directors and officers; and

g.    The Corporation's most recent annual report delivered to the West Virginia Secretary of State.


ARTICLE VI

Miscellaneous

Section 6.1  Waiver of Notice.  Unless otherwise provided by law, whenever any notice is required to be given to any shareholder, director, or member of any committee, a written waiver of notice, signed by the person entitled to such notice, whether before or after the time stated for the meeting or other action, shall be deemed equivalent to the giving of such notice. A shareholder, director, or member of a committee who attends a meeting shall be deemed to have had timely and proper notice of the meeting, unless he attends for the express purpose of objecting to the transaction of any business at such meeting because the meeting is not lawfully called or convened.

7

Section 6.2 <u>Fiscal Year</u>. The fiscal year of the Corporation shall end on December 31 of each year, or such other date as determined by resolution of the Board of Directors.

Section 6.3 <u>Amendments to the Bylaws</u>. Except as otherwise provided by law, these Bylaws may be altered, amended, or repealed, and new Bylaws may be adopted, by the Board of Directors by resolution, but a bylaw made by the Board may be repealed or changed, and new bylaws made, by the shareholders. The shareholders may prescribe that any bylaw made by them shall not be altered, amended, or repealed by the Board.

8

# EXHIBIT -2-

## SHAREHOLDERS AGREEMENT

AGREEMENT, dated as of ~~June 2 2002~~ by and among those individuals executing this Agreement (hereinafter sometimes individually referred to as a "Shareholder", and collectively, as the "Shareholders"), and Data Mountain Solutions, Inc. (the "Corporation"), a West Virginia corporation, with its principal office located at 1116 Smith Street, Charleston, West Virginia.

## W I T N E S S E T H:

WHEREAS, the Shareholders are the owners of a controlling interest of the issued and outstanding shares of stock of the Corporation (hereinafter collectively referred to as the "Shares") as set forth on Exhibit A annexed hereto; and

WHEREAS, the Corporation is in the business of electronic data management services and related services (sometimes referred to herein as the "Business"); and

WHEREAS, the Shareholders desire to assure the continuity of the management and policies of the Corporation, and in furtherance thereof, to arrange for the disposition of the Shares now owned or hereafter acquired by any of them.

NOW, THEREFORE, in consideration of the mutual promises, covenant and conditions herein contained, the parties hereto agree as follows:

1.    Management of the Corporation.

(a)    Each of the Shareholders agrees that, from and after the date hereof, such Shareholder will vote all of the shares of the Corporation owned or held of record by such Shareholder so as to elect and, thereafter for the term of this Agreement, continue in office each of the following individuals as a member of the Board of Directors of the Corporation:

> Frederick S. Hill, Jr.
> Anthony J. Watson
> Gregg Giordano
> Derek Mcumber

Each of these individuals shall continue to serve as director so long as he retains an ownership interest, directly or indirectly, in the Corporation. There shall be no other individuals as directors, except as a replacement of one of these directors.

(b)    Each Shareholder agrees to resign from all positions such Shareholder then holds as an officer and/or director of the Corporation in the event that such Shareholder transfers title to all shares of the Corporation owned or held of record by such Shareholder, other than a transfer as a pledge authorized by Paragraph 3 of this Agreement.

2      Issuance of Additional Shares.  The Corporation may issue additional shares to the Shareholders, or to other individuals; provided, however, that any individual(s) who acquire(s) shares pursuant to this Paragraph 2 shall agree in writing to be bound by all of the provisions of this Agreement as a "Shareholder" and, upon acceptance of such transfer, shall be deemed to have granted to each of the other Shareholders the irrevocable proxies and powers of attorney referred to in Paragraphs 5 and 13.

3.     Restrictions on Transfer or Disposition of Shares.

(a)     During the term hereof, no Shareholder, without the prior written consent of all the Shareholders, shall directly or indirectly sell, assign, mortgage, hypothecate, transfer, pledge, create a security interest in or lien upon, encumber, give, place in trust, or otherwise voluntarily or involuntarily dispose of any shares now owned or hereafter acquired by him (any of the foregoing acts being referred to herein as a "disposition" of such shares), except as hereinafter specifically provided.  Any disposition of such shares, other than as permitted by this Agreement, shall be null, void and without effect as against the Corporation and the other Shareholders.

(b)     The Shareholders acknowledge that the restrictions imposed herein on the disposition of their shares are fair and reasonable in consideration of their absolute necessity for the proper conduct of the business by the Corporation.

(c)     Notwithstanding the foregoing, in the event that the restrictions on transfer contained in this Agreement are adjudged by any authority of competent jurisdiction to be invalid, violative of any provision of the West Virginia Corporation Act or any successor statute, or otherwise unenforceable, or any such authority orders the sale, assignment, or other transfer of all or any portion of the shares contrary hereto, then the Corporation or its designee shall have the option, but shall not be required, to purchase all or any of the shares owned or transferred by the subject Shareholder, which option shall be exercised, if at all, by giving written notice to such Shareholder and/or the transferee of the shares, as the case may be, within twenty (20) days after the issuance of the final judgment, order, or ruling of such authority.

(d)     The purchase price of the shares purchased pursuant to this Paragraph 3 shall be determined as provided in Paragraph 5, and such purchase shall be effected in the manner, and upon the terms and conditions, set forth in Paragraph 6.

(e)     The closing of any transaction pursuant to this Paragraph 3 shall be held at the Corporation's office or as mutually agreeable to all parties to the transaction ten (10) days after the Corporation's exercise of its option contained herein.

(f)     The Purchase Price to be paid for the Shares of a selling Shareholder shall be binding upon all Shareholders in any action pursuant to any minority shareholder provisions under the Corporation Act or other applicable laws or principles.

2

4.    Purchase of Shares in the Event of Death, Permanent Disability, Incompetency, Bankruptcy, Retirement or Voluntary or Involuntary Termination of a Shareholder.

(a)    In the event of a Shareholder's (i) death, (ii) total and permanent disability, as hereinafter defined, (iii) adjudication of incompetency, or (iv) bankruptcy, as hereafter defined, the Shareholder, his executor, administrator, personal representative, court-appointed guardian, or other fiduciary, as the case may be (hereinafter collectively the "Seller"), on the 30th day after the appointment of such fiduciary, or on the 30th day after a determination of permanent disability is made, shall be deemed to have immediately offered for sale to the "Purchaser" (as defined in Paragraph (e)) all of the shares owned by such Shareholder on the date of such event (the "Seller's Shares") at the Purchase Price indicated in Paragraph 5 and upon the terms and conditions indicated in Paragraph 6, and such Purchaser shall have the option to purchase such shares at such price and upon such terms and conditions, except as otherwise specifically provided herein. The closing date for such sale shall be the later of ninety (90) days after the date of the offer or thirty days after the receipt of insurance proceeds, if any, but in no event later than one hundred twenty (120) days after the offering event (the "Closing Date").

(b)    The term "total and permanent disability" shall mean total disability as defined in the disability buy-out policies on the life of a Shareholder. If no buy-out policies are in effect on a Shareholder, the determination of a Shareholder's total and permanent disability shall be made by a duly licensed and qualified physician acceptable to a majority of the Shareholders. The term "total and permanent disability" shall mean that a Shareholder is unable to devote his/her full time and attention to the business of the Corporation for a continuous period of twelve (12) calendar months as a result of disease, accident, or other infirmity. The determination of disability pursuant to this Paragraph 4(b) shall be binding upon all Shareholders. Unless agreed to by a simple majority of the Shareholders, intermittent appearances at the Corporation's place of business or attendance to duties elsewhere shall not stop the running of the period of disability, unless the disabled Shareholder shall return to fulltime work for at least twenty (20) successive business days.

(c)    The term "bankruptcy" shall mean (i) a petition seeking an order for relief pursuant to the provisions of any bankruptcy laws filed by or against a Shareholder, except if the petition is filed against such Shareholder and such petition is discharged within sixty (60) days of the filing of such petition, (ii) a Shareholder makes an assignment for the benefit of creditors or otherwise makes application for relief as debtor under any U.S. or state statute or, (iii) a receiver, custodian or other trustee or fiduciary is not removed within sixty (60) days.

(d)    In the event of the death, total disability, or adjudication of incompetence of a Shareholder, his spouse, if any, may elect to waive the buy-out provisions of this Paragraph and hold the shares of the deceased or disabled Shareholder indefinitely, subject to the following conditions:

3

(i)    The spouse shall sign and agree to all of the terms of this Shareholders' Agreement, as amended to the date of signing.

(ii)    The spouse agrees to grant proxies to the three other Shareholder parties to this Agreement, assigning one-third of the voting rights of the shares to each of the other Shareholders throughout the term of this Agreement.

(iii)    The spouse shall be bound by all of the provisions of this Agreement, including the provisions regarding the sale of any shares.

(e)    (i)    The "Purchaser" of the Seller's Shares shall be either the remaining Shareholders or the Corporation, as set forth in this Paragraph.

(ii)    First option.  The Seller shall notify the Corporation and each of the other Shareholders of the offer for sale of the Seller's Shares.  Each of the other Shareholders shall have the first option to purchase his proportionate share, as herein defined, of all of the Seller's Shares so offered for a period of sixty (60) days from the receipt of notice of the offer of the Seller's Shares.  This option shall be exercisable as set forth in Paragraph (v) herein.

(iii)    Second Option.  In the event that a Shareholder fails or refuses to exercise his option to purchase his proportionate share of all of the Seller's Shares within the sixty (60) day option period, the Seller shall notify the other Shareholders in writing of the availability of said Shares ("Second Offer Notice") and the other Shareholders shall have the second option for a period of ten (10) days after the receipt of such notice to purchase his "proportionate share" of the remainder of the Seller's Shares, said option being exercisable as set forth in Paragraph (v) herein.

(iv)    Third Option.  In the event that the options to purchase the Shares of the Selling Shareholder set forth in (ii) and (iii) above expire unexercised, the Seller shall notify the Corporation in writing of the availability of said Shares and the Corporation shall have the option for a period of ten (10) days after the receipt of such notice to purchase all of the Seller's Shares, said option being exercisable as set forth in Paragraph 4(e)(v).

(v)    Option Exercise.  An option to purchase the Seller's Shares under this Paragraph 4(e) shall be exercised by either a Shareholder or the Corporation, as the case may be, by delivering written notice to that effect to the Seller within the relevant option period.  Failure to give such notice within the relevant option period shall be deemed a waiver of the option.

(vi)    Proportionate Share.  The term "proportionate share" as used herein means that portion of the Shares of the Corporation offered for sale or intended to be transferred which the shares of the Corporation then owned by a non-selling Shareholder bear to all the outstanding shares of the Corporation, excluding those offered for sale or otherwise

4

intended to be transferred. In addition, if any of the shares offered for sale are not purchased by the Shareholder first entitled thereto, the term "proportionate share" shall include that portion of the shares of the Corporation not purchased by the Shareholder first entitled thereto which the Shares of the Corporation owned by a Shareholder bear to the shares of the Corporation (other than those offered for sale or intended to be transferred) owned by all Shareholders, other than the Shareholder first entitled to purchase.

(vii)     Third-Party Purchase. In the event that the shares offered for sale under this Paragraph 4 remain unpurchased after the expiration of the options provided for above, then the Seller shall be free to transfer all, but not less than all, of the Seller's Shares to any bona fide third party offeror. In the event that the transfer by the Seller to the bona fide third party offeror does not occur within ninety (90) days after expiration of the option periods described above, then the terms and provisions of this Paragraph 4(e) will immediately reattach to such shares.

5.     Value of the Shares.

(a)     The Base Purchase Price. The redemption or purchase price (hereinafter "Purchase Price") to be paid for the shares redeemed or purchased pursuant hereto shall be based on an amount equal to (x) the Book Value of the Corporation, multiplied by (y) a fraction (A) the numerator of which shall be the number of the Seller's Shares and (B) the denominator of which shall be all shares of the Corporation which are issued and outstanding (the foregoing product is referred to as the "Base Purchase Price"), except as otherwise specifically provided herein

(b)     Determination of Book Value. For purposes of this Agreement, Book Value shall be determined by the certified public accountants regularly engaged by the Corporation, in accordance with generally accepted accounting principles (but not necessarily an audit), and the regular methods and practices used by the Corporation in keeping its books applied on a consistent basis, except that the following provisions, even though not necessarily consistent with generally accepted accounting principles, shall apply:

(i)     good will and similar intangible assets, including any contracts which the Corporation may have with third parties, shall be of no value unless such assets shall have been acquired and paid for in cash and in such event, if any, the value thereof shall be taken at the amount paid therefor, less any amortization thereof.

(ii)     real estate and fixed assets consisting of, but not limited to, furniture, fixtures, machinery, and equipment, shall be taken at cost less accumulated depreciation, except that any depreciation taken on an accelerated basis shall be recomputed on a straight line basis;

(iii)    accounts receivable shall be stated at the face value thereof, less provision for doubtful accounts and less trade discounts and allowances (if the accounts shall be carried gross upon the books);

(iv)    adequate provision for reserves for any taxes for which it is determined that the Corporation may be obligated to pay, shall be accrued and applied as a liability as of the balance sheet date;

(v)    any securities owned by the Corporation shall be taken at the market value thereof if such securities are listed on a national securities exchange or if otherwise publicly traded, and any other securities shall be taken at the value at which they are carried on the books of the Corporation, provided that securities of subsidiary companies shall be valued by means of the equity method of accounting;

(vi)    all merchandise inventory whatsoever and wheresoever the same may be, whether in transit, in storage, or otherwise, shall be valued at cost or market value whichever shall be lower at that time;

(vii)    prepaid insurance and other prepaid expenses and charges shall be valued at the amount at which they are carried on the books of the Corporation; and

(viii)    adequate provision for reserves for accounts payable and any other known liabilities of the Corporation shall be taken as a liability as of the balance sheet date.

(c)    Expenses. The determination of Book Value pursuant to this Paragraph 5 shall be at the expense of the Corporation if such determination is made or deemed to have been made due to an event contemplated in Paragraph 4 (but shall otherwise be at the expense of the Seller).

(d)    Determination of Price. Notwithstanding anything to the contrary contained herein, all periods relating to the purchase or redemption of the Seller's Shares hereunder shall be tolled for no longer than ninety (90) days until any statement of the final Base Purchase Price has been prepared and delivered to the Board of Directors of the Corporation. As soon as such statement is received, all applicable time periods shall commence to run. Nothing set forth in this Paragraph 5(d) shall limit in any respect the obligation of a party hereto to purchase or to sell the shares subject hereto.

(e)    Death Price. In the event of the purchase of a Seller's Shares resulting from death, the Purchase Price for the Seller's Shares shall be the greater of the Base Purchase Price or the proceeds of any policy or policies of life insurance received by the Corporation.

(f)    Disability/Incompetency Price. In the event of the total and permanent disability or incompetency of a Shareholder, the Purchase Price for the Seller's Shares shall be the

6

greater of the Base Purchase Price or the proceeds of any disability buy-out insurance policy received by the Corporation on account of such disability.

(g)    Bankruptcy Price.  In the event of the bankruptcy of a Shareholder pursuant to Paragraph 4(c), the Purchase Price for the Seller's Shares shall be equal to the Base Purchase Price.

(h)    Salary.  Anything in this Paragraph 5 to the contrary notwithstanding, any Seller shall receive, in addition to the Purchase Price, all accrued but unpaid salary and/or expense allowance, if any, due from the Corporation.

6.    Payment of Purchase Price.

(a)    Payment of the Purchase Price for the Seller's Shares, as determined under Paragraph 5, shall be made as follows:

(i)    An amount equal to one hundred percent (100%) of the net proceeds received by the Corporation from insurance policies held by it upon the life of a deceased Shareholder or disability buy-out insurance, if any, shall be paid in cash on the later of fifteenth day following the receipt of the insurance proceeds or the Closing Date.

(ii)    If there are no proceeds of life insurance available to buy the Seller's Shares, then cash in an amount equal to twenty percent (20%) of the Purchase Price shall be paid on the Closing Date.

(iii)    The balance, if any, of the Purchase Price shall be paid on the Closing Date by the Purchaser's non-negotiable installment promissory note(s) in the principal amount of such balance, due in one hundred twenty (120) equal monthly installments bearing interest at the Applicable Federal Rate (as defined by the Internal Revenue Code of 1986, as amended from time to time).

(iv)    The promissory note(s) shall provide that, in the event of the sale of fifty (50%) percent or more of the assets of the Corporation or in the event of a sale by the remaining Shareholders of a controlling interest the Corporation, the entire unpaid balance of the note shall be automatically due and payable.  The note(s) shall also provide that in the event of (a) the dissolution and liquidation of the Corporation, or (b) the filing of a petition in bankruptcy or an assignment for the benefit of creditors with respect to the Purchaser, or (c) the appointment of a receiver or other fiduciary to take charge of its or his assets, the unpaid balance of such note(s) shall become due and payable forthwith.

(v)    Such note(s) shall further provide that in the event of a default in the payment of any installment of principal or interest due thereon, the entire unpaid balance of

7

the note shall become due and payable at the election of the holder of the note on fifteen (15) days' prior notice, unless such default is cured within such period. Such note(s) shall further provide for costs of collection and attorneys' fees.

(b)     All payments required to be made pursuant to this Paragraph 6 shall be reduced on a pro rata basis by any benefits received by the Seller under any non-buy-out disability insurance policy paid for by the Corporation.

(c)     The Purchaser may, upon thirty (30) days' notice, at Purchaser's option, pay to the Seller the remaining principal balance of said note at any time prior to the maturity of such note without penalty.

(d)     The initial payment for the Seller's Shares shall be made against delivery of such Shares in the following manner: Certificates representing the Shares shall be endorsed in blank, and, in the event that the purchase is from a legal representative, a certified copy of the certificates of appointment of the representative and the order of the court relating thereto, a certified copy of the will, if any, an affidavit stating that all legacies, debts, claims and taxes have been paid or are adequately provided for, and a state tax waiver and a release of tax liens, if applicable.

(e)     The Seller's Shares shall, on the Closing Date, be pledged with the Seller's attorney (the "Escrowee") to secure full payment of the Purchaser's note. The shares shall be pledged by depositing with the Escrowee the certificate or certificates representing the shares, with stock powers affixed thereto, duly endorsed in blank for transfer. Such certificates and the powers shall constitute the entire collateral for the payment of the Purchaser's note with accrued interest thereon. During the time while such collateral is held by the Escrowee, the Purchaser shall have all voting, dividend and other ownership rights relating thereto, subject, however, to the restrictions and obligations imposed upon a Shareholder in accordance with the terms hereof.

(f)     In the event of a Purchaser's default in making any payment required under a note, which default shall continue for a period of fifteen (15) days after notice has been received by such Purchaser from the Seller, the Seller shall give notice to the then Shareholders, other than the defaulting Purchaser. The remaining Shareholders (one or more) shall have the right to purchase the shares pledged with respect to the note in default. The remaining Shareholders who elect to purchase the shares shall signify by notice to the Seller within fifteen (15) days after receipt of the Seller's written notice. The price shall be the outstanding principal balance, including accrued and unpaid interest, due under the defaulting Purchaser's note. Payment of such price shall be made on or before the forty-fifth (45) day following receipt of the Seller's notice of the default by the non-defaulting Shareholders. Upon payment, the Escrowee shall deliver to the purchasing Shareholder(s) the shares pledged with respect to the defaulted note, together with the assignments relating thereto. If more than one Shareholder desires to purchase such shares, absent any other agreement between them, each such Shareholder shall have the right to purchase that number of such shares in proportion to the number of shares owned by him to the number of

8

shares owned by all remaining Shareholders desiring to purchase said shares. If all such shares are not purchased pursuant to the provisions of this Paragraph 6(f), the Seller shall have the right, without any further notice to any other person, and without advertisement, to sell at public or private sale, assign, grant options to purchase, and deliver all such shares, or any portion thereof in such manner as the Seller, in his discretion, may deem proper. At such sale, the Seller or anyone else may purchase such shares (or any portion thereof) for his or its own account without accountability to the Purchaser and freed and discharged from any equity of redemption.

(g)     In addition to the foregoing, at the expiration of said fifteen (15) day period specified in Paragraph 6(f), all dividend, voting and other ownership rights relating to such shares shall vest in the Seller until such time as the default is cured.

(h)     Upon full payment of any Purchaser's note, the Escrowee shall deliver to the Purchaser the shares pledged with respect thereto, together with all assignments relating thereto.

(i)     Upon the sale of a Seller's Shares, such Seller shall pay to the Corporation and the other Shareholders, from the first sums he receives from the sale of his Shares, any and all amounts that such Seller owes to the Corporation and/or to the other Shareholders. The Corporation shall be entitled to deduct the full amount of such indebtedness from the initial payment of the Purchase Price payable to such Seller hereunder and thereafter from the installments of its note in direct order of maturity.

7.     After-Acquired Securities.

All of the provisions of this Agreement shall apply to all securities of the Corporation now owned or that may be issued or transferred hereafter to a Shareholder as a result of any additional issuance, purchase, exchange or reclassification of securities, corporate reorganization or any other form of capitalization, consolidation, merger, share split, or share dividend, or which are acquired by a Shareholder in any other manner. In addition, all of the provisions of this Agreement shall apply to all securities of the Corporation acquired by any other person pursuant to Paragraph 2 of this Agreement.

8.     Legends.

The Corporation will cause to have typed, printed or stamped on each certificate representing shares, the following legends:

The sale, transfer and other disposition of these shares is subject to the terms of a Shareholders' Agreement dated as of _____, as amended from time to time, by and among the Corporation and the parties signatory thereto, including the holder hereof (the "Agreement"), a copy of which Agreement is on file at the offices of the Corporation. No transfer of such shares shall be valid or effective except in accordance with the Agreement.

9

9.    Dissolution and Liquidation.

Notwithstanding anything to the contrary contained in Paragraph 4, the Corporation or the remaining shareholders, in lieu of the purchase provisions of said Paragraph 4, may elect to dissolve and liquidate the Corporation immediately. Such dissolution and liquidation shall be achieved through an orderly program calculated to protect the interests of the individual parties hereto and in accordance with governing laws and shall take place over a period of time not to exceed one (1) year following the date of the demand.

10.    Arbitration and Specific Performance.

(a)    Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, may, at the option of any party thereto, be resolved by arbitration by a panel of three (3) arbitrators in accordance with the Rules of the American Arbitration Association then prevailing, and such arbitration shall be held in _____ or other place mutually agreeable to the parties. The decision of such panel shall be enforceable in any court having jurisdiction. The panel can enter an ex parte order if a Shareholder fails or refuses to participate in the arbitration proceeding.

(b)    Subject to the foregoing, inasmuch as the shares are closely held and the market for them is limited, irreparable damage would result if this Agreement is not specifically enforced. The parties hereto agree that their respective rights and obligations shall be enforceable in a court of equity by a decree of specific performance and that appropriate injunctive relief may be applied for and granted in connection therewith. Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies which any party may have hereunder or otherwise.

11.    Termination.  This Agreement shall terminate:

(a)    Upon the mutual consent in writing of all the then Shareholders; or

(b)    At such time as all the outstanding shares are held by one Shareholder. Nothing contained in this Paragraph 11 shall affect or impair any rights or obligations arising prior to the time of the termination hereof as herein provided, or which may arise by any event causing the termination hereof.

12.    Voting of Shares.

(a)    The Shareholders agree among themselves that the equitable allocation of ownership between them is one-fourth owned by each, and they agree that it is essential to maintain such ownership proportions between themselves. Each of the Shareholders agrees that

10

he shall vote his shares in all transactions related to the ownership of shares in such a manner as to maintain the ownership proportions relationship.

(b)    Nothing contained in this Agreement shall violate the proportional relationship between Shareholders unless the party whose proportion is reduced agrees to such change in writing.

13.    Restrictive Covenants.

(a)    During the period in which a Shareholder holds stock in the Corporation, each Shareholder agrees:

(i)    the Shareholder will devote such time as required by the Corporation to the business, interests and affairs of the Corporation (allowing a reasonable time for vacations, and the like);

(ii)    the Shareholder will use his best efforts to promote the business, interests, and affairs of the Corporation;

(iii)    the Shareholder will not perform work for or participate, directly or indirectly, in any firm, company, corporation or other venture, which is engaged in a business similar to that of the Corporation, including participation as a partner, shareholder, owner, investor, lender, or employee in any such firm, company, corporation or other venture except upon the express unanimous consent of the other Shareholders and the Board of Directors;

(iv)    However, notwithstanding the foregoing, in the event that a Shareholder offers his shares for purchase pursuant to Paragraph 4 above and such shares remain unpurchased following expiration of the periods in Paragraph 4(e)(i) through (vii), then the provisions of this Paragraph 13 shall be deemed null and void thereafter as to the Shareholders whose shares were so offered for purchase. Nothing contained in this Paragraph 13 shall be interpreted to prevent a Shareholder from holding no more than five percent (5%) in any publicly owned company, even if such company may compete with the Corporation.

(b)    Each Shareholder acknowledges and agrees that all memoranda, notes, records, software, and other documents, whether printed, typed, handwritten or stored on data files or other media, made or compiled by the Shareholder, or made available to a Shareholder during the term of such Shareholder's share ownership (including the period prior to the term of this Agreement) concerning the Corporation's business and its customers shall be the Corporation's property and shall be delivered to the Corporation on the termination of such Shareholder's share ownership, or at any earlier time on request of the Board of Directors of the Corporation. The Shareholder may retain copies of such memoranda, notes, records, software, other documents, data files and other media, but shall not disclose, give, transfer, transmit or in

11

any other manner disclose any of the information contained in such products, memoranda, notes, records, software, other documents, data files or other media to anyone other than to his attorneys and accountants. The Corporation shall be the sole owner of all patent, trademark, copyright and other intellectual property rights with respect to any of such property or rights referred to in this Paragraph 13(b).

(c)    Each Shareholder will have access to confidential knowledge and information vital to the Corporation's financial condition, business methods, systems, personnel, plans, policies and clients. By reason of this, each Shareholder consents and agrees that if such Shareholder violates any of the provisions of this Paragraph 13, the Corporation would sustain irreparable harm, and, therefore, in addition to any other remedies (including, but not limited to, damages) which it may have hereunder or otherwise, it shall be entitled to apply to any court of competent jurisdiction for an injunction restraining the Shareholder from committing or continuing any such violation, and the Shareholder shall not object to any such application. If the Corporation is successful in any suit or action, whether in law or in equity, the Shareholder will pay the Corporation's reasonable attorneys' fees and costs incurred in connection with that suit or action.

(d)    The provisions of this Paragraph 13 shall survive the termination or expiration of this Agreement, irrespective of the reason therefor and notwithstanding the existence of any claim or claims of action of the Shareholder against the Corporation or the other Shareholders, whether predicated hereunder or otherwise.

(e)    The Shareholder agrees that for a period of one (1) year following the termination of his interest as a shareholder in the Corporation for any reason whatsoever, he will not, directly or indirectly, under any circumstances, own, manage, operate, engage, control, participate or become interested in the ownership, management, operation or control of, or be connected in any manner with, whether as individual, partner, shareholder, director, officer, principal, agent, employee or consultant, or in any other relation or capacity whatsoever, any business, enterprise, or endeavor which:

(i)    provides or offers to provide, on behalf of a competitor of the Corporation, products or services that compete with the business of the Corporation, to any customer or client of the Corporation;

(ii)    engages in or becomes interested in any business within a fifty-mile radius of the city of Charleston, West Virginia, in which products or services are provided or offered that compete with the business, products or services of the Corporation.

(f)    The Shareholder further agrees that for a period of one (1) year following the termination of his interest as a shareholder in the Corporation for any reason whatsoever, he will not directly or indirectly:

12

       (i)     employ, hire or cause to be employed or hired, any person who is employed by the Corporation on the termination date of his interest as a shareholder or within six months prior thereto; or

       (ii)    cause, invite, solicit, entice or induce any such person to terminate his employment with the Corporation.

       (g)    Each Shareholder acknowledges and agrees that no portion to the Purchase Price that such Shareholder receives as Seller shall be allocated to the restrictive covenants of this Paragraph.

    14.    Life and Disability Insurance Owned by Corporation.
The Corporation may obtain insurance on the life and disability of each Shareholder, naming itself as beneficiary thereunder. The policies and all proceeds received thereunder shall be held in trust by the Corporation for the purposes hereof, and it shall have the right to take out additional insurance on the life and/or disability of any such Shareholder whenever, in its opinion, additional insurance may be required to carry out its obligations hereunder.

    15.    Notices.
All notices, offers, acceptances and other communications to be made, served or given under or pursuant to the terms hereof shall be in writing and shall be sent by personal delivery, by recognized overnight courier, or by registered or certified mail, return receipt requested, postage prepaid, to the Corporation at its then principal office and to a Shareholder at such Shareholder's principal residence address or place of business as on file with the Corporation. Any party may direct a new address to which each such notice or communication shall be sent by giving written notice thereof to all of the other parties hereto. Any notice, offer, acceptance or other communications sent in the manner set forth above shall be deemed to have been given when received or refused.

    16.    Counterparts.
This Agreement may be executed in any number of counterparts, all of which taken together shall constitute but one and the same Agreement.

    17.    Complete Agreement.
This Agreement constitutes the complete agreement and understanding among the parties hereto with respect to the matters set forth herein and supersedes and terminates any and all prior existing agreements or understandings between or among any of the parties hereto with respect to such matters. No alteration, amendment or modification of any of the terms and provisions hereof shall be valid unless made pursuant to an instrument in writing. signed by each of the parties. The

failure of any party at any time to enforce his rights hereunder shall in no manner affect the right of such party at a later time to enforce the same. No waiver by any party of any condition, or breach of any provision, term, covenant, representation or warranty contained herein, whether by conduct or otherwise, shall be deemed to be or be construed as a further or continuing waiver of any such condition or of the breach of any other provision, term, covenant, representation or warranty hereof.

18.    Successors and Assigns.

All of the terms and provisions hereof shall bind and inure to the benefit of the parties' respective heirs, successors, assigns, and personal representatives.

19.    Applicable Law.

This Agreement shall be governed by and construed and enforced in accordance with the law of the State of West Virginia without giving effect to principles of conflicts of law thereof.

20.    Severability.

In the event that any provisions hereof shall be held to be invalid or unenforceable in any respect, the validity, legality, or enforceability of the remaining provisions hereof, and any partially unenforceable provisions to the extent enforceable in any jurisdiction, shall be unaffected thereby.

21.    Headings.

The headings contained herein are for convenience only and, unless otherwise specifically provided herein, are not to be deemed a part of this Agreement.

22.    Gender, Number, and References.

As used in this Agreement: (a) the masculine gender shall include the feminine and the neuter genders, the neuter shall include the masculine and feminine genders, the singular shall include the plural and the plural shall include the singular, and (b) the terms "herein," "hereof," "hereunder," and other words of similar import refer to the Agreement as a whole and not to any particular paragraph, subparagraph, or clause.

23.    Additional Capital.

No Shareholder shall be required to make additional capital contributions to the Corporation. However, the foregoing shall not prohibit any Shareholder from making voluntary loans to the Corporation, on such terms and conditions as shall be mutually agreeable to such lending Shareholder and the Corporation through its Board of Directors.

14

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

ATTEST:                                    DATA MOUNTAIN SOLUTIONS, INC.

By: _____
_____                              President
                Secretary

_____                    _____ (SEAL)
                Witness                              Shareholder

_____                    _____ (SEAL)
                Witness                              Shareholder

_____                    _____ (SEAL)
                Witness                              Shareholder

_____                    _____ (SEAL)
                Witness                              Shareholder

15

# EXHIBIT -3-











# EXHIBIT -4-

John,

Derek and I met today to try to work this out but I afraid that it is not looking good. I proposed the following options. Derek made it clear that he is currently pursuing legal action against me and Tony. I am not clear as to what the complaint is but I think it has to do with breach of contract. He also alleges that DMS has bought Tony stock and my stock.

I do have to point out that the NTI contract states that they can cancel the DMS contract and take over control of the facilities and source code in the event that any legal action is brought against the DMS that could disrupt performance of the contract. If Derek were to go through with his suit it could cause NTI to take control of the DMS facilities.

Derek did offer to buy me out but I was not clear on the terms and he should be asked to state them in writing to you. I think he was saying that I can have NTI pay me part of what I am under contract with NTI ($120K) and I count my bonus ($40K) as my payment for my stock and I can keep doing business with DMS but I can not have any source code or have any claim to other DMS assets.

Needless to say I think that that offer goes to show Derek state of mind and why I think this will not be resolved. However in an effort to move things forward I will counter his offer to buy me out with terms that I could live with (see option III bellow).

First I must state that the agreement with NTI is with WAVE Interface/DMS and was written prior to Derek becoming part of DMS. As a matter of fact I don even think DMS was a legitimate entity but I may be wrong. Therefore I think it prudent that we only talk about the DMS contracts with NTI. That equates to approximately $220,000 per year.

Second I also think it is important to restate that all the software and any documentation that have been produced by any shareholder for use in or in an attempt to get DMS business is the property of DMS only and no shareholder will have any claim or rights to the intellectual property unless granted by DMS.

At this point my primary interest is in maintaining control of DMS. I have been moving forward and attempting to win new business and changing the name of the company at this point will put the new business at risk. However I understand that the current situation is uncomfortable for all involved, so I am willing to be as amenable as possible to make all parties comfortable. Therefore we can do one of three things:

> I. Derek can stay on as primary support to the GSA contract and he will get paid a salary of $120,000 as long as he continues to perform the duties necessary to support the dotgov contract including any new requirements that fall under the existing terms. Any new requirement (such as DNSSec) that DMS may be tasked to perform, Derek will receive additional compensation which will be determined at time the proposal is submitted to NTI. DMS reserves the right to use other engineering support if Derek prices DMS out of competition by exceeding industry expected pricing.

In addition Derek will be compensated 100% of the profits from Cisco and E-net and he maintains the stock and his position on the board or he can sell his stock to DMS for $45,000 (30% of the outstanding share of DMS). That gives him a total estimated compensation over $150,000/year plus medical insurance and $2,000 paid into his medical spending account. Also in the employment contract Derek will have the opportunity leave DMS at any time and DMS will grant him non-exclusive rights to use DMS source code as long as it does not compete with DMS business and for 2 years after the completion of any DMS contract. Derek must turn over usable copies of all source code to the board and he must maintain usable copies that can be accessed by the board and fully brief and keep updated a back-up engineer.

II. Derek can quit and DMS will grant him non-exclusive rights to use DMS developed software to pursue business on his own as long as it does not interfere with current DMS customers for as long as they remain DMS customers and for 2 years after the end of that contract. DMS will also give Derek the CISCO contract and the E-net contract and two servers, his laptops, power supply, the Cisco switch that he has at home and other home office equipment. He will continue to own DMS stock unless he wishes to sell to an interested party or DMS will buy his stock for $45,000 (30% of the outstanding share of DMS) payable at closing. Derek must turn over usable copies of all source code to the board and fully brief the new engineer.

III. I will sell DMS my stock (60% of the outstanding share of DMS) for $90,000 plus two servers, the Cisco switch in the rack, my laptops and all my home office equipment, and non-exclusive rights to use DMS source code as long as it does not compete with DMS current business and for 2 years after the completion of any DMS contract accept in the case of Dotgov and NTI. Where in the event DMS fails to perform DMS for fits this protection. Performance will be defined by NTI in another document. This includes all rights to the WebPutty source code. DMS also grants use of all other intellectual property and releases all claims to my business concepts that I just developed and to the proposals that were just submitted in which name DMS was named as sub-contractor. Derek and DMS agree to release me further action including any claim on my contract with NTI. Derek and DMS agree to release Tony from any further action and agree to pay him the money still owed to him and for reimbursement to Secure-a-cabinet and his work with me on the law enforcement network totaling $10,000.

These offer are final and will expire Friday the 21st or upon receipt of any legal notice from Derek.

# EXHIBIT -5-

# LUMAN, LANGE, THOMAS & MCMULLEN, LLP

ATTORNEYS AT LAW
SUITE 506
1660 L STREET, N.W.
Washington, D.C. 20036
Telephone (202) 463-1260
Facsimile (202) 463- 6328
JTHOMAS@LLTMLAW.COM

GENE C. LANGE
SEAN P. MCMULLEN*††
JOHN W. THOMAS*

OF COUNSEL
JOSEPH C. LUMAN*

*ALSO ADMITTED IN  VIRGINIA
†NOT ADMITTED IN DISTRICT OF COLUMBIA
‡ALSO ADMITTED IN MARYLAND

August 22, 2006

BY HAND

Philip J. McNutt, Esquire
Hughes and Bentzen, PLLC
1100 Connecticut Avenue, NW
Washington, D.C. 20036

                Re:     Data Mountain Solutions, Inc.

Dear Mr. McNutt:

        In response to your letters of July 28 and August 16, I am enclosing copies of all of the documents in the possession of Luman, Lange, Thomas & McMullen, LLP, related to Data Mountain Solutions, Inc., which you requested.

        This afternoon, we received a fax from David Bledsoe, Esq., demanding that the original stock book and minute book be kept in the custody of this firm.  In response, we see two possible ways to deal with this.

        First, a majority of the shareholders agree on a disposition of these items, or

        Second,  we bring an interpleader action in Fairfax County Circuit Court in which we ask the court to take possession of these items until the parties' respective rights are determined.  We will insist upon being paid our customary fees to bring such an action.

        Either of these options is fine with us.

                                        Sincerely,

                                        John W. Thomas

Enclosures

cc:     David Bledsoe, Esq.
        Frederick S. Hill, Jr.

CERTIFICATE NO: 1

ISSUED TO   Luman, Lange & Wheeler, LLP

FOR _____ 140 _____ SHARES

DATED _____

RECEIVED CERTIFICATE NO. _____ FOR _____ SHARES

THIS _____ DAY OF _____

USE FORM BELOW FOR TRANSFER FROM ORIGINAL ISSUE

FROM WHOM TRANSFERRED:

DATED _____

ORIGINAL CERTIFICATE NUMBER

RECORD OF TRANSFER OF SURRENDER CERTIFICATE

NEW CERTIFICATES ISSUED TO:

| | NUMBER ORIGINAL UNITS | NUMBER OF UNITS TRANSFERRED | | NUMBER OF UNITS TRANSFERRED | NUMBER OF NEW CERTIFICATES |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

DATED _____

ATTACH CANCELLED CERTIFICATE HERE

CERTIFICATE NO: 2

ISSUED TO    Frederick S. Hill, Jr.

FOR _____ 22,500 _____ SHARES

DATED _____

RECEIVED CERTIFICATE NO. _____ FOR _____ SHARES

THIS _____ DAY OF _____

USE FORM BELOW FOR TRANSFER FROM ORIGINAL ISSUE

FROM WHOM TRANSFERRED:

DATED _____

| ORIGINAL CERTIFICATE NUMBER | NUMBER ORIGINAL UNITS | NUMBER OF UNITS TRANSFERRED |
|---|---|---|
|  |  |  |
|  |  |  |

RECORD OF TRANSFER OF SURRENDER CERTIFICATE

NEW CERTIFICATES ISSUED TO:

| | | NUMBER OF UNITS TRANSFERRED | NUMBER OF NEW CERTIFICATES |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

DATED _____

ATTACH CANCELLED CERTIFICATE HERE

ATTACH CANCELLED CERTIFICATE HERE

.RTIFICATE NO: 3                FOR ___ 22,500 ___ SHARES

ISSUED TO  Anthony J. Watson

USE FORM BELOW FOR TRANSFER FROM ORIGINAL ISSUE

FROM WHOM TRANSFERRED:

DATED

| ORIGINAL CERTIFICATE NUMBER | NUMBER ORIGINAL UNITS | NUMBER OF UNITS TRANSFERRED |
|---|---|---|
| | | |
| | | |
| | | |

DATED _____

RECORD OF TRANSFER OF SURRENDER CERTIFICATE

NEW CERTIFICATES ISSUED TO:

| | NUMBER OF UNITS TRANSFERRED | NUMBER OF NEW CERTIFICATES |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

DATED _____

RECEIVED CERTIFICATE NO. _____ FOR _____ SHARES

THIS _____ DAY OF _____

ATTACH CANCELLED CERTIFICATE HERE

CERTIFICATE NO: 4

ISSUED TO   Gregg Giordano

FOR ____ 22,500 ____ SHARES

DATED

RECEIVED CERTIFICATE NO. _____ FOR _____ SHARES

THIS _____ DAY OF _____

USE FORM BELOW FOR TRANSFER FROM ORIGINAL ISSUE

FROM WHOM TRANSFERRED:

DATED

ORIGINAL CERTIFICATE NUMBER

RECORD OF TRANSFER OR SURRENDER CERTIFICATE

NEW CERTIFICATES ISSUED TO:

DATED

| | NUMBER ORIGINAL UNITS | NUMBER OF UNITS TRANSFERRED | NUMBER OF NEW CERTIFICATES |
|---|---|---|---|

ATTACH CANCELLED CERTIFICATE HERE

CERTIFICATE NO: **5**

ISSUED TO   Derek Mcurber

FOR _____ **22,500** _____ SHARES

DATED _____

RECEIVED CERTIFICATE NO. _____ FOR _____ SHARES

THIS _____ DAY OF _____

USE FORM BELOW FOR TRANSFER FROM ORIGINAL ISSUE

FROM WHOM TRANSFERRED:

DATED _____

| ORIGINAL CERTIFICATE NUMBER | NUMBER ORIGINAL UNITS | NUMBER OF UNITS TRANSFERRED |
|---|---|---|
| | | |
| | | |

RECORD OF TRANSFER OF SURRENDER CERTIFICATE

NEW CERTIFICATES ISSUED TO:

| | NUMBER OF UNITS TRANSFERRED | NUMBER OF NEW CERTIFICATES |
|---|---|---|
| | | |
| | | |

DATED _____

ATTACH CANCELLED CERTIFICATE HERE

CERTIFICATE NO: **6**

ISSUED TO   John D.  and  Sandra O.  Millhiser

FOR _____ ₦,000 _____ SHARES

DATED _____

RECEIVED CERTIFICATE NO. _____ FOR _____ SHARES

THIS _____ DAY OF _____

USE FORM BELOW FOR TRANSFER FROM ORIGINAL ISSUE

FROM WHOM TRANSFERRED:

DATED _____

| ORIGINAL CERTIFICATE NUMBER | NUMBER ORIGINAL UNITS | NUMBER OF UNITS TRANSFERRED |
|---|---|---|
| | | |
| | | |

RECORD OF TRANSFER OF SURRENDER CERTIFICATE

| NEW CERTIFICATES ISSUED TO: | | NUMBER OF UNITS TRANSFERRED | NUMBER OF NEW CERTIFICATES |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

DATED _____

ATTACH CANCELLED CERTIFICATE HERE

CERTIFICATE NO: 7

ISSUED TO   Luman, Lange, Thomas & McMullen, LLP

FOR ___ 52 ___ SHARES

DATED

RECEIVED CERTIFICATE NO. _____ FOR _____ SHARES

THIS _____ DAY OF _____

**USE FORM BELOW FOR TRANSFER FROM ORIGINAL ISSUE**

FROM WHOM TRANSFERRED:

DATED

ORIGINAL CERTIFICATE NUMBER

DATED

NEW CERTIFICATES ISSUED TO:

**RECORD OF TRANSFER OF SURRENDER CERTIFICATE**

| | NUMBER ORIGINAL UNITS | NUMBER UNITS TRANSFERRED | NUMBER OF UNITS TRANSFERRED | NUMBER OF NEW CERTIFICATES |
|---|---|---|---|---|

DATED

RTIFICATE NO: 8

ISSUED TO        Christopher Wheeler

FOR        42        SHARES

DATED

RECEIVED CERTIFICATE NO.

...IS        DAY OF        FOR        SHARES

ATTACH CANCELLED CERTIFICATE HERE

USE FORM BELOW FOR TRANSFER FROM ORIGINAL ISSUE

FROM WHOM TRANSFERRED:

DATED

ORIGINAL CERTIFICATE NUMBER

RECORD OF TRANSFER OF SURRENDER CERTIFICATE

NEW CERTIFICATES ISSUED TO:

DATED

| | NUMBER ORIGINAL UNITS | NUMBER OF UNITS TRANSFERRED |
| --- | --- | --- |
| | NUMBER OF UNITS TRANSFERRED | NUMBER OF NEW CERTIFICATES |

# Data Mountain Solutions, Inc.

**TOTAL AUTHORIZED ISSUE**
10,000,000 SHARES PAR VALUE $.01 EACH

COMMON STOCK

See Reverse for
Certain Definitions

**This is to Certify that** _____

_____ **is the owner of** _____

_____ *fully paid and non-assessable shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.*

**Witness,** *the seal of the Corporation and the signatures of its duly authorized officers.*

**Dated** _____

PRESIDENT

© 1999 CORPEX BANKNOTE CO., BAY SHORE N.Y.

# EXHIBIT -6-

# HUGHES & BENTZEN, PLLC

ATTORNEYS AT LAW
1100 CONNECTICUT AVENUE, NW
SUITE 340
WASHINGTON, DC 20036

(202) 293-8975
FACSIMILE (202) 293-8973

WWW.HUGHESBENTZEN.COM

MICHAEL P. BENTZEN, P.C., DC, MD
GEORGE J. HUGHES, DC, MD
ELIZABETH HUGHES, DC, MD
PHILIP J. McNUTT, DC,MD
STUART H. SORKIN, P.C., DC, FL
CHRISTOPHER WHEELER, DC, MD

OTHER OFFICES:
ROCKVILLE, MARYLAND

July 28, 2006

## BY HAND-DELIVERY

Gregg Giordano
2403 Dakota Lakes Drive
Herndon, VA 20105

John W. Thomas, Esq.
1660 L Street, N.W.
Suite 506
Washington, DC 20036

## BY OVERNIGHT COURIER

Data Mountain Solutions, Inc.
1116 Smith Street
Charleston, WV 25301

Re: Data Mountain Solutions, Inc./Derek McUmber, *et al.*

Dear Mr. Giordano and Mr. Thomas:

Please be advised that I have been retained by Mr. Derek McUmber ("Mr. McUmber"), regarding his ownership interests in, and other relationships with Data Mountain Solutions, Inc. ("DMS"). Mr. McUmber has provided me with various documents regarding DMS, including the By-Laws of DMS (the "By-laws") and the Shareholders' Agreement of DMS, dated June 2, 2003 (the "Shareholders' Agreement"). He has also provided me with copies of cancelled checks & wire and/or other transfers showing substantial withdrawals, transfers, and diversions of DMS' funds into accounts either owned, or controlled, by Mr. Giordano. I have also reviewed correspondence to and from Mr. Thomas, including a recent undated letter to him from Mr. Giordano (the "Giordano Letter") purporting to make an offer to Mr. McUmber that states the offer will expire on "Friday the 21st" of July, 2006.

It appears there have been multiple blocks of stock in DMS either transferred to or issued by Mr. Giordano that were not properly authorized and violated the By-laws, the Shareholders' Agreement, and applicable law.

It further appears that there has been an appropriation of the assets, funds, and/or contract receipts of DMS without proper accounting or corporate authority.

Gregg Giordano
John Thomas, Esquire
Data Mountain Solutions, Inc.
July 27, 2006
Page 2

Accordingly, under his rights as a shareholder and director of DMS, Mr. McUmber hereby demands that you produce, within the next thirty (30) days, for inspection and copying by Mr. McUmber and/or his attorneys, the following documents:

a) **All** of the records required to be kept by DMS as set forth in Section 5.5 of the By-laws, including, without limitation, minutes of meetings of the Shareholders and Directors;

b) any Notices (or Waivers of Notice) of meetings of the Shareholders of DMS, and of meetings of the Directors of DMS, and of any actions taken by written consent in lieu of any such meetings;

c) any and all contracts or agreements related to DMS (whether proposed or accepted) and any addenda, modifications, or supplements to those contracts or agreements, including, without limitation, the "NTI contract", the "contract with NTI ($120K)", the "agreement with NTI [of] WAVE Interface/DMS", and the "GSA contract", referenced respectively in the second, third, fifth, and seventh paragraphs of the Giordano Letter;

d) any and all documents concerning the income, investments, disbursements, expenses, and other financial affairs of DMS, including bank account records, cancelled checks, asset/monies transfer records, and filings with the IRS and with applicable state and local taxing entities (and all documents used or reviewed in preparing such tax filings) related to the financial affairs and/or taxation of DMS;

e) any and all documents concerning salaries, compensation, disbursements, and/or any other monies or other consideration paid to DMS' officers, directors, employees, and contractors, including any employment, contractor, agency, or similar agreements for the payment of such monies or other consideration, and filings with the IRS and with applicable state and local taxing entities (and all documents used or reviewed in preparing such tax filings) related to such monies or other consideration;

f) all documents regarding any income, expenses, and ownership interests of Mr. Giordano related to DMS or its clients (such as NTI), including but not limited to IRS Forms 941, 1099, 1040, and any similar forms or other documents reflecting income, expenses, and ownership interests of Mr. Giordano pertaining to NTI, other DMS clients, and DMS;

HUGHES & BENTZEN, PLLC

Gregg Giordano
John Thomas, Esquire
Data Mountain Solutions, Inc.
July 27, 2006
Page 3

g) any and all documents concerning any disposition or transfer of any shares of stock in DMS, including, but not limited to, the "stock transfer" and other "books of the Corporation" referenced in Section 4.2 of the By-Laws;

h) all documents concerning the allegation in the Giordano Letter, paragraph III, that Mr. Giordano's "stock [is now] 60% of the outstanding share [sic] of DMS," including any documents related to the purchase by, or any other transfer or disposition to Mr. Giordano, of more than one-fourth of the outstanding shares of DMS' stock;

I) all documents related to the value of the shares, the purchase price for shares, and the payment of such purchase price (pursuant to paragraphs 5-6 of the Shareholders' Agreement) for the shares of DMS' stock now claimed owned and/or controlled by Mr. Giordano that are more than one-fourth of the outstanding shares of DMS' stock;

j) all documents concerning the formation, incorporation, ownership, shareholders, officers, directors, contracts, and financial affairs, business, and the like, of the juridical entity referred to as "WAVE Interface/DMS" in the fifth paragraph of the Giordano Letter.

Please be advised that if I do not receive by the close of business on August 2, 2006 your written confirmation or agreement that the documents will be produced, as requested above, then Mr. McUmber will immediately seek all available remedies to enforce his rights in this matter. Without the requested information, Mr. McUmber has insufficient information to determine whether he can agree to the so-called "offer" contained in the Giordano Letter, or to any mediation, arbitration, settlement, or release of Mr. McUmber's claims against you.

I also understand that in retaliation for Mr. McUmber's proper requests for information regarding the stock of DMS (such as the identity of recent recipients of such stock, the consideration calculated and paid for such stock, and the current stock ownership percentages you assert for DMS), Mr. Giordano's only response has been to terminate the regular compensation due and owing to Mr. McUumber on account of DMS and its clients. Such maneuvering is obviously part of your ongoing

HUGHES & BENTZEN, PLLC

Gregg Giordano
John Thomas, Esquire
Data Mountain Solutions, Inc.
July 27, 2006
Page 4


effort to impair Mr. McUmber's livelihood and thereby force settlement with you or a release
on terms that may be skewed in your favor. Please be advised that if I do not also receive – by the close
of business on August 2, 2006 – your agreement to **immediately** pay the prior compensation due Mr.
McUmber along with your assurance of the continued payment of such compensation to Mr. McUmber,
then he will immediately seek all available remedies to enforce his rights in this matter.

Finally, please also be advised that I have been contacted by other shareholders of DMS' stock,
regarding their rights concerning your recent illegal and improper moves to increase Mr. Giordano's and
Mr. Thomas' ownership interests in DMS to the detriment of other DMS shareholders. It is clear that
your failures over the past few years to hold or give notice of the annual or **any** other Meetings of the
Shareholders of DMS, all while you were enriching yourselves in secret through the illegal issuance of
additional shares of DMS stock and by payments to you and/or your associated firms, has caused and is
continuing to cause severe distress and substantial damages to all the other shareholders of DMS.
Accordingly, I demand that you cease and desist from taking any further monies, salaries, fees, assets,
stock, or any other property or remuneration from DMS until these matters are resolved by settlement,
adjudication, or other disposition.

I look forward to your response to this Letter by next Wednesday, and the production of the
requested documents within the next thirty (30) days.

Sincerely,

Philip J. McNutt

cc: Derek McUmber (by hand delivery)

HUGHES & BENTZEN, PLLC

# EXHIBIT -7-



John W. Thomas
1660 L Street, N.W., Suite 506
Washington, D.C.  20036
Voice: 202-463-1260
Fax: 202-463-6328

### FAX COVER SHEET

TO:        Phillip J. McNutt, Esquire
           Hughes & Bentzen, PLLC
           202-293-8973

DATE:      August 3, 2006

NUMBER OF PAGES:  __3__  INCLUDING THIS COVER SHEET

RE:        Data Mountain Solutions, Inc.

See attached.

**NOTICE OF CONFIDENTIALITY.** The materials in this facsimile transmission are intended solely for the designated recipient and may contain confidential information. If this transmission is erroneously received by another party, please call the sender (collect) to notify him of the error and destroy this document. Thank you.

1660 L Street, NW, Suite 506
Washington, DC 20036

August 3, 2006

<u>VIA FACSIMILE (202-293-8973) AND FIRST CLASS MAIL</u>

Phillip J. McNutt, Esquire
Hughes & Bentzen, PLLC
1100 Connecticut Avenue, N.W., Suite 340
Washington, D.C. 20036

   Re:  Data Mountain Solutions, Inc., and Derek McUmber

Dear Mr. McNutt:

   This letter is in response to your letter dated July 28, 2006, written on behalf of your client, Derek McUmber, with regard to the dispute over ownership of stock in Data Mountain Solutions, Inc. (the "Corporation" or "DMS").

   You address the letter to Gregg Giordano and me personally, as well as to the Corporation. This letter is my personal response to your demands and accusations directed at me personally.

   On page 4 of your letter, you falsely accuse me of despicable actions, namely, "your recent illegal and improper moves to increase Mr. Giordano's and Mr. Thomas' ownership interests in DMS to the detriment of other DMS shareholders," and the further allegation that, "you were enriching yourselves in secret through the illegal issuance of additional shares of DMS stock and by payments to you and/or your associated firms." I have never owned any stock in the Corporation. I have neither engaged in nor encouraged any "moves" to increase any person's or entity's ownership interest in the Corporation. I have not "enriched" myself in any way, let alone "in secret." I have had no transactions at all with the Corporation except in my role as Counsel to DMS through Luman, Lange, Thomas & McMullen. LLP. Your letter contains serious allegations of illegal conduct by me – they may well be defamatory – and they are totally without basis.

   There is not one shred of evidence to support any of your allegations against me. I, in turn, would demand that you contact the "other shareholders" of DMS who allegedly made these accusations and check your facts before going further. As you know Luman, Lange, Thomas & McMullen, LLP has 192 shares DMS. Pursuant to the terms of a Partner Termination Agreement between Luman, Lange, Thomas & McMullen, LLP, and Christopher Wheeler dated October 1, 2003, your partner, Mr. Wheeler, received and, to the best of my knowledge, still owns 42 shares of DMS. I believe Mr. Wheeler knows who the other DMS shareholders are.

   The same paragraph of your letter concludes with the demand, "Accordingly, I demand that you cease and desist from taking any further monies, salaries, fees, assets, stock, or any

other property or remuneration from DMS until these matters are resolved." This is certainly easy to abide by, since I have never taken any payments or other things of value from the Corporation.

Finally, starting in 2002, Luman, Lange & Wheeler provided legal services to the Corporation from time to time, with the worked shared between myself and Christopher Wheeler. After Mr. Wheeler left our firm, Luman, Lange, Thomas & McMullen, LLP, had no significant contacts with the Corporation for nearly three years. Until Messrs. McUmber and Hill contacted Luman, Lange, Thomas & McMullen, LLP, this spring, I thought that your partner Christopher Wheeler was handling any legal work for DMS.

I have no documents of the Corporation in my personal possession.

I would be pleased to dispense with the letter writing and discuss Mr. McUmber's interests and concerns whenever you want.

Yours truly,

John W. Thomas

# EXHIBIT -8-

# Lum⁓ Lange, Thomas & McMullen, ⁓P

ATTORNEYS AT LAW

Suite 506
1660 L Street, N.W.
Washington, DC  20036-5603

TELEPHONE (202) 463-1260
FACSIMILE (202) 463-6328

STATEMENT FOR SERVICES RENDERED & EXPENSES INCURRED

Data Mountain
Attn: Frederick S. Hill, Jr.
1831 Brett Court
Annapolis MD 21401

September 05, 2003

Invoice No.10411

Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 06/02/2003 JWT | Edit shareholders' agreement, meeting minutes, and bylaws; review documents with principals; arrange for execution of power of attorney from A. Watson to F. Hill regarding loan from United Bank; file application for registration in Maryland | 5.25 175.00/hr | |
| 06/05/2003 JWT | Review further mark up of WebPutty escrow agreement | 1.25 175.00/hr | |
| 06/06/2003 JWT | Review terms of WebPutty escrow agreement with G. Giordano; edit licensing clauses | 1.50 175.00/hr | |
| 06/09/2003 JWT | Follow up telephone conference with G. Giordano regarding WebPutty escrow; review and forward VA registration documents to F. Hill | 1.00 175.00/hr | |
| 06/10/2003 JWT | Email with F. Hill and G. Giordano regarding escrow, copyright, execution of agreements by Tony; telephone conference with G. Giordano reviewing options for response to WebPutty's announcement of quitting business | 1.50 175.00/hr | |
| 06/12/2003 JWT | Telephone conference with G. Giordano and D. Mcumber regarding escrow and immigration; confer with GCL regarding immigration issues | 0.50 175.00/hr | |
| 06/13/2003 JWT | Review and edit amendment to WebPutty license regarding use of software; telephone conference with D. Mcumber regarding visa requirements | 1.00 175.00/hr | |

Data Mountain

Page    2

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 06/17/2003 JWT | Email with F. Hill regarding copyright of slogan | 0.25<br>175.00/hr | |
| 06/18/2003 JWT | Forward news regarding data management needs in food industry | 0.25<br>175.00/hr | NO CHARGE |
| 07/03/2003 JWT | Telephone conference with A. Watson regarding issuance of shares and proprtionate ownership | 0.25<br>175.00/hr | |
| 07/07/2003 JWT | Review documents related to terms of stock issuance regarding question from A. Watson regarding proportions; telephone conference with G. Giordano regarding lack of response from WebPutty on escrow agreement | 0.75<br>175.00/hr | |
| 07/11/2003 JWT | Meet with A. Watson to sign corporate documents; telephone conference regarding share allocations | 0.50<br>175.00/hr | |
| 07/29/2003 JWT | Prepare stock certificates and finalize corporate documents | 0.75<br>175.00/hr | |
| 07/30/2003 JWT | Supervise printing of stock certificates | 0.25<br>175.00/hr | |
| 08/08/2003 JWT | Meet with A. Watson regarding corporate records matters and status of projects; Telephone conference with F. Hill regarding next meeting | 0.50<br>175.00/hr | |
| 08/19/2003 JWT | Review status of negotiations with WebPutty with G. Giordano | 0.25<br>175.00/hr | |
| 08/22/2003 JWT | Forward stock certificates to F. Hill for signature | 0.25<br>175.00/hr | |
| 08/27/2003 JWT | Review emails and draft agreements between DMS and WebPutty | 1.50<br>175.00/hr | |
| 08/28/2003 JWT | Analyze contract options with WebPutty licensing; identify potential breach by WebPutty; prepare memo to G. Giordano summarizing analysis | 2.00<br>175.00/hr | |
| 08/29/2003 JWT | Review comments from G. Giordano and discuss options for action regarding WebPutty agreement | 2.25<br>175.00/hr | |
| | For professional services rendered | 21.75 | $3,762.50 |
| | Previous balance | | $7,922.15 |
| 07/10/2003 Less Payment Received | | | ($2,500.00) |
| 08/29/2003 Less Payment to be Received in Stock (37 Shares at $50.00 each) | | | ($1,850.00) |

Data Mountain

Page    3

| | Amount |
|---|---|
| Total payments and adjustments | ($4,350.00) |
| Balance due | $7,334.65 |

# LUMAN, LANGE, THOMAS & MCMULLEN, LLP

ATTORNEYS AT LAW

GENE C. LANGE
SEAN P. MCMULLEN*†
JOHN W. THOMAS*

SUITE 506
1660 L STREET, N.W.
Washington, D.C. 20036
Telephone (202) 463-1260
Facsimile (202) 463- 6328
LLTM@LLTMLAW.COM

OF COUNSEL
JOSEPH C. LUMAN*

*ALSO ADMITTED IN VIRGINIA
†NOT ADMITTED IN DISTRICT OF COLUMBIA

November 25, 2003

Frederick S. Hill, Jr. President
Data Mountain Solutions, Inc.
1831 Brett Court
Annapolis, Maryland 21401

Re:    Billing Statement

Dear Fred:

Enclosed is a statement for our services for Data Mountain Solutions, Inc. The statement covers the past three months, but you will see that there are also several entries which date to 2002. We are confident that these hours have not been billed before, but please let me know if you have any contrary information. I will prepare another stock certificate for our firm's additional shares and send it to you for signature.

We have set out as a separate subcategory the time involved in serving as the escrow agent for the WebPutty software. These services were done for a flat fee of $500, and the hours are not charged to the corporation.

We hope that all is going well with the GSA contract and the other activities of Data Mountain Solutions, Inc. Please do not hesitate to contact us with any questions.

Yours truly,

John W. Thomas

Enclosure

# Lume Lange, Thomas & McMullen, LLP

ATTORNEYS AT LAW

Suite 506
1660 L Street, N.W.
Washington, DC 20036-5603

TELEPHONE (202) 463-1260
FACSIMILE (202) 463-6328

STATEMENT FOR SERVICES RENDERED & EXPENSES INCURRED

Data Mountain
Attn: Frederick S. Hill, Jr.
1831 Brett Court
Annapolis MD 21401

November 24, 2003

Invoice No.10441

Professional Services

|  |  |  | Hrs/Rate | Amount |
|---|---|---|---|---|
| 03/27/2002 | JWT | Review status of corporate document preparation; follow up with F. Hill | 1.00 175.00/hr |  |
| 03/28/2002 | JWT | Telephone conference with F. Hill regarding document preparation priorities and status of facility lease discussions; update term sheet | 1.50 175.00/hr |  |
| 03/29/2002 | JWT | Telephone conference with F. Hill and A. Watson regarding plans for agreements with vendors and customers and shareholders agreement | 1.25 175.00/hr |  |
| 04/12/2002 | JWT | Edit GE subcontractor agreement to provide more equitable terms; Telephone conference with F. Hill regarding plans for GE, other prospective customers, including Charleston area hospitals | 3.25 175.00/hr |  |
|  | CW | Conferences regarding papers viz GE desired by client, stock for fees arrangement, status of pending transactions | 1.25 200.00/hr |  |
| 04/15/2002 | JWT | Telephone conference with F. Hill and G. Giordano regarding terms of master agreement with GE | 1.50 175.00/hr |  |
| 04/16/2002 | JWT | Edit and revise draft master agreement with GE | 3.50 175.00/hr |  |
| 05/21/2002 | CW | Conference regarding issues for meeting set this Friday at 10:00AM | 0.50 200.00/hr |  |

Data Mountain                                                                      Page    2

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 05/23/2002 CW | Conferences in office regarding meeting tomorrow, status of venture, next round of docs. needed | 0.75 200.00/hr | |
| 05/24/2002 CW | Conference with JT, conference with client regarding matters, further conference with JT regarding structure, liability avoidance, agreements among principals, forum structure | 1.25 200.00/hr | |
| 05/28/2002 CW | Conferences regarding matter, termination provisions needed/reviewed for litigation avoidance, conference regarding same | 1.00 200.00/hr | |
| 06/07/2002 CW | Conferences regarding matter, WVA venture | 0.50 200.00/hr | |
| 09/03/2003 JWT | Email with F. Hill regarding status of corporate matters, i.e., MD registration, resident agent, and stock certificates | 0.75 175.00/hr | |
| 09/08/2003 GCL | Met with JT on representation, stocks and ownership of company | 0.25 200.00/hr | |
| 09/10/2003 GCL | Met with JT on escrow agreements; discussed same | 0.25 200.00/hr | |
| JWT | Review email regarding acceptance of software license with WebPutty; finalize, proofread agreement; review escrow agent agreement | 1.50 175.00/hr | |
| 09/11/2003 SPM | Office conference regarding WebPutty, potential solution | 0.25 150.00/hr | |
| JWT | Review WebPutty issues and escrow terms with G. Giordano; draft revisions and forward to him; draft escrow agent agreement between DMS and LLTM; review email from A. Watson regarding proposed sublease of facilities in Charleston | 2.25 175.00/hr | |
| 09/23/2003 JWT | Telephone conference with F. Hill regarding agreement with WebPutty on escrow and licensing software; edit escrow agreement between DMS, WebPutty and LLTM and forward draft to F. Hill | 1.25 175.00/hr | |
| 09/24/2003 JWT | Review executed WebPutty agreement received from F. Hill | 0.25 175.00/hr | NO CHARGE |
| 09/25/2003 JWT | Review change to draft WebPutty escrow agreement from D. Chamberlain; edit and forward revised document | 0.50 175.00/hr | |
| 09/29/2003 JWT | Review email and fax from D. Chamberlain regarding WebPutty escrow; telephone conference with G. Giordano regarding handling payment | 0.50 175.00/hr | |

Data Mountain                                                                          Page     3

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 09/30/2003 JWT | Telephone conference with G. Giordano regarding procedures for handling WebPutty source code | 0.25 175.00/hr |  |
| 10/06/2003 JWT | Telephone conference with G. Giordano regarding WebPutty software escrow; confer with SPM and GCL regarding same | 0.25 175.00/hr |  |
| 10/09/2003 JWT | Confer with GCL regarding terms of WebPutty escrow | 0.25 175.00/hr |  |
| 10/13/2003 JWT | Draft letter regarding acceptance of software provided by WebPutty | 0.75 175.00/hr |  |

|  | SUBTOTAL: | [ 26.50 | 4,731.25] |
|---|---|---|---|

Escrow

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 09/30/2003 JWT | Execute and forward WebPutty escrow agreement to F. Hill and D. Chamberlain Escrow | 0.25 175.00/hr | NO CHARGE |
| 10/01/2003 JWT | Telephone conference with F. Hill regarding setting up WebPutty escrow; send notice to parties regarding receipt of funds and documents Escrow | 0.50 175.00/hr | NO CHARGE |
| 10/03/2003 JWT | Make administrative arrangements regarding review of WebPutty software Escrow | 0.25 175.00/hr | NO CHARGE |
| 10/08/2003 JWT | Meet with G. Giordano regarding review of WebPutty software Escrow | 1.75 175.00/hr | NO CHARGE |
| 10/09/2003 JWT | Review questions with G. Giordano; email questions to D. Chamberlain Escrow | 0.75 175.00/hr | NO CHARGE |
| 10/10/2003 JWT | Meet with G. Giordano; emails to D. Chamberlain regarding compiling issues Escrow | 0.75 175.00/hr | NO CHARGE |
| 10/14/2003 JWT | Review documents and disburse funds to WebPutty Escrow | 0.50 175.00/hr | NO CHARGE |

|  | SUBTOTAL: | [ 4.75 | 0.00] |
|---|---|---|---|

|  | For professional services rendered | 31.25 | $4,731.25 |
|---|---|---|---|

Data Mountain                                                                                    Page        4

        Additional Charges :

|  |  | <u>Amount</u> |
|---|---|---|
| 10/01/2003 | Escrow Agent Fee | 500.00 |
| 11/14/2003 | Delivery Fees | 15.45 |
|  | Long Distance Phone Fees | 11.55 |
|  | Copying/ Postage Fees | 25.00 |
|  | Total costs | $552.00 |
|  | Total amount of this bill | $5,283.25 |
|  | Previous balance | $7,334.65 |
| 10/10/2003 | Less Payment Received | ($3,000.00) |
| 11/14/2003 | Less Payment to be Received in Shares (47 Shares @ $50 per Share) | ($2,350.00) |
|  | Total payments and adjustments | ($5,350.00) |
|  | Balance due | $7,267.90 |

# LUMAN, LANGE, THOMAS & McMULLEN, LLP

ATTORNEYS AT LAW

GENE C. LANGE
SEAN P. McMULLEN*‡
JOHN W. THOMAS*

SUITE 506
1660 L STREET, N.W.
WASHINGTON, D.C.  20036
Telephone (202) 463-1260
Facsimile  (202) 463- 6328
jthomas@LLTMLAW.COM

OF COUNSEL
JOSEPH C. LUMAN*

*ALSO ADMITTED IN  VIRGINIA
†NOT ADMITTED IN DISTRICT OF COLUMBIA
‡Also Admitted In Maryland

June 23, 2006

Frederick S. Hill, Jr.
Data Mountain Solutions, Inc.
1831 Brett Court
Annapolis, Maryland 21401

Re: Billing Statement

Dear Fred:

I want to try to stay current with you now, so I am sending a bill for our services which covers the two-plus years since the last bill up to two weeks ago.  I have not calculated a credit for partial payment in shares of the company.  Please do not hesitate to contact me with any questions.  Thanks.

Yours truly,

LUMAN, LANGE, THOMAS
& McMULLEN, LLP

John W. Thomas

Luman, Lange, Thomas & McMullen, LLP
Suite 506
1660 L Street, N.W.
Washington, DC  20036-5649


Invoice submitted to:
Data Mountain
Attn: Frederick S. Hill, Jr.
1831 Brett Court
Annapolis MD 21401


June 23, 2006

*PAID $2,841.25 6/25/06 , ck. # 1318*

Invoice #10698


Professional Services

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 12/4/2003 | Telephone conference with F. Hill, G. Giordano regarding status of corporate matters and potential investment by an outside investment group | 0.75<br>175.00/hr | 131.25 |
| 4/14/2004 | Review and forward annual report form for Virginia to F. Hill | 0.50<br>180.00/hr | 90.00 |
| 4/23/2004 | Prepare stock certificates | 0.25<br>180.00/hr | 45.00 |
| 4/29/2004 | Email with F. Hill regarding activities of the company | 0.50<br>180.00/hr | 90.00 |
| 7/21/2004 | Review and forward notice regarding annual fee and annual report | 0.50<br>180.00/hr | 90.00 |
| 7/28/2004 | Telephone conference with G. Giordano regarding updating corporate records for changes in ownership and management | 0.25<br>180.00/hr | 45.00 |
| 8/6/2004 | E-mail regarding plans for corporate changes | 0.25<br>180.00/hr | 45.00 |
| 5/2/2005 | Review and forward annual registration and report forms for Virginia | 0.25<br>180.00/hr | 45.00 |
| 12/13/2005 | Telephone conference with D. Mcumber regarding transferring corporate charter to Virginia and updating corporate records; research status of corporation with Virginia State Corporation Commn.; research statutory requirements for transfer of charter via merger or share exchange | 1.00<br>180.00/hr | 180.00 |

Data Mountain                                                                      Page    2

|  | | Hrs/Rate | Amount |
|---|---|---|---|
| 3/23/2006 | Review e-mail from F. Hill regarding new venture; send acknowledgement | 0.50<br>180.00/hr | 90.00 |
| 3/24/2006 | Review draft documents for wine project | 0.75<br>180.00/hr | 135.00 |
| 3/27/2006 | Review e-mail regarding organizing issues | 0.25<br>180.00/hr | 45.00 |
| 3/29/2006 | Prepare and send memo regarding advantages and disadvantages of forming new legal entity to operate "ask the wine guy"; check name availability with State Corporation Commission | 1.25<br>180.00/hr | 225.00 |
| 3/30/2006 | Telephone conferences with F. Hill and D. Mcumber regarding corporate governance issues and decision-making for Wine Guy; discuss need to resolve relationship with Tony Watson | 1.00<br>180.00/hr | 180.00 |
| 4/5/2006 | Telephone conference and e-mail from F. Hill and G. Giordano regarding corporate operations questions for the corporation and for the Wine Guy | 1.50<br>180.00/hr | 270.00 |
| 4/10/2006 | E-mail wtih F. Hill regarding status of Tony Watson in corporation; pose questions about plans in 2004 to spin off Securicabinet business | 0.50<br>180.00/hr | 90.00 |
| 4/12/2006 | Review e-mail regarding stock and director questions | 0.25<br>180.00/hr | 45.00 |
| 4/19/2006 | E-mail with F. Hill regarding corporate matters | 0.50<br>180.00/hr | 90.00 |
| 4/24/2006 | Review and forward Virginia annual registration forms | 0.25<br>180.00/hr | 45.00 |
| 4/26/2006 | Review bylaws and shareholders agreement regarding questions from F. Hill on voting rights and procedures | 0.50<br>180.00/hr | 90.00 |
| 4/27/2006 | E-mail regarding Board meeting | 0.25<br>180.00/hr | 45.00 |
| 5/16/2006 | Review notice of Board meeting | 0.25<br>180.00/hr | 45.00 |
| 5/24/2006 | Telephone conference with F. Hill to plan for meeting on May 25 | 0.25<br>180.00/hr | 45.00 |
| 5/26/2006 | Work on draft agreement among shareholders to restructure company | 0.50<br>180.00/hr | 90.00 |
| 6/2/2006 | Work on memo outlining corporate organization procedures, issues | 1.00<br>180.00/hr | 180.00 |

Data Mountain                                                                    Page     3

|            |                                                                              | Hrs/Rate        | Amount       |
|------------|------------------------------------------------------------------------------|-----------------|--------------|
| 6/5/2006   | Work on memo outlining corporate organization questions                      | 1.00<br>180.00/hr | 180.00       |
| 6/6/2006   | Review letter from M. Dymersky; discuss issues with SPM                      | 0.50<br>180.00/hr | 90.00        |
| 6/7/2006   | Telephone conference with M. Dymersky and L. Machado regarding Mcumber's claims against Giordano | 0.50<br>180.00/hr | 90.00        |
| 6/9/2006   | Confer with GCL regarding sorting out the corporate disputes; work on opinion letter; leave message for F. Hill | 1.25<br>180.00/hr | 225.00       |

|            | For professional services rendered     | $3,056.25   |
|------------|-----------------------------------------|-------------|
|            | Previous balance                        | $7,267.90   |
|            | Accounts receivable transactions        |             |
| 6/20/2004  | Less Payment Received                   | ($3,500.00) |
| 4/24/2006  | Less Payment Received                   | ($3,767.90) |
| 6/20/2006  | Less Courtesy Discount                  | ($215.00)   |
|            | Total payments and adjustments          | ($7,482.90) |
|            | Balance due                             | $2,841.25   |

# EXHIBIT -9-

ug 18 06 09:52p     Frederick S Hill Jr        4102240943            p.1



Data Mountain Solutions

*Your Technology Utility.* ©

## FACSIMILE TRANSMITTAL SHEET

| TO:<br>Mr. John W. Thomas | FROM:<br>Fred Hill |
|---|---|
| COMPANY:<br>Luman, Lange, Thomas & McMullen, LLP | DATE:<br>8/18/2006 |
| FAX NUMBER:<br>(202) 463-6328 | TOTAL NO. OF PAGES INCLUDING COVER:<br>2 |
| PHONE NUMBER:<br>(202) 463-1260 | SENDER'S REFERENCE NUMBER: |
| RE:<br>Termination/Data Mountain Solutions | YOUR REFERENCE NUMBER: |

☑ URGENT    ☑ FOR REVIEW    ☐ PLEASE COMMENT    ☑ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:
Dear Mr. Thomas:

I am in receipt of both your letter addressed to Philip J. McNutt, Esq. dated August 3, 2006 and your unauthorized email addressed to "Data Mountain Solutions, Inc., Shareholders" dated August 17, 2006.

I am confused. Your letter to Mr. McNutt states that you and your firm have not represented "DMS" for some time now yet the email from yesterday clearly states otherwise. I do not feel that the best interest of the company and its shareholders is being represented in this challenging time in the company's history. I therefore would like this letter to serve as formal Notice from Data Mountain Solutions, Inc. that you and your firm are immediately terminated as counsel for DMS.

Please have the following items packaged and ready for courier pick-up by the end of business this Monday, August 21, 2006:

1. All corporate documents, originals and copies. Particularly as referenced in your email, "copies of various documents and corporate records that we accumulated as counsel for DMS, including Articles of Incorporation, Bylaws, Shareholders Agreement, corporate minutes from several years ago, and the like."

2. Corporate Starter Kit and Stamp.

3.  All stock registry and stock transfer records.

In addition, Data Mountain Solutions, Inc. (DMS) is reserving all of its rights regarding its representation by your law firm, including reserving DMS' rights regarding fees paid by monies and stock issuances for billed legal services rendered during the past three year period in which your letter dated August 3, 2006 claims another attorney "was handling any legal work for DMS." Thank you in advance for your urgent attention to this matter.

Sincerely,

Frederick S. Hill, Jr.
President

2

EXHIBIT -10-

# HUGHES & BENTZEN, PLLC

ATTORNEYS AT LAW
1100 CONNECTICUT AVENUE, NW
SUITE 340
WASHINGTON, DC 20036

(202) 293-8975
FACSIMILE (202) 293-8973

WWW.HUGHESBENTZEN.COM

MICHAEL P. BENTZEN, P.C., DC, MD
GEORGE J. HUGHES, DC, MD
ELIZABETH HUGHES, DC, MD
PHILIP J. MCNUTT, DC,MD
STUART H. SORKIN, P.C., DC, FL
CHRISTOPHER WHEELER, DC, MD

OTHER OFFICES:
ROCKVILLE, MARYLAND

August 16, 2006

## BY HAND-DELIVERY

John W. Thomas, Esq.
Luman, Lange, Thomas & McMullen, LLP
1660 L Street, N.W.
Suite 506
Washington, DC 20036

Re: Data Mountain Solutions, Inc./Derek McUmber, *et al.*

Dear Mr. Thomas:

I have reviewed your letter dated August 3, 2006 with my client, Derek McUmber ("Mr. McUmber"), and other shareholders & officers of Data Mountain Solutions, Inc. ("DMS"). Frankly, your letter is very suspicious in many respects and has raised my client's level of concern over actual and potential concealment and fraud related to the income, assets and ownership of DMS.

1. You have failed or refused to produce the requested records of DMS that Mr. McUumber is entitled to inspect and copy. Specifically, your letter states that "after Mr. Wheeler left our firm [in August, 2003], Luman, Lange, Thomas & McMullen, LLP, had no significant contacts with the Corporation for nearly three years." This statement is an apparent attempt to show that your firm does not, and has not, represented DMS    However, your allegation of "no significant contacts...for nearly three years" is plainly contradicted by your prior assertion (on p.1 of your Letter) that you are "Counsel to DMS through Luman, Lange, Thomas & McMullen, LLP". Moreover, the Invoices from your law firm to DMS show that for the months comprising calendar years 2003-2006, you billed numerous hours for multiple contacts by you with DMS and for review of DMS corporate documents, all for the **same** time-period your letter now claims you had "**no** significant contacts with the Corporation."

2. Curiously, your letter was faxed from "Luman, Lange, Thomas & McMullen," your current firm, but not written on firm letterhead. Along with the other deficiencies of your letter, this is a transparent, unprofessional and unethical attempt to avoid the legitimate questions, issues and demands of my letter to you of July 28, 2006. You attempt to limit your responses to the requests and claims of Mr. McUmber by qualifying your responses with words like "personal", "personally." Indeed, at the outset, you qualify your letter by saying that it is a "personal response" to Mr. McUmber's requests and claims as "directed" to you "personally." In this manner, you have attempted to avoid and have refused to produce the requested information ("I have no documents of

John W. Thomas, Esq.
Luman, Lange, Thomas & McMullen, LLP
August 16, 2006
Page 2

the Corporation in my personal possession"). Your "defense" to Mr. McUmber's legitimate claims and demands is contained in the allegation that you "personally" have not received monies, fees, and/or stock from DMS. However, as a fundamental matter of law, Mr. McUmber's requests for information from and claims against "you" are imputed to whatever entities under which and by which you have allegedly performed services for DMS, and are **not** limited to you personally. (You will note that my letter was addressed to the firm's office address and not to your residence)[1] Indeed, you seem to recognize this axiom by referring throughout your Letter to various acts, services, and possessions of your firm, "Luman, Lange, Thomas & McMullen, LLP." However, you seem to skip in an out of your firm capacity as needed to bolster your "claims" and "defenses' such as they are.

   3. Unfortunately, you have deliberately chosen to provide my client with **none of the documents or information** regarding the payments and stock issuances from DMS which were part of the subject matter of my letter to you of July 28, 2006. You have done nothing to alleviate Mr. McUmber's concerns about the concealed stock issuances and unwarranted and excessive payments. In fact your letter raises the level of Mr. McUmber's concerns. As just one example, your Letter states that I somehow "know Luman, Lange, Thomas & McMullen, LLP has 192 shares DMS", and that I should "check [my] facts before going further". But without the requested corporate records, I do not and cannot know the shareholders of DMS, nor the number/type of shares held by them, nor the consideration for the issuance of such shares. I have been trying to "check my facts", but you have failed and refused to produce needed records, and continue to do so.

   Your Letter, while full of unprofessional insults, diatribes, and diversions, completely fails to address the extent of, amounts, and alleged reasons for the DMS stock and monies received by Mr. Giordano, and by **you** ( which of course includes any law firms or other entities for which you were acting or employed) – information that Mr. McUmber is entitled to and has properly requested. Therefore, please be advised that Mr. McUmber will forthwith seek appropriate equitable and legal relief against you in Court.

                                        Sincerely,

                                        Philip J. McNutt

cc: Derek McUmber

_____

[1]To avoid any continuing confusion in this regard I have added the firm name to the address, above.

John W. Thomas, Esq.
Luman, Lange, Thomas & McMullen, LLP
August 16, 2006
Page 3


Greg Giordano
c/o David Bledsoe, Esquire

Data Mountain Solutions, Inc.(By overnight courier)
1116 Smith Street
Charleston, WV 25301

# EXHIBIT -11-

## Christopher Wheeler

| | |
|---|---|
| **From:** | John W. Thomas [jthomas@lltmlaw.com] |
| **Sent:** | Thursday, August 17, 2006 5:56 PM |
| **To:** | Gregg Giordano; Fred Hill; Derek Mcumber; Tony Watson; Christopher Wheeler |
| **Cc:** | Philip McNutt |
| **Subject:** | Data Mountain Solutions |

TO: Data Mountain Solutions, Inc., Shareholders

As many of you probably know, since May, the four principal shareholders of Data Mountain Solutions, Inc. (Gregg Giordano, Fred Hill, Derek McUmber, and Tony Watson) have sought to work out certain differences of priorities and goals that they have for the company. At the end of May, these principals came to me as counsel for DMS to assist them in working out a resolution of these differences. In representing DMS, we have remained neutral to the claims of the principal shareholders. We provided unbiased advice to the principal shareholders as to the requirements of applicable provisions of the corporate documents and of corporate law and as to whether certain actions taken and/or proposed were in compliance with the various applicable provisions. These matters have not been resolved, and we have been notified that both Derek and Gregg have hired attorneys to help them work out the differences.

Derek's attorney, Philip McNutt, sent a letter at the end of July, addressed to Gregg and DMS, as well as to me, personally. In this letter, Mr. McNutt suggested that DMS's shareholders had been defrauded, and further appeared to include me as a perpetrator of such fraud. Mr.
McNutt also demanded that I turn over any documents that purported to show such fraud. I responded with some degree of outrage and expressed my shock that Derek or any of the other principals of DMS would make such allegations against me personally. I also responded that I had no documents or other evidence in my personal possession. I did not respond on behalf of DMS because, as noted above, DMS was sent the same letter separately, and no one from DMS requested my assistance or otherwise contacted me to respond or turn over documents on behalf of DMS. On August 16, I received another letter from Mr. McNutt which suggests that his request to me was intended to include DMS's counsel. I can provide you with copies of Mr. McNutt's letters and my response to his initial letter for review upon request.

We have copies of various documents and corporate records that we accumulated as counsel for DMS, including Articles of Incorporation, Bylaws, Shareholders Agreement, corporate minutes from several years ago, and the like. Under the applicable corporate law, a shareholder does not appear to be given the right to demand corporate documents from the corporation's counsel. Further, to the best of our knowledge, Derek already received copies of all the documents in our possession at the time these documents were originally created. Nevertheless, we have no objection to providing a copy of our DMS documents to Derek's attorney, especially if it assists in the parties reaching a resolution of their differences, nor do we have any desire to get in the middle of the ongoing dispute between the principals. Accordingly, we have decided to provide copies of the requested documents to Mr. McNutt.

We are writing this memo to all of the shareholders to provide you with notice of our intention to provide Mr. McNutt the documents, and to give each shareholder the opportunity to note any objections that he might have to our making such a response.. If you have reason to object to this response, please let us know promptly of the basis of your objection. If we have not received any justifiable objection by close of business on TUESDAY, AUGUST 22, 2006, we will copy and send the requested documents to Mr. McNutt in the following days.

--
John W. Thomas
Luman, Lange, Thomas & McMullen, LLP
1660 L Street, N.W., Suite 506
Washington, D.C. 20036
(tel) 202-463-1260
(fax) 202-463-6328

The information contained in and/or included with and/or attached to this e-mail is attorney-client privileged and confidential, intended only for the use of the addressee. If you are not the intended recipient, or the recipient's employee or agent, you are hereby notified that any reading, disclosure, distribution, or copying of the information included with this e-mail is prohibited. If you have received this communication in error, please notify us immediately by telephone, and destroy the transmitted materials.

# EXHIBIT -12-

**DAVID I. BLEDSOE**
ATTORNEY AT LAW
601 KING STREET
ALEXANDRIA, VIRGINIA 22314
TELEPHONE (703) 879-0484
FACSIMILE (703) 684-1851

OF COUNSEL
JOHN A. RITCHIE

ADMITTED IN VIRGINIA,
MARYLAND AND D.C.

August 22, 2006

**BY FAX**
John W. Thomas , Esquire
Hughes and Bentzen, PLLC
1660 L Street NW
Suite 3506
Washington DC  20036

　　　　Re: Data Mountain Solutions, Inc.

Dear Mr. Thomas:

　　　　I have a copy of the July 28, 2006 letter from Mr. McNutt, Mr. McUmber's lawyer, and I understand that you have received a similar letter from Mr. Hill that seeks the same documents and also purports to fire your firm as corporate counsel to DMS. While Mr. McNutt has not seen fit to respond to my inquiries, it would not appear that Mr. McUmber would be entitled to most of the requested documents as a shareholder of DMS under West Virginia law. Nevertheless, my client has no objection to you providing Mr. McUmber or Mr. Hill with copies of whatever documents you deem fit in your professional judgment; however, given the nature of the dispute here, my client would object to your providing original documents to anyone and would request that you retain all originals, including the stock book, minute book, etc. until all outstanding matters are resolved.

　　　　My client, a shareholder, director and officer of DMS, can affirm that there has been no action by the board of directors firing your firm or authorizing Mr. Hill to fire your firm. Therefore, Mr. Giordano requests that you remain as corporate counsel unless and until such action is in fact taken by the board of directors.

　　　　Please call me if you have any questions.

Sincerely,

David I. Bledsoe

cc:    Philip McNutt, Esq.
        Fred Hill

# EXHIBIT -13-

**From:** John W. Thomas [mailto:jthomas@lltmlaw.com]
**Sent:** Mon 8/21/2006 3:28 PM
**To:** Hill, Frederick
**Cc:** pmcnutt@hughesbentzen.com
**Subject:** Data Mountain Solutions, Inc.

Dear Fred –

This morning I received your fax and e-mail sent to my office at 10:00 pm last Friday, and our firm will comply with your directions the best we can. We acknowledge your termination notice and will do nothing more by or on behalf of the corporation unless requested to do so by all four DMS principals.

There are several comments in your fax that I must respond to. First, you described the e-mail I sent on Friday as "unauthorized," and that is not correct. By that e-mail, I was seeking authority from the shareholders to provide copies of DMS documents to Derek McUmber's attorney, Philip McNutt. As corporate counsel, and given the current circumstances, we were correct in seeking corporate approval.

Second, you mentioned my response to Mr. McNutt's first letter and suggested that I was taking inconsistent positions. What I said to Mr. McNutt was that I did not have significant contact with the corporation for nearly 3 years, and I thought that DMS had another attorney – perhaps Chris Wheeler. When you and Derek contacted me in late 2005, I realized that that was not the case. If you review the billing statement we sent you dated June 23, 2006, you can verify that we did little besides receiving and forwarding the Virginia State Corporation Commission registration forms from the latter part of 2003 through 2005.

In my e-mail on Friday, I said I was going to send copies of documents to Mr. McNutt if no shareholders objected. I suggested close-of-business on Tuesday for a response, since Tony Watson is in Egypt and we had to mail the notice to the Milhisers. So, we are committed to complying with the request of Derek's attorney for the documents that you also demanded

8/23/2006

this morning. Your demand this morning complicates our ability to response. This is a position we do not like to be in.

We are assembling all the documents, and we intend to comply with your request and Mr. McNutt's. You will get the original corporate minute book, shareholder register, and starter kit. Mr. McNutt will get copies of the same. If there are other corporate records in our files, we will provide them in the same manner. Unless we receive legitimate objection to our turning the documents over to Mr. McNutt by tomorrow evening, we intend to provide such on Wednesday. Please send your courier over to receive them on Wednesday afternoon. In no event will we have your requested documents ready today.

The last paragraph of your letter again raises questions about the services of this firm over the past three years, which are detailed in the billing statement we sent you in June. I would be glad to discuss this with you, the other shareholders, or Mr. McNutt at any time.

I have tried to stay in a neutral position throughout, since you and Derek raised questions about Gregg's plans earlier this year. I have consistently advised the four DMS principals of the corporate procedures that need to be followed, and I have said that the shareholders agreement requires you four principal shareholders to agree on changes to stock ownership and election of board members.

Pursuant to your direction today, we are no longer counsel for DMS. We will prepare our final billing statement and forward it to you in the near future. We will expect to be paid for our services to DMS.

--
John W. Thomas
Luman, Lange, Thomas & McMullen, LLP
1660 L Street, N.W., Suite 506
Washington, D.C. 20036
(tel) 202-463-1260
(fax) 202-463-6328

The information contained in and/or included with and/or attached to this e-mail is attorney-client privileged and confidential, intended only for the use of the addressee. If you are not the intended recipient, or the recipient's e agent, you are hereby notified that any reading, disclosure, distribution, or copying of the information included mail is prohibited. If you have received this communication in error, please notify us immediately by telephone, the transmitted materials.

# EXHIBIT -14-

# LUMAN, LANGE, THOMAS & MCMULLEN, LLP

ATTORNEYS AT LAW
SUITE 506
1660 L STREET, N.W.
Washington, D.C. 20036
Telephone (202) 463-1260
Facsimile (202) 463- 6328
JTHOMAS@LLTMLAW.COM

GENE C. LANGE
SEAN P. MCMULLEN*‡†
JOHN W. THOMAS*

OF COUNSEL
JOSEPH C. LUMAN*

*ALSO ADMITTED IN VIRGINIA
†NOT ADMITTED IN DISTRICT OF COLUMBIA
‡ALSO ADMITTED IN MARYLAND

August 22, 2006

BY HAND

Philip J. McNutt, Esquire
Hughes and Bentzen, PLLC
1100 Connecticut Avenue, NW
Washington, D.C. 20036

Re:    Data Mountain Solutions, Inc.

Dear Mr. McNutt:

In response to your letters of July 28 and August 16, I am enclosing copies of all of the documents in the possession of Luman, Lange, Thomas & McMullen, LLP, related to Data Mountain Solutions, Inc., which you requested.

This afternoon, we received a fax from David Bledsoe, Esq., demanding that the original stock book and minute book be kept in the custody of this firm. In response, we see two possible ways to deal with this.

First, a majority of the shareholders agree on a disposition of these items, or

Second, we bring an interpleader action in Fairfax County Circuit Court in which we ask the court to take possession of these items until the parties' respective rights are determined. We will insist upon being paid our customary fees to bring such an action.

Either of these options is fine with us.

Sincerely,

John W. Thomas

Enclosures

cc:    David Bledsoe, Esq.
       Frederick S. Hill, Jr.

# EXHIBIT -15-

## Philip McNutt

| | |
|---|---|
| **From:** | John W. Thomas [jthomas@lltmlaw.com] |
| **Sent:** | Tuesday, August 29, 2006 9:23 AM |
| **To:** | Philip McNutt; Fred Hill; Tony Watson; David Bledsoe |
| **Subject:** | Data Mountain Solutions, Inc. |

To the Board of Directors of Data Mountain Solutions, Inc. --

On August 24, Gregg Giordano's attorney, David Bledsoe, requested that we update the corporation's stock ownership records to reflect the repurchase of part of Fred Hill's stock by the corporation in two transactions in 2004 and 2005. It is our understanding that these transactions were unanimously approved by the four principal shareholders, and Mr. Hill has been paid the agreed amount, but the stock transfer records of the corporation have not been updated to reflect the transactions.

The actions to be taken consist of the following: Prepare a new stock certificate for Mr. Hill for 7,494 shares; prepare a stock transfer record of the issuance of the certificate; and amend the record for the issuance of certificate number 2 to Mr. Hill to show that the certificate has been cancelled. We will provide the new certificate (number 9) for signature by the president (Mr. Hill) and secretary (Mr. Giordano).

We are willing but reluctant to take these steps, even though they are purely ministerial, because of the parties' current stalemate and the directive from Mr. Hill that our services are terminated. Nevertheless, taking these ministerial steps is a simple task that we can do, and it is an action that ought to be done. Accordingly, we will prepare the documents as described above for signatures by Mr. Hill and Mr. Giordano unless we receive an objection from one of the Board members by noon EDT on Friday, September 1.

--
John W. Thomas
Luman, Lange, Thomas & McMullen, LLP
1660 L Street, N.W., Suite 506
Washington, D.C. 20036
(tel) 202-463-1260
(fax) 202-463-6328

The information contained in and/or included with and/or attached to this e-mail is attorney-client privileged and confidential, intended only for the use of the addressee. If you are not the intended recipient, or the recipient's employee or agent, you are hereby notified that any reading, disclosure, distribution, or copying of the information included with this e-mail is prohibited. If you have received this communication in error, please notify us immediately by telephone, and destroy the transmitted materials.

**DAVID I. BLEDSOE**
ATTORNEY AT LAW
901 KING STREET
ALEXANDRIA, VIRGINIA 22314
TELEPHONE (703) 879-0424
FACSIMILE (703) 684-1851

OF COUNSEL
JOHN A. RITCHIE

ADMITTED IN VIRGINIA,
MARYLAND AND D.C.

August 24, 2006

**BY FAX**
John W. Thomas , Esquire
Hughes and Bentzen, PLLC
1660 L Street NW
Suite 3506
Washington DC  20036

Re: Data Mountain Solutions, Inc.

Dear Mr. Thomas:

I have reviewed the corporate records you provided me, and it appears that the stock transfer book and stock certificates are not up to date. Those records do not reflect Mr. Hill's sales to the corporation of first, 11,250 of his shares pursuant to a document entitled "Stock Purchase Agreement – 1," bearing a date of May 1, 2004 and later, 3,756 of his shares pursuant to a document entitled "Stock Purchase Agreement – 2", dated May 10, 2005. There is no controversy that these transactions were consummated over a year ago, and that Mr. Hill received the consideration for those sales.

I request that the stock transfer records be made current by you immediately, and Mr. Hill's former stock certificate cancelled and a new replacement stock certificate issued reflecting his current holding, which I calculate is 7,494 shares. If you do not wish to undertake these ministerial tasks, or other parties object, please let me know, and Mr. Giordano, the corporation's Secretary, can come into your office and correct the documents and issue the new certificate.

Please call me if you have any questions.

Sincerely,

David I. Bledsoe

cc:     Philip McNutt, Esq.
        Fred Hill

# EXHIBIT -16-

# HUGHES & BENTZEN, PLLC

ATTORNEYS AT LAW
1100 CONNECTICUT AVENUE, NW
SUITE 340
WASHINGTON, DC 20036

(202) 293-8975
FACSIMILE (202) 293-8973

WWW.HUGHESBENTZEN.COM

MICHAEL P. BENTZEN, P.C., DC, MD
GEORGE J. HUGHES, DC, MD
ELIZABETH HUGHES, DC, MD
PHILIP J. MCNUTT, P.C., DC,MD
STUART H. SORKIN, P.C., DC, FL
CHRISTOPHER WHEELER, DC, MD

OTHER OFFICES:
ROCKVILLE, MARYLAND

August 31, 2006

## BY HAND-DELIVERY

John W. Thomas, Esq.
1660 L Street, N.W.
Suite 506
Washington, DC 20036

Re: Data Mountain Solutions, Inc.

Dear Mr. Thomas:

Please be advised that our firm has now been retained by Frederick S. Hill, Jr. ("Mr. Hill"). Thus, we now represent both Mr. Hill and Mr. McUmber ("Mr. McUmber"), regarding their ownership interests in, and other relationships with, Data Mountain Solutions, Inc. ("DMS").

This Letter is in response to your e-mail dated August 29, 2006, wherein you state your intent to alter the stock registry and transfer records of Data Mountain Solutions, Inc. unless you receive an objection from one of the Board members by noon EDT on Friday, September 1, 2006.

My first response to your email is that I don't understand what authority you have to perform any tasks. My understanding is that your services were terminated.

The second response to your email is that no actions should be taken to alter any of the documents in view of the fact that there is a dispute among the shareholders as to who owns what shares and what authority exists for certain corporate actions. Therefore, I would suggest that your duty, as former counsel to the Corporation, is to preserve the record, as is, for resolution of any disputes through the corporation's by-laws, or other appropriate means.

I also note that in your prior letter you stated an intention to interplead the corporate documents into the Circuit Court for Fairfax County, Virginia. I am curious why you would need to interplead anything at this point. Moreover, I am even more curious why you would be seeking to interplead the corporate documents of a West Virginia corporation into a court in the Commonwealth of Virginia. I am not even sure that the corporation is qualified to do business in Virginia and it is certainly not resident in Virginia.

John W. Thomas, Esquire
August 31, 2006
Page 2


If, in fact, your services have been terminated, you should be doing nothing.  Instructions from counsel for the corporate secretary are not sufficient for you to act in any capacity.

Although no action on the part of our clients should be necessary, in light of the deadline set forth in your e-mail this will serve as notice to you that  Mr. Hill and Mr. McUmber object to your taking any actions.

Thank you for your consideration.

Sincerely,

Philip J. McNutt

cc:     Derek McUmber (by hand delivery)
        Fred Hill (by hand delivery)

# EXHIBIT -17-

**DAVID I. BLEDSOE**
ATTORNEY AT LAW
601 KING STREET
ALEXANDRIA, VIRGINIA 22314
TELEPHONE (703) 879-0424
FACSIMILE (703) 684-1851

OF COUNSEL
JOHN A. RITCHIE

ADMITTED IN VIRGINIA,
MARYLAND AND D.C.

September 1, 2006

**BY FAX**
John W. Thomas , Esquire
Luman, Lange, Thomas & McMullen
1660 L Street NW
Suite 3506
Washington DC  20036

Re: <u>Data Mountain Solutions, Inc.</u>

Dear Mr. Thomas:

Thank you for the copy of Mr. McNutt's letter, which he inexplicably failed to copy me on.

Section 3.5 of the Bylaws require my client as Secretary to have custody of the minutes and stock book. As Secretary, Mr. Giordano demands that you relinquish such original records to his custody. Please let me know a convenient time for Mr. Giordano to pick up the original records and stock book.

Please call me if you have any questions.

Sincerely,

David I. Bledsoe

cc:     Philip McNutt, Esq.

Sincerely,

David I. Bledsoe

cc:     Philip McNutt, Esq.
        Fred Hill

# EXHIBIT -18-

**DAVID I. BLEDSOE**
ATTORNEY AT LAW
601 KING STREET
ALEXANDRIA, VIRGINIA 22314
TELEPHONE (703) 879-9484
FACSIMILE (703) 684-3851

OF COUNSEL
JOHN A. RITCHIE

ADMITTED IN VIRGINIA,
MARYLAND AND D.C.

September 5, 2006

**BY FAX**
John W. Thomas , Esquire
Luman, Lange, Thomas & McMullen
1660 L Street NW
Suite 3506
Washington DC 20036

        Re: Data Mountain Solutions, Inc.

Dear Mr. Thomas:

        I received your letter of last Friday.

        Your latest proposed solution is unacceptable. We have repeatedly asked Mr. McNutt to explain the various charges in his first letter and his clients to cooperate with us to enable DMS to go forward. Those requests have been completely ignored. We have no desire to wait for further intransigence.

        Our latest request, *that the corporate book be corrected by you to reflect the undisputed sale of stock in 2005 by Mr. Hill,* has been rejected by Mr. McNutt. Mr. McNutt claims, with no factual basis whatsoever, that there is a dispute as to the fact that Mr. Hill over a year ago sold back stock to the corporation. There is no such actual dispute, as Mr. McUmber, Mr. Hill and Mr. McNutt are all aware; we have signed and executed sales agreements and Mr. Hill has accepted and cashed checks for the sale of stock. Mr. McNutt's suggestion that there is a dispute is an utter fabrication and a gross misrepresentation. *Mr. McNutt has demanded that the stock book remain incorrect.* If there were any more evidence needed of the bad faith of Mr. McNutt and his clients, the attempt to now claim that this transaction actually never occurred, and to insist that the stock books be maintained as showing Mr. Hill as the owner of stock that he sold over a year ago, would more than suffice.

        My client is the Secretary of the corporation, who is required by the Bylaws to have custody of the books and records. There is absolutely no legal basis upon which you can withhold these records from him. I will vigorously oppose any attempt to "interplead" the corporate records, since there is absolutely no viable legal argument that anyone other than my client is to have them. My client will be in contact today to take possession of the original minutes and stock book, and will correct the stock book *as he*

*is required by the Bylaws to do.* I trust you will not interfere with his attempt to fulfil his duty as Secretary.

    Please call me if you have any questions.

                                                    Sincerely,

                                                    David I. Bledsoe

cc:    Philip McNutt, Esq.