## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
DATA MOUNTAIN SOLUTIONS, INC., et al.,  )
                                        )
           Plaintiffs,                  )
                                        )
v.                                      ) CA 06-1666 (PLF)
                                        )
GREGG GIORDANO, et al.,                 )
                                        )
           Defendants.                  )
_____

### DEFENDANT GREGG GIORDANO'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Defendant Gregg Giordano, by counsel, files this Opposition to Plaintiffs' Motion for a Preliminary Injunction. On September 29, 2006, this Court denied Plaintiffs' Motion for a Temporary Restraining Order, finding that the plaintiffs would suffer no irreparable injury. Nothing in the interim has changed, and the Court should deny Plaintiff's Motion for a Preliminary Injunction.

The prefiling conduct of the plaintiffs is quite instructive in understanding the "emergency" nature of plaintiff's request for an injunction, and plaintiffs' claims of irreparable harm. On July 28, 2006, plaintiffs' counsel wrote a letter to Mr. Giordano and Mr. Thomas, in which many of the allegations of the Complaint were hinted at. Exhibit 6 to Plaintiff's Memo. Mr. Giordano hired undersigned counsel, who began a series of telephone calls to plaintiffs' counsel. Plaintiff's counsel declined to respond to these calls. Thereafter, on August 15, 2008, undersigned counsel wrote a letter to plaintiff's counsel, requesting that he respond to the telephone calls and offering

voluntarily to eliminate any dispute over the transactions complained of by specifically 1) rescinding the sale of stock between Giordano and Watson and 2) escrowing the $40,000 bonus that plaintiffs dispute.  Ex. E, attached hereto.  Plaintiff's Counsel refused to respond to this letter as well.

On August 22, 2006, undersigned counsel wrote a second letter to Mr. McNutt, asking that he respond to the August 15 letter.[1]  Mr. McNutt also refused to respond to this letter.  On August 28, 2006, in response to a letter from Mr. Hill to Mr. Giordano, undersigned counsel wrote to Mr. Hill, who was then unrepresented, and offered to place all monies in dispute into a bank account to be controlled by Mr. Hill, Mr. McUmber, and Mr. Giordano.[2]  Ex. F, attached hereto.  Rather than accept these voluntary concessions – indeed, rather than even responding in any way to them -- Hill and McUmber have chosen to come into court almost two months later, seeking the extraordinary remedy of a temporary restraining order and preliminary injunction.  The Court should not countenance such frivolous and vexatious tactics.

On September 29, 2006, this Court denied Plaintiffs' hearing for a Temporary Restraining Order, specifically finding that the plaintiffs would suffer no irreparable injury whatsoever.  This Court must maintain that finding, as nothing has happened in the interim to develop any further potential of irreparable injury to the plaintiffs.

Plaintiffs were able to put forward only two "irreparable" injuries in support of its motion for a temporary restraining order.  Neither was irreparable then, and neither is irreparable now.  The Court should dismiss this nonsensical motion and direct the parties to arbitrate this matter as the Shareholders' Agreement provides.

---

[1] Due to an error in printing the letter, the August 22 letter bore the incorrect date of August 15.
[2] Due to an error in printing the letter, the August 28 letter also bore the incorrect date of August 15.

What is truly at issue here, and what Plaintiffs McUmber and Hill seek, is the court's assistance in perpetrating a fraud on defendants and the other stockholders of DMS. Plaintiff McUmber and Hill ask this Court to "freeze" the corporate stock records to prevent those records being updated to reflect the undisputed sale in 2005 of most of Hill's stock. This sale reduced Hill's percentage of ownership in DMS from roughly 22% to roughly 7%. The sale was recorded in two separate documents, attached hereto as Exhibits A and B. There is no dispute that this sale took place and that Hill received $32,000 in exchange for his stock. Hill now wishes to be able to vote the stock he sold over a year ago in any future shareholder meetings. Thus, there is an attempt to obtain control of DMS by fraud: an attempt by Hill and McUmber. The Court should not allow itself to be made a party to this fraud by freezing the status quo of an incorrect stock book.

## FACTUAL BACKGROUND

DMS is a tiny company specializing in information technology. It has only a handful of shareholders, and annual revenues of roughly $300,000.

DMS's principal place of business is at 8619 Westwood Center Drive, Suite 200, Vienna, VA 22182 ('The Virginia Office"). The Virginia Office is where DMS maintains the datacenter that is the central thrust of DMS's activities, and the main source of DMS's income. DMS employees work at and use the Virginia Office in order to service and maintain DMS's data center. Giordano Affidavit, ¶16-17.

West Virginia requires DMS as a West Virginia corporation to have a registered office in West Virginia. DMS's registered office is with an executive suite operation in

Charleston, West Virginia. DMS maintains no physical office at this location, and DMS has no employees who live or work in West Virginia. No business activity of any sort takes place at the registered office in West Virginia. DMS does no actual business in the state of West Virginia. Id.

Plaintiff Derek McUmber ("McUmber") is a shareholder and director of DMS. He owns 22,500 shares of DMS stock, or approximately 29 percent of outstanding shares. Plaintiff Fred Hill ("Hill') is a shareholder, director, and officer of DMS. He owns 5,625 shares of DMS stock, or approximately 7 percent of outstanding shares. Hill is the President and Treasurer of the Corporation. Giordano Affidavit, ¶2,4.

Defendant Gregg Giordano ("Giordano")is shareholder, director, and officer of DMS. He owns 22,500 shares of DMS stock, or approximately 29 percent of outstanding shares. He is the Secretary of the Corporation. Giordano Affidavit, ¶3.

Defendant Anthony Watson ("Watson") is a shareholder and director of DMS. He owns 22,500 shares of DMS stock, or approximately 29 percent of outstanding shares. Giordano Affidavit, ¶5.

At one time, Hill owned 22,500 shares of stock of DMS, the same as the other three major stockholders. However, in 2 separate transactions, dated May 18, 2005, Hill sold back a total of 16,875 of his shares to the Corporation for a total compensation of $32,000. Giordano Affidavit, ¶6-7 .Attached as Exhibits A and B to the Memorandum in Opposition are true and correct copies of the Stock Purchase Agreement 1 and Stock Purchase Agreement 2 executed by Hill and by McUmber on behalf of DMS. There is no dispute that Hill sold back these shares to the Corporation and received the compensation for them. Id. Plaintiffs have in their possession copies of the cancelled checks paid to

Hill for his stock.  Giordano Affidavit, ¶8.  .Attached as Exhibit C to the Memorandum in Opposition are emails from Hill confirming his receipt of these checks.

The stock book of the Corporation has not been updated to reflect the fact that Hill no longer owns this stock.  Hill and McUmber have refused to permit the stock records to be corrected to reflect the fact that Hill has sold back his stock.  Giordano Affidavit, ¶  One of the actions that Plaintiffs McUmber and Hill seek in this matter is to have the stock book "frozen" so that Hill can continue to vote shares that he does not own and has not owned for over a year.  Giordano Affidavit, ¶9.

At all times prior to May 25, 2006, Giordano was authorized to sign checks for DMS.  Sometime in May 2006, either Hill or McUmber had Giordano removed as a signatory on the DMS checking account.  This action was not authorized by any corporate resolution or by the Board of Directors.  Giordano currently has no ability to withdraw funds from any DMS checking account, or any ability to even review checking transactions online over the internet. Giordano Affidavit, ¶10.

As of October 12, 2006, the balance in the DMS operating account was $120,353. The statement in the Complaint that the balance is nearly zero is blatantly and categorically false.  Giordano Affidavit, ¶11.

DMS's normal monthly expenses over the past year have averaged approximately $6,000 (not including taxes).  Thus, there are more than sufficient funds in the operating account to operate DMS for the next year.  For the past three months, Mr. Hill and Mr. McUmber appear, based on the balance available in the DMS account, to be depleting the account at a rate of roughly $15,000 a month.  This is approximately $9,000 more per

month than DMS's average monthly expenses over the previous year.  Giordano Affidavit, ¶12.

Giordano is not permitted to see what these expenditures or withdrawals are for, nor will Mr. Hill or Mr. McUmber reveal to Giordano, an officer and shareholder, what these expenditures or withdrawals are for.  Giordano is not in possession of the company's financial records.  Virtually all financial records of the company are in the hands of Mr. McUmber's sister, who was DMS's former bookkeeper, or Mr. Hill, DMS's treasurer.  Giordano Affidavit, ¶12.

Mr. Watson and Mr. Giordano entered into an agreement to have Giordano purchase most of Watson's shares of DMS.  When Hill and McUmber objected to the purchase,  Giordano offered to rescind the purchase.  Hill and McUmber refused to respond to this offer.  Since the filing of this suit, Watson and Giordano have rescinded the purchase agreement.  Giordano Affidavit, ¶14.

Despite the garbled allegations of the Complaint, Mr. Watson never sold back any of his shares to DMS.  The parties for several months attempted to negotiate the sale of Mr. Watson's stock to DMS, but Mr. McUmber refused to consent to the sale, and the sale was never executed.  Mr. Watson never received any compensation from DMS with regard to any alleged purchase of his stock by DMS.  Giordano Affidavit, ¶15.

In June and July of 2006, McUmber and Hill attempted to persuade Watson to sell all his 22,500 shares of stock to DMS rather than to Giordano.  Watson never executed any document consummating such sale and never received any compensation for such a sale.   Attached as Exhibit D is email correspondence between the parties in which Mr. McUmber first attempts to consummate a sale between Watson and DMS for Watson's

stock, and later announces that the sale is "hereby rescinded and rendered void."

Giordano Affidavit, ¶15.

## **ARGUMENT**

### I. THIS COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER THIS MATTER.

This Court does not have subject matter jurisdiction over this matter, as the

putative parties are not diverse.  Plaintiffs McUmber and Hill have brought this matter

ostensibly as a shareholders' derivative action.[3]  DMS, which is aligned as an ostensible

plaintiff in this matter, is a corporation.  Corporations are citizens of both the state of

their incorporation and the state of their principal place of business.  28 U.S.C. 1332.

DMS is incorporated in West Virginia, but its principal place of business is in Virginia.

Giordano Aff., ¶ ___.  Defendant Giordano is a resident of Virginia, as is defendant John

Thomas.  Accordingly, the inclusion of DMS as a plaintiff destroys diversity.

Plaintiffs attempt to end-run this fact by attempting to confuse DMS's registered

office in West Virginia – an office required by West Virginia statute -- with its principal

place of business.  See, e.g., Gavin v. Read Corp. 356 F.Supp. 483 (E.D. Pa. 1973).  A

corporation's principal place of business, according to federal jurisprudence, is found by

applying a "nerve center" test.  Masterson-Cook v. Criss Bros. Iron Works, Inc. 722

---

[3] Giordano does not agree that this matter qualifies under F.R.Civ. P. 23.1 as a derivative action. First, there is no right of the corporation which it has failed to enforce. There has been no effort on the part of plaintiffs Hill and McUmber to obtain the action desired from the directors, nor does the complaint describe any such effort.  Indeed, as noted above, the plaintiffs have steadfastly resisted any attempt to have meeting of the board or a shareholders' meeting in an effort to resolve this dispute.  Moreover, the plaintiffs do not adequately represent the interests of the shareholders, two of whom are the defendants, in this matter. Indeed, the defendants own almost 60% of DMS stock.  Nonetheless, plaintiffs have seen fit to attempt to bring this matter as a derivative action, and as such, DMS must be considered a putative plaintiff for diversity purposes as long as Hill and McUmber maintain that this action is a shareholders' derivative suit. Accordingly, "plaintiffs" as used in this brief will refer only to Hill and McUmber unless otherwise noted.

F.Supp. 810 (D.D.C. 1989).  DMS's headquarters are in Vienna, Virginia, and the vast

majority of its operations take place in Virginia.  Giordano Aff., _____.  DMS is a citizen

of Virginia for purposes of diversity, and thus this court does not have subject matter

jurisdiction.

Moreover, the Shareholders' Agreement upon which Hill and McUmber's

Complaint is based contains an arbitration provision.  See Exhibit 2 to Plaintiff's Memo,

paragraph 12.  Giordano has invoked that provision, and pursuant to the Federal

Arbitration Act, 9 U.S.C. 1 et seq., this matter must be stayed.  See Ex. G.


II.     THIS COURT DOES NOT HAVE PERSONAL JURISDICTION
        OVER GIORDANO.

It is unclear why this matter was brought in the District of Columbia.  Plaintiffs

do not specify how they contend that Giordano is subject to long-arm jurisdiction other

than by a vague reference to D.C. Code §13-422 and §13-423.

§13-422 does not apply:

A District of Columbia court may exercise personal jurisdiction over a
person domiciled in, organized under the laws of, or maintaining his or its
principal place of business in, the District of Columbia as to any claim for
relief.

Giordano is not domiciled nor does he maintain a place of business in the District of

Columbia.

Nor does §13-423 apply:

(a) A District of Columbia court may exercise personal jurisdiction
over a person, who acts directly or by an agent, as to a claim for relief
arising from the person's --

(1) transacting any business in the District of Columbia;
(2) contracting to supply services in the District of

Columbia;

(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia;

(5) having an interest in, using, or possessing real property in the District of Columbia;

(6) contracting to insure or act as surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed within the District of Columbia at the time of contracting, unless the parties otherwise provide in writing; or

(7) marital or parent and child relationship in the District of Columbia if:

(A) the plaintiff resides in the District of Columbia at the time the suit is filed;

(B) such person is personally served with process; and

(C) in the case of a claim arising from a marital relationship:

(i) the District of Columbia was the matrimonial domicile of the parties immediately prior to their separation, or

(ii) the cause of action to pay spousal support arose under the laws of the District of Columbia or under an agreement executed by the parties in the District of Columbia; or

(D) in the case of a claim affecting the parent and child relationship:

 (i) the child was conceived in the District of Columbia and such person is the parent or alleged parent of the child;

   (ii) the child resides in the District of Columbia as a result of the acts, directives, or approval of such person; or

   (iii) such person has resided with the child in the District of Columbia.

(E) Notwithstanding the provisions of subparagraphs (A) through (D), the court may exercise personal jurisdiction if there is any basis consistent with the United States Constitution for the exercise of personal jurisdiction.

 b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

This case involves wrongs allegedly suffered by plaintiffs residing in Maryland, Virginia, and West Virginia, due to acts allegedly done by a Virginia resident in Virginia. There is no act of Giordano complained of in the Complaint that is alleged to have taken place in the District of Columbia. This case does not involve any transaction of business by Giordano in the District of Columbia, or the contracting by Giordano to supply services in the District of Columbia. Nor has Giordano caused any alleged injury in the District of Columbia, given that the plaintiffs are all residents of Maryland, Virginia, or West Virginia. There are no issues involving real property, insurance, or domestic relations situated in the District of Columbia. Thus, as Giordano is not subject to personal jurisdiction in the District of Columbia, this Court does not have power to grant an injunction against Giordano.

III.    PLAINTIFFS HAVE SHOWN NO GROUNDS FOR THIS
        COURT TO ISSUE A PRELIMINARY INJUNCTION.

Even if the Court had subject matter jurisdiction and personal jurisdiction over Giordano, plaintiff would still not be entitled to the relief that they seek. In order to grant a preliminary injunction, a court must find consider an injury that is certain, great, and actual, not theoretical. The injury must be imminent and irreparable. Mere economic loss does not suffice. Housing Study Group v. Kemp, 736 F.Supp. 321(D.D.C. 1990). The movant must provide proof that the harm is certain to occur and that the harm will directly result from that which the movant seeks to enjoin. Varicom Int'l v. Office of Personnel Management, 934 F.Supp. 440 (D.D.C. 1996).

In determining the issuance of a preliminary injunction, the court must weigh the likelihood of plaintiff's success on the merits; whether the plaintiff will suffer irreparable harm if the injunction is not granted; whether the injunction would substantially impair the right of the nonmoving party or others; and the public interest. FEC v. GOPAC, 897 F.Supp. 615 (D.D.C. 1995).

The true "status quo" that the plaintiffs seek to preserve is an incorrect stock book. In 2005, plaintiff Hill sold back 16,875 of his shares to the Corporation for a total compensation of $32,000, reducing his ownership from roughly 22% to roughly 7%. Giordano Aff, ___; Exhibits A, B, C. Despite this undisputed sale, the stock book has never been corrected to reflect the sale which took place over a year ago and which is not in dispute. Plaintiffs have fought tooth and nail to prevent the stock book from being correct. Inexplicably, despite the fact that Giordano as Secretary of DMS is required and entitled to correct the book to reflect the sale, Defendant Thomas has acquiesced in Plaintiffs' demand that the stock book be maintained in its incorrect state and has refused to surrender the book to Giordano or to permit Giordano to record this undisputed event.

The second "status quo" that the Plaintiffs seek to freeze is their wrongful control of all company funds. Sometime in May 2006, Plaintiffs removed Giordano as a signatory on the DMS account, a position he had held for years. Plaintiffs improperly did this without any corporate resolution or Board of Directors meeting. Now, having done so, and spending company funds at an unprecedented and alarming rate, they ask the Court to preserve their usurpation of financial control. This is not the status quo ante: it is merely the current situation, recently achieved due to Plaintiff's unauthorized seizing of control of the bank accounts.

A. Plaintiff can show no likelihood of success on the merits.

It is difficult to know where to begin to dissect the sloppy and bizarre Complaint. In sum, the Complaint contains causes of action which do not exist and seeks relief which cannot be granted. In the first place, the Complaint makes no attempt to distinguish between the rights that Hill and McUmber may attempt to assert as officers, directors, or shareholders, and the rights that DMS may assert as a corporation. Nor does the Complaint recognize that since the actions complained of took place almost exclusively in Virginia, and none in the District of Columbia, that Virginia substantive law will apply.

The true aim of the Complaint is to have additional stock reissued to Hill to replace the stock that he sold to DMS beginning in 2004. In an amazing show of chutzpah, the Plaintiffs' major argument, styled as estoppel, fraud, breach of contract, misrepresentation and a veritable kitchen sink of other torts, is that the Shareholders' Agreement, which contains an exhortation in the preamble regarding the "equitable allocation of ownership," in fact can be used to require the corporation to reissue additional stock to Hill to replace that which he sold. Plaintiffs further complain that the proposed sale of stock between Watson and Giordano, *which has already been rescinded*, would also change the "equitable allocation of ownership." The basis for much of the Complaint is that "it is essential to maintain an equitable allocation of ownership," i.e., that Hill, McUmber, Giordano, and Watson must always hold equal shares of DMS stock. This is the stated goal of the relief sought in various counts. Given that Hill sold back

most of his shares of stock for $32,000 over a year ago, Plaintiffs in essence seek an injunction reissuing over 16,000 shares of free, uncompensated stock to Hill.

Plaintiffs are absolutely estopped from maintaining that there must always be an "equitable allocation of ownership." Plaintiff Hill and McUmber have previously disregarded that "requirement" when they executed 2 separate purchase Agreements by which DMS bought back Hill's stock, and when they attempted to have DMS purchase Watson's stock.

In Exhibits A and B, entitled Stock Purchase Agreement 1 and Stock Purchase Agreement 2, Hill sold back a total of 16,875 of his shares to the Corporation for a total compensation of $32,000. Hill decided to sell his stock back to DMS in exchange for cash. DMS and its shareholders agreed. Hill received every penny owed to him for the transaction. More important, those Agreements are signed by Hill and by McUmber, the very parties who seek to claim that it is unthinkable that any stock in DMS could ever be sold and that all four major stockholders must always have the same percentage of ownership.

Further, Plaintiffs attempted to convince Watson to sell his stock not to Giordano, but to DMS, another plain "violation" of Plaintiffs' "requirement" of "equitable allocation. See Exhibit D. Plaintiffs' hypocritical argument, upon which most of the Complaint is based, does not merit a serious response.

A brief look at some of the other, more outlandish claims and causes of actions follows.

Count II is styled Specific Performance, and seeks to rescind the stock transfer between Giordano and Watson. Count IV is styled rescission, and seeks the same relief.

These counts have been mooted by the defendants' agreement to rescind the stock purchase between Watson and Giordano, *which defendants first offered to do on August 15, 2006, six weeks before this matter was filed, and an offer which plaintiffs and their counsel steadfastly refused to accept or even respond to.* Thus, Count II and Count IV will be dismissed as moot.

Likewise, Count VI, "Breach of Contract," seeks damages for breach of contract. The only contract mentioned is the Shareholders' Agreement. To the extent that the Shareholders' Agreement has been breached by the attempted purchase of Watson's stock by Giordano, that breach has been remedied by the rescission of that purchase. Plaintiffs can show absolutely no damage arising from this breach, which is a necessary element of the cause of action: the parties' relative percentages of ownership have been returned to the previous levels.

Count VIII asserts that defendants tortiously interfered with DMS's contract with NTI. It is difficult to understand this allegation, since the contract is still being performed by all parties.

Count VII alleges another nonexistent cause of action: "Tortious Breach of Covenant of Good Faith and Fair Dealing." There is no such cause of action in Virginia. Nor has any case been found by counsel recognizing this cause of action in the District of Columbia. See Brown v. News World Communications, Inc. 1990 WL 137378 (D.D.C. September 10, 1990) ("with respect to the claim for tortious breach of an implied covenant of good faith and fair dealing, the Court does not find any support for a cause of action in the District of Columbia").

Count XII, entitled "Fraud/Tortious Misrepresentation," is another puzzler. Plaintiffs allege that Giordano committed fraud when he signed the Shareholders Agreement.  In general, a breach of a contractual duty cannot constitute fraud; however, a promise to perform a contractual duty can constitute fraud if the promisor made it with present intention not to perform the promise.  <u>Richmond Metropolitan Authority v. McDermott Street Bevis, Inc</u>., 256 Va. 553, 507 S.E.2d 344 (1998).  However, Plaintiffs must prove, by clear and convincing evidence, that Giordano entered into the contract with an intent to not to perform the contract, a nearly impossible task.  Plaintiffs have no hope of prevailing on this count.

Count  XIII, "Declaratory Relief" seeks relief that a court simply cannot grant: <u>inter</u> <u>alia</u>, that the Plaintiffs are entitled to possession of the corporate records; that the court must reestablish "the equitable allocation of ownership," i.e., permit Hill to have back the stock that he sold to DMS over a year ago; and that Giordano and Watson are entitled to "no shares."

Under the Bylaws, the Secretary, Giordano, is to have custody of the stock records and minutes.  The court cannot strip away shares of stock from legitimate stockholders, or order the corporation to issue additional free stock to Plaintiffs in violation of the Shareholders' Agreement and Bylaws  The Court cannot order the Bylaws and Shareholders' Agreement to be ignored or overridden, and that is precisely what the Plaintiffs are seeking.

What is absolutely clear is that Hill and McUmber, with less than 37% of the shares of DMS between them, cannot judicially appropriate for themselves control of the

corporation.  That is the purpose of the motion for injunction, and the goal of the entire

Complaint, and Plaintiffs have no possible chance of succeeding on the merits.

B.  <u>Plaintiffs can show no irreparable harm.</u>

As this Court has previously found on the hearing for a Temporary Restraining

Order, Plaintiffs can show no possible irreparable harm from a denial of the preliminary

injunction.  Giordano is unable to dispose of the Company's source codes, for the simple

reason that he has possession of no source codes: McUmber has all of them, and, in

violation of his fiduciary duties to DMS and its shareholders, has steadfastly refused to

permit any other DMS officer to have access to them as a means of leverage over DMS.

Indeed, it is odd that McUmber should seek to ensure that nonexistent corporate assets

are taken from Giordano, when he is unwilling to release the very valuable corporate

assets in his personal possession to the corporation.  Injunction is an equitable remedy,

and plaintiffs must come with clean hands.  See <u>Bayly Corp. v. Marantette</u>, 1982 WL

1337 (D.D.C., October 19, 1982).

Nor is the Company in danger of foundering.  The allegation in the Complaint

that the bank account is nearly empty is absolutely false.  See Giordano Affidavit.

Plaintiffs have admitted that the company will be fine financially for twelve months or

more.

C.  <u>Defendant and other shareholders will suffer substantial impairment of their rights
if the injunction is granted</u>.

The relief Plaintiffs seek is to preserve the stock records in their current incorrect

state to prevent the true majority of shareholders from exercising their rights.  Hill and

McUmber wish to prevent the 2005 sale of Hill's stock back to DMS to be recorded in

the stock book, thus allowing Hill to vote thousands of shares of stock that he does not

own.  This is a fraud on DMS and its stockholders, and the Court should not in any way approve or acquiesce in this fraud.   An injunction freezing the corporate books in their current, incorrect state would allow Hill to exercise control over the affairs of DMS that he does not have.  The stock book should be corrected, and Giordano as Secretary should be permitted to correct it.

Moreover, it is Plaintiffs' filing of this litigation, and this injunction proceeding, that threatens the company's existence.  The NTI Contract that is the main source of DMS's income provides that NTI may terminate the contract at any time in its sole discretion if there is litigation involving DMS or its officers.  Exhibit H, Paragraph 6.2.  The true danger to DMS's existence is from the Plaintiffs, and this misguided litigation, not the Defendants.

D.   The public interest does not support an injunction.

Plaintiffs have seized sole control of DMS's bank account through the unauthorized removal of Giordano as a signatory – unauthorized by any Board Meeting or any corporate resolution – and are attempting to have Hill continue to vote shares of stock, thus depriving all other shareholders of DMS of their rightful ownership of shares.  It cannot possibly be maintained that allowing this type of fraud to be maintained in any way serves the public interest.  Again, plaintiffs are barred from equitable relief by unclean hands.

Thus, all four factors – likelihood of success on the merits, irreparable harm to Plaintiffs, irreparable harm to Defendants, and the public interest – all militate in favor of the denial of a preliminary injunction.

In sum, this Court does not have subject matter jurisdiction over this case, as presently aligned, nor does it have personal jurisdiction over Giordano. Plaintiffs can allege no irreparable injury, and the Court should not disturb its previous finding that they will suffer no irreparable injury.

For the foregoing reason, Defendant prays this Court deny the Motion for a Preliminary Injunction, and for such other relief as to the Court seems proper[4]

---

[4] Should the Court decide to grant an injunction, it will be putting the entire financial accounts, current and future, and all assets in the hands of 2 minority shareholders, the Plaintiffs, who collectively own less than 37% of the Company, rather than in the hands of all shareholders. Plaintiffs claim that the future revenue due to DMS is $410,000, and that Defendants have converted an additional $95,000 in payments and an additional $119,012.36 in assets. There are real and valuable assets, notably all source codes for DMS projects, which are in the sole possession of Plaintiff McUmber.

Any injunction requires the posting of a bond. F.R.Civ. P. 65(c). If an injunction were to be granted, Plaintiff should be required to post a bond that is double the amount of the assets that they assert are involved. Defendant would request the Court impose a bond of at least $1,350,000. See Transamerica Rental Finance Corp. v. Rental Experts, 790 F. Supp. 378 (D. Conn. 1982).

<u>REQUEST FOR HEARING</u>

Defendant requests oral argument on this Motion.


Respectfully submitted,



<u>By:  /s/ David Bledsoe</u>
Bar Number 422596
bledsoelaw@earthlink.net
300 North Washington Street
Suite 700
Alexandria VA 22314
Tel.:  703-379-9424
Fax:  703-684-1851

## CERTIFICATE OF SERVICE

I certify that on October 10, 2006, a copy of the foregoing Motion for Enlargement of Time to Respond to Plaintiffs' Complaint was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing:

Philip J. McNutt, Esquire
Hughes and Bentzen, PLLC
1100 Connecticut Avenue
Suite 340
Washington DC  20036

And by first class mail to:

John W. Thomas , Esquire
Luman, Lange, Thomas & McMullen
1660 L Street NW
Suite 3506
Washington DC  20036

Anthony Watson
303-F Holden Green
Cambridge MA  02138

   /s/David I. Bledsoe             
David I. Bledsoe

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

DATA MOUNTAIN SOLUTIONS, INC., et al., )
)
        Plaintiffs, )
)
v. )     CA 06-1666 (PLF)
)
GREGG GIORDANO, et al., )
)
        Defendants. )
)

---

### AFFIDAVIT OF GREGG GIORDANO

Under penalty of perjury, I, Gregg Giordano, depose and say:

1.      I am one of the defendants in this matter.  I am over the age of twenty-one, and this affidavit is made on personal knowledge.

2.      Plaintiff Derek McUmber ("McUmber")  is a shareholder and director of DMS.  He owns 22,500 shares of DMS stock, or approximately 29 percent of outstanding shares.

3.      I am a shareholder, director, and officer of DMS.  I own 22,500 shares of DMS stock, or approximately 29 percent of outstanding shares.  I am the Secretary of the Corporation.

4.      Plaintiff Fred Hill ("Hill") is a shareholder, director, and officer of DMS. He owns 5,625 shares of DMS stock, or approximately 7 percent of outstanding shares. Hill is the President and Treasurer of the Corporation.

5.      Defendant Anthony Watson ("Watson") is a shareholder and director of DMS. He owns 22,500 shares of DMS stock, or approximately 29 percent of outstanding shares.

6.      At one time, Hill previously owned 22,500 shares of stock of DMS. However, in 2 separate transactions, dated May 18, 2005, Hill sold back a total of 16,875 of his shares to the Corporation for a total compensation of $32,000. Attached as Exhibits A and B to the Memorandum in Opposition are true and correct copies of the Stock Purchase Agreement 1 and Stock Purchase Agreement 2 executed by Hill and by McUmber on behalf of DMS.

7.      There is no dispute that Hill sold back these shares to the Corporation and received the compensation for them. The following checks from the DMS checking account are those that Hill received as payment for his stock.:

TABLE

Cashed Checks for Stock Purchase Agreement 1:

| Payment # | Date | Chk # | Amount | memo |
|---|---|---|---|---|
| 1 | 4/5/04 | 1055 | $2,000.00 | stock |
| 2 | 5/7/05 | 1061 | $2,000.00 | stock |
| 3 | 6/18/04 | 1064 | $2,000.00 | stock |
| 4 | 7/5/04 | 1072 | $2,000.00 | stock |
| 5 | 8/1/04 | 1087 | $2,000.00 | stock |
| 6 | 8/27/04 | 1111 | $2,000.00 | stock |
| 7 | 9/27/04 | 1120 | $2,000.00 | stock |
| 8 | 10/28/04 | 1138 | $2,000.00 | stock |
| 9 | 11/26/04 | 1150 | $2,000.00 | stock |
| 10 | 12/14/04 | 1160 | $2,000.00 | stock |
| 11 | 1/31/05 | 1181 | $2,000.00 | stock |
| 12 | 2/22/05 | 1188 | $2,000.00 | stock |

Cashed Checks for Stock Purchase Agreement 2:

| Payment # | Date | Chk # | Amount | memo |
|---|---|---|---|---|
| 1 | 3/22/05 | 1205 | $2,000.00 | Stock |
| 2 | 5/18/05 | 1220 | $2,000.00 | Stock |
| 3 | 6/6/05 | 1228 | $2,000.00 | Stock |
| 4 | 7/1/05 | 1240 | $2,000.00 | Stock |

8.     Plaintiffs have in their possession copies of the cancelled checks paid to Hill for his stock. Attached as Exhibit C to the Memorandum in Opposition are emails from Hill confirming his receipt of these checks.

9.     The stock book of the Corporation has not been updated to reflect the fact that Hill and McUmber have refused to permit the stock records to be corrected to reflect the fact that Hill has sold back his stock. One of the actions that Plaintiffs McUmber and Hill seek in this matter is to have the stock book "frozen" so that Hill can continue to vote shares that he does not own and has not owned for over a year.

10.     At all times prior to May 25, 2006, I was authorized to sign checks for DMS. Sometime in May 2006, either Hill or McUmber had me removed as a signatory on the DMS checking account. This action was not authorized by any corporate resolution or by the Board of Directors. I currently have no ability to withdraw funds from any DMS checking account. The plaintiffs have also removed my ability to review checking transactions online over the internet.

11.     As of October 12, 2006, the balance in the DMS operating account was $120,353. The statement in the Verified Complaint that the balance is nearly zero is blatantly false. DMS's normal monthly expenses over the past year have averaged approximately $6,000 (not including taxes). Thus, there are more than sufficient funds in

the operating account to operate DMS for the next year.  Plaintiff McUmber has stated

the same conclusion to me.

12.    Since 2005, DMS's average monthly expenses have been roughly $6,000.

For the past three months, Mr. Hill and Mr. McUmber appear, based on my review of the

balance available in the DMS account, to be depleting the account at a rate of roughly

$15,000 a month.  This is approximately $ 9,000 more per month than DMS's average

monthly expenses over the previous year.  I am not permitted to see what these

expenditures or withdrawals are for, nor will Mr. Hill or Mr. McUmber tell me what

these expenditures or withdrawals are for.  I am not in possession of the company's

financial records.  Virtually all financial records of the company are in the hands of Mr.

McUmber's sister, DMS's former bookkeeper, or Mr. Hill, DMS's treasurer.

13.    I am not in possession of any source code owned by DMS, as plaintiffs are

well aware.  The only source codes owned by DMS are in the possession of Mr.

McUmber, who has steadfastly refused to release such codes to the company or even

provide backup copies to a third-party escrow.

14.    Mr. Watson and I have rescinded our agreement for me to purchase his

shares of stock.  I first made the offer to the plaintiffs to rescind this purchase through my

counsel on August 15, 2006, some six weeks before the Complaint in this matter was

filed.  Hill and McUmber refused to respond to my offer.

15.    Mr. Watson never sold back any of his shares to DMS.  The parties for

several months attempted to negotiate the sale of Mr. Watson's stock to DMS, but Mr.

McUmber refused to consent to the sale, and the sale was never executed.  Mr. Watson

never received any compensation from DMS with regard to any alleged purchase of his

stock by DMS.  Attached as Exhibit D to the Memorandum in Opposition is email correspondence between the parties in which Mr. McUmber first attempts to consummate a sale between Watson and DMS for Watson's stock, and later announces that the sale is "hereby rescinded and rendered void."

16.     West Virginia requires DMS as a West Virginia corporation to have a registered office in West Virginia.  DMS's registered office is with an executive suite operation in Charleston, West Virginia.  DMS maintains no physical office at this location, and DMS has no employees who live or work in West Virginia.  No business activity of any sort takes place at the registered office in West Virginia.  DMS does no actual business in the state of West Virginia.

17.     DMS's principal place of business is at 8619 Westwood Center Drive, Suite 200, Vienna, VA 22182 ('The Virginia Office").  The Virginia Office is where DMS maintains the datacenter that is the central thrust of DMS's activities, and the main source of DMS's income.  DMS employees work at and use the Virginia Office in order to service and maintain DMS's data center.

18.     I certify upon penalty of perjury that the foregoing is true and correct.


Gregg Giordano

## Stock Purchase Agreement ⌐ 1

THIS AGREEMENT is made and entered into this 1st day of May, 2004, by and between Fred Hill, (hereinafter referred to as "Seller") and Data Mountain Solutions, Inc., (hereinafter referred to as "Purchaser");

WITNESSETH:

WHEREAS, the Seller is the record owner and holder of the issued and outstanding shares of the capital stock of Data Mountain Solutions, Inc., (hereinafter referred to as the "Corporation"), a West Virginia corporation, which Corporation has issued capital stock of 11,250 shares of $ 0.01 par value common stock, and

WHEREAS, the Purchaser desires to purchase said stock and the Seller desires to sell said stock, upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and in order to consummate the purchase and the sale of the Corporation's Stock aforementioned, it is hereby agreed as follows:

1. PURCHASE AND SALE:

Subject to the terms and conditions hereinafter set forth, at the closing of the transaction contemplated hereby, the Seller shall sell, convey, transfer, and deliver to the Purchaser certificates representing such stock, and the Purchaser shall purchase from the Seller the Corporation's Stock in consideration of the purchase price set forth in this Agreement. The certificates representing the Corporation's Stock shall be duly endorsed for transfer or accompanied by appropriate stock transfer powers duly executed in blank, in either case with signatures guaranteed in the customary fashion, and shall have all the necessary documentary transfer tax stamps affixed thereto at the expense of the Corporation.

The closing of the transactions contemplated by this Agreement (the "Closing"), shall be held at, on May 15th ,2004, at the Corporate office, or such other place, date and time as the parties hereto may otherwise agree.

2. AMOUNT AND PAYMENT OF PURCHASE PRICE.

The total consideration and method of payment thereof are fully set out in Exhibit "A" attached hereto and made a part hereof.

3. REPRESENTATIONS AND WARRANTIES OF SELLER.

Seller hereby warrants and represents:

(a) Organization and Standing. Corporation is a corporation duly organized, validly existing and in good standing under the laws of the State of West Virginia and has the corporate power and authority to carry on its business as it is now being conducted.

(b) Restrictions on Stock.

i. The Seller is not a party to any agreement, written or oral, creating rights in respect to the Corporation's Stock in any third person or relating to the voting of the Corporation's Stock.

EXHIBIT A

ii. Seller is the lawful owner of the Stock, free and clear of all security interests, liens, encumbrances, equities and other charges.

iii. There are no existing warrants, options, stock purchase agreements, redemption agreements, restrictions of any nature, calls or rights to subscribe of any character relating to the stock, nor are there any securities convertible into such stock.

4. REPRESENTATIONS AND WARRANTIES OF SELLER AND PURCHASER.

Seller and Purchaser hereby represent and warrant that there has been no act or omission by Seller, Purchaser or the Corporation which would give rise to any valid claim against any of the parties hereto for a brokerage commission, finder's fee, or other like payment in connection with the transactions contemplated hereby.

5. GENERAL PROVISIONS

(a) Entire Agreement.

This Agreement (including the exhibits hereto and any written amendments hereof executed by the parties) constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

(b) Sections and Other Headings.

The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(c) Governing Law.

This agreement, and all transactions contemplated hereby, shall be governed by, construed and enforced in accordance with the laws of the State of Virginia. The parties herein waive trial by jury and agree to submit to the personal jurisdiction and venue of a court of subject matter jurisdiction located in Fairfax County, State of Virginia. In the event that litigation results from or arises out of this Agreement or the performance thereof, the parties agree to reimburse the prevailing party's reasonable attorney's fees, court costs, and all other expenses, whether or not taxable by the court as costs, in addition to any other relief to which the prevailing party may be entitled.

IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on the date first above written.

Signed, sealed and delivered in the presence of:

_____                    _5/12/05_____

Fred Hill                                                         Date

_____                    _5/18/05_____

DMS Corporate Officer                                      Date

EXHIBIT "A"

AMOUNT AND PAYMENT OF PURCHASE PRICE

(a) Consideration.

As total consideration for the purchase and sale of the Corporation's Stock, pursuant to this Agreement, the Purchaser shall pay to the Seller the sum of Twenty four Thousand  Dollars ($24,000) such total consideration to be referred to in this Agreement as the "Purchase Price".

(b) Payment.

The Purchase Price shall be paid as follows:

The sum of Two Thousand Dollars ($2,000) to be delivered to Seller upon the first day of each month for 12 months or until the total sum of Twenty Four Thousand Dollars ($24,000) is delivered toward the execution of this Agreement.

NOTICE

The information in this document is designed to provide an outline that you can follow when formulating business or personal plans. Due to the variances of many local, city, county and state laws, we recommend that you seek professional legal counseling before entering into any contract or agreement.

## Stock Purchase Agreement

THIS AGREEMENT is made and entered into this 10th day of May, 2005, by and between Fred Hill, (hereinafter referred to as "Seller") and Data Mountain Solutions, Inc., (hereinafter referred to as "Purchaser");

WITNESSETH:

WHEREAS, the Seller is the record owner and holder of the issued and outstanding shares of the capital stock of Data Mountain Solutions, Inc., (hereinafter referred to as the "Corporation"), a West Virginia corporation, which Corporation has issued capital stock of 3,756 shares of $ 0.01 par value common stock, and

WHEREAS, the Purchaser desires to purchase said stock and the Seller desires to sell said stock, upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and in order to consummate the purchase and the sale of the Corporation's Stock aforementioned, it is hereby agreed as follows:

1. PURCHASE AND SALE:

Subject to the terms and conditions hereinafter set forth, at the closing of the transaction contemplated hereby, the Seller shall sell, convey, transfer, and deliver to the Purchaser certificates representing such stock, and the Purchaser shall purchase from the Seller the Corporation's Stock in consideration of the purchase price set forth in this Agreement. The certificates representing the Corporation's Stock shall be duly endorsed for transfer or accompanied by appropriate stock transfer powers duly executed in blank, in either case with signatures guaranteed in the customary fashion, and shall have all the necessary documentary transfer tax stamps affixed thereto at the expense of the Corporation.

The closing of the transactions contemplated by this Agreement (the "Closing"), shall be held at, on May 15th ,2005, at the Corporate office, or such other place, date and time as the parties hereto may otherwise agree.

2. AMOUNT AND PAYMENT OF PURCHASE PRICE.

The total consideration and method of payment thereof are fully set out in Exhibit "A" attached hereto and made a part hereof.

3. REPRESENTATIONS AND WARRANTIES OF SELLER.

Seller hereby warrants and represents:

(a) Organization and Standing. Corporation is a corporation duly organized, validly existing and in good standing under the laws of the State of West Virginia and has the corporate power and authority to carry on its business as it is now being conducted.

(b) Restrictions on Stock.

i. The Seller is not a party to any agreement, written or oral, creating rights in respect to the Corporation's Stock in any third person or relating to the voting of the Corporation's Stock.

EXHIBIT B

ii. Seller is the lawful owner of the Stock, free and clear of all security interests, liens, encumbrances, equities and other charges.

iii. There are no existing warrants, options, stock purchase agreements, redemption agreements, restrictions of any nature, calls or rights to subscribe of any character relating to the stock, nor are there any securities convertible into such stock.

4. REPRESENTATIONS AND WARRANTIES OF SELLER AND PURCHASER.

Seller and Purchaser hereby represent and warrant that there has been no act or omission by Seller, Purchaser or the Corporation which would give rise to any valid claim against any of the parties hereto for a brokerage commission, finder's fee, or other like payment in connection with the transactions contemplated hereby.

5. GENERAL PROVISIONS

(a) Entire Agreement.

This Agreement (including the exhibits hereto and any written amendments hereof executed by the parties) constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

(b) Sections and Other Headings.

The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(c) Governing Law.

This agreement, and all transactions contemplated hereby, shall be governed by, construed and enforced in accordance with the laws of the State of Virginia. The parties herein waive trial by jury and agree to submit to the personal jurisdiction and venue of a court of subject matter jurisdiction located in Fairfax County, State of Virginia. In the event that litigation results from or arises out of this Agreement or the performance thereof, the parties agree to reimburse the prevailing party's reasonable attorney's fees, court costs, and all other expenses, whether or not taxable by the court as costs, in addition to any other relief to which the prevailing party may be entitled.

IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on the date first above written.

Signed, sealed and delivered in the presence of:

_____                          _____5/12/05_____

Fred Hill                                                       Date

_____                          _____5/18/05_____

DMS Corporate Officer                                   Date

EXHIBIT "A"

AMOUNT AND PAYMENT OF PURCHASE PRICE

(a) Consideration.

As total consideration for the purchase and sale of the Corporation's Stock, pursuant to this Agreement, the Purchaser shall pay to the Seller the sum of Eight Thousand Dollars ($8,000) such total consideration to be referred to in this Agreement as the "Purchase Price". A $2,000 good faith advance has been accepted by the Seller from the Corporation in anticipation of this Agreement.

(b) Payment.

The Purchase Price shall be paid as follows:

 The sum of Two Thousand Dollars ($2,000) to be delivered to Seller upon the first day of each month for 4 ~~12~~ months or until the total sum of Eight Thousand Dollars ($8,000) is delivered toward the execution of this Agreement.

(b) Termination.

The Termination terms of this agreement are as follows:

The sum of Two Thousand Dollars ($2,000) is to be delivered to Seller upon the first day of each month for 3 months or until the total sum of Six Dollars ($6,000) is delivered toward the execution of this Agreement. A ($2,000) advance has been delivered by the Corporation to the Seller in anticipation of this agreement for 939 shares. By written notice, prior to the delivery of a ($2,000) monthly purchase, the Seller may terminate this purchase agreement and retain the remaining shares of the Corporation's Stock.

NOTICE

The information in this document is designed to provide an outline that you can follow when formulating business or personal plans. Due to the variances of many local, city, county and state laws, we recommend that you seek professional legal counseling before entering into any contract or agreement.

**Subject:** Stock Purchase Checks-Revised
**From:** "Fred Hill" <fred.hill@datamtnsol.com>
**Date:** Wed, 04 May 2005 22:18:12 -0400
**To:** derek.mcumber@datamtnsol.com, gregg.giordano@datamtnsol.com
**CC:** kathleen.bowman@datamtnsol.com

It looks like I missed one check.

After reviewing my personal statements, I noticed I made a
deposit on 2/28/05 of $2,000.  I don't have the March '05
statement and so I don't have the check number, but I'm
sure you'll find the canceled check and the debit in
March's statement.  So, the initial agreement is settled
and I've received a total of $24K.

Please confirm, thanks.

EXHIBIT C

**Subject:** Stock Purchase Checks, Agreement
**From:** "Fred Hill" <fred.hill@datamtnsol.com>
**Date:** Wed, 04 May 2005 21:17:06 -0400
**To:** derek.mcumber@datamtnsol.com, gregg.giordano@datamtnsol.com
**CC:** kathleen.bowman@datamtnsol.com

Derek/Gregg,

I have attached both the agreement sent to me last year and
a list of checks I have received to this point for my stock
sale.

According to my records, it looks as if I've only received
eleven checks for a total of $22K and therefore last
month's payment was not in fact the final payment for the
initial agreement.

Please confirm this reflects the same in your records.

Thanks,
Fred

**Data Mtn-SusanHunt-FredHill-Stock Purchase Agreement.doc**     **Content-Type:**     application/msword
**Content-Encoding:** base64

**Data Mtn-Stock Purchase Checks-Fred.doc**     **Content-Type:**     application/msword
**Content-Encoding:** base64

**Subject:** Invoices, Payments
**From:** "Fred Hill" <fred.hill@datamtnsol.com>
**Date:** Wed, 16 Jun 2004 12:52:45 -0400
**To:** kathleen.bowman@datamtnsol.com
**CC:** gregg.giordano@datamtnsol.com, brenda@datamtnsol.com

Hi Kate,

Thanks for taking care of the items we spoke of today and
for the record, below is a breakdown (invoices are also
attached):

-I am selling shares back to the company and I am to
receive a $2,000 check from Data Mtn each month, address
below:

Fred Hill
1831 Brett Court
Annapolis, MD  21401
(410) 224-0942
(301) 529-2039 (Cell)

-We have had a student (Tom Adkins) working at United
Bank's help desk during the last 4-5 week period and he
needs to be paid.  He is paid $15/hour and we charge the
bank $20/hour.  The invoices for this work are attached.
 The total we need to send Tom is $1,905.00.  His address
and social sec. # is as follows:

Tom Adkins
5206 Glow Drive
Cross Lanes, WV  25313
SSN: 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

The company will net $635 and with that money, we'll have
to pay our WV phone bill but I'll go over the details with
you once we have taken care of these items.  Many thanks!

Regards,
Fred Hill

| **DMS+Invoice-Help Desk-United-Invoice#1.doc** | **Content-Type:** | application/msword |
| | **Content-Encoding:** | base64 |

| **DMS+Invoice-Help Desk-United-Invoice#2.doc** | **Content-Type:** | application/msword |
| | **Content-Encoding:** | base64 |

| **DMS+Invoice-Help Desk-United-Invoice#3.doc** | **Content-Type:** | application/msword |
| | **Content-Encoding:** | base64 |

**Subject:** stock payments to Fred
**From:** kathleen bowman <kathleen.bowman@datamtnsol.com>
**Date:** Wed, 22 Jun 2005 12:31:27 -0400
**To:** Derek McUmber <derek.mcumber@datamtnsol.com>, gregg giordano
<gregg.giordano@datamtnsol.com>


```
See the attached spread sheet.

Fred is expecting another $2000 in July, making the total payments for stock to
$32,000.00.  (see below)

Fred Hill wrote: (in June)
> > >Hi Katie,
> >
> >Hope all is well with you and you had a nice weekend.
> >Did you receive the two mailings I sent you in good order?
> >I also wanted to remind you to please send me the check for
> >this month.  Next month's will be the last one.
> >Thank you.
> >
> >-Fred


--
```

Kathleen Bowman
703-927-2264



| payments for stock & expenses.xls | **Content-Type:** | application/vnd.ms-excel |
| --- | --- | --- |
| | **Content-Encoding:** | base64 |

> > Tony, Fred, and John:
> >
> > The DMS Treasury Stock Transfer Agreement
> effective date May 25, 2006
> > emailed to you on July 10, 2006 is hereby resinded
> and rendered void.
> >
> > Further paperwork to follow.
> >
> > Thank you.
> >
> > Sincerely,
> >
> > Derek McUmber
> >
> >
> > Fred Hill wrote:
> >
> >> Tony,
> >>
> >> Attached is an executed agreement to complete the
> sale transfer of
> >> all your shares to the company and paying you
> what is still
> >> apparently owed to you. Please print it up (if
> possible), sign and
> >> fax it to John Thomas' office at (202) 463-6328.
> As stated, the
> >> funds will be wired to you once the signed
> document is received.
> >> Thanks.
> >
> >
>--------------------------------------------------------------------
> >
> >No virus found in this incoming message.
> >Checked by AVG Free Edition.
> >Version: 7.1.405 / Virus Database: 268.11.1/421 -
> Release Date: 8/16/2006
> >
> >
>

Do You Yahoo!?
Tired of spam? Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

EXHIBIT D

**Data Mountain Solutions**
Treasury Stock Transfer Agreement

As of May 25, 2006 ("Effective Date"), this treasury stock transfer agreement ("Agreement") is entered into by and between Data Mountain Solutions, Inc., a West Virginia Corporation, having it's main office located at 1116 Smith Street Charleston, WV 25301 ("Company") and Mr. Anthony J. Watson, residing at 303 F Holden Green Cambridge, MA 02138 ("Stockholder").

This agreement is to complete the email conversations by and between the Data Mountain Solutions' shareholders beginning February, 16 2005 and ending at the board meeting dated May 25, 2006. This agreement formalizes Mr. Watson's expressed desires and completes the sale of stock from Mr. Watson to the Company.

By signing this agreement, I Mr. Anthony Watson formally transfer all 22,500 shares of DMS stock to the Corporation per the terms in the June 3, 2003 Shareholder Agreement that bears my signature. This agreement required that any stock transfers not alter the ownership of the remaining founders without the written consent of all founding shareholders in the agreement. I did not have this consent and therefore my stock transfer shall be in accordance with the June 3, 2003 Shareholder Agreement.

DMS will wire transfer the remaining $10,000 for Mr. Watson's shares to the Baltimore Municipal Employee Credit Union bank account where the initial funds were deposited upon fax receipt of this signed document. DMS and the signed principles below agree to mutually release and hold harmless Mr. Watson and the remaining shareholders on any past liability with respect to this stock transfer or Data Mountain business responsibilities.

In witness whereof, the parties hereto have caused this Stock Transfer Agreement to be executed as of the Effective Date.

_____          7/11/06
Frederick S. Hill, President                        Date

_____          7/10/2006
Derek McUmber, CEO                                Date

_____          _____
Anthony J. Watson, Shareholder ,                Date

DAVID I. BLEDSOE
ATTORNEY AT LAW
601 KING STREET
ALEXANDRIA, VIRGINIA 22314
TELEPHONE (703) 879-9424
FACSIMILE (703) 684-1851

OF COUNSEL
JOHN A. RITCHIE

ADMITTED IN VIRGINIA,
MARYLAND AND D.C.

August 15, 2006

Philip J. McNutt, Esquire
Hughes and Bentzen, PLLC
1100 Connecticut Avenue
Suite 340
Washington DC  20036

Re: <u>Data Mountain Solutions, Inc.</u>

Dear Mr. McNutt:

I have tried to call you numerous times over the past two weeks regarding your letter of July 28, 2006, but have not received a call back from you.

Your letter is rather confusing, in that it is addressed to both my client, Mr. Giordano, and the corporation's attorney, Mr. Thomas.  It is difficult to determine which of your various accusations and demands are directed at whom.

A number of your accusations are bewildering, and my client and I are simply at a loss to understand them.  Please provide me with specific details of each instance of the following allegations:

1.  "Substantial withdrawals, transfers and diversion of DMS's funds into accounts either owned or controlled by Mr. Giordano."

2.  "Multiple blocks of stock in DMS either transferred to or issued by Mr. Giordano that were not properly authorized and violated the By-laws, the Shareholders' Agreement, and applicable law."

3.  "Appropriations of the assets, funds and/or contract receipts of DMS without proper accounting or corporate authority."

4.  "Recent illegal and improper means to increase Mr. Giordano's and Mr. Thomas' ownership interests in DMS."

Likewise, your letter is confusing in that it seeks to demand documents from Mr. Giordano that are not in his possession, many of which are available to Mr. McUmber from other sources, and numerous documents which your client would not seem to be entitled to receive as a shareholder under West Virginia law.  Most of the company's

EXHIBIT E

financial records are in the possession of its treasurer, Mr. Hill, or your client's sister, who perform bookkeeping services for DMS.

Moreover, your demand that Mr. McUmber be paid "the prior compensation due him, and that we provide "assurance of the continued payment of such compensation" is less than precise. Again, please provide me details of what your client believes he is entitled to receive and the basis for that belief.

It appears that Mr. McUmber is in possession of source code that is the property of DMS which he has refused to turn over to DMS. This source code is the copyrighted work of DMS, and Mr. McUmber's use of it to extort additional compensation from DMS is a violation of his duties as an officer, director and employee, and his refusal to release it to DMS would appear to be a violation both of the United States Copyright Act and a violation of the Uniform Trade Secrets Act.

Until this matter can be resolved, my client is prepared to return the $40,000 bonus that was approved at the last director's meeting into a suitable escrow and to reverse the sale of stock from Mr. Watson. I would suggest that this controversy would best be decided by mediation, or by a meeting of the principals and counsel. Please let me know your client's view on that proposal.

I look forward to your response.

Sincerely,

David I. Bledsoe

**DAVID I. BLEDSOE**
ATTORNEY AT LAW
601 KING STREET
ALEXANDRIA, VIRGINIA 22314
TELEPHONE (703) 379-9424
FACSIMILE (703) 684-1851

OF COUNSEL
JOHN A. RITCHIE

ADMITTED IN VIRGINIA,
MARYLAND AND D.C.

August 15, 2006

**BY FAX 410-224-0943**
Fred Hill
Data Mountain Solutions
1116 Smith Street
Charleston WV 25301

Re: <u>Data Mountain Storage</u>

Dear Fred:

As you are aware, I represent Gregg Giordano. I have been unable to get Mr. McUmber's attorney to respond to multiple telephone calls and letters over the past three week in which I have attempted to find some mediated solution to the current controversies. I am interpreting that silence as Mr. McUmber's unwillingness to discuss some sort of settlement of the various issues.

My client, as a shareholder, officer and director, is concerned regarding the financial operations of DMS. Apparently, the signing authority on the bank accounts was changed by you or Mr. McUmber, albeit without informing Mr. Giordano and without the required corporate resolution of the board of directors. This unauthorized action is the reason why Mr. Giordano is reluctant to deposit the NTI checks in this account.

In order to make sure there is no wasting of corporate assets, and to ensure the continued financial stability of DMS while these matters are being sorted out, I would suggest that the full board of directors pass a resolution requiring the signatures of yourself, Mr. Giordano, and Mr. McUmber on all checks or transfers from all DMS checking accounts. This would satisfy Mr. Giordano's concerns in the short term and permit him to deposit the NTI checks without fear of misapplication of these funds.

Please call me if you have any questions.

Sincerely,

David I. Bledsoe

EXHIBIT F

**DAVID I. BLEDSOE**
ATTORNEY AT LAW
601 KING STREET
ALEXANDRIA, VIRGINIA 22314
TELEPHONE (703) 379-9424
FACSIMILE (703) 684-1851

OF COUNSEL
JOHN A. RITCHIE

ADMITTED IN VIRGINIA,
MARYLAND AND D.C.

October 12, 2006

**BY FAX**
Philip J. McNutt, Esquire
Hughes and Bentzen, POLK
1100 Connecticut Avenue
Suite 340
Washington DC 20036

Re: Data Mountain Solutions, Inc.

Dear Mr. McNutt:

As I mentioned in our meeting last Tuesday, my client is invoking his right under the Shareholder's Agreement to have this matter resolved by arbitration. This letter will serve as formal confirmation of the invocation of that right.

Pursuant to our obligation to confer regarding motions, please let me know if your clients will consent to the stay required by the Federal Arbitration Act, or whether a motion to compel arbitration and stay this matter will be needed.

Sincerely,

David I. Bledsoe

cc: John Thomas, Esq.
Anthony J. Watson

EXHIBIT G

Corporate Proprietary Data          Native Technologies, Inc.

## TEAMING AGREEMENT

This Agreement is entered into as of the 8th day of ~~July~~ January 2002 between "Native Technologies Inc."( NTI ) and WaveInterface (Wave)/Data Mountain Solutions, Inc. (DMS).

WHEREAS, certain federal agencies have entered into discussions with Wave/DMS regarding products and services provided by Wave/DMS, and said federal agencies have requested that Wave/DMS provide said products and services via a federally recognized procurement process

WHEREAS, Wave/DMS desires that NTI participate in said proposals and provide the requested federally recognized procurement process via NTI's 8a, Hub Zoned, American Indian Owned and Managed abilities

WHEREAS, NTI desires to be a prime offeror, and to submit said responsives via NTI's afore mentioned federal abilities to the Customer in concert with Wave/DMS services and agree that NTI will perform this function for a fixed fee of 3% of the total contract value and will not act in any capacity without the consent of Wave/DMS.

NOW, THEREFORE, in consideration of the mutual benefits to be derived therefrom and of the mutual convenants and promises hereinafter set forth, the parties agree to enter into a Contractor Team Arrangement within the meaning of the Federal Acquisition Regulations (FAR), Part 9.6 as follows:

## ARTICLE 1 - RELATIONSHIP OF THE PARTIES

1.1 NTI shall act as prime offeror under the proposal and Wave/DMS shall act as the sole Subcontractor to NTI under the proposal. Under the Program, NTI shall act as prime contractor and Wave/DMS as first-tier Subcontractor, subject to the conditions set forth in Article 5 below. The duties and responsibilities of both parties during this agreement shall result from these respective relationships.

1.2 Wave/DMS agrees that it will not act as a prime offeror in any proposal that Wave/DMS brings to NTI. NTI agrees that it will not enter into a teaming arrangement with any other subcontractor for the scope of work as defined in Exhibit A or pursue any other business without Wave/DMS with the contracted agency under these same conditions. Wave/DMS – NTI subcontract document, statement of work are subject to the conditions of Article 4 below. However, nothing in the Agreement shall be deemed to restrict either party from quoting, offering to sell, or selling to other agencies not covered under this agreement. Should either party violate the terms of this paragraph the injured party shall have recourse to all available remedies, at law or in equity, to compensate for any and all damages suffered as a result of breach of this paragraph.

1.3 In order to adhere to any requirement imposed by the Federal Government or the SBA Wave/DMS will supply and NTI agrees to contract with or directly hire personnel supplied by Wave/DMS. NTI agrees that all personnel hired by NTI from Wave/DMS under the agreement can only be taken off a project with the witen consent of Wave/DMS or the end of the contract.

1.4 Each party shall act as an independent contractor. No other relationship outside of that contemplated by the terms of this agreement shall be created. Neither party may obligate the other to any extent except as explicitly set forth herein.

## ARTICLE 2 - RESPONSIBILITIES OF THE PARTIES

General responsibilities of both parties for the term of this agreement shall be as follows:

2.1 NTI and Wave/DMS shall use their best efforts to secure the prime contract under the opportunities to be pursued through preparation of a responsive and responsible proposal.

Corporate Proprietary Data            Native Technologies, Inc.

2.2 **NTI and Wave/DMS** shall cooperate completely in the marketing activities related to the opportunities.

2.3 Each party shall bear the expense of preparation of its own portion of the opportunities and proposal activities.

## ARTICLE 3 – NTI RESPONSIBILITIES

NTI's specific responsibilities for the opportunity are as follows:

For the purpose of this agreement
3.1 **NTI** shall be Listed as the prime contractor in the proposals.

3.2 **NTI** shall identify **Wave/DMS** as a team member in the proposal and the subcontractor of all allowable services and products proposed.

3.3 **NTI** shall grant the necessary authority to a **Wave/DMS** representative to act on behalf NTI in submittal, negotiations and management of the proposal and awarded contract.

3.4 **NTI** Shall provide to **Wave/DMS** in a timely manner any NTI corporate information (i.e. schedule pricing, financials)

## ARTICLE 4 – Wave/DMS RESPONSIBILITES

The **Wave/DMS's** specific responsibilities for the proposals are as follows:

4.1 **Wave/DMS** shall prepare and submit to NTI all aspects of the proposal including but not limited to Program Management, Technical information and Costing necessary to be responsive to Exhibit A. NTI has requested, and granted the authority for a Wave/DMS representative act in and/or submit information in response to the proposal.

a. In the event an award is made to NTI as a result of the proposals NTI and **Wave/DMS** agrees to immediately enter into a subcontract agreement.

## ARTICLE 5 - INVENTIONS AND PATENTS

5.1 Inventions conceived solely by one party and independent of the subject matter of this Agreement shall be the sole property of the inventing party. The parties agree that, in the case of joint inventions, they shall enter into good faith negotiations to establish their respective rights and responsibilities concerning such inventions, and such rights and responsibilities shall survive this Agreement.

5.2 Patents, copyrights and trade secrets in computer software, including computer software documentation, shall be treated in the same manner, as shall inventions under Paragraph 5.1, above.

## ARTICLE 6 - DURATION OF AGREEMENT

6.1 This Agreement shall remain in effect until any of the following occurs:

12 wks
a. The elapse of 24 months from the effective date of this Agreement; or the length of any associated federal contract whichever is longer.

b. by mutual agreement in writing to rescind this Agreement with 60 days notice;

c. any other circumstance listed elsewhere in this Agreement.



Corporate Proprietary Data          Native Technologies, Inc.

6.2 Regardless of Paragraph 6.1, above, this Agreement may terminate at any point should any of the following circumstances occur;

    a.   the existence of any litigation or proceeding in process, pending, or threatened against either party or its officers or employees which,

        (1)  in the judgment of the other party, operate to enjoin or otherwise restrict the activities contemplated by this Agreement, or

        (2)  in the judgment of the other party would adversely affect the rights of the other party; or

        (3)  in the judgment of the other party would affect the ability of the party in question to perform pursuant to this Agreement; or

        (4)  in the judgment of either party would make continuation of this Agreement otherwise inadvisable.

    b.   any material adverse change in the financial condition or operational capability of either party which, in the opinion of the unaffected party, would restrict the activities under this Agreement

    c.   an agency has suspended, debarred, or otherwise declared NTI or Wave/DMS ineligible (as the preceding terms are defined in the applicable procurement regulations) for contracting with any agency of the executive branch of the United States.  In addition to the above events of termination, each party has the right to terminate this Agreement if the other party breaches or is in default of any material obligation hereunder, which default is incapable of cure, or which, being capable of cure, has not been cured within ten (10) business days after the day of receipt of written notice of such default from the non-defaulting party or within such additional cure period as the non-defaulting party may authorize. For purposes of this paragraph, a party will be considered in default of a material obligation if it becomes insolvent, makes a general assignment for its business or assets, or becomes subject to any proceeding under any bankruptcy or insolvency law, whether domestic or foreign, or has been wound up or been liquidated, voluntarily or otherwise.

6.3 This Article shall not affect any rights or obligations explicitly identified herein as surviving the expiration of this Agreement.

## ARTICLE 7 - ASSIGNMENT

With the exception of subsidiaries or other affiliates, neither party may assign or in any way transfer its interests or obligations under this Agreement except by the express written consent of the other party <u>which consent will not be unreasonably withheld.</u>

## ARTICLE 8 - NON-HIRING

During the term of this Agreement and the resulting intended subcontract, and for a period of one year following either the expiration or termination thereof, neither party to this Agreement shall directly solicit for hire nor knowingly allow any of its employees, agents, officers or representatives to directly solicit for hire any employee or employees of the other party who are associated with or involved in the performance of the proposals.

## ARTICLE 9 - GENERAL CONDITIONS

9.1 This Agreement shall be governed by and construed in accordance with the laws of Virginia



FROM : Native Technologies, Inc.          FAX NO. : 7038605145          Jan. 13 2003 01:59PM  P4

Corporate Proprietary Data          Native Technologies, Inc.

9.2 This Agreement may be amended by mutual written consent of the parties.

## ARTICLE 10 - ORGANIZATIONAL CONFLICT OF INTEREST

It is understood by both parties that neither party is knowingly adversely affected by any organizational conflict of interest related to any proposal or opportunities as of the date of this Agreement.

## ARTICLE 11 - INCORPORATION OF DOCUMENTS

The following documents are attached hereto and are specifically made a part of this Agreement:

a. Wave/DMS – NTI Subcontract Document

## ARTICLE 12 - PUBLICITY

Any news releases, public announcements, advertisements, or publicity to be released by the Subcontractor in connection with any proposals or ensuing contract award must have the prior written approval of NTI, which shall not be unreasonably withheld.

## ARTICLE 13 - MODIFICATIONS

This Agreement constitutes the entire Agreement of the parties hereto, and all previous communications between the parties, whether written or oral with reference to the subject matter of this Agreement, are hereby canceled and superseded. No modification of this Agreement shall be binding upon the parties hereto, unless such is in writing and duly signed by the respective parties hereto.

NOW, THEREFORE, the parties above named have caused this Agreement to be executed by their duly authorized representatives as of the day and year first set forth above.

WAVE/DMS                                        Native Technologies Inc.

_____                         _____
(Signature)                                     (Signature)

GREGG GIORDANO                                  Joseph F. Abbate
(Name)                                          (Name)

                                                CEO / President
(Title)                                         (Title)

01/13/03                                        01/13/03
(Date)                                          (Date)

Corporate Proprietary Data            Native Technologies, Inc.

## EXHIBIT A

_____ – NTI Subcontractor Document

The final break out for the GSA agreement will be as follows:

NTI will perform Program Management for 5% - Responsibilities include maintaining NTI date in contractor database, filing necessary corporate information with the GSA to ensure payment and processing, submission of invoices in a timely manner and payment of sub-within 3 days after receipt of payment

Gregg Giordano will perform Project Management 47.5% - Responsibilities include: performing all day-to-day contract administrative duties and provide and maintain all data necessary for NTI to perform billing function. And Wave/DMS will perform Technical services for 47.5% - Responsibilities include design build and maintain all software, hardware and network technology necessary for to support the GSA contract.