IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DATA MOUNTAIN SOLUTIONS, INC.,        :
et al

                                                            :

                          Plaintiffs

                                                            :

        v.                                                                    1:06-CV-01666-PLF

                                                            :

GREGG GIORDANO, et al

                                                            :

                          Defendants

                                                            :


**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
THE MOTION TO DISMISS FILED BY THE DEFENDANT, GREGG GIORDANO**

COME NOW, the Plaintiffs, Data Mountain Solutions, Inc. ("DMS"), Derek McUmber

("McUmber") and Frederick Hill ("Hill"), by and through their counsel, and, submit the

following Memorandum in Opposition to the Motion to Dismiss filed herein by the Defendant,

Giordano:

## Background and Introduction

Through their Complaint filed herein, the Plaintiffs are seeking specific performance of

the parties' Shareholder Agreement, and injunctive and other legal and equitable relief  to

prevent the defendants from seizing control of the plaintiff corporation, Data Mountain

Solutions, Inc. ("DMS" or the "Corporation"). The Plaintiffs are also seeking the return of funds

in excess of $200,000 that were stolen, withheld and converted by the Defendant, Giordano.

Plaintiffs are also requesting an accounting of those funds, particularly the proceeds from DMS'

contract with Native Technologies, Inc. ("NTI"). The Defendants have failed and are refusing to

turn over the originals of DMS'  stock registry, stock transfer, and  other corporate books and

records in their possession, despite repeated recent demands therefor from the Plaintiffs.  The

Defendants have threatened to use their control over DMS' stock registry and stock transfer

books to illegally claim control of DMS and its major assets, including the income from the NTI

contract under which DMS is a subcontractor.

The individual parties to this action, plaintiffs, McUmber and Hill, and defendants,

Giordano and Watson, are the founding shareholders of DMS and the owners, collectively, of as

much as 90% of the issued and outstanding stock of DMS.  At the conception of the Corporation,

the founding shareholders entered into a Shareholders Agreement, the purpose of which was to

assure that, without agreement of the Shareholders, no one shareholder could acquire a

disproportionate share of the ownership of the Corporation. The Shareholders Agreement was

dated June 2, 2003 and was executed by and among McUmber, Watson, Hill and Giordano (the

"Shareholders Agreement").  *See* Shareholders Agreement, Complaint Exhibit 2, at 1.

Under the Shareholders Agreement the founding shareholders agreed that no

Shareholder, "without the prior written consent of **all** the Shareholders" may directly or

indirectly sell, assign, mortgage, hypothecate, transfer or otherwise voluntarily or involuntarily

dispose of **any** shares of  DMS stock owned by him. *See id.*, at para. 3(a)(emphasis added).

Despite the express language of the Shareholders Agreement and the absence of authority

or approval from the Corporation, Giordano issued and negotiated a check payable to "Cash", in

the amount of $40,000, and issued another check in the amount of $20,000, both out of the DMS

bank account  "starter-kit."  The Complaint alleges that the Defendant, Giordano, a minority

shareholder and the corporate secretary of DMS, converted and misappropriated the $60,000 he

took without permission or authority from the DMS bank account and used those funds as part of

a scheme whereby he attempted to acquire, personally, the DMS stock of defendant Watson, such that  Giordano now claims that he is the majority shareholder and thereby in "control" of DMS.  However, that stock, pursuant to the agreement of the shareholders and the terms of the Shareholders Agreement, was to be acquired by the Corporation and returned to the Treasury of the Corporation.  All of Giordano's actions attempting to gain control of DMS, were in direct violation of the terms and conditions of the Shareholders Agreement.  Those actions include attempted stock transfers which Giordano sought to record in the Corporation's books and records, attendance at so-called mediation meetings in the District of Columbia at the office of Defendant, Thomas at which Giordano asserted his majority stock ownership of DMS, and the threatened seizure of control of the corporation all within the District of Columbia.   Those actions also include the conversion of the contract proceeds of the GSA contract with NTI, under which DMS acts as subcontractor.  The NTI contract and its invoices, the proceeds of which the Defendant, Giordano, has illegally confiscated, are generated by GSA at its headquarters in Washington, DC.

The Complaint further alleges that Giordano asserted, at the mediation meetings among the parties held in Thomas' office, that he is the majority shareholder of DMS using his wrongful reasoning that he is now majority owner of NTI and allegedly now "controls" the NTI contract,. Using his contacts with the principal of NTI and his administrative position relative to the NTI contract (Program Manager for NTI), Giordano has intercepted and now holds substantial payments from NTI that are payable to plaintiffs DMS and McUmber.   Giordano is now collecting and holding those checks or otherwise controlling those funds.  They are not being deposited into the Corporation's account and have not been for at least four months.  Moreover,

while Giordano has apparently paid himself the amounts received under the NTI contract and agreed to by McUmber, Giordano, NTI and DMS, he has illegally and improperly withheld the agreed upon payments to DMS and McUmber.

The Plaintiffs allege in their Complaint that DMS' stock registry, stock transfer books, and similar corporate record books are in the possession of defendant Thomas and Luman, Lange, Thomas & McMullen, his law firm ("LLTM"), who have already taken shares of DMS stock without any record of authorization or approval. The shares were allegedly issued to Thomas/LLTM as payments for legal services rendered during time-periods concerning which they have denied providing **any** such services.

 It is clear from the failure to produce the originals of any corporate records and the failure to produce copies of all of the records that the defendants are hiding what they have already done and are now planning to create changes to the original corporate documents in their possession. That "hiding" not only includes refusal to produce records in the possession of Giordano, but also records in the possession of Thomas, specifically the NTI contract and the corporate books and records.[1] The retention of the original documents, and the failure to produce copies of all originals, were done on the orders of DMS' corporate secretary, Giordano, who also stands accused of concealed self-dealing with the assets and stock of DMS. To worsen matters, Giordano issued orders to Thomas/LLTM to "correct", change, modify, or otherwise wrongly alter the corporate books so that Giordano emerges as the majority shareholder of DMS, to the detriment of all other DMS shareholders, including the plaintiffs herein.

---

[1]Giordano asserted at the parties' meeting at Mr. Bledsoe's office that Thomas had the original or a copy of the NTI contract. Mr. Thomas did not produce the NTI contract in his limited document production to the Plaintiffs and it is not clear whether Thomas actually has a

The Shareholders Agreement provides that Court-Ordered injunctive relief is an appropriate remedy for resolving disputes with DMS' shareholders. ***See*** Shareholders Agreement, at 10, para. 10(b). Prior to filing their Complaint, the Plaintiffs, on several occasions, sought documents from the Defendants related to the issues raised in the Plaintiffs' pending Motion. Except for a few corporate documents received from the Defendant, Thomas, no documents were produced.

Only after being sued through this litigation has the Defendant, Giordano, now offered to rescind his transaction with the Defendant, Watson. However, no similar offer has been made by Watson. Furthermore, no offer has been made to account for the funds stolen by Giordano for his alleged "purchase" of Watson's stock, or the remaining consideration provided to the Defendant, Watson, in the same transaction. And, the Plaintiffs believe Giordano is still asserting he controls 60% of DMS stock. Without DMS' corporate documentation regarding actual or alleged stock transactions, the Plaintiffs have only the allegations of Giordano to rely upon in preparation for the hearing on their Motion.

As part of his Motion to Dismiss filed herein, Giordano produced an agreement between NTI and DMS (the "Teaming Agreement") which, on its face, expired as early as January, 2005. This is the only documentation the Plaintiffs have seen regarding the NTI contract or DMS' rights and obligations under that contract. The Plaintiffs have not seen, and do not have, a copy of the current NTI contract nor do they have any knowledge of the location or disposition of the NTI contract income since June, 2006, which amounts to approximately $44,000 per month or $176,000 through October, 2006.

---

copy of the subject contract in his possession.

At a conference call with Judge Bates on September 29, 2006, Giordano, through his counsel, made several representations to Judge Bates related to the NTI income. Included among those representations was the promise that Giordano would not take any money belonging to DMS from the NTI contract. *See* Judge Bates' Memorandum and Order dated September 29, 2006, at 3. The October payment from NTI was due on or about October 7, 2006, in the approximate amount of $44,000, of which DMS would have been entitled to nearly $40,000 including the payments due both McUmber and Giordano. None of those funds have been deposited into DMS' account and DMS has not been made aware of the status or disposition of those funds. The Plaintiffs assert that Giordano's failure to produce the proceeds from the October payment and his failure to deposit those funds into the corporate account of DMS constitutes a violation of this Court's Order of September 29, 2006. Specifically that order was based upon Giordano's representations that he "would not transfer corporate assets" and would "make or facilitate making any standard and necessary corporate payments." Yet, Giordano continues to hide and convert Corporate property and assets.

The above recitations set forth some of the factual and procedural background necessary to understand the factual and procedural weaknesses of Giordano's Motion to Dismiss. The Plaintiffs incorporate into this Memorandum their Opposition [Docket No. 13] to the Motion for Protective Order filed herein by Giordano and the Declarations of the Plaintiffs, Hill and McUmber which are attached to their Opposition. Also attached hereto is a Declaration by McUmber which specifically addresses some of the issues raised in Giordano's Motion to Dismiss.

## <u>Argument</u>

**A.    The Plaintiffs Have Carried Their Burden to Prove Jurisdiction Over the Parties and the Subject Matter of This Complaint**

The party seeking to invoke federal jurisdiction has the burden of establishing that the jurisdiction exists. However, the plaintiff need only make a *prima facie* showing of the jurisdictional facts to prevail. ***See, Mitchell Energy Corporation v. Mary Helen Coal Co., Inc.***, 524 F.Supp. 558, 561 (D.D.C. 1981). Although the Court may consider matters outside the pleadings, it need not do so. ***Gordon v. National Youth Work Alliance***, 218 U.S. App. D.C. 337, 675 F.2d 356, 361 (D.C. Cir. 1982). All factual disputes regarding jurisdiction must be resolved in favor of the plaintiffs. ***Crane v. New York Zoological Society***, 282 U.S. App. D.C. 295, 894 F.2d 454, 456 (D.C. Cir. 1990), citing ***Reuben v. United States***, 242 U.S. App. D.C. 370, 750 F.2d 1039, 1052 (D.C.Cir. 1984).

1.    This Court has Subject Matter Jurisdiction Pursuant to 28 U.S.C. §1332(a)

As this Court is well aware, one of the longstanding bases for federal jurisdiction is diversity of citizenship, that is, when the action is one between citizens of different states, and the amount in controversy is more than $75,000. 28 U.S.C. §1332(a). The Plaintiffs' allegations regarding the citizenship of the parties is set forth in paragraphs 3 through 8 of the Complaint filed herein. In his motion Giordano does not dispute the citizenship allegations of any party. The sole exception is DMS which Giordano claims has dual citizenship in West Virginia and Virginia. If true the Virginia citizenship could defeat diversity since the Defendant, Giordano, is also a citizen of Virginia.

The Defendant argues that the Corporation is a citizen of the Commonwealth of Virginia. Thus, the Defendant argues, no diversity exists and the court must dismiss this case. Giordano's

- 7 -

primary focus is an alleged "office" at 8619 Westwood Center Drive, Vienna, Virginia.  *See* Giordano's Opposition to Motion for Preliminary Injunction, p.3; Giordano's Memorandum in Support of Motion to Dismiss (Giordano Memorandum in Support), at 3;  Giordano's undated Affidavit (accompanying Giordano Memorandum in Support), ¶8.

However, the "office" asserted by Giordano is a 19" wide computer rack on which approximately 5 pieces of computer equipment sit.  There is no office, no desk, no phone, no operation at the Vienna address. *See* Hill Declaration, ¶10; McUmber Declaration, ¶10. In fact, that site is merely a series of rows of similar racks leased by Navisite to its customers like DMS. The mere existence of a small amount of computer equipment at a rented space in Virginia is not enough to establish a principal place of business.

As this Court is also certainly aware, federal courts follow a "nerve center" test to determine corporate citizenship for the purpose of applying the diversity jurisdiction rules of 28 U.S.C. §1332(a). ***Masterson-Cook v. Criss Brothers Iron Works, Inc.***, 722 F.Supp. 810, 812 (D.D.C. 1989), citing ***Knee v. Chemical Leaman Tank Lines, Inc.***, 293 F. Supp. 1094 (E.D. Pa. 1968); ***National Spinning Co. v. City of Washington***, 312 F. Supp. 958 (E.D.N.C. 1970). When no one state is clearly the center of corporate activity or accounts for a majority of the company income, the headquarters logically assumes greater importance in determination of the principal place of business. ***Id.,*** citing ***Mahoney v. Northwestern Bell Tel. Co.***, 258 F. Supp. 500 (D. Neb. 1966), aff'd, 377 F.2d 549 (8th Cir. 1967). Under well established case law, including those cases cited above, the facts asserted in the Complaint (as buttressed by the Declarations of McUmber and Hill), show that the principal place of business of the Corporation is West Virginia.  Even if the company does business at or through other locations in Virginia and Maryland, under the

- 8 -

nerve center test, West Virginia is the proper state of citizenship.  All corporate documents list West Virginia as the principal office (Hill Declaration, ¶¶16, 16a).  The Corporation does maintain an office in West Virginia, and in no other jurisdiction (McUmber Declaration, ¶8. Hill Declaration, ¶8.  Government filings show the principal office in West Virginia. Hill Declaration, ¶16a.  Most of the Corporation's business is conducted through the West Virginia address.  Hill Declaration, ¶19, McUmber Declaration, ¶19.  Other than the lease of a computer rack in Vienna, Virginia, DMS has no interest in real property in Virginia.  It has no telephone in Virginia.  It pays no taxes in Virginia and has no physical office or place of business in Virginia.  Since some of the business of the Corporation is conducted at the home addresses of the principals but West Virginia is the only office, under the holding of ***Masterson-Cook, supra***, West Virginia is the state of citizenship of the Corporation.

> When no one state is clearly the center of corporate activity or accounts for a majority of the company income, the headquarters logically assumes greater importance in determination of the principal place of business

***Id.***, 722 F.Supp. 810, 812, citing ***Mahoney v. Northwestern Bell Telephone Company***, 258 F.Supp 500 (D.Nebraskas 1966), ***aff'd***, 377 F.2d 549 (8th Cir. 1967).  It is undisputed, in the instant case, that DMS' corporate headquarters are located in West Virginia.  It is also undisputed that certain work in support of the corporation and its operations is conducted from the residences of the three principals, Hill, McUmber and Giordano.  Furthermore, substantially all of the support, maintenance and technical performance by DMS for its contracts, including the NTI contract, is performed by McUmber.  That performance is primarily conducted from his residence in Maryland.  Attached hereto, and made a part hereof by this reference is a Declaration of Derek McUmber which specifically addresses the corporate resources at the

facility in Vienna, Virginia compared to those at the corporation's West Virginia address. Attached as an Exhibit to his affidavit are pictures of the computer rack which Giordano asserts is the Corporation's principal place of business. Under the theory of ***Masterson-Cooke***, a case relied upon by Giordano (***See*** Giordano's Memorandum in Support of Motion to Dismiss (Giordano Memorandum), at 3) since the business of the Corporation is spread among different jurisdictions, including Maryland, the District of Columbia, West Virginia and Virginia, the Corporation's headquarters in West Virginia becomes the compelling factor in the principal place of business test. ***Id.***, citing ***Riggs v. Island Creek Coal Co.***, 542 F.2d 339 (6th Cir. 1976).

The Exhibits to the Complaint, the numerous facts recited in the Declarations of Hill and McUmber and the Exhibits attached to those Declarations show that West Virginia is the only business location of the Corporation. The Defendant, Giordano, attempts to counter these specific factual recitations with unfounded conclusions, none of which support a principal place of business in any jurisdiction but West Virginia. By the very nature of the business and its purpose, West Virginia is the only place of business for diversity consideration. Thus there is complete diversity since the Plaintiffs are citizens of Maryland and West Virginia and the Defendants are citizens of Virginia, the District of Columbia and Massachusetts.

      2.      The District of Columbia has Jurisdiction Over the Defendant, Giordano.

The next argument made by Giordano is that there is no personal jurisdiction over him. To prevail on a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima facie* case showing pertinent jurisdictional facts. ***Edmond v. United States Postal Service General Counsel***, 949 F.2d 415, 424 (D.C. Cir. 1991) quoted in ***United States of America v. Philip Morris, Inc.***, 116 F.Supp.2d 116, 121 (D.D.C. 2000). In determining whether

a factual basis exists for the exercise of personal jurisdiction "factual discrepancies appearing in the record must be resolved in favor of the plaintiff." *Crane v. New York Zoological Society*, 894 F.2d 454, 456 (D.C. Cir. 1990), quoting *Reuber v. United States*, 750 F.2d 1039, 1052 (D.C.Cir. 1984).

Although the party seeking to invoke federal jurisdiction has the burden to establish that jurisdiction exists, the plaintiff need only make a prima facie showing of jurisdictional facts to prevail.  Otherwise merely controverting the facts alleged by the Plaintiff through affidavit would cause dismissal in almost every case. *See, Mitchell Energy Corporation v. Mary Helen Coal Co., Inc.*, 524 F.Supp. 558, 561 (D.D.C. 1981)

In this case, the Defendant has pointed to the statute that provides personal jurisdiction, namely, D.C. Code §13-423. *See* Giordano Memorandum, at 4-5. Indeed the bad acts complained of in the Complaint all occurred in the District of Columbia.  *See*, for example, Complaint, ¶¶12, 14, 18, 19, 23, 25, 28, 30, 31, 32, 33, 36, 38, 39; McUmber Declaration, ¶¶24, 27, 28 and 29; Hill Declaration, ¶¶24, 25, 26, 27. The Defendant's attempts to take over DMS by manipulation of its corporate records all took place in the District of Columbia. There are other bad acts, including the manipulation of contracts involving contacts in the District of Columbia, which subject the Defendant to jurisdiction in the District of Columbia.

Jurisdiction over the Defendant, Giordano, is governed by the applicability of one or more sections of the District of Columbia long-arm statute, D.C. Code §13-423(a) which states, in part:

> [a] District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's
>
> (1) transacting any business in the District of Columbia;

....
(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
(4) causing tortious injury in the District of Columbia by an act or omission outside  the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; ...

D.C. Code § 13-423(a).

A defendant has minimum contacts with a jurisdiction when he has purposefully directed activities at residents of D.C., and the litigation results from those activities.  *United States v. Philip Morris, Inc., supra*, 116 F.Supp.2d at 129. If a defendant purposefully directs his activities at a forum he can be subjected to jurisdiction in that forum.  *World-Wide Volkswagon Corp. v. Woodson* , 444 U.S. 286, 297 (1980), quoted in *Philip Morris, supra*, 116 F.Supp.2d at 129.

As already pled, Giordano performed the following actions, *inter alia*, giving rise to claims of tort and subjecting him to injunctive and other legal and equitable relief herein:

1.  He attended meetings at Luman, Lange, Thomas & McMullen, 1660 L St., NW, including a meeting on or about May 25, 2006 for the purposes of seizing control over the corporation and to hide his theft of corporate assets.

2.  He demanded that Thomas and Luman, Lange, et al, modify corporate documents to reflect his unlawful purchase of the stock of defendant, Watson.

3.  He communicated with Thomas in the District of Columbia by telephone, email and correspondence in furtherance of his attempts to take unlawful control over the Corporation and to steal Corporate assets, including, without limitation,  conferences, telephone conferences and communications with Thomas which occurred on or about  May 25, 2006 (meeting at Luman,

Lange, et al), June 19, 2006 (discussing "issues" with Thomas), June 20, 2006, June 27, 2006

(re: purchase of Watson's stock), June 28, 2006 (re: Watson stock communications), July 7,

2006(proposal for purchase of Watson's stock), July 10, 2006 (emails regarding Watson Stock

transaction), July 11, 2006 (follow up with Thomas about McUmber meeting), July 12, 2006

(telephone conversations and emails to Thomas regarding buy-sell agreement), July 21, 2006

(telephone conversations with Thomas about Giordano's "deadline for offer"), July 24, 2006

(Giordano's plans to hold a board meeting). *See* Letter from John W. Thomas dated October 5,

2006 which includes invoice #10729 dated October 3, 2006. The October 5 letter and its

attachment is attached hereto as Exhibit 1.

    4. He has converted an asset of DMS, namely, its contract income from the NTI contract

with GSA, which contract and invoicing is originated by Giordano in the District of Columbia

through the GSA headquarters' Pegasus billing system.

    The above facts, supported by the allegations of the Complaint and the Exhibits attached

to the Complaint, along with the Declarations of the Plaintiffs, Hill and McUmber, satisfy the

four part test set forth in ***Jacobsen***. Giordano transacted business in the District at and through

Thomas' office and the GSA. The Plaintiffs' claims arise from those acts (conversion of the

Corporation's contract income and assertion of control of the equity in the Corporation). Clearly,

Giordano had sufficient contacts with the District of Columbia as outlined in subparagraphs 1

through 4 above. This Court's exercise of jurisdiction over Giordano will not offend the

traditional notions of fair play and substantial justice, since the Corporation's Virginia resident

agent (Thomas) has an office in D.C., the parties met for mediation in D.C. at Thomas' office,

and Giordano's Virginia counsel is admitted to this Court.

- 13 -

Because the wrongful actions of Giordano either originated in the District of Columbia, or were advanced through contacts in the District of Columbia, there is ample basis for personal jurisdiction over Giordano. The mere conclusory assertions in Giordano's Affidavit do not overcome the well pled allegations of the Complaint as to the place of Giordano's wrongdoing. Giordano's Affidavit raises no factual issues. Regardless, the factual assertions and documentation set forth, and referred to, in the Complaint, the Exhibits attached to the Complaint and the factually specific Declarations of Hill and McUmber, supported by corporate documentation, clearly establish jurisdiction over this matter and each Defendant.

B.    **The Plaintiffs' Complaint is Specifically Authorized by the Shareholders Agreement**

The third argument raised by Giordano is that the arbitration clause of the Shareholders Agreement requires that the Complaint be dismissed, or at least stayed, pending arbitration. Giordano Memorandum in Support, at 6-7.

The Plaintiffs first response is that most of the allegations of the Complaint are not disputes under the Shareholders Agreement. They involve neither interpretation of the Shareholders Agreement or violations of the Shareholders Agreement. For example, the conversion by Giordano of DMS funds is not a dispute under the Shareholders Agreement. The conversion of the NTI contract and its proceeds is not a dispute under the Shareholders Agreement.

Moreover, the suggestion that the Shareholders Agreement requires dismissal or a stay pending arbitration is simply a misreading of the Shareholders Agreement ("The Agreement"). Section 10 of The Agreement is titled "Arbitration and Specific Performance." Although inartfully worded, paragraph (b) of that Section clearly is intended to, and does allow, specific

performance and injunctive relief, in addition, and as an alternative, to arbitration. The only way to make sense out of the two paragraphs of Section 10 is to read them in the alternative, that is, remedies include arbitration and, if necessary, specific performance and injunctive relief. Thus, until injunctive relief is determined, arbitration cannot prevent a cause of action seeking the equitable relief contemplated in paragraph 10 (b). Giordano has conceded that arbitration does not prevent the equitable relief set forth in paragraph 10 (b). *See* Giordano Memorandum in Support, at 7, footnote 1.

Additionally, arbitration without at least some equitable or declaratory relief would endanger the purpose of the Shareholders Agreement and make arbitration useless. Reading the Agreement as a whole, it is clear that, at the very least, injunctive relief and specific performance are remedies intended to complement arbitration, not to be replaced by arbitration. Furthermore, the ownership of the Corporation is not a dispute under the Shareholders Agreement but a dispute over the present equity ownership of the Corporation, an issue that requires, at the very least, a declaration by this court as to whom the owners are and in what percentage before any disputes regarding the Shareholders Agreement can be arbitrated.

The Plaintiffs further argue that the Defendants have already opted out of arbitration by choosing to go through mediation at Mr. Thomas's office in May, 2006. It is questionable, at best, whether, once the parties have chosen a route to resolve their disputes, they may now change their choice after the mediation was unsuccessful. Once mediation is unsuccessful, the parties may not come back and change their minds. The arbitration clause is not mandatory, but permissive, "at the option" of one of the shareholders. They choose mediation with Thomas, instead of arbitration.

Finally, there are significant matters in the Complaint that are not disputes under the Shareholders Agreement, including, without limitation, control over the assets of the Corporation, including the proceeds of the NTI contract, the usurpation or attempted usurpation of the Corporation's business opportunities and the effect of the Watson transaction whereby assets of the Corporation have been transferred to Anthony Watson in return for his shares in the Corporation. These are all matters requiring court action that do not involve disputes under the Shareholders Agreement.

### C.    The Plaintiffs' Action is a Proper Derivative Action

The final argument made by Giordano is that the Complaint fails because it does not meet the test of Fed. R. Civ. P. 23.1. This argument is non-sensical. The Defendant seems to suggest in his Memorandum (p. 9) that the Plaintiffs never attempted to act through the Board of Directors of the Corporation. However, the Complaint and its attached exhibits make clear that Giordano asserted that he had complete control over the Corporation by virtue of owning 60% of the outstanding shares, including the shares of the Defendant, Watson. Under this logic McUmber and Hill represented, at best, a minority interest in the Corporation such that the action which Giordano argues is required for the derivative suit would be completely futile. Furthermore, the parties attempted to resolve these issues before, during and after the meeting at Thomas' office in May, 2006 without success which brought about this lawsuit.

The Defendant's argument appears to be little more than a smoke screen to continue to hide relevant information and documentation from the Plaintiffs. In the meantime, it remains unrefuted that Giordano stole at $60,000 from the Corporation's bank account and has converted unknown sums from the NTI contract amounting to at least $150,000. To suggest that somehow

Giordano and Watson, the recipient of some of the stolen funds, are now in the best position to represent the interests of the shareholders and the Corporation is, at best, absurd and laughable. To suggest that Hill and McUmber, who have not stolen any assets from the Corporation, who have not withheld or converted assets of the Corporation and who are seeking only a declaration of each party's rights and obligations and a return of corporate property, are engaged in a "power play" is a pure fantasy without any factual foundation.

The Complaint is a proper derivative action because it attempts to preserve the rights of all shareholders in the face of improper or illegal acts of some (Giordano, Thomas and Watson) who have taken, or jeopardized, assets of the Corporation.

<u>Conclusion</u>

For the reasons set forth above, the Defendant's Motion to Dismiss or for a Stay pending arbitration should be denied and the Plaintiffs should be allowed immediate discovery to determine the status of corporate assets and property converted by the Defendants.

Dated:  November 1, 2006                      HUGHES & BENTZEN, PLLC


By:    /s/Philip J. McNutt
       Philip J. McNutt
       Federal Bar No. MD08555
       DC Bar No. 491258
       1100 Connecticut Avenue, NW
       Suite 340
       Washington, D.C.  20036
       Tel: (202) 293-8975

       <u>Attorneys for Plaintiffs</u>

- 17 -

**<u>Certificate of Service</u>**

I hereby certify that a copy of the foregoing Memorandum was served electronically on the 1st Day of November, 2006 on counsel below and by regular, first class mail, postage prepaid, this 1st day of November, 2006 to Anthony Watson, 303-F Holden Green,  Cambridge, MA 02138:

David Bledsoe, Esquire

and

John W. Thomas, Esquire


 /s/Philip J. McNutt
Philip J. McNutt

# LUMAN, LANGE, THOMAS & MCMULLEN, LLP

ATTORNEYS AT LAW

GENE C. LANGE
SEAN P. MCMULLEN*‡
JOHN W. THOMAS*

SUITE 506
1660 L STREET, N.W.
WASHINGTON, D.C.  20036
Telephone (202) 463-1260
Facsimile  (202) 463- 6328
jthomas@LLTMLAW.COM

OF COUNSEL
JOSEPH C. LUMAN*

*ALSO ADMITTED IN VIRGINIA
¹NOT ADMITTED IN DISTRICT OF COLUMBIA
‡Also Admitted in Maryland

October 5, 2006

VIA FIRST CLASS MAIL

David L. Bledsoe, Esq.
300 North Washington Street
Alexandria, Virginia 22314

Philip J. McNutt, Esq.
Hughes & Bentzen, PLLC
1100 Connecticut Avenue, N.W., Suite 340
Washington, D.C. 20036

Re: Data Mountain Solutions, Inc., et al. v. Giordano, et al.

Dear Messrs. Bledsoe and McNutt:

The purpose of this letter is to set out our demands regarding the issues related specifically to Luman, Lange, Thomas & McMullen, LLP, and me with regard to this case.

First, we will continue to hold the corporate records as I represented to the court last Friday, awaiting direction either from the court or from all four principals of the corporation. When this issue is resolved, there is no basis for me to continue to be a party to this suit, and I expect a full release and your consent to my dismissal from the law suit at that time.

Second, I plan to resign as Virginia registered agent for the corporation. I will not notify the State Corporation Commission for two weeks, to give you an opportunity to identify an alternative.

Third, I have enclosed a billing statement for our legal services since mid-June. You will see that about one-third of the fees covers our efforts regarding the principals' attempts to frame a resolution in June and July. The balance is the time expended in responding to the requests for documents and the demands for action or inaction by all the parties. We have provided a substantial discount to the bill. We expect the prompt

David L. Bledsoe, Esq.
Philip J. McNutt, Esq.
October 5, 2006
Page 2

payment of this bill, presumably from the corporate account referred to in the conference call with Judge Bates. We will continue to bill, and expect to receive payment, for our continued services to the corporation, which we are required to perform as a part of this law suit.

Yours truly,

John W. Thomas

Enclosure

# Luman, Lange, Thomas & McMullen, LLP
Suite 506
1660 L Street, N.W.
Washington, DC  20036-5649
(202) 463-1260

Invoice submitted to:
Data Mountain
Attn: Frederick S. Hill, Jr.
1831 Brett Court
Annapolis MD 21401

October 03, 2006

Invoice #10729

Professional Services

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 6/12/2006 JWT | Work on memo analyzing corporate organization issues; research corporate registration status in WV and VA; telephone conference with Hill regarding taking over bookkeeping, corporate records | 2.50 180.00/hr | 450.00 |
| 6/13/2006 JWT | Work on memo regarding corporate transactions | 1.75 180.00/hr | 315.00 |
| 6/14/2006 JWT | Telephone conference with M. Dymersky regarding opinion letter; confer with GCL regarding opinion letter; finalize and send letter | 1.00 180.00/hr | 180.00 |
| 6/15/2006 JWT | Follow up with F. Hill regarding failure of principals to communicate with each other | 0.25 180.00/hr | 45.00 |
| 6/16/2006 JWT | Telephone conferences with F. Hill, confer with SPM regarding work on corporate affairs; mail copies of memo to directors | 0.75 180.00/hr | 135.00 |
| 6/19/2006 JWT | Review e-mail from T. Watson regarding corporate affairs; reply; discuss issues with G. Giordano | 1.50 180.00/hr | 270.00 |
| 6/20/2006 JWT | Review issues with D. Mcumber, G. Giordano; follow up conversations with SPM and M. Dymersky | 2.50 180.00/hr | 450.00 |
| 6/21/2006 JWT | Work on plan for corporate governance | 2.00 180.00/hr | 360.00 |

Data Mountain                                                                                    Page    2

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 6/22/2006 JWT | Telephone conference with F. Hill regarding terms of company contracts, roles of parties, ideas for compromise; work on plan | 2.00 180.00/hr | 360.00 |
| 6/27/2006 JWT | E-mail with Hill, Giordano, Watson regarding purchase of Watson's stock | 0.50 180.00/hr | 90.00 |
| 6/28/2006 JWT | Review e-mail from Watson and Giordano regarding stock purchase communications since early 2005 | 0.50 180.00/hr | 90.00 |
| 7/3/2006 JWT | Telephone conference with Mcumber regarding news that he is working on a plan to resolve the issues, to be offered later in the week | 0.25 180.00/hr | 45.00 |
| 7/6/2006 JWT | Review proposal by Mcumber for treatment of stock transaction | 0.50 180.00/hr | 90.00 |
| 7/7/2006 JWT | Review proposal for purchase of Watson's stock with Mcumber; discuss issues with Giordano | 1.50 180.00/hr | 270.00 |
| 7/10/2006 JWT | Review copies of e-mail sent by Giordano regarding negotiations with Watson for stock purchase in 2005 | 0.75 180.00/hr | 135.00 |
| 7/11/2006 JWT | Follow up with Giordano regarding meeting with Mcumber; review issues with Giordano; review e-mail from Hill and Mcumber regarding Watson's stock | 1.50 180.00/hr | 270.00 |
| 7/12/2006 JWT | Review voice mail and e-mail from Giordano; discuss buy-sell offer with Giordano | 0.50 180.00/hr | 90.00 |
| 7/17/2006 JWT | Review and assess Giordano's buy-out proposal; telephone conference with McUmber's former attorney | 0.50 180.00/hr | 90.00 |
| 7/21/2006 JWT | Telephone conferences with Giordano and Mcumber regarding Giordano's deadline for offer and Mcumber's review by new law firm | 0.75 180.00/hr | 135.00 |
| 7/24/2006 JWT | Telephone conferences with Giordano and Mcumber regarding recommendations of Mcumber's new lawyers, Giordano's plans to hold a board meeting | 0.50 180.00/hr | 90.00 |

Data Mountain                                                                    Page     3

|  |  |  | Hrs/Rate | Amount |
|---|---|---|---|---|
| 7/25/2006 | JWT | Research WV corporate law regarding proxies and voting by shareholders and directors | 0.75<br>180.00/hr | 135.00 |
| 7/26/2006 | JWT | Telephone conference with D. Bledsoe, new attorney for Giordano, regarding status of buy-sell negotiations | 0.25<br>180.00/hr | 45.00 |
| 7/27/2006 | JWT | Telephone conference with Hill regarding status of negotiations among principals | 0.25<br>180.00/hr | 45.00 |
| 7/28/2006 | SPM | Review correspondence from Hughes & Bentzen to JWT regarding: Data Mountain; request for documents; office conference regarding responding | 1.25<br>180.00/hr | 225.00 |
|  | JWT | Review letter from P. McNutt; work on reply to McNutt and notice to shareholders | 2.50<br>180.00/hr | 450.00 |
| 7/31/2006 | GCL | Met with JWT on demand letter ostensibly from McNutt | 0.50<br>200.00/hr | 100.00 |
|  | JWT | Review e-mail from Giordano; confer with GCL; telephone conference with D. Bledsoe | 0.50<br>180.00/hr | 90.00 |
| 8/1/2006 | GCL | Worked with JWT on letter in response to McNutt demands | 1.25<br>200.00/hr | 250.00 |
|  | JWT | Confer with GCL regarding issues between shareholders; leave message for Hill; draft response to McNutt letter; telephone conference with with Bledsoe regarding Bylaws | 2.25<br>180.00/hr | 405.00 |
| 8/2/2006 | GCL | Dealt with demand for docs from McNutt | 0.75<br>200.00/hr | 150.00 |
|  | JWT | Review e-mail from D. Bledsoe regarding WV law; confer with GCL regarding response to McNutt; edit response | 1.50<br>180.00/hr | 270.00 |
| 8/3/2006 | GCL | JWT; worked on letter to McNutt; worked on same | 1.25<br>200.00/hr | 250.00 |
|  | JWT | Work on response to letter from P. McNutt | 0.75<br>180.00/hr | 135.00 |

Data Mountain                                                                                      Page    4

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 8/4/2006 | GCL | Review of McNutt letter and various demands for information | 1.00<br>200.00/hr | 200.00 |
| 8/7/2006 | SPM | Office conference regarding status of DMS matter; review correspondence to P McNutt | 0.50<br>180.00/hr | 90.00 |
| | GCL | Telephone conference with JWT on letter to Bledsoe, attorney for Giordano; met with SPM on case and letter and moving forward | 0.75<br>200.00/hr | 150.00 |
| 8/10/2006 | JWT | E-mail response to D. Bledsoe regarding P.McNutt letter | 0.25<br>180.00/hr | 45.00 |
| 8/16/2006 | GCL | Letter in signed by McNutt alleging improprieties with legal services; discussed ramifications and approach to take on same; met extensively in house on same | 2.00<br>200.00/hr | 400.00 |
| | SPM | Review response letter from P McNutt; office conference regarding responding, underlying disputes among principals, shareholders; discuss producing documents after approval by shareholders | 1.50<br>180.00/hr | 270.00 |
| | JWT | Review letter from P. McNutt regarding demand for documents of the corporation; begin to review and assemble documents | 1.50<br>180.00/hr | 270.00 |
| 8/17/2006 | GCL | Worked on materials to be sent to clients regarding demands from McNutt | 1.00<br>200.00/hr | 200.00 |
| | SPM | Review, revise draft e-mail to shareholders regarding producing corporate documents to McNutt; office conference regarding response | 1.25<br>180.00/hr | 225.00 |
| | JWT | Work on memo to shareholders regarding McNutt's request for corporate documents; review documents | 2.75<br>180.00/hr | 495.00 |
| 8/18/2006 | JWT | Discuss status with SPM, GCL | 0.50<br>180.00/hr | 90.00 |
| | GCL | Met inhouse on status of turning documents over on behalf of client to McNutt | 1.00<br>200.00/hr | 200.00 |
| | SPM | Office conference regarding status of situation of turning over documents to McNutt | 0.75<br>180.00/hr | 135.00 |

Data Mountain

Page     5

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 8/21/2006 | GCL | Worked on various issues relating to production of documents and corporate materials; telephone conferences with Bledsoe on our position; met in house; review of docs for transmission to McNutt; worked on responses to Fred Hill demanding corporate materials; worked with JWT on same; dealt with the five visits of messengers from Hughes and Bentzen; no calls or communications with McNutt or any other attorney at H&B; all attempts to deal with situation avoided by H&B; letters to same not responded to; met with SPM on interpleader possibility; review of statute in VA on same | 8.00 200.00/hr | 1,600.00 |
| | SPM | Review fax from F. Hill regarding termination, providing documents; office conference regarding status, response, underlying basis for dispute; review draft response letter to Hill, revise; deal with production of file; review documents for responsive documents; confer with JWT, GCL | 5.75 180.00/hr | 1,035.00 |
| | JWT | Review and prepare response to fax from Hill regarding termination of representation and turning over records; review files to gather documents; telephone conferences with Hill regarding timing and scope of response; telephone conference with Bledsoe about the communications from Hill | 5.25 180.00/hr | 945.00 |
| 8/22/2006 | GCL | Worked on getting documents ready to send to McNutt; worked on letters on same; review of Bledsoe letter demanding orginial corp docs stay with LLTM; met in house substantially on how to deal with conflicting demands; prepared docs for transmittal to McNutt | 1.25 200.00/hr | 250.00 |
| | SPM | Review Va statute regarding interpleader; office conference JWT, GCL; review letters from attorney for Giordano regarding his position regarding original corp. books; office conference regarding how to respond; assist in compiling document production, letter, e-mails regarding document production | 3.75 180.00/hr | 675.00 |
| | JWT | Review e-mail from D. Bledsoe; work with SPM and GCL regarding document production for P. McNutt; prepare cover memo to P. McNutt and shareholders regarding delivery of copies. | 2.50 180.00/hr | 450.00 |
| 8/23/2006 | GCL | Met inhouse on documents and state of controversy between shareholders | 0.50 200.00/hr | 100.00 |
| | JWT | Review e-mail from Bledsoe regarding corporate property; telephone conference with Giordano regarding deliver of copy of documents | 0.50 180.00/hr | 90.00 |

Data Mountain                                                                Page    6

|  |  | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 8/24/2006 JWT | Review documents to prepare for meeting with D. Bledsoe; meet with Bledsoe to review corporate documents | | 1.25<br>180.00/hr | 225.00 |
| 8/28/2006 JWT | Prepare notice to shareholder regarding preparation of stock certificate, update transfer records | | 1.00<br>180.00/hr | 180.00 |
| 8/29/2006 JWT | Finalize and send e-mail regarding updating stock records | | 0.25<br>180.00/hr | 45.00 |
| 9/1/2006 JWT | Review letter of instruction from McNutt not to update stock records; forward copy to Bledsoe; review response from Bledsoe; prepare and send further response to Bledsoe and McNutt suggesting a meeting of the parties | | 2.00<br>180.00/hr | 360.00 |
| 9/5/2006 GCL | Telephone conference with SPM and JWT on new position by Bledsoe on getting stock record book; other conversations on same; how to approach to maintain neutrality; discussed response possibilities to maintain neutrality and avoid exposure due to conflicting orders by parties | | 0.75<br>200.00/hr | 150.00 |
|  | JWT | Review letter for D. Bledsoe, consider next steps; telephone conference with G. Giordano regarding custody of stock transfer book; confer with SPM and GCL on ways to resolve; research WV corporation law | 3.00<br>180.00/hr | 540.00 |
| 9/6/2006 GCL | Worked on letter to be sent by JWT on latest Bledsoe and McNutt demands | | 0.50<br>200.00/hr | 100.00 |
|  | JWT | Work on letter to Bledsoe and McNutt regarding getting out of the middle of the matter | 0.75<br>180.00/hr | 135.00 |
| 9/7/2006 GCL | Worked on proposed letter from firm relating to latest demands, particularly from Bledsoe | | 0.50<br>200.00/hr | 100.00 |
|  | JWT | Work on letter to parties regarding conflicting demands and need for parties to resolve issues | 1.25<br>180.00/hr | 225.00 |
| 9/8/2006 JWT | Telephone call from D. Bledsoe requesting action on stock transfer records; confer with SPM regarding response letter; finalize and send letters requesting the parties to leave LLTM out | | 0.50<br>180.00/hr | 90.00 |

**For professional services rendered**                                89.75      **$16,575.00**

Data Mountain                                                                                           Page     7

Additional Charges :

|                    |                                          | Qty/Price | Amount        |
|--------------------|------------------------------------------|-----------|---------------|
| 7/25/2006 JWT      | Other Expense                            | 1         | 112.92        |
|                    | Long distance calls                      | 112.92    |               |
| 8/22/2006 JWT      | Other Expense                            | 1         | 137.28        |
|                    | Photocopying                             | 137.28    |               |

|                                                    |               |
|----------------------------------------------------|---------------|
| **Total additional charges**                       | **$250.20**   |
| **Total amount of this bill**                      | **$16,825.20**|
| **Previous balance**                               | **$2,841.25** |

Accounts receivable transactions

| 6/29/2006 Less Payment Received                              | ($2,841.25)   |
|--------------------------------------------------------------|---------------|
| 10/3/2006 Less: Discount against time before July 28, 2006   | ($185.00)     |
| 10/3/2006 Less: Discount against time for July 28, 2006, and thereafter | ($1,850.00) |
| **Total payments and adjustments**                           | **($4,876.25)** |

| Balance due | $14,790.20 |
|-------------|------------|

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

DATA MOUNTAIN SOLUTIONS, INC., *et al.*   )
                                          )
      Plaintiffs,                        )
                                          )
v.                                        )   Civil Action No. 1:06CV01666-PLF
                                          )
GREGG GIORDANO, *et al.*                  )
                                          )
      Defendants.                        )
                                          )
_____   )

### DECLARATION OF DEREK MCUMBER, UNDER PENALTY OF PERJURY, IN SUPPORT OF THE PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS FILED BY THE DEFENDANT, GREGG GIORDANO

In accordance with the requirements of LCvR 11.2, the undersigned, states, under

penalty of perjury, as follows:

1. He is the Chief Executive Officer of Data Mountain Solutions, Inc. ("DMS") and has held that position since 2003.

2. That DMS is a West Virginia Corporation formed for the purpose of providing turn key information technology to government and corporate clients.

3. That attached hereto as Exhibit A to this Affidavit is a photo of the computer rack space rented by DMS at spaced leased by Navisite, Inc. in Vienna, Virginia. The subject rack is approximately 19" wide and is the only space owned or used by DMS in Virginia.  The sole purpose of the rack is to hold computer equipment for customer's applications and services.  No business of DMS is conducted from or at

the Navisite space.  DMS has no capacity to receive or make phone calls there, or to receive mail.

4.  The Corporation's only business address and principal place of business is 1116 Smith Street, Charleston, West Virginia and has been since the corporation's inception in 2002.  Contracts negotiated by or on behalf of DMS list the West Virginia address as the Corporation's principal office.

5.  The Corporation's office in West Virginia is in a building owned and operated by the West Virginia Enterprise Center.  It is an incubator facility which handles administrative and office functions for companies such as DMS.  DMS has a phone number at that address which is answered by a receptionist who is paid for by the monthly rent which DMS pays to the Enterprise Center.  The Corporation also receives mail at that address and has office space available there for the Corporation's use, as needed.

6.  The Corporation maintains no other office space, mailing address or phone number, except that certain communications are made directly to officers, employees and directors related to their respective duties.

7.  In addition to his duties as an officer of DMS, the Defendant, Giordano, is the program manager under NTI's contract with GSA.  DMS is a subcontractor to NTI under that contract.  Giordano's program manager duties are performed for NTI.  All of the technical work on the NTI contract for DMS is performed by McUmber or performed under his direct supervision.

8.  The funds due DMS under its subcontract with NTI are billed by Giordano to

GSA at its headquarters in Washington, DC. Once approved, payment is then generated from Texas and paid to NTI for eventual disbursement to DMS, McUmber and Giordano.

9. Since the June, 2006 invoice payment, the Declarant has received no information concerning any payments due DMS or McUmber from the NTI contract. Through June, 2006 the monthly invoices approximated $44,000 of which approximately $40,000 is payable to DMS, McUmber and Giordano.

10. The matters and facts set forth above are personally known to Declarant who is competent to testify thereto.

11. Declarant is above the age of twenty-one years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 1, 2006.

Derek McUmber



