**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
DATA MOUNTAIN SOLUTIONS, INC., et al.,    )
                                                        )
          Plaintiffs,                          )
                                                        )
v.                                                     ) CA 06-1666 (PLF)
                                                        )
GREGG GIORDANO, et al.,                        )
                                                        )
          Defendants.                        )
_____)

**DEFENDANT GREGG GIORDANO'S REPLY MEMORANDUM IN SUPPORT
OF MOTION TO DISMISS, OR IN THE ALTERNATIVE, TO STAY
<u>PROCEEDINGS AND TO COMPEL ARBITRATION</u>**

      Defendant Gregg Giordano, by counsel, pursuant to F.R.Civ. P. 12(b) and 9

U.S.C. §3, files this Reply Memorandum in Support of his Motion to Dismiss, or, in the

Alternative, to Stay Proceedings and to Compel Arbitration.

      As the parties are currently aligned, this Court does not have subject matter

jurisdiction and must dismiss.  Moreover, Giordano is not subject to the long-arm

jurisdiction of the District of Columbia.  Even if McUmber and Hill wish to concede that

this matter is not a shareholders' derivative action, then the Court must dismiss this case

in favor of arbitration, or stay proceedings under the Federal Arbitration Act and compel

the plaintiffs to arbitrate.

**ARGUMENT**

I. THIS COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION.

This Court does not have subject matter jurisdiction over this matter, as the putative parties are not diverse.[1]  Plaintiffs McUmber and Hill have brought this matter ostensibly as a shareholders' derivative action.   DMS, which is aligned as an ostensible plaintiff in this matter, is a corporation.  Corporations are citizens of both the state of their incorporation and the state of their principal place of business.  28 U.S.C. §1332. DMS is incorporated in West Virginia, but its principal place of business is in Virginia. Defendant Giordano is a resident of Virginia, as is defendant John Thomas.  Accordingly, the inclusion of DMS as a plaintiff destroys diversity.

A corporation's principal place of business, according to federal jurisprudence, is found by applying a "nerve center" test.  Masterson-Cook v. Criss Bros. Iron Works, Inc., 722 F.Supp. 810 (D.D.C. 1989).  Plaintiffs' affidavits try to skirt the truth by asserting or implying that West Virginia is the "nerve center" of the company.  DMS's registered office in West Virginia – an office required of all West Virginia corporations by West Virginia statute – cannot be its principal place of business, since it maintains no employees there and conducts no business there.[2]  Plaintiffs' insistence that the company has a West Virginia address, required by West Virginia law, and that it occasionally

---

[1] Most of the "Background and Introduction" of Plaintiff's Opposition and most of Frederick Hill's Declaration have no bearing on the issues before the Court on this Motion.  Defendant disputes the accuracy of the Background and Introduction and both the Hill Declaration and McUmber Declaration, but will confine his argument here to those issues that bear directly on the Motion.

[2]  Hill's affidavit is very careful not to specify whether DMS has now or merely had at one time employees in West Virginia.  Likewise, McUmber's affidavit also very carefully skirts the truth by claiming only that no business is conducted now at the Virginia Office, when for a period of two years it was his daily workplace and that of Kathleen Bowman's as well.

receives mail there does not remotely qualify that "mail drop" as its principal place of business.  See, e.g., Gavin v. Read Corp. 356 F.Supp. 483 (E.D. Pa. 1973).

Attached is the affidavit of Kathleen Bowman, DMS's former Chief Administrative Officer.  For her entire length of full-time employment, some fifteen months, she worked daily at DMS's headquarters in Vienna, Virginia.  Moreover, despite his Declaration, so did plaintiff Derek McUmber.  Bowman Affidavit, ¶ 4; Giordano Supp. Affidavit ¶ 5.  *McUmber worked at the same Virginia Office almost daily for two years.*  Attached to the Giordano Supplemental Affidavit are two emails from McUmber: in one, he discusses the fact that he works "a minimum of 40 hours a week at the office," i.e., the Virginia Office, and not at his Maryland home.  Id, Ex. 3.  Thus, the Court should carefully weigh the veracity of the affidavits submitted by plaintiffs, since the plaintiffs clearly wish the Court to believe a falsehood: that no company business has ever been conducted at the Virginia Office.

Plaintiffs also cite the fact that DMS files state tax returns only in West Virginia.  The fact that DMS has filed no tax returns in Virginia is the fault of DMS's treasurer: plaintiff Fred Hill.  More important, Virginia is the only foreign jurisdiction in which DMS was authorized to do business prior to the drafting of this lawsuit.  Plaintiffs only registered DMS to transact business in the District of Columbia on August 29, 2006, in preparing to file this litigation.  See Exhibit 4 to Giordano Supp. Affidavit, which is a printout from the District of Columbia Department of Consumer and Regulatory Affairs website, showing that the initial date of registration in the District was August 29, 2006: four weeks before this case was filed.  In other words, DMS does no business in the District of Columbia, and never has, yet plaintiffs registered DMS with the D.C.

Department of Consumer and Regulatory Affairs solely so that they might deceive the Court into thinking that DMS had some actual connection with the District of Columbia.

Contracts between DMS and its clients almost always use a Virginia address as the Company's address or principal place of business. See Ex. 1 to Giordano Supp. Affidavit. Furthermore, DMS's only bank accounts are with United Bank of Virginia, based in the Commonwealth of Virginia. Giordano Supp. Affidavit, ¶ 8.

Over 75% of DMS's annual income comes from its contract with NTI, a client based in Herndon, Virginia. Historically, income from Virginia-based clients has accounted for over 80 % of DMS's total revenue. Giordano Supp. Affidavit, ¶ 9. DMS has no contract with and receives no revenue from the federal government's General Services Administration. DMS has no contracts with any entity in the District of Columbia or West Virginia. DMS has no employees in West Virginia and no employees in the District of Columbia. Id., ¶ 10-12.

Thus, the "nerve center" of DMS's operations is inarguably Virginia, not West Virginia. DMS is a citizen of Virginia for purposes of diversity, and thus this court does not have subject matter jurisdiction, and must dismiss this matter under Rule 12(b)(1).


II.     THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER GIORDANO.

Even if the Court did have subject matter jurisdiction, Giordano is not subject to long-arm jurisdiction in the District of Columbia. Plaintiffs bear the burden of proving personal jurisdiction and cannot rely on conclusory allegations. GTE New Media Services Inc. v. Ameritech Corp., 21 F.Supp.2d 27, 36 (D.D.C. 1998). The Court need not consider the allegations of the Complaint as true, but may accept affidavits and other

evidence in determining personal jurisdiction.  <u>United States v. Philip Morris Inc</u>., 116

F.Supp.2d 116, 120 n. 4 (D.D.C. 2000).

Plaintiffs have now admitted that one of their two cited bases of personal

jurisdiction, D.C. Code §13-422, does not apply.  Plaintiffs now rely exclusively on §13-

423 as the basis of jurisdiction over Giordano, but will not say which of three

subparagraphs they are relying upon:

> (a) A District of Columbia court may exercise personal jurisdiction
> over a person, who acts directly or by an agent, as to a claim for relief
> arising from the person's --
>
>> (1) transacting any business in the District of Columbia;
>>  *   *   *   *   *   *   *   *   *   *   *
>> (3) causing tortious injury in the District of Columbia by
>> an act or omission in the District of Columbia;
>> (4) causing tortious injury in the District of Columbia by
>> an act or omission outside the District of Columbia if he
>> regularly does or solicits business, engages in any other
>> persistent course of conduct, or derives substantial
>> revenue from goods used or consumed, or services
>> rendered, in the District of Columbia;
>> b) *When jurisdiction over a person is based solely upon this
>> section, only a claim for relief arising from acts enumerated in this section
>> may be asserted against him.*
>> (Emphasis supplied).

However, Plaintiffs concede that there is no tortious injury suffered within the

District of Columbia.  This case involves wrongs allegedly suffered by plaintiffs residing

in Maryland, Virginia, and West Virginia, due to acts allegedly done by a Virginia

resident in Virginia.  Plaintiffs do not – indeed, cannot -- even attempt to argue that any

alleged tortious injury occurred in the District of Columbia.  Thus, plaintiffs are left only

with the "transacting business" clause of (a)(1).

However, there is no wrongful act of Giordano alleged in the Complaint that is

actually alleged to have taken place in the District of Columbia.  The primary action

complained of – the now-rescinded sale of stock from Watson to Giordano – took place in Maryland, not the District of Columbia.  All other alleged tortious actions by Mr. Giordano took place in the Commonwealth of Virginia.

Rather, plaintiffs assert that *after* the acts complained of – paying himself a bonus and entering into a contract to buy defendant Watson's stock – Giordano communicated with DMS's attorney, John Thomas, whose office was in the District of Columbia.  Those communications and contacts form the entire basis of plaintiffs' argument for Giordano's being subject to personal jurisdiction here.

In Cellutech, Inc. v. Centennial Cellular Corporation, 871 F.Supp. 46 (D.D.C. 1994), this court held that the presence of a transactional attorney in the District of Columbia, and defendant's use of that attorney was an insufficient basis for asserting jurisdiction over the defendant.  This Court noted:

> To establish personal jurisdiction under the "transacting business" clause of the long-arm statute, plaintiff must prove that 1) the defendant transacted business in the District; 2) the claim arose from the business transacted in the District; and 3) the defendant had such minimum contacts with the District such that the Court's exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice. . ." While the long-arm statute is interpreted broadly, plaintiff must allege some specific facts evidencing purposeful activity by defendants in the District of Columbia by which they invoked the benefits and protections of its laws and specific acts connecting the defendants with the forum.

Id. at 48-9 (citations omitted).  The court found that the presence of a transactional attorney in the District, and defendant's communications with him, regarding matters without a D.C. nexus were not sufficient contacts with the District to assert long-arm jurisdiction, and therefore granted defendant's motion to dismiss.  Id. at 49-50.

Likewise, here, Giordano, a Virginia resident, performed the vast majority of the acts complained of in either Maryland or in Virginia.  He resides and works in Virginia.

He is an officer and shareholder of a West Virginia corporation with its principal place of business in Virginia. Neither he nor DMS transact business in the District of Columbia.[3] His communications with DMS's attorney, a Virginia practitioner with an office in the District of Columbia, is not a sufficient contact for Giordano to anticipate being haled into court in the District in relation to his dispute with the plaintiffs.

Nor can Plaintiffs aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant. <u>Rush v. Sawchuk,</u> 444 U.S. 320, 331 (1980). The fact that one of the defendants, Thomas, committed alleged acts in or is based in D.C. cannot be used to argue for personal jurisdiction as to Giordano. [4]

In sum, plaintiffs fail to allege specific facts evidencing purposeful activity by Giordano in the District of Columbia by which he invoked the benefits and protections of its laws, or specific significant acts connecting him with the forum. As in <u>Cellutech</u>, this Court should grant the motion to dismiss for lack of personal jurisdiction.

III.    EVEN IF THIS COURT HAD SUBJECT MATTER JURISDICTION, THIS CASE SHOULD BE DISMISSED AND THE PLAINTIFFS COMPELLED TO ARBITRATE.

Finally, even if the Court did have subject matter jurisdiction, and Giordano were subject to long-arm jurisdiction in the District of Columbia, this matter must be dismissed or stayed in favor of arbitration. The Shareholders' Agreement upon which Hill and

---

[3] As noted above, plaintiffs Hill and McUmber did register DMS as a foreign corporation in Virginia mere weeks before filing this litigation, in a frivolous attempt to pretend there was some D.C. connection with this matter.

[4] Plaintiff's most absurd argument for long-arm jurisdiction is that Giordano has retained undersigned counsel, a member of this Court's bar, to defend this matter.

7

McUmber's Complaint is based contains an arbitration provision. The Shareholders

Agreement provides:

> Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, may, at the option of any party thereto, be resolved by arbitration by a panel of three (3) arbitrators in accordance with the Rules of the American Arbitration Association then prevailing….

Shareholders Agreement, ¶10(a). See Exhibit 2 to Plaintiff's Memorandum in Support of

Preliminary Injunction. Giordano has invoked that provision, and pursuant to the Federal

Arbitration Act, 9 U.S.C. 1 et seq., this matter must be dismissed or stayed.

The Federal Arbitration Act ("FAA") provides that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. §3. Giordano has invoked his option to have this matter resolved by arbitration.

The FAA manifests Congress's intent of a liberal federal policy favoring

arbitration. Brown v. Wheat First Securities, Inc., 257 F.3d 821 (D.C.Cir.), cert. denied,

534 U.S. 1067(2001). There is a presumption of arbitrability unless it can be said with

positive assurance that the arbitration clause is not susceptible of an interpretation that

covers the asserted dispute. Doubt is always resolved in favor of arbitrability. AT&T

Technologies, Inc. v. Communications Workers of America, 475 U.S. 643 (1989).

The FAA provides that if any issue before the court is subject to arbitration, the

court shall "upon application of one of the parties stay the trial of the action until such

arbitration has been had in accordance with the terms of the agreement…" 9 U.S.C. §3;

see also Hughes v. CACI, Inc.-Commercial, 384 F.Supp.2d 89 (D.D.C. 2005).  Plaintiffs

entered into a valid and binding contract containing an arbitration clause.  Giordano has

invoked that clause, and the plaintiffs must arbitrate their claims. [5] Cole v. Burns Int'l

Security Services, 105 F.3d 1465 (D.C.Cir. 1997) (affirming district court's dismissal of

complaint in favor of arbitration).

Plaintiffs make two contentions in an effort to stave off the inevitability of

arbitration.  First, they contend that the gravamen of the Complaint is really not about the

Shareholder's Agreement.  This is risible.  The Shareholders' Agreement or the shares of

ownership are referred to on virtually every page of the 45-page Complaint.  See

Complaint, ¶¶ 9, 10, 12, 14, 15, 16, 17,18, 19, 20, 21, 22, 23, 25, 26, 27, 31, 33, 34, 35,

36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59,

60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 80, 81, 82, 83, 84, 85,

86, 87, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 105, 106, 107, 108,

109, 110, 111, and 112.   Every single count of the Complaint refers to the Shareholders'

Agreement, either directly or by incorporation of previous allegations.

The entire thrust of the Complaint, tediously repeated dozens of times, is that the

Shareholders' Agreement requires all four shareholders to always maintain equal

ownership of shares.  The relief sought is in essence 1) rescinding the sale of stock

between Watson and Giordano; 2) freezing the stock book in its current incorrect state,

thereby effectively reissuing over 16,000 shares of free stock to plaintiff Hill, who sold

those shares of stock over a year ago to the corporation; and 3) having Watson's 25,000

---

[5] Although the Shareholder's Agreement has a provision allowing a court to grant specific performance of the Shareholder's Agreement, there is nothing left to specifically perform.  Watson and Giordano have rescinded the purchase of stock.

shares of stock forfeited to or seized by DMS without compensation.  The basis for each of this claims is the same:  that the Shareholders' Agreement requires it.

The arbitration clause in the Shareholders' Agreement is remarkably broad in scope.  Cf. Mitsubishi Motors Corp. v. Soler, 473 U.S. 614 (1985).  Contrary to plaintiffs' wishes, it does not cover only actual breaches of the Agreement, but "[a]ny controversy or claim *arising out of or relating to* this Agreement…." [emphasis supplied.] The literal scores of references in the Complaint to the Shareholders' Agreement or the stock is the clearest proof that this entire controversy "arises out of or relates to" the Shareholders' Agreement.

Plaintiff's second argument is that Giordano waived his right to arbitration by "attempting to mediate" this matter at John Thomas's office in May 2006.  Presumably, the "mediation" referred to is the Board of Directors Meeting in May 2006 at John Thomas's office.  Even if that meeting were an actual mediation, rather than a scheduled directors' meeting, there is no legal authority whatsoever for the proposition that an attempt to "mediate" a dispute waives the legal right to arbitrate.  Defendant's right to arbitrate is granted by the Shareholders' Agreement and governed by the Federal Arbitration Act, 9 U.S.C. §1 et seq.   Giordano's right to elect arbitration has been timely raised, and plaintiffs' argument is ludicrous.

Thus, even if McUmber and Hill dropped their claim that this is a shareholders' derivative suit, creating true diversity between the parties, this Court would still be required to dismiss or stay these proceedings in favor of arbitration.  This action must be dismissed in favor of arbitration.

## <u>CONCLUSION</u>

In sum, this Court does not have subject matter jurisdiction over this case, as presently aligned, nor does it have personal jurisdiction over Giordano. Moreover, the matters in dispute must be arbitrated if one of the parties requests arbitration, which Giordano has. For the foregoing reasons, Defendant prays this Court dismiss this Action for lack of subject matter jurisdiction, or, in the alternative, dismiss Giordano as a defendant for lack of personal jurisdiction over Giordano, or in the alternative, dismiss or stay these proceedings and compel Plaintiffs to refer this matter to arbitration, and for such other relief as to the Court seems proper.

Respectfully submitted,

By: /s/ David Bledsoe
Bar Number 422596
bledsoelaw@earthlink.net
300 North Washington Street
Suite 700
Alexandria VA 22314
Tel.: 703-379-9424
Fax: 703-684-1851

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 8, 2006, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing:

Philip J. McNutt, Esquire
Hughes and Bentzen, PLLC
1100 Connecticut Avenue
Suite 340
Washington DC  20036


John W. Thomas , Esquire
Luman, Lange, Thomas & McMullen
1660 L Street NW
Suite 3506
Washington DC  20036

And by first class mail to:

Anthony Watson
303-F Holden Green
Cambridge MA  02138

___/s/David I. Bledsoe_____
David I. Bledsoe

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DATA MOUNTAIN SOLUTIONS, INC., et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>GREGG GIORDANO, et al., )<br><br>Defendants. ) | CA 06-1666 (PLF) |

## SUPPLEMENTAL AFFIDAVIT OF GREGG GIORDANO

Under penalty of perjury, I, Gregg Giordano, depose and say:

1.      I am one of the defendants in this matter.  I am over the age of twenty-one, and this affidavit is made on personal knowledge.

2.      West Virginia requires Data Mountain Solutions, Inc. ("DMS") as a West Virginia corporation to have a registered office in West Virginia.  DMS's registered office is with an executive suite operation in Charleston, West Virginia.  DMS maintains no physical office at this location, and DMS has not had any employees live or work in West Virginia since late April 2004.  No business activity of any sort has ever taken place at the registered office in West Virginia.  To my knowledge, DMS has not done any business in the state of West Virginia since June 2004, and the total income from all business in West Virginia since DMS's founding is less than $10,000.

3.      DMS's principal place of business is at 8619 Westwood Center Drive, Suite 200, Vienna, VA 22182 ('The Virginia Office").  The Virginia Office is where DMS maintains the datacenter that is the central thrust of DMS's activities, and the main

source of DMS's income. DMS employees work at and use the Virginia Office in order to service and maintain DMS's data center.

4.    Contracts between DMS and its clients almost always use my home address in Virginia as the Company's address or principal place of business. Attached as Exhibit 1 to this Affidavit are various contracts executed by and invoices sent to or by DMS, all showing a Virginia address.

5.    From approximately May 2004 until May 2006, plaintiff Derek McUmber worked almost daily at a workstation at the Virginia Office. Attached as Exhibit 2 to this Affidavit is a March 31, 2006 email from McUmber to myself and Kathleen Bowman in which he discusses the fact that he will be working from home that day rather than at the Virginia Office. Attached as Exhibit 3 is a May 11, 2005 email from McUmber to me in which he complains that he must pay childcare expenses in order to spend "a minimum of 40 hours at the office." The office to which he is referring is the Virginia Office.

6.    From approximately May 2004 to August 2005, Kathleen Bowman, DMS's Chief Administrative Officer and Documentation Specialist, worked almost daily at a workstation at the Virginia Office.

7.    There are conference rooms available at the Virginia Office, and DMS holds meetings at its Virginia Office. For example, the documents memorializing the sale of Fred Hill's stock to the corporation were executed at the Virginia Office.

8.    DMS's only bank accounts are with United Bank of Virginia, based in the Commonwealth of Virginia.

9.     Over 75% of DMS's annual income comes from its contract with NTI, which is based in Herndon, Virginia. Historically, income from Virginia-based clients has accounted for over 80 % of DMS's total revenue.

10.    DMS has no contract with and receives no revenue from the federal government's General Services Administration.

11.    Only Derek McUmber and I perform services for DMS clients. Fred Hill performs basic DMS administrative functions.  Mr. Hill is also DMS's treasurer and is responsible for the filing of tax returns in each state.

12.    DMS has no employees in West Virginia and no employees in the District of Columbia.

13.    DMS has no clients or customers in the District of Columbia or West Virginia. Prior to August 2004, the only jurisdiction in which DMS was authorized to transact business as a foreign corporation was Virginia. On August 29, 2006, shortly before filing this litigation, plaintiffs Hill and/or McUmber registered DMS for the first time ever to conduct business in the District of Columbia. Attached as Exhibit 4 to this Affidavit is the printout from the D.C. Department of Consumer and Regulatory Affairs, showing August 29, 2006 as the initial date of registration.

14.    Up until Hill changed the invoicing address in June 2006, most mail to DMS came to a post office box in Oakhill, Virginia, which I picked up and distributed as appropriate.

15.    DMS's registered office is essentially a post office address at an executive suite company in Charleston, West Virginia. DMS has no physical office space at its registered office in West Virginia. Any mail that comes to the registered office in West

Virginia is forwarded by the executive suite company which DMS uses in West Virginia to me, Mr. McUmber, or Mr. Hill.

16.    I certify upon penalty of perjury that the foregoing is true and correct.


Executed this 7th day of November, 2006.

Gregg Giordano

**Sales Order**                                                            Q-SYNY01-A-PM-46537

**Account:**

Data Mountain Solutions, Inc
2403 Dakota Lakes Drive
Herndon, VA 20171

**NaviSite, Inc.**

400 Minuteman Road

Andover, MA 01810

Phone: 978-682-8300

Fax: 978-946-8662

**NaviSite**

| | |
|---|---|
| **DataCenter:** | North Syracuse, NY (SYNY01) |
| **Date:** | 05/23/2005 |
| **Sales Rep:** | Paula Melanson |

**One Time Fees**

| Qty | Description | Type | Base | Extended | Total |
|---|---|---|---|---|---|
| 1 | IP Addr Mgmt 1/16 ClassC 16 IPs -Install | INSTANCE | $100.00 | $100.00 | $100.00 |
| | *per CR000124665* | | | | |
| | | | | **One Time Total:** | **$100.00** |

**Recurring Monthly Fees**

| Qty | Description | Type | Base | Extended | Total |
|---|---|---|---|---|---|
| 1 | IP Addr Mgmt 1/16 ClassC 16 IPs ( 11 usable) | INSTANCE | $75.00 | $75.00 | $75.00 |
| | *per CR000124665* | | | | |
| | | | | **Recurring Monthly Total:** | **$75.00** |

The terms of this Sales Order shall be 12 months commencing on 05/23/2005. If this Sales Order extends beyond the current term of the Client's Master Services Agreement, the current term of the Client's Master Services Agreement, including all outstanding Sales Orders, shall be deemed to be amended to expire on the date this Sales Order expires, subject to renewal according to the Client's Master Services Agreement.

Terms: All terms are subject to credit approval, all prices are subject to change and the terms of this Sales Order are made subject to the terms and conditions of the Master Services Agreement signed by the Client under which NaviSite, Inc. provides hosting services, software and/or equipment (the "Agreement"). By signing below the Client hereby agrees to be bound by the terms and conditions set forth herein and in the Agreement.

**Agreed To By Customer:** ----------------------                    **Date:** ----------------

**Accepted By:**                  ----------------------                    **Date:** ----------------

EXHIBIT 1

# Acicular Consulting Group, Inc.

# Consulting Services

# Statement of Work

Prepared for:

# Data Mountain Solutions, Inc.

### 2403 Dakota Lakes Drive

### Herndon, Virginia 20171

### July 3, 2004

ACICULAR

CONSULTING GROUP, INC.

*Proprietary and Confidential. Do not use without Written Consent from Etemity.*                    *Page 1*

## Scope of Statement of Work

The estimated work, price, duration, and scope of the engagement covered by this Statement of Work (SOW) are limited to the requirements addressed in this document. Any references in this document to other functions or future needs of the project are provided for informational purposes only.

## The Engagement:

Acicular will provide resources for the stated hourly rate on an as needed basis to Data Mountain Solutions, Inc. Data Mountain Solutions, Inc. and Acicular have agreed to the skill set and requirements of the resource. The scope of the project will be to assist Data Mountain Solutions, Inc. with ongoing development engagements.

## Estimated Schedule

Start Date: June 20, 2004
Estimated Completion Date: No fix end date, on as needed basis

## Required Resources

| Level of Staff Required | Resource | % Availability | Hourly Rate |
|---|---|---|---|
| Senior Developer | Jing Xue | On-Needed | $85 |
| Senior Developer | Dino Damalas | On-Needed | $85 |
| Developer 1 | Lou Bui | On-Needed | $50 |

## Standard Assumptions and Work Practices

➢ Data Mountain Solutions, Inc. will make available to Acicular any and all relevant documentation including systems, programs, operations and user documentation of existing, or planned systems that may affect the scope of the project.

➢ Acicular will notify the client, Data Mountain Solutions, Inc., of any changes in the scope, level of effort, or technical design of the project as soon as possible.

➢ The Data Mountain Solutions, Inc. Project Manager will communicate all organizational and environmental changes that may affect the project schedule and/or deliverables in writing to the Acicular Developer as soon as possible.

➢ Data Mountain Solutions, Inc. will provide reasonable office space, computer, telephone, fax, e-mail and other infrastructure-related facilities necessary for the execution of the assignment.

➢ Data Mountain Solutions, Inc. will be responsible for all expenses incurred under this Statement of Work., including travel expenses.

## Terms

Acicular send invoices to Data Mountain Solutions, Inc. at the above address for consulting Services rendered at the end of each calendar month. All invoices shall be payable in full by Client no later than thirty (30) days from the date of such invoices and Acicular reserves the right to suspend or terminate any Services provided under any SOW or under this Agreement if Client does not timely pay Acicular for such Services.



**CONSULTING GROUP, INC.**
*Proprietary and Confidential. Do not use without Written Consent from Eternity.*

Data Mountain Solutions, Inc.
June 20, 2004

**Agreement**
ACKNOWLEDGED AND AGREED TO, as of the day and year first written below.

For Data Mountain Solutions, Inc.:          For Acicular:

_____          _____
Name                                      Name

_____          _____
Title                                     Title

_____          _____
Date                                      Date

# Invoice



**Data Mountain Solutions**

*Your Technology Utility.*

**Invoice No. CISCD003**

Invoice Date: 6/10/06

**Reference Order No.      200864406**

Data Mountain Solutions                                          Dated 6/04/06
2403 Dakota Lakes Dr.
Herndon, VA 20171          Supplier # 122584
(730) 966-9694

| Ship To: | Cisco Systems | Bill To: | Cisco Systems |
|---|---|---|---|
| | Lisa Soriano | | Accounts Payable |
| | 755 Sycamore Drive | | P.O. Box 641570 |
| | Milpitas, CA  95035 | | San Jose, CA 95164-1570 |

| Payment Terms | Contract No. | Delivery | Page |
|---|---|---|---|
| Net 60 | P.O. 200864406 | FOB | 1 of 1 |
| | quote# 180052 | Origin | |

| Item | Reference | Description | Qty | Unit | Unit Price | Ext Net Price |
|---|---|---|---|---|---|---|
| 1 | PO: 200864406 | | 1 | EA | $53,500 | $53,500.00 |
| | Item 1 | Data Mountain Solutions License & Maintenance – Addendum to original; from June 3, 2006 to June 3, 2007 | | | | |
| | PR200163711 Terms and Conditions | | | | | |

**DMS Payment Information:**

| ABA Number: | No.   056004445 |
|---|---|
| Account Name: | Data Mountain Solutions, Inc |
| Account Type: | Checking |
| Bank Account #: | No.   0042859222 |
| Bank Name: | United Bank |
| Bank Address: | Leesburg, VA |

| | Total Due: | $53,500.00 |
|---|---|---|

## INDEPENDENT CONTRACTOR SERVICES AGREEMENT

Effective Date: August 25, 2003

This agreement is made by and between Data Mountain Solutions, Inc. ("DMS"), a West Virginia corporation having a principle place of business at 2403 Dakota Lakes Dr., Herndon, VA 20171 and Clarion Technologies Pvt Ltd, ("Contractor"), a company having an address at A4/2 Amba Vatika, Kondhwa, Pune, 411048, Maharashtra, India.

1.    <u>Engagement of Services</u>.  DMS may issue Consulting Task Orders to Contractor in the form attached to this agreement as Exhibit A ("Consulting Task Order").  Subject to the terms of this Agreement, Contractor will render the services set forth in Consulting Task Order(s) accepted by Contractor by the completion date set forth therein.

2.    <u>Compensation.</u>  DMS will pay Contractor the fee set forth in each Consulting Task Order for services rendered pursuant to this agreement.  Contractor will be reimbursed following receipt of Contractor's invoice only for expenses which are expressly provided for in a Consulting Task Order or which have been approved in advance in writing by a DMS manager, provided Contractor has furnished such documentation for authorized expenses as DMS may reasonably request.  Upon termination of this Agreement or any reason, Contractor will be paid fees on the basis stated in the Consulting Task Order(s) for work completed through the termination date. s

3.    <u>Independent Contractor Relationship</u>.  Contractor's relationship with DMS is that of an independent contractor, and nothing in this Agreement is intended to, or should be construed to, create a partnership, agency, joint venture or employment relationship. Neither contractor, nor its employees are authorized to make any representation, contract or commitment on behalf of DMS unless specifically requested or authorized in writing to do so by a DMS manager. Contractor is solely responsible for, and will file, on a timely basis, all tax returns and other tax filing s, and make all payments required to be filed with, or made, federal, state, or local tax authority with respect to the performance of services and receipt of fees under this Agreement. Contractor is solely responsible for, and must maintain adequate records of, expenses incurred in the course of performing services under this Agreement.  No part of Contractor's compensation will be subject withholding by DMS for the payment of any Contractor employee social security, federal, state, or any other employee payroll taxes.

4.    <u>Intellectual Property Rights</u>.

      4.1    <u>Disclosure and Assignment of Work Product</u>

      (a)    <u>Work Product</u>. "Work Product" includes any and all new or useful art, discovery, improvement, development, invention or other work product, whether or not patentable or copyrightable, and all related know-how, designs, mask works, trademarks, formulae, processes, manufacturing techniques, trade secrets, ideas, solely or jointly with others, make, conceive or reduce to practice within the scope of Contractor's work for DMS under this Agreement.

(b)    Disclosure and Ownership of Work Product.  Contractor agrees to promptly disclose to DMS every and all Work Product.  Contractor hereby assigns and agrees to assign to DMS or its designee its entire right, title and interest worldwide in all such Work Product and any associated intellectual property rights.

(c) Assistance. Contractor agrees to execute upon DMS's request a signed transfer of copyright to DMS in the form included in each Consulting Task Order for all Work Product subject to copyright protection, including computer programs, notes, sketches, drawings and reports.  Contractor agrees to assist DMS in any reasonable manner to obtain and enforce for DMS's benefit patents, copyrights, and other property rights in any and all countries, and Contractor agrees to execute when requested, patent, copyright or similar applications and assignments to DMS and any other lawful documents deemed necessary by DMS to carry out the purpose of this Agreement.  If called upon to render assistance under this paragraph, Contractor will be entitled to a fair and reasonable fee in addition to reimbursement of authorized expenses incurred at the prior written request of DMS.  In the event that DMS is unable for any reason to secure Contractor's signature to any document required to apply for or execute any patent, copyrights or other applications with respect to any Work Product (including improvements, renewals, extensions, continuations, divisions or continuations in part thereof), Contractor hereby irrevocably designates and appoints DMS and its duly authorized officers and agents as its agents and attorneys-in-fact to act for and in its behalf and instead of Contractor, to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights, mask works or other rights thereon with the same legal force and effect as if executed by Contractor.

4.2    Confidential Information.

(a)    Definition of Confidential Information. "Confidential Information" as used in this Agreement shall mean any and all technical and non-technical information, including patent, copyright, trade secret, and proprietary information, techniques, sketches, drawings, models, reports, inventions, know-how, processes, apparatus, equipment, algorithms, software programs, software source documents, and formulae related to the current, future and proposed business, products and services of DMS, its suppliers and customers, and includes, without limitation, its respective information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing manufacturing, customer lists, business forecasts, and sales, merchandising and marketing plans and information.

(b) Nondisclosure and Nonuse Obligations. Contractor will use the Confidential Information solely to perform Consulting Task Order(s) for the benefit of DMS. Contractor agrees that it shall not use or disclose or permit the use or disclosure of DMS's Confidential Information to any third party except as permitted under this Agreement or with DMS's prior written consent. Contractor will immediately give notice to DMS of any unauthorized use or

disclosure of the Confidential Information.

(c)     Exclusions from Nondisclosure and Nonuse Obligations. Contractor's obligations under Paragraph 4.2(b) ("Nondisclosure and Nonuse Obligations") with respect to any portion of Confidential Information shall terminate when Contractor can document to DMS's satisfaction that: (a) it was in the public domain at or subsequent to the time it was communicated to Contractor by the disclosing party through no fault of Contractor; (b) it was rightfully in Contractor's possession free of any obligation of confidence at or subsequent to the time it was communicated to Contractor by the disclosing party; (c) it was developed by Contractor independently of and without reference to any information communicated to Contractor by the disclosing party; or (d) the communication was necessary in response to a valid order by a court or other governmental body, was otherwise required by law, or was necessary to establish the rights of either party under this Agreement.

(d)     Disclosure of Third Party Information. Contractor shall not communicate or provide any information to DMS, or bring any information onto DMS's premises, in violation of the proprietary rights of any third party, including, without limitation, any former employer of Contractor. Such information includes, but is not limited to, proprietary information related to such third party's product research and development, features, release schedules, customer lists, marketing plans, financial information, personnel, costs and pricing, or any other confidential information of such third party not in the public domain.

4.3     Return of DMS's Property. All materials (including, without limitation, documents, drawings, models, apparatus, sketches, design and lists) furnished to Contractor by DMS, whether delivered to Contractor by DMS or made by Contractor in the performance of services under this Agreement (the "DMS Property") are the sole and exclusive property of DMS or its suppliers or customers. Contractor agrees to promptly deliver the original and any copies of the DMS Agreement by either party for any reason, Contractor agrees to promptly deliver to DMS or destroy, at DMS's option, the original and any copies of the DMS Property. Contractor agrees to certify in writing that Contractor has so returned or destroyed all such DMS Property.

5.     No conflict of Interest. During the term of this Agreement, Contractor will not accept work, enter into a contract, or accept an obligation, inconsistent or incompatible with Contractor's obligations, or the scope of services rendered for DMS, under this Agreement. Contractor warrants that, to the best of its knowledge, there is no other contract or duty on its part inconsistent with this Agreement. Contractor agrees to indemnify DMS from any and all loss or liability incurred by reason of the alleged breach by contractor of any agreement with any third party.

6.     Term and Termination.

6.1 Term. This Agreement is effective as of the Effective Date set forth above and will terminate on the first anniversary of the Effective Date unless terminated earlier as set forth below.

6.2     Termination by DMS. DMS may terminate this Agreement, with or without

cause, at any time upon two (2) days prior written notice to Contractor during any trial period specified in a Task Order. DMS also may terminate this Agreement immediately in its sole discretion upon Contractor's material breach of Section 4 ("Intellectual Property Rights"), Section 7 ("Noninterference with Business") and/or upon any acts of gross misconduct by Contractor directly affecting this Agreement or the independent contractor relationship.

6.3    Termination by Contractor. Except during the term of a Consulting Task Order, Contractor may terminate this Agreement, with or without cause, at any time upon two (2) Weeks prior written notice to DMS.

6.4 Survival. The rights and obligations contained in Sections 4 ("Intellectual Property Rights"), 7 ("Noninterference with Business"), 10 ("Governing Law"), 11 ("Severablility"), 12 ("Waiver"), 13 ("Injunctive Relief for Breach"), 14 ("Entire Agreement") and 15 ("Attorneys' Fees") will survive any termination or expiration of this Agreement and continue in full force and effect thereafter.

7.    Noninterference with Business. During this Agreement, and for a period of two years immediately following its termination, Contractor agrees not to interfere with the business of DMS in any manner. By way of example and not of limitation, Contractor agrees not to solicit or induce any employee or independent contractor to terminate or breach an employment, contractual or other relationship with DMS.

8.    Successors and Assigns. Contractor may not subcontract or other wise delegate its obligations under this Agreement without DMS's prior written consent. Subject to the foregoing, this Agreement will be for the benefit of DMS's successors and assigns, and will be binding on Contractor's assignees.

9.    Notices. Any notice required or permitted by this Agreement shall be in writing and shall be delivered personally; (ii) by overnight courier upon written verification of receipt; (iii) by telecopy or facsimile transmission upon acknowledgment of receipt of electronic transmission; or (iv) by certified or registered mail, return receipt requested, upon verification of receipt. Notice shall be sent to the addresses set forth above or such other address as either party may specify in writing.

10.    Governing Law. This Agreement shall be governed in all respects by the laws of the United States of America and by the laws of the State of Virginia, without regard to conflict of law principles.

11.    Severability. Should any provisions of this Agreement be held by a court of law to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

12.    Waiver. The waiver by DMS of a breach of any provision of this Agreement by Contractor shall not operate or be construed as a waiver of any other or subsequent breach by Contractor.

13.    Injunctive Relief for Breach. Contractor's obligations under this Agreement are of a unique character that gives them particular value; breach of any of such obligations will result in irreparable and continuing damage to DMS for which there will be no adequate remedy at law; and, in the event of such breach, DMS will be entitled to injunctive relief and/or a decree for specific performance, and such other and further relief as may be proper (including monetary damages if appropriate).

14.   Entire Agreement. This Agreement constitutes the entire agreement between the parties relating to this subject matter and supersedes all prior or contemporaneous oral or written agreements concerning such subject matter.  The terms of this Agreement will govern all Consulting Task Orders and services undertaken by Contractor for DMS.  This Agreement may only be changed by mutual agreement of authorized representatives for the parties in writing. This Agreement may be executed in counterparts.

15.   Attorneys' Fees. If any dispute arises between the parties with respect to this Agreement, the prevailing party shall be entitled to the payment by the other party of all reasonable attorneys' fees and costs incurred in connection with the dispute.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first

written above.

DMS:                                                        Contractor:

DMS, Inc.                                                 Clarion Technologies Pvt Ltd

By: _____        By: _____

Name: _____         Name: Swati Agrawal

Title: _____          Title: Managing Director



# DATA MOUNTAIN

2403 Dakota Lakes Drive
Herndon, Virginia 20171
703-863-5004 fax 301-263-0548

**Invoice No.** 110025

*INVOICE*

| Customer | | Date | 7/13/2005 |
|---|---|---|---|
| Name | Cisco Systems c/o Albers, Carl | Order No. | 200764729 |
| Address | PO Box 641579 | Rep | Hunt |
| City | San Jose    State CA    ZIP 95164-1570 | FOB | Origin |
| Phone | | | |

| Qty | Description | Unit Price | TOTAL |
|---|---|---|---|
| 300000 | PO: 200764729 Item 1 DMS CD/DVD Runtime Renwal | $0.05 | $15,000.00 |
| 1 | Item 2 Development Kit | $25,000.00 | $25,000.00 |
| | | SubTotal | $40,000.00 |
| | | Shipping & Handling | $0.00 |
| | | Taxes      State | |
| | | **TOTAL** | $40,000.00 |

**Payment Details**

- ABA: 056004445
- Name: Data Mountain Solutions, Inc.
- Type: Checking
- Account #: 0042859222
- Bank: United Bank
- Branch: Vienna, VA

Office Use Only

*Terms: Upon Receipt , Shipped Electronic Delivery*

*Invoice 1 of 2*

**From:**   Derek McUmber
**To:**     Kathleen Bowman; Gregg
**Date:**   3/31/2006 10:02:13 AM
**Subject:** Working at home

---

Andrew has a fever today so I will be working from home if GSA needs anything.

derek


--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.385 / Virus Database: 268.3.3/298 - Release Date: 3/30/2006

EXHIBIT 2

**From:**    Derek McUmber
**To:**      gregg@datamtnsol.com
**Date:**    5/11/2005 11:40:53 AM
**Subject:** Additional numbers

Hi gregg:

As you are considering the numbers we discussed yesterday, keep in mind
I spend $700/week after tax on daycare to ensure I can put a minimum of
40 hours at the office or without disruption on DMS and NTI work.

This is an expense you are not willing to make during your weeks with
Rachel.

I did not attempt to get reimbursed from DMS for this.

Thanks,

Derek

EXHIBIT 3

| DC HOME | ABOUT DC | RESIDENTS | BUSINESS | VISITORS | DC GOVERNMENT |





## Organization Information

**DCRA HOME**

**SERVICES**
Basic Business License
Business Resource Center
Building/Land Regs
Compliance/Enforcement
Organization Registration
Inspections
Land Plats
Licensing Center
Building Plan Review
  Status
Permits

**INFORMATION**

**ONLINE SERVICE
  REQUESTS**

# Online Organization Registration
## Search Registered Organizations

Organization Details - Step  [ 1 ] [ 2 ] [ 3 ]

To view another organization from the search, select the **Return to Search Results**
button below. You may also **print** the organization details, or start a **new search**. Use
the **Back to Main Page button** to continue the registration process.

| Organization | | Registered Agent |
|---|---|---|
| **Organization Name:** | DATA MOUNTAIN SOLUTIONS, INC. | CORPORATION SERVICE COMPANY |
| **State:** | WV | 1090 VERMONT AVE., N.W. Washington, DC 20005 |
| **Status:** | ACTIVE | |
| **Initial Date of Registration:** | 8/29/2006 | |
| **File No.:** | 262585 | |
| **Organization Type:** | FOREIGN BUSINESS CORPORATION | |

| << Back to Main Page | < Return To Search Results | Print Results |
| New Search | | |

For more information, contact the Corporation Division (202) 442-4400 or email us.

Government of the District of Columbia
Citywide Call Center : (202) 727-1000
TTY/TDD Directory

Telephone Directory by
Topic | Agencies | DC
Council | Search |
Elected Officials

Feedback | Translation
| Accessibility | Privacy
& Security | Terms &
Conditions

John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

EXHIBIT 4

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DATA MOUNTAIN SOLUTIONS, INC., et al.,    )
    )
        Plaintiffs,    )
    )
v.    )    CA 06-1666 (PLF)
    )
GREGG GIORDANO, et al.,    )
    )
        Defendants.    )

## AFFIDAVIT OF KATHLEEN BOWMAN

Under penalty of perjury, I, Kathleen Bowman, depose and say:

1.    I am over the age of twenty-one, and this affidavit is made on personal knowledge.

2.    I was hired by Data Mountain Solutions, Inc. ("DMS") as a part-time employee in October 2003. My title was Chief Administrative Officer. My duties over the course of my employment by DMS at various times included maintaining corporate contacts database, corporate expense spreadsheets, time/attendance spreadsheets, and the physical filing system. I also maintained "to do lists," and the calendar of meetings and deadlines. I prepared checks for signature by Gregg Giordano and Derek McUmber and maintained the check book and reconciled bank accounts. I also drafted and typed correspondence, presentations, reports, and proposals, among other duties. From October 2003 until May 2004, I performed these duties at my home in Virginia, at Gregg Giordano's home in Virginia, and occasionally at Derek McUmber's home in Maryland.

3.    In approximately May 2004, I became a full-time employee of DMS. At that time, my daily place of employment became DMS's Virginia Office at 8619 Westwood Center Drive, Suite 200, Vienna, VA 22182 ("The Virginia Office"). The Virginia Office is where DMS maintains the datacenter that is the central thrust of DMS's activities, and the main source of DMS's income. I reported for work at that location and performed my job at my desk at the Virginia Office from May 2004 until August 2005. On occasion, my place of employment would be Mr. Giordano's or Mr. McUmber's home; however, that was infrequent. In August of 2005, my position changed from full-time to part-time again. My place of employment from August 2005 to June 2006 was my home.

4.    I was not the only DMS employee who worked at the Virginia Office. From May 2004 until at least August 2005, when I left the Virginia Office, Derek McUmber also worked on an almost daily basis at his desk at the Virginia Office. I was terminated by DMS in the spring of 2006.

5.    During my tenure as an employee of DMS, the corporate bank accounts were maintained at United Bank of Virginia, with its principal place of business in Virginia.

6.    I certify upon penalty of perjury that the foregoing is true and correct.


Dated: __11/8/2006__

Kathleen Bowman